## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| **DENKA PERFORMANCE ELASTOMER LLC,** ) | |
| ) | |
| **Petitioner,** ) | |
| ) | |
| **v.** ) | **No. 24-1135** |
| ) | |
| **UNITED STATES ENVIRONMENTAL** ) | |
| **PROTECTION AGENCY and** ) | |
| **MICHAEL REGAN, Administrator,** ) | |
| **United States Environmental Protection** ) | |
| **Agency,** ) | |
| ) | |
| **Respondents.** ) | |

### PETITIONER'S EMERGENCY MOTION FOR STAY PENDING REVIEW
#### (Ruling Requested By June 28, 2024)

James C. Percy
JONES WALKER LLP
445 N. Boulevard, Suite 800
Baton Rouge, LA 70802
Telephone: (225) 248-2130
jpercy@joneswalker.com

Robert E. Holden
Brett S. Venn
JONES WALKER LLP
201 St. Charles Ave
New Orleans, LA 70170
Telephone: (504) 582-8000
bholden@joneswalker.com
bvenn@joneswalker.com

David A. Super
Jason B. Hutt
Jeffrey R. Holmstead
Britt Cass Steckman
Kevin M. Voelkel
BRACEWELL LLP
2001 M Street NW, Ste. 900
Washington, DC 20036
Telephone: (202) 828-5800
david.super@bracewell.com
jason.hutt@bracewell.com
jeff.holmstead@bracewell.com
britt.steckman@bracewell.com
kevin.voelkel@bracewell.com

*Counsel for Petitioner Denka Performance Elastomer LLC*

## <u>RULE 28 CERTIFICATE OF PARTIES AND RELATED CASES</u>

Pursuant to D.C. Circuit Rule 28, Petitioner Denka Performance Elastomer LLC ("DPE") certifies as follows:

**A.     Parties and Amici**

<u>Petitioner</u>:  Denka Performance Elastomer LLC.

<u>Respondents</u>:   United States Environmental Protection Agency and Michael S. Regan, as Administrator for the United States Environmental Protection Agency.

<u>Amici</u>:  None as of the time of filing of this motion.

**B.     Rule Under Review**

DPE has petitioned the Court to review EPA's final rule entitled "*New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry*," published in the Federal Register at 89 Fed. Reg. 42,932 on May 16, 2024.

**C.     Related Cases**

There are no related cases pending in this Court.  However, there is a related case pending in the United States District Court for the Eastern District of Louisiana captioned *EPA v. Denka Performance Elastomer LLC*, No. 2:23-cv-00735 (E.D. La.) ("Section 303 Litigation").  In the Section 303 Litigation, filed on February 28, 2023, under EPA's emergency authority Section 303 of the Clean Air Act, EPA alleges

that the Facility's chloroprene emissions are causing an "imminent and substantial endangerment," and EPA seeks an injunction requiring DPE to shut down the Facility immediately and not resume production until DPE can demonstrate its ability to maintain chloroprene concentrations below 0.2 $\mu g/m^3$ or 0.3 $\mu g/m^3$ depending on the monitoring method. In the Section 303 Litigation, the district court has indicated its intent to assess the validity of the scientific evidence underlying EPA's claims at trial. *United States v. DPE*, No. 2:23-cv-00735 (E.D. La.), R. Doc. 90 at 18 ("Although the Court has dismissed Denka's claims under the APA, Denka may still challenge the science behind the United States' Section 303 action.").

On February 12, 2024, after having demanded expedited litigation on the alleged "emergency" for nearly a year, EPA moved for an indefinite continuance of the March 2024 trial date in the Section 303 Litigation. To justify the continuance, EPA pointed to the expected issuance of the Rule by March 29, 2024. On February 16, 2024, the district court granted EPA's unopposed continuance in the Section 303 Litigation, directing the parties to advise the court when the Final Rule is published after which the Court would set a status conference to discuss a new trial date. *United States v. DPE*, No. 2:23-cv-00735 (E.D. La.), R. Doc. 169.

On May 28, 2024, the parties filed with the district court a joint notice of publication of the Final Rule.

Date:  May 28, 2024

Respectfully submitted,

 /s/ David A. Super
David A. Super

**Counsel for Petitioner**
**Denka Performance Elastomer LLC**

# RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and D.C. Circuit Rule 26.1, Petitioner Denka Performance Elastomer LLC ("DPE") files the following statement:

DPE is a privately owned limited liability company formed under the laws of the State of Delaware, headquartered in LaPlace, Louisiana, and authorized to do business in the State of Louisiana. DPE owns and operates a manufacturing facility in LaPlace, Louisiana that produces Neoprene by utilizing chloroprene, a chemical regulated under the EPA final rule at issue in this appeal. DPE's membership interests are held by Denka USA LLC (whose ultimate parent is Denka Company Limited) and Diana Elastomers, Inc. (whose ultimate parent is Mitsui & Co., Ltd). Denka Company Limited and Mitsui & Co. Ltd. are each Japanese companies listed on the Tokyo Stock Exchange.

Date: May 28, 2024     Respectfully submitted,

          */s/ David A. Super*
          David A. Super

          ***Counsel for Petitioner***
          ***Denka Performance Elastomer LLC***

# CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 18(A)

The undersigned counsel for Denka Performance Elastomers LLC ("DPE") certifies that this motion for stay complies with Circuit Rule 18(a)(1). On April 17, 2024, DPE sought an administrative stay from EPA. *See* Exhibit V ("Because the Final Rule allows only 90 days from the effective date to implement the Rule's requirements, and time is of the essence, DPE requests that EPA respond to this stay request immediately."). By letter dated April 30, 2024, EPA denied DPE's stay request without prejudice. *See* Exhibit W ("April 30 Denial"). In the April 30 Denial, EPA took the position that DPE may seek EPA's approval of an extension of the 90-day compliance period pursuant to EPA regulation by explaining "the specific measures [DPE] intends to pursue to reduce emissions" from the DPE Facility to justify the extension. *Id.* at 2. EPA further asserted that it would "consider at that time any renewed request by [DPE] for an administrative stay of the Final Rule." *Id.*

As discussed further herein, there is no lawful basis for EPA's disparate treatment of the DPE Facility, requiring DPE to propose and engage in "specific measures" to further "reduce emissions" in order to alleviate the irreparable burdens caused by EPA's 90-day implementation requirement, when all other facilities subject to the Rule, including multiple facilities with higher estimated risk than the DPE Facility, are not subject to any such requirements yet still received at least a

two-year implementation period. Nor does Fed. R. App. P. 18(a) require DPE, in light of EPA's April 30 Denial, to submit a second request for an administrative stay. DPE "move[d] first before the agency" for a stay of its final agency action pending judicial review. Fed. R. App. P. 18(a)(1). EPA then "denied the motion." *See* Fed. R. App. P. 18(a)(2)(A)(ii). This satisfies the Rule 18(a) requirements at issue.

Following the April 30 Denial, DPE engaged in several meetings with EPA (through counsel) regarding the prospect of an extension of the 90-day implementation period. Consistent with the April 30 Denial, EPA continued to demand that DPE must commit to substantial additional actions—not required of any other facilities subject to the Rule—to obtain relief from the 90-day implementation period. On May 24, 2024, DPE responded to EPA's April 30 Denial and disputed EPA's position. *See* Exhibit X.

The undersigned further certifies under Circuit Rule 18(a)(2) that, on May 24, 2024, counsel for DPE notified counsel for EPA by videoconference that DPE would be filing this motion for stay and counsel for EPA stated that EPA opposes the motion.

Date: May 28, 2024                    Respectfully submitted,

                                       */s/ David A. Super*
                                      David A. Super

                                      **Counsel for Petitioner**
                                      **Denka Performance Elastomer LLC**

# TABLE OF CONTENTS

RULE 28 CERTIFICATE OF PARTIES AND RELATED CASES.......................i

RULE 26.1 DISCLOSURE STATEMENT............................................iv

CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 18(a) ......................v

TABLE OF AUTHORITIES .....................................................ix

TABLE OF EXHIBITS ...................................................... xii

I.      INTRODUCTION.............................................................1

II.     BACKGROUND..............................................................3

        A.      EPA's Lawsuit Under Section 303 Of The CAA. .....................3

        B.      EPA's Rule Regulating Chloroprene And EtO. ........................4

III.    JURISDICTION AND VENUE..........................................8

IV.     STANDARD OF REVIEW ..................................................9

V.      ARGUMENT ...........................................................9

        A.      DPE Is Likely To Succeed On The Merits. ..............................9

                1.      DPE cannot possibly comply with the Rule in 90
                        days. ......................................................9

                2.      EPA's imposition of a 90-day compliance period is
                        arbitrary and capricious. ..................................11

                        a.      EPA's purported "finding" of an imminent
                                endangerment has no support in the
                                administrative record............................11

                        b.      EPA's "singling out" the Facility for
                                disparate treatment is arbitrary and
                                capricious.............................................14

       3.     EPA's imposition of a 90-day compliance period is a classic "surprise switcheroo" in violation of the APA. ................................................................................18

   B.    DPE Suffers Escalating And Irreparable Harm Absent A Prompt Stay. ..............................................................................19

   C.    A Stay Will Not Injure Other Parties And Is Supported By The Public Interest. .............................................................22

VI.   REQUEST FOR RELIEF....................................................................24

CERTIFICATE OF COMPLIANCE .......................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*BellSouth Telecomms., Inc. v. MCI-Metro Access Transmission Servs., LLC*,
    425 F.3d 964 (11th Cir. 2005) ............................................................21

*Burlington Northern & Santa Fe Ry. Co. v. Surface Transp. Bd.*,
    403 F.3d 771 (D.C. Cir. 2005).............................................................17

*Env't Integrity Project v. EPA*,
    425 F.3d 992 (D.C. Cir. 2005)..........................................2, 9, 18, 19

*Greyscale Invs., LLC v. SEC*,
    82 F.4th 1239 (D.C. Cir. 2023)....................................................18, 22

*Kreis v. Sec'y of the Air Force*,
    406 F.3d 684 (D.C. Cir. 2005)....................................................18, 22

*League of Women Voters of U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016)................................................................23

*Lilliputian Sys. Inc. v. PHMSA*,
    741 F.3d 1309 (D.C. Cir. 2014)..................................................18, 22

*Monsanto Co. v. EPA*,
    19 F.3d 1201 (7th Cir. 1994) ...............................................................5

*Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)..............................................................................11

*N. Mariana Islands v. United States*,
    686 F. Supp. 2d 7 (D.D.C. 2009).......................................................24

*Nken v. Holder*,
    556 U.S. 418 (2009)..............................................................................9

*North Carolina v. EPA*,
    531 F.3d 896 (D.C. Cir. 2008)...........................................................14

*In re NTE Conn., LLC*,
   26 F.4th 980 (D.C. Cir. 2022)......................................................21

*Odebrecht Constr., Inc. v. Fla. Dep't of Transp.*,
   715 F.3d 1268 (11th Cir. 2013) .................................................21

*Southwest Airlines v. FERC*,
   926 F.3d 851 (D.C. Cir. 2019)...................................................17

*Steger v. Def. Investigative Serv. Dep't of Def.*,
   717 F.2d 1402 (D.C. Cir. 1983)...................................................9

*United States v. Denka Performance Elastomer, LLC, et al.*,
   No. 2:23-cv-00735 (E.D. La. filed Feb. 28, 2023) ...................7

*Wages & White Lion Investments, L.L.C. v. FDA*,
   16 F.4th 1130 (5th Cir. 2021) ..............................................21, 22

*Window Covering Mfrs. Ass'n v. CPSC*,
   82 F.4th 1273 (D.C. Cir. 2023)..................................................11

*Wis. Gas Co. v. FERC*,
   758 F.2d 669 (D.C. Cir. 1985)...................................................21

**Statutes**

5 U.S.C. § 705 .................................................................................24

5 U.S.C. § 706(2)(A) .........................................................................9

28 U.S.C. § 1331 ...............................................................................8

42 U.S.C. § 7412 ..........................................................................8, 14

42 U.S.C. § 7412(f)(2)(A)..................................................................4

42 U.S.C. § 7412(f)(4)(A).................................................4, 5, 14, 15

42 U.S.C. § 7412(f)(4)(B)...............................................................5, 6

42 U.S.C. § 7603 ......................... 3, 4, 5, 7, 8, 10, 11, 12, 13, 14, 18, 23

42 U.S.C. § 7607(b) ...........................................................................8

42 U.S.C. § 7607(d)(4)(B)(i) ...................................................................12

42 U.S.C. § 7607(d)(7) ...........................................................................12

42 U.S.C. § 7607(d)(9)..............................................................................9

**Rules**

Fed. R. App. P. 18...................................................................................1

Fed. R. App. P. 27(a)(3) ..........................................................................3

**Regulations**

20 C.F.R. § 639.2 ...................................................................................20

40 C.F.R. § 63.6(i)(6)(ii)..........................................................................22

40 C.F.R. § 63.100(k)(11)-(12)..............................................................7, 16

40 C.F.R. § 63.481(o) ...........................................................................7, 24

40 C.F.R. § 63.481(p)(2)........................................................................7, 24

40 C.F.R. § 63.507(c)(6)...........................................................................8

88 Fed. Reg. 25080 (April 25, 2023) .....................................................5, 6

**TABLE OF EXHIBITS**

| | |
|---|---|
| Exhibit A | 89 Fed. Reg. 42,932 (May 16, 2024) ("Rule") |
| Exhibit B | 88 Fed. Reg. 25,080 (April 25, 2023) ("Proposed Rule") |
| Exhibit C | Letter from Steven D. Shermer, Department of Justice, to David Super, Bracewell LLP (October 20, 2023) |
| Exhibit D | DPE's Memorandum in Support of Motion for Summary Judgment, *United States v. Denka Performance Elastomer, LLC, et al.*, No. 2:23-cv-00735 (E.D. La.), R. Doc. 131-2 |
| Exhibit E | U.S. Memorandum in Opposition of Motion for Summary Judgment, *United States v. Denka Performance Elastomer, LLC, et al.*, No. 2:23-cv-00735 (E.D. La.), R. Doc. 150 |
| Exhibit F | Declaration of Christopher Meyers, P.E. in Support of Petititioner's Emergency Motion for Stay Pending Review (May 24, 2024) |
| Exhibit G | Residual Risk Assessment for the Synthetic Organic Chemical Manufacturing Industry (SOCMI) Source Category in Support of the 2024 Risk and Technology Review Final Rule (March 2024), EPA Docket No. EPA-HQ-OAR-2022-0730-2807 |
| Exhibit H | Declaration of Jeffery Harrington in Support of Preliminary Injunction, *United States v. Denka Performance Elastomer, LLC, et al.*, No. 2:23-cv-00735 (E.D. La.), R. Doc. 9-9 |
| Exhibit I | March 26, 2024 Email and attachments from Njeri Moeller, USEPA/OAQPS to Sofie E. Miller, EOP/OMB, regarding Passback Response #2 of Rule |
| Exhibit J | Denka Performance Elastomer LLC Comments re: *EPA's New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry*, 88 Fed. Reg. 25080 (April 25, 2023) (Docket No. EPA-HQ-OAR-2022-0730; FRL-9327-01-OAR) (July 7, 2023) |
| Exhibit K | National Emission Standards for Coke Oven Batteries, 70 Fed. Reg. 19,992 (April 15, 2005) |

| | |
|---|---|
| Exhibit L | National Emission Standards for Halogenated Solvent Cleaning, 72 Fed. Reg. 25,138 (May 3, 2007) |
| Exhibit M | National Emission Standards for Sterilization Facilities, 89 Fed. Reg. 24,090 (April 5, 2024) |
| Exhibit N | Residual Risk Assessment for the Commercial Sterilization Facilities Source Category in Support of the 2024 Risk and Technology Review Final Rule (January 2024), EPA Docket No. EPA-HQ-OAR-2019-0178-1576 |
| Exhibit O | National Emission Standards for Hazardous Air Pollutants: Miscellaneous Organic Chemical Manufacturing Residual Risk and Technology Review, 85 Fed. Reg. 49084 (August 12, 2020) |
| Exhibit P | Residual Risk Assessment for the Miscellaneous Organic Chemical Manufacturing Source Category in Support of the 2020 Risk and Technology Review Final Rule (April 2020), EPA Docket No. EPA-HQ-OAR-2018-0746-0189 |
| Exhibit Q | 2019 AirToxScreen: Assessment Results (2019 AirToxScreen National Cancer Risk by Pollutant) |
| Exhibit R | OMB Review of Proposed Rule (March 2023) |
| Exhibit S | Declaration of Michelle Helfrich in Support of Petititioner's Emergency Motion for Stay Pending Review (May 24, 2024) |
| Exhibit T | U.S. Response to DPE First Set of Interrogatories, *United States v. Denka Performance Elastomer, LLC, et al.*, No. 2:23-cv-00735 (E.D. La.) |
| Exhibit U | Declaration of Dr. Kenneth A. Mundt, PhD, FACE, *United States v. Denka Performance Elastomer, LLC, et al.*, No. 2:23-cv-00735 (E.D. La.) |
| Exhibit V | Letter from David Super, Bracewell LLP, to Michael S. Regan, Administrator, EPA (April 17, 2024) |
| Exhibit W | Letter from Joseph Goffman, Assistant Administrator, EPA, to David Super, Bracewell LLP (April 30, 2024) |
| Exhibit X | Letter from David Super, Bracewell LLP, to Joseph Goffman, EPA (May 24, 2024) |

## I. INTRODUCTION

Pursuant to Federal Rule of Appellate Procedure 18, Denka Performance Elastomer LLC ("DPE") seeks a stay pending review of the 90-day compliance deadline set forth in a rule ("Rule") (Exhibit A) promulgated by the Environmental Protection Agency ("EPA") under the Clean Air Act ("CAA"). EPA's 90-day compliance deadline applies only to chloroprene emissions from a single facility, DPE's Neoprene manufacturing facility in Louisiana (the "Facility"), the Nation's only such facility.[1] The Rule requires DPE to meet a comprehensive slate of capital-intensive emission control requirements *in only 90 days*—which EPA acknowledges is impossible—or shut down until it does. The very same Rule gives all other regulated sources at least two years to come into compliance, despite expressly finding that some pose *greater* risk than the single Neoprene source. The impossible-to-meet 90-day period is unnecessary to protect the public from harm, as EPA recognized when it proposed to provide Neoprene sources with a two-year compliance period in the proposed rule issued in April 2023 ("Proposed Rule") (Exhibit B). The Proposed Rule provided no inkling that EPA would cut the implementation period from two years to 90 days, and the Rule fails to articulate any

---

[1] Neoprene is a synthetic rubber used in many applications, from military and medical devices to consumer products.

substantive basis for doing so.  It was a quintessential "surprise switcheroo."  *Env't*

*Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005).

The switch was orchestrated solely to respond to DPE's dispositive legal

argument made in a pending lawsuit that EPA brought against DPE two months

*before* EPA issued the Proposed Rule.  In sum, the Rule is arbitrary and capricious

because it is impossible to meet, is unsupported by the administrative record, and

provides no explanation for its disparate treatment of DPE or the 180-degree change

in agency policy.  The Rule is also capricious because EPA's switcheroo was plainly

implemented to support its unadjudicated enforcement case.  For all these reasons,

DPE has a strong likelihood of success on the merits.

Further, DPE is currently suffering irreparable harm due to EPA's finding that

the Facility is causing imminent endangerment and—given the absurdly short

implementation period—the need to immediately react to the Rule's requirements.

Absent relief from the 90-day implementation period, DPE will have no ability to

comply with the Rule and will be forced to shut down the Facility, likely

permanently.  In contrast, a stay pending appeal will not harm other parties and is in

the public interest.

Finally, because the clock is now ticking and DPE is suffering escalating

irreparable harm, DPE respectfully requests a ruling on this stay motion by June 28,

2024.[2]  If a stay is granted, DPE is prepared to engage in expedited briefing on its challenge to the Rule if the Court deems it appropriate.

## II.     BACKGROUND

**A.     EPA's Lawsuit Under Section 303 Of The CAA.**

On February 28, 2023, seeking to use its emergency powers in Section 303 of the CAA, EPA filed an unprecedented action in the U.S. District Court for the Eastern District of Louisiana against DPE ("Section 303 Litigation") alleging that the Facility is causing an "imminent and substantial endangerment" because its emissions result in off-site, ambient air concentrations of chloroprene greater than $0.2\ \mu g/m^3$—a level EPA alleges is needed to ensure that the lifetime cancer risk for a person located continuously at the Facility's fenceline *all day, every day for 70 years* is no higher than 1-in-10,000.

When EPA filed the Section 303 Litigation, EPA knew it would shortly be issuing the Proposed Rule to address the exact same alleged risk from the Facility's chloroprene emissions, and it did so two months later.  EPA also knew that it was required to issue the final rule by March 29, 2024.  Nonetheless, in the Section 303 Litigation, EPA sought relief demanding that DPE shutdown the Facility immediately and not resume production until it could demonstrate its ability to

---

[2]  DPE believes it is reasonable to provide EPA with the standard ten days to respond to this Motion, followed by DPE's reply.  Fed. R. App. P. 27(a)(3).

maintain chloroprene concentrations below 0.2 µg/m$^3$ or 0.3 µg/m$^3$ depending on the monitoring method. *See* Exhibit C at 2 (EPA's "Statement of Final Relief").

In December 2023, DPE moved for summary judgment in the Section 303 Litigation, arguing that, because the Facility's emissions do not present an "imminent endangerment," as EPA conceded in the Proposed Rule by providing the two-year compliance period, then there was no "imminent *and substantial* endangerment" as a matter of law. Exhibit D at 5-8. EPA had no meaningful response to that argument, except to say that the Proposed Rule was not final. Exhibit E at 5-6 & n.6.

On February 12, 2024, after having demanded expedited litigation on the alleged "emergency" for nearly a year, EPA abruptly moved for an indefinite continuance of the March 2024 trial date. As its sole justification for the continuance, EPA pointed to the expected issuance of the Rule by March 29, 2024. On February 16, 2024, the district court granted EPA's continuance.

## B.     EPA's Rule Regulating Chloroprene And EtO.

Section 112(f) of the CAA requires EPA to assess health risks of industrial emissions and prescribe emission control standards if EPA determines that existing standards do not provide an "ample margin of safety to protect public health." 42 U.S.C. § 7412(f)(2)(A). Section 112 requires EPA to give sources at least 90 days to come into compliance and provides that EPA may permit a source up to

two years to comply (referred to as a "waiver") if "the Administrator finds that such period is necessary for the installation of controls and that steps will be taken during the period of the waiver to assure that the health of persons will be protected from imminent endangerment." 42 U.S.C. § 7412(f)(4)(A) & (B); *see Monsanto Co. v. EPA*, 19 F.3d 1201, 1203 (7th Cir. 1994) (reversing EPA's denial of §112(f) waiver request where source "clearly needed additional time to install appropriate controls"). EPA routinely grants such compliance waivers, typically as part of a rule. In fact, DPE is unaware of any such rule in which regulated entities were not given enough time to install the required emission controls.

The Proposed Rule, which was filed two months *after* EPA filed the Section 303 Litigation alleging an "imminent and substantial endangerment," proposed to give DPE the full two years to comply, explaining that this was appropriate because the "proposed [emission control requirements] will require additional time to plan, purchase, and install equipment for … chloroprene control." Exhibit B at 25,178. The Proposed Rule estimated that the Facility's emissions created a risk of 0.06 incidences of cancer per year, and that 2,300 individuals near the Facility could be exposed to greater than a 1-in-10,000 risk based on the *maximum* individual risk estimate. *Id.* at 25,107 (Table 2).

Given the inclusion of the two-year compliance period in the Proposed Rule, EPA necessarily concluded that the Facility's estimated risk level did not constitute

an "imminent endangerment." *See* 42 U.S.C. § 7412(f)(4)(B). Notably, the Proposed Rule included the same two-year compliance period for sources of ethylene oxide ("EtO"), several of which, according to EPA's risk calculations, posed a higher risk than the Facility. Exhibit B at 25,106 (estimating risk level 3.3 times higher than Facility); *id.* at 25,178 (proposing waivers for Facility and EtO facilities). DPE submitted comments to the Proposed Rule explaining that DPE needed *more than* two years to comply.

Since the Proposed Rule was issued, data from DPE's continuous fenceline monitoring system show that the Facility's emissions are lower than ever. Exhibit F ¶¶ 45-49 (Declaration of DPE's Environmental Manager). Air monitoring data are depicted in the chart below and show significant decreases in chloroprene concentrations near the Facility between 2022 (red bars) and 2023 (purple bars):



Nonetheless, on March 28, 2024, the EPA Administrator signed the Rule giving DPE only 90 days to comply, although the risk estimates applicable to the DPE Facility in the Rule remain unchanged. Exhibit A at 43,236-37 (40 C.F.R. § 63.481(o) & (p)(2) (setting 90-day compliance period)); *compare* Exhibit B at 25,107 (6-in-10,000 risk level for DPE in Proposed Rule), *with* Exhibit A at 42,958 (6-in-10,000 risk level for DPE in Rule).[3] Despite higher risk estimates for EtO sources, the Rule provides those sources with the same two-year compliance period contained in the Proposed Rule. *Id.* at 43,154 (40 C.F.R. § 63.100(k)(11)-(12)); *id.* at 42,962 (20-in-10,000 facility-wide maximum individual risk for facilities in SOCMI Source Category). The Rule offers no explanation for EPA's disparate treatment of the Facility as compared to the EtO sources.

The Rule contains only a one-sentence explanation for cutting DPE's compliance period from two years to 90 days:

> In a change from the proposed rule, the EPA is shortening the compliance deadline for affected sources producing neoprene, due to the EPA's finding that chloroprene emissions from the only such source pose an imminent and substantial endangerment under CAA section 303, 42 U.S.C. § 7603. *United States v. Denka Performance Elastomer, LLC, et al.*, No. 2:23-cv-00735 (E.D. La. filed Feb. 28, 2023).

---

[3] EPA sometimes refers to these risks as 600-in-1,000,000, which is the same as 6-in-10,000. For consistency, this Motion refers to risks calculated by EPA as *x*-in-10,000.

Exhibit A at 42,955. There is, however, no such "finding" in the Section 303 Litigation, merely an EPA *allegation* that has not been adjudicated, despite the fact that EPA filed the Section 303 Litigation 15 months ago (and three months ago requested that the trial be postponed indefinitely). The *rulemaking* record contains no analysis or evidence supporting EPA's purported "finding" of "imminent and substantial endangerment."

On April 19, 2024, DPE submitted to the Louisiana Department of Environmental Quality ("LDEQ") a request to extend the compliance period to two years. LDEQ has not yet acted on DPE's request. To thwart such efforts (and further illustrate the litigation-driven, capricious actions of EPA's rulemaking), the Rule purports to revoke LDEQ's long-standing authority to extend compliance dates for rules such as this one, *but only with respect to DPE*. Exhibit A at 43,261 (40 C.F.R. § 63.507(c)(6)). The Proposed Rule did not contain a single word about possibly revoking LDEQ's authority.

On May 16, 2024, EPA published the Rule in the Federal Register. On May 16, 2024, DPE filed a Petition for Review of the Rule

### III. JURISDICTION AND VENUE

The Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this case challenges a rulemaking under the CAA, 42 U.S.C. § 7412. Venue is appropriate in this Court pursuant to 42 U.S.C. § 7607(b).

# IV.    STANDARD OF REVIEW

When deciding whether to stay an agency action, courts consider four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009).

The Court will reverse EPA's actions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Env't Integrity Project*, 425 F.3d at 995 (citing 5 U.S.C. § 706(2)(A)) (other citations omitted); *see also* 42 U.S.C. § 7607(d)(9).

# V.    ARGUMENT

## A.    DPE Is Likely To Succeed On The Merits.

### 1.    DPE cannot possibly comply with the Rule in 90 days.

EPA's 90-day compliance deadline for DPE, and DPE alone, is arbitrary and capricious.  An agency "cannot, despite its considerable discretion, treat similar situations dissimilarly, and, indeed, can be said to be at its most arbitrary when it does so." *Steger v. Def. Investigative Serv. Dep't of Def.*, 717 F.2d 1402, 1406 (D.C. Cir. 1983).

There is no dispute that DPE requires far more than 90 days to install the emission controls necessary to comply with the Rule.  In the Proposed Rule, which

contained substantially similar requirements as the Rule, EPA acknowledged that "[t]he proposed provisions will require additional time to plan, purchase, and install equipment for … chloroprene control" and therefore "propos[ed] a compliance date of 2 years after the publication date of the final rule." Exhibit B at 25,178. The Rule says nothing to the contrary.

As DPE explained in its comments on the Proposed Rule, DPE will need *at least* two years to plan, develop, test, and install the controls required by the Rule. Exhibit F ¶¶ 4-37 (describing comments). Inexplicably, the Rule retains a two-year compliance period for the substantially similar, and in many cases identical, emission controls for EtO sources, and reasserts EPA's rationale for those deadlines, despite some EtO sources having higher estimated risks than the Facility. *See* Exhibit G at 42,956 (Table 1) (20-in-10,000 risk level for SOCMI Source Category); *id.* at 42,958 (Table 2) (6-in-10,000 risk level for Neoprene Production Source Category). These two-year EtO deadlines starkly demonstrate the impossibility of the 90-day compliance period for DPE. Similarly, in the Section 303 Litigation, EPA, through its expert, expressly represented to the district court that it would take DPE 90 days *just to plan one* of the control projects required by the Rule. Exhibit H ¶ 77 (EPA expert's declaration); Exhibit F ¶ 40. Here, it was plainly arbitrary and capricious for EPA to impose an absurdly short (and impossible-to-meet)

compliance deadline on DPE, when the same Rule gives all other facilities (including several that pose a higher risk) at least two years to come into compliance.

**2.  EPA's imposition of a 90-day compliance period is arbitrary and capricious.**

**a.  EPA's purported "finding" of an imminent endangerment has no support in the administrative record.**

EPA's sole justification for cutting the two-year compliance period to 90 days is EPA's *allegation* of an "imminent and substantial endangerment" in the Section 303 Litigation. Exhibit A at 42,955. That single sentence in the Rule is decidedly not reasoned decisionmaking. *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983) ("[T]he agency must explain the evidence which is available, and must offer a rational connection between the facts found and the choice made.") (cleaned up). EPA must explain its reasons for imposing that impossible-to-meet compliance period, particularly given EPA's first-time, selective departure from the compliance periods contained in the Proposed Rule for just one of more than 200 regulated sources. *See Window Covering Mfrs. Ass'n v. CPSC*, 82 F.4th 1273, 1291 (D.C. Cir. 2023) (vacating CPSC rule selecting default one-year compliance period where "the Commission's stated reasons for declining to find 'good cause' to extend the [default] compliance deadline were flawed").

Moreover, EPA's claim of an "imminent and substantial endangerment" in the Section 303 Litigation is merely an unproven *allegation*, not an agency "finding"

as the Rule declares, and plainly not reasoned decisionmaking. 42 U.S.C. §§ 7607(d)(4)(B)(i) & (d)(7). Indeed, in March 2024, during interagency review of the Rule, the Office of Management and Budget ("OMB") expressly recommended that EPA "add[] or cite[] factual support" in the Rule for its "finding" that the Facility was causing an "imminent and substantial endangerment." Exhibit I at 394. EPA rejected OMB's recommendation, stating that the Section 303 Litigation "contains all the necessary factual information." *Id.* Thus, through a single sentence, EPA purports to incorporate into the administrative record the entire record of the Section 303 Litigation *after* the close of the notice-and-comment period. Exhibit A at 42,955. Other than that single sentence, however, the administrative record contains nothing to support EPA's "finding." In contrast, in its comments to the Proposed Rule, DPE submitted a vast amount of "factual information" to show that the Facility's emissions do not pose even an appreciable cancer risk and refuting EPA's assertion of an "imminent and substantial endangerment." *See* Exhibit J (DPE July 2024 Comments to Proposed Rule (voluminous exhibits omitted)). Even if it were appropriate for EPA to bootstrap the entire district court record into the administrative rulemaking record after the close of the notice-and-comment period, that district court record contains substantial evidence refuting EPA's purported "finding." In short, whether the Facility poses an "imminent and substantial

endangerment"—an issue aggressively litigated for over a year—remains hotly disputed and has not been adjudicated by the district court.

Indeed, it is DPE's position that the Facility poses no "imminent and substantial endangerment" as a matter of law. Exhibit D at 5-8. EPA included the two-year compliance period in the Proposed Rule—thereby conceding the lack of an "imminent endangerment"—*two months after* EPA initiated the Section 303 Litigation alleging an "imminent and substantial endangerment." *Id.* If EPA believed that the mere existence of the Section 303 Litigation demonstrated the existence of an "imminent endangerment," then surely EPA would have said so in the Proposed Rule issued two months *after* EPA commenced the litigation. Instead, when DPE sought summary judgment based on the Proposed Rule's concession of the lack of imminent endangerment, EPA's only response was that the Proposed Rule was "not final." Exhibit E at 5-6 & n.6. EPA's tactical decision to keep DPE and the rest of the rulemaking participants in the dark about a critical change until the last possible moment is antithetical to the notice-and-comment regime at the heart of APA rulemaking. Critically, EPA's risk estimate for the Facility has not changed since the Proposed Rule. *See* Exhibit B at 25,107 (6-in-10,000 risk level); Exhibit A at 42,958 (6-in-10,000 risk level). In fact, the only meaningful change is that chloroprene emissions from DPE's Facility have gone *down* (as continuously

reported to EPA) and are at an all-time low. Exhibit F ¶¶ 45-49; *see also supra* at 6 (discussing emissions chart).

But now, to avoid summary judgment, EPA has simply orchestrated—via a single sentence in the Rule—its litigation position in the Section 303 Litigation as a purported administrative "finding." Rulemaking driven solely by litigation position is not reasoned decisionmaking and is plainly arbitrary and capricious. *See North Carolina v. EPA*, 531 F.3d 896, 930 (D.C. Cir. 2008) (It is "entirely arbitrary" to base regulatory standard "on irrelevant factors.").

> **b.** **EPA's "singling out" the Facility for disparate treatment is arbitrary and capricious.**

EPA's purported "finding" that the Facility's emissions constitute an "imminent endangerment" is unprecedented and contradicts more than 30 years of EPA rulemaking under Section 112. Although EPA has often found lifetime cancer risks greater than 1-in-10,000 in past rulemakings, EPA has *never* before claimed that such a risk posed an "imminent endangerment" or refused to give regulated parties sufficient time to install pollution controls. In fact, EPA has issued final rules that expressly allow for lifetime cancer risks *greater* than 1-in-10,000 even *after* emission control requirements are met. For example, in the Section 112(f) rule for coke ovens, EPA accepted a *post-control* cancer risk of 2.7-in-10,000 and a post-

control cancer incidence of 0.06 per year.  Exhibit K at 19,993-94.[4]  A 0.06 annual

cancer incidence is the same incidence that EPA estimates for DPE's Facility in the

Rule *before the new controls are installed*.  Exhibit A at 42,963 (Table 5).  By

imposing a 90-day compliance deadline here, EPA claims that a 0.06 annual cancer

incidence rate results in an "imminent endangerment" from DPE's Facility during a

two-year implementation period but was perfectly acceptable for coke oven facilities

*indefinitely*.

In recent Section 112 rulemakings, EPA has consistently extended

compliance periods for facilities with estimated maximum individual risks ("MIRs")

equal to or far greater than DPE's Facility, for facilities with higher estimated cancer

incidences and for which a greater number of people were exposed to an estimated

risk above 1-in-10,000.  In this year's rulemaking for commercial sterilization

facilities, EPA gave all facilities two-year compliance periods, including twelve

facilities with MIRs equal to or greater than DPE's Facility.  Exhibit M at 24,102

(setting two-year compliance period); Exhibit N at Table 2a-1 (identifying

12 facilities with risk levels greater than 6-in-10,000).

Likewise, the Rule inexplicably provides a compliance period of at least two

years to *all facilities other than DPE*, including two facilities for which EPA

---

[4] *See also* Exhibit L at 25143 (setting risk level for halogenated solvent cleaning at 2-in-10,000).

estimates MIRs that are more than three times greater than EPA's estimate for DPE's Facility. Exhibit A at 43,154 (40 C.F.R. § 63.100(k)(11)-(12)); Exhibit F (Table 2). Similarly, EPA provided extensions for numerous facilities in the Miscellaneous Organic Chemical Manufacturing source category with MIRs equal to or greater than DPE's Facility. Exhibit O at 49,093 (two-year compliance period); Exhibit P at Table 2a (identifying facilities with risk levels equal to or greater than 6-in-10,000). As shown in the following chart, in the past four years, EPA has provided two-year compliance periods to at least *sixteen* facilities with MIRs higher than DPE's Facility:



EPA also estimates that there are fifteen U.S. census tracts where EtO poses a higher cancer risk than chloroprene poses. *See* Exhibit Q. Yet EPA has not imposed a 90-day compliance deadline on the EtO facilities in any of those fifteen tracts.

It was arbitrary and capricious for EPA to apply a new policy that an estimated risk of 1-in-10,000 constitutes an "imminent endangerment" without even mentioning, let alone explaining, the basis for the fundamental change. *Southwest Airlines v. FERC*, 926 F.3d 851, 856 (D.C. Cir. 2019) ("A full and rational explanation becomes especially important when, as here, an agency elects to shift [its] policy or depart[] from its typical manner of administering a program.") (quotation omitted).

The fact that EPA's reversal in policy applies *solely* to DPE's Facility, despite many other facilities causing greater risk, makes the complete absence of any explanation all the more arbitrary and capricious. "Where an agency applies different standards to similarly situated entities and fails to support this disparate treatment with *a reasoned explanation and substantial evidence* in the record, its action is arbitrary and capricious and cannot be upheld." *Burlington Northern & Santa Fe Ry. Co. v. Surface Transp. Bd.*, 403 F.3d 771, 777 (D.C. Cir. 2005) (citation omitted) (emphasis added).

Indeed, EPA expressly admitted in the Section 303 Litigation that DPE has been "singled out."  Exhibit E at 7-8.  Whether an agency may use its enforcement discretion to treat like cases differently may be debatable, but this sort of disparate treatment of similarly situated parties in a rulemaking is a hallmark of arbitrary and capricious agency action.  *Greyscale Invs., LLC v. SEC*, 82 F.4th 1239, 1242 (D.C. Cir. 2023) ("It is a fundamental principle of administrative law that agencies must treat like cases alike."); *Kreis v. Sec'y of the Air Force*, 406 F.3d 684, 687 (D.C. Cir. 2005).  Failure to provide the "*how*" and "*why*" necessary to justify disparate treatment is arbitrary and capricious.  *Lilliputian Sys. Inc. v. PHMSA*, 741 F.3d 1309, 1313-14 (D.C. Cir. 2014).  Here, EPA offers no substantive explanation for EPA's disparate treatment of DPE.

### 3. EPA's imposition of a 90-day compliance period is a classic "surprise switcheroo" in violation of the APA.

"Given the strictures of notice-and-comment rulemaking, an agency's proposed rule and its final rule may differ only insofar as the latter is a 'logical outgrowth' of the former … Thus, we have refused to allow agencies to use the rulemaking process to pull a surprise switcheroo on regulated entities."  *Env't Integrity Project*, 425 F.3d at 996.  Here, the Proposed Rule gave no indication whatsoever that EPA would cut the compliance period from two years to 90 days.  Indeed, because EPA has *never* failed to provide a waiver to comply with similar requirements, DPE had no reason to anticipate EPA would do so here for the first

time—until February 2024, when EPA abruptly sought to postpone indefinitely the Section 303 Litigation. *Id.* at 997 (an EPA "flip-flop" between proposed and final rule must be "preceded by adequate notice and opportunity for public comment" on changed position).

During the interagency review process, EPA explicitly acknowledged that DPE would need at least two years to come into compliance with the Rule. When OMB was reviewing the Proposed Rule, it questioned whether the proposed two-year compliance period was appropriate and whether steps would be needed to protect from "imminent endangerment." Exhibit R at 347. EPA brushed off concerns about any purported imminent endangerment and responded with the same rationale it used in the Rule to justify a two-year compliance period for EtO facilities: "Significant capital will need to be invested in controls here to further reduce emissions [of EtO] and chloroprene. . . . This takes significant time [to] engineer, install, and update operating procedures and staff." *Id.* These comments, which DPE reviewed when it prepared comments on the Proposed Rule, underscore that EPA's "surprise switcheroo" in the Rule is arbitrary and capricious. *Env't Integrity Project*, 425 F.3d at 996.

**B.    DPE Suffers Escalating And Irreparable Harm Absent A Prompt Stay.**

EPA's imminent endangerment "finding" and the 90-day compliance period impose continuing, escalating, and irreparable harms on DPE. As explained in the

Declaration of DPE's Plant Manager, DPE's irreparable harm includes workforce instability, a triggering of DPE's WARN Act obligations,[5] impacts on DPE's social license to operate and goodwill as well as its commercial relationships with suppliers and customers, unrecoverable loss of revenue associated with indefinite shutdown preparations, and the accelerated expenditure of resources and funds to comply with the Rule's requirements, which DPE must begin incurring immediately and would have no means of recovering if DPE's judicial challenge to the Rule is successful. Exhibit S ¶¶ 10-27. Unless DPE can obtain relief from the 90-day compliance deadline, the Facility will have to shut down *and likely never restart*. Exhibit F ¶¶ 4-44; Exhibit S ¶ 22.

DPE's harms also include significant costs—which can never be recovered— associated with analyzing the feasibility, cost, and timing of complying with the Rule on an incredibly expedited basis; indeed, the 90-day compliance period is only 12.5 percent of a two-year period granted to every other facility covered by the Rule and only 8.2 percent of the time period that DPE explained was necessary in its comments to the Rule. Exhibit F ¶¶ 50-54. Even a two-year compliance period hardly provides sufficient time for DPE to integrate analyses and planning activities for major compliance projects into its day-to-day operations, and the 90-

---

[5] 20 C.F.R. § 639.2 (employers with 100 or more employees must provide at least 60 calendar days' advance written notice of a plant closing and/or mass layoff).

compliance period will force DPE to divert resources away from other Facility priorities and engage teams of outside specialists that would otherwise not be needed. *Id.* Given the unique aspects of DPE's operations as the only Neoprene manufacturer in the country, outside consulting teams unfamiliar with DPE's operations are far less efficient than existing personnel with knowledge of the processes. *Id.*

These harms are irreparable. *See, e.g.*, *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (recognizing that threats to "the very existence of the movant's business" may constitute irreparable harm); *In re NTE Conn., LLC*, 26 F.4th 980, 990-91 (D.C. Cir. 2022) ("[F]inancial injury can be irreparable where no adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation.") (cleaned up); *Wages & White Lion Investments, L.L.C. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021) ("[C]omplying with [an agency order] later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs."); *Odebrecht Constr., Inc. v. Fla. Dep't of Transp.*, 715 F.3d 1268, 1288 (11th Cir. 2013) (Interference with a business's "ability to . . . retain employees" is irreparable.); *BellSouth Telecomms., Inc. v. MCI-Metro Access Transmission Servs., LLC*, 425 F.3d 964, 970 (11th Cir. 2005) ("[T]he loss of customers and goodwill is an irreparable injury.") (cleaned up).

In denying DPE's request for an administrative stay, EPA suggested that DPE is not suffering irreparable harm because DPE can request an extension of the 90-day period under EPA regulations by committing to implement specific emission reduction projects. *See* Exhibit W. But there is no lawful basis for EPA's disparate treatment of the DPE Facility, requiring DPE to implement "specific measures" to "reduce emissions" (40 C.F.R. § 63.6(i)(6)(ii)) to obtain a reasonable implementation period, when all other facilities subject to the Rule, including multiple facilities with higher estimated risk than the DPE Facility, are not subject to any such requirements yet still received a two-year implementation period. EPA should not be permitted to use its unlawful imposition of a 90-day compliance period as leverage to extract concessions from DPE, the cost of which could never be recovered, *Wages & White Lion*, 16 F.4th at 1142, and that do not apply to any other similarly situated entity. Such disparate treatment is plainly arbitrary and capricious. *Greyscale*, 82 F.4th at 1242; *Lilliputian*, 741 F.3d at 1313-14; *Kreis*, 406 F.3d at 687.

## C. A Stay Will Not Injure Other Parties And Is Supported By The Public Interest.

In contrast to the irreparable harms to DPE, a stay pending review will pose virtually no risk to the public. The Facility's current chloroprene emissions are at an all-time low. *See supra* at 6 (discussing emissions chart). Moreover, according to EPA's "maximum plausible" estimate of risk, without the Rule, there will be 0.06

cancer incidences per year due to the DPE Facility's emissions, which equates to roughly one cancer case every 17 years. Exhibit A at 42,963 (Table 5). EPA admits that the value on which the risk estimate is based is a "plausible upper limit to the true value" and, in some circumstances, "the true risk could be as low as zero." Exhibit B at 25,103. Yet, even taking the Rule's risk estimate as true—which DPE disputes—extending the compliance period from 90 days to two years would equate to less than *1/8th of a cancer case over the next 70 years*. Thus, there is a vanishingly small risk of incremental harm to the community if the Rule is stayed until DPE's appeal is heard.

Further, the rulemaking record contains no real-world evidence of a single incidence of cancer attributable to the DPE Facility's chloroprene emissions, let alone any evidence that cancer rates in the vicinity of the Facility have actually increased. EPA admitted in the Section 303 Litigation that it has no such evidence. Exhibit T at 28. The lack of an association between chloroprene and cancer is corroborated by tumor incidence data collected by the Louisiana Tumor Registry, Exhibit U ¶¶ 44-50, and a robust epidemiological study of workers historically exposed to substantially greater levels of chloroprene, which found no linkage between chloroprene and the types of cancer that EPA attributes to it. *Id.* ¶¶ 28-43.

Finally, there is no public interest in EPA's indefensible 90-day compliance period. *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)

("There is generally no public interest in the perpetuation of unlawful agency action"); *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009) ("The public interest is served when administrative agencies comply with their obligations under the APA.").

## VI.   REQUEST FOR RELIEF

DPE requests that the Court grant a stay pending review of the 90-day compliance deadline (40 C.F.R. § 63.481(o) & (p)(2)) in the Rule that applies to chloroprene emissions from the Facility.  5 U.S.C. § 705.

Date:  May 28, 2024

Respectfully submitted,

*/s/ David A. Super*

James C. Percy
JONES WALKER LLP
445 N. Boulevard, Suite 800
Baton Rouge, LA 70802
Telephone: (225) 248-2130
jpercy@joneswalker.com

Robert E. Holden
Brett S. Venn
JONES WALKER LLP
201 St. Charles Ave
New Orleans, LA 70170
Telephone: (504) 582-8000
bholden@joneswalker.com
bvenn@joneswalker.com

David A. Super
Jason B. Hutt
Jeffrey R. Holmstead
Britt Cass Steckman
Kevin M. Voelkel
BRACEWELL LLP
2001 M Street NW, Ste. 900
Washington, DC 20036
Telephone: (202) 828-5800
david.super@bracewell.com
jason.hutt@bracewell.com
jeff.holmstead@bracewell.com
britt.steckman@bracewell.com
kevin.voelkel@bracewell.com

*Counsel for Petitioner*
*Denka Performance Elastomer LLC*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I certify that this motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because this motion contains 5,198 words.

I further certify, pursuant to Fed. R. App. P. 27(d)(1)(E), that this motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this motion has been prepared in Times New Roman 14-point font using Microsoft Word 2013.

Date: May 28, 2024

 */s/ David A. Super*
David A. Super

**Counsel for Petitioner**
**Denka Performance Elastomer LLC**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date, I have caused a true and correct copy of the foregoing *Petitioner's Emergency Motion for Stay Pending Review* to be electronically filed with the Clerk of the Court using the CM/ECF System, which will send a notice of filing to all registered users.


Date: May 28, 2024

 _/s/ David A. Super_
David A. Super

**Counsel for Petitioner**
**Denka Performance Elastomer LLC**