IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

DENKA PERFORMANCE ELASTOMER LLC,

*Petitioner*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, ET AL.,

*Respondents.*

———————————

ON PETITION FOR REVIEW OF FINAL AGENCY ACTION OF THE
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

———————————

**RESPONDENTS' OPPOSITION TO MOTION TO STAY FINAL RULE**

———————————

*Of Counsel:*
MICHAEL THRIFT
HALI KERR
  Office of General Counsel
  U.S. Environmental Protection
Agency
  Washington, D.C.

TODD KIM
*Assistant Attorney General*

BRANDON N. ADKINS
*Attorney, Environmental Defense
Section*
Environment and Natural Resources
Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
(202) 616-9174
Brandon.Adkins@usdoj.gov

# TABLE OF CONTENTS

Table of Contents ............................................................................................. ii

Table of Authorities ........................................................................................ iii

Introduction ......................................................................................................1

Background .......................................................................................................3

      A.    Statutory Background ................................................................3

      B.    The Rule ....................................................................................4

      C.    Clean Air Act Endangerment Action .......................................6

      D.    Denka's Response to the Rule ...................................................7

Standard of Review ..........................................................................................8

Argument ..........................................................................................................9

    I.    Denka is Unlikely to Succeed on the Merits. ......................................10

      A.    EPA Reasonably Required Denka to Submit an Extension Request. ...................................................................10

      B.    Denka's Procedural Challenge Fails. .......................................15

    II.    Denka Will Not Suffer Certain and Great Irreparable Injury. ............16

    III.    The Balance of Harms and Public Interest Favor Denying a Stay. .....................................................................................................18

    IV.    Remedy ................................................................................................20

Conclusion .....................................................................................................22

# TABLE OF AUTHORITIES

**Cases**

*Allied Loc. & Reg'l Mfrs. Caucus v. EPA,*
    215 F.3d 61 (D.C. Cir. 2000) ...................................................................8

*Ass'n of Battery Recyclers, Inc. v. EPA,*
    716 F.3d 667 (D.C. Cir. 2013) ............................................. 4, 12, 20

*Cal. Cmtys. Against Toxics v. EPA,*
    928 F.3d 1041 (D.C. Cir. 2019) ............................................. 9, 10

*Cuomo v. U.S. Nuclear Regul. Comm'n,*
    772 F.2d 972 (D.C. Cir. 1985) ...................................................................8

*Dickson v. Sec'y of Def.,*
    *Def.*, 68 F.3d 1396 (D.C. Cir. 1995) ...................................................12

*EME Homer City Generation, L.P. v. EPA,*
    795 F.3d 118 (D.C. Cir. 2015) ...................................................16

*Env't Integrity Project v. EPA,*
    425 F.3d 992 (D.C. Cir. 2005) ...................................................15

*Hilton v. Braunskill,*
    481 U.S. 770 (1987) ...................................................................8

*Monsanto Co. v. EPA,*
    19 F.3d 1201 (7th Cir. 1994) ............................................. 12, 13

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.,*
    463 U.S. 29 (1983) ...................................................................11

*Nken v. Holder,*
    556 U.S. 418 (2009) ............................................. 8, 16, 17

*NRDC v. EPA,*
    529 F.3d 1077 (D.C. Cir. 2008) ................................................................. 4, 18, 20

*United States v. Oakland Cannabis Buyers' Coop.,*
    532 U.S. 483 (2001) ...............................................................................19

*Winter v. NRDC,*
    555 U.S. 7 (2008) ...................................................................................8

*Wis. Gas Co. v. FERC,*
    758 F.2d 669 (D.C. Cir. 1985) ............................................................. 16, 17, 18

**Federal Statutes**

5 U.S.C. § 705 ...............................................................................................7

5 U.S.C. § 706 ...............................................................................................8

42 U.S.C. § 7412 ...................................... 3, 4, 5, 7, 11, 12, 13, 18, 19, 20, 21

42 U.S.C. § 7603 ...........................................................................................1

42 U.S.C. §7607 ................................................................................. 8, 15, 16

**Federal Regulations**

40 C.F.R. § 63.6 ................................................................... 5, 7, 11, 12, 13

40 C.F.R. § 63.481 ................................................................................. 5, 21

**Federal Register Publications**

54 Fed. Reg. 38,044 (Sept. 14, 1989) .................................................... 4, 18

89 Fed. Reg. 42,932 (May 16, 2024) ............................... 3, 4, 8, 11, 19, 20

iv

## INTRODUCTION

The stay motion filed by petitioner Denka Performance Elastomer, LLC, is unusual in that it does not endeavor to show a likelihood of success in invalidating the challenged rule of the Environmental Protection Agency ("EPA"). The motion contends only that EPA erred in applying the Clean Air Act's default compliance deadline of ninety days (that is, for purposes of this rule, October 15, 2024) rather than "up to" two years (as far out as but no farther than July 15, 2026) to chloroprene emissions from Denka's neoprene-manufacturing facility in St. John the Baptist Parish, Louisiana. Because the motion does not argue Denka is likely to succeed on the merits of any attacks it may mount on the underlying rule, the Court must assume for purposes of resolving this motion that those attacks lack merit, such that EPA's rule will be upheld and Denka will have to comply with it.

That assumption has three important implications for the Court's disposition of this motion. First, it limits the likelihood-of-success inquiry to the issue whether EPA acted arbitrarily or capriciously in requiring Denka to achieve the chloroprene standards by the Act's default compliance deadline, while allowing the company to request a later deadline based on a site-specific showing. EPA explained that it had commenced a lawsuit against Denka in federal district court, claiming that the facility's emissions "present[] an imminent and substantial endangerment to public health or welfare, or the environment." 42 U.S.C. § 7603. That is a non-arbitrary

reason for requiring Denka, unlike polluters subject to different emissions standards covering different source categories imposed by the same rule, to affirmatively demonstrate to EPA why circumstances at Denka's facility necessitate a compliance deadline later than the statutory default.

Second, the assumption that the rule is valid colors the Court's consideration of the non-merits stay factors. A cognizable irreparable harm to Denka could only stem from, at most, some difference between the cost of complying with EPA's standards by October 2024 and the cost of complying by July 2026. Denka has not established that the cost differential is both certain and great, as would be required to support a stay. And regardless, any cost increase would be outweighed by the strong public interest, including the significant health benefits, in applying the compliance date Congress chose as the default.

Third, because the rule is presumed valid and Denka must comply with it even if the Court grants this motion, Denka would be entitled at most to an interim order that shifts, but does not lift, Denka's compliance deadline pending judicial review. Even that relief should be denied, though, because Denka has not met its burden on any of the stay factors.

**BACKGROUND**

**A.      Statutory Background**

The Clean Air Act establishes a comprehensive program for controlling and improving the Nation's air quality. At dispute are emission standards that EPA promulgated under 42 U.S.C. § 7412. 89 Fed. Reg. 42,932 (May 16, 2024) ("the Rule").

Section 7412 establishes a process for regulating emissions of hazardous air pollutants from stationary sources. Among the hazardous air pollutants that Congress identified for regulation is the carcinogen chloroprene. 42 U.S.C. § 7412(b)(1). EPA must identify the types of facilities (called source categories) that emit hazardous air pollutants like chloroprene and establish emissions standards for each category. *See id.* § 7412(c).

Section 7412's regulatory framework uses a two-stage process. First, for each category of regulated sources, EPA sets technology-based emission standards. *Id.* § 7412(d). Later, EPA must review the standards to see (1) whether to update them given technological developments (this is known as the technology review), *id.* § 7412(d)(6), and (2) whether more measures are needed to address any remaining health risks or adverse environmental effects (this is known as the residual-risk review), *id.* § 7412(f)(2).

The residual-risk review considers, among other things, the maximum lifetime individual cancer risk from exposure to the source category's emissions. That risk is generally presumed to be acceptable if it is no higher than 1 in 10,000 (or 100 in 1 million). *See* 54 Fed. Reg. 38,044, 38,044–45 (Sept. 14, 1989) (setting forth EPA's approach to risk); 42 U.S.C. § 7412(f)(2)(B); *NRDC v. EPA*, 529 F.3d 1077, 1080 (D.C. Cir. 2008).

The compliance deadline for section 7412(f) chloroprene standards applicable to Denka is relevant to the motion. Existing sources generally must comply with section 7412(f) residual risk standards within ninety days after their effective date. 42 U.S.C. § 7412(f)(4)(A). Congress authorized EPA to grant a longer compliance period of up to two years after the effective date of section 7412(f) standards. *Id.* § 7412(f)(4)(B); *Ass'n of Battery Recyclers, Inc. v. EPA*, 716 F.3d 667, 672 (D.C. Cir. 2013). EPA may grant such an extension upon finding that (1) it is necessary for the installation of controls and (2) steps will be taken during the extension period to ensure that the health of persons will be protected from imminent endangerment. 42 U.S.C. § 7412(f)(4)(B).

## B. The Rule

In the Rule, EPA amended emissions standards that apply to several source categories under section 7412, among other regulations. Relevant here, the Rule imposes section 7412(f) standards for ethylene oxide and chloroprene emissions.

Denka makes chloroprene and uses the chloroprene to produce neoprene, an oil-resistant substitute for natural rubber. *See* Mot. 1 & n.1. Denka is the only affected neoprene producer currently operating in the United States. 89 Fed. Reg. at 42,955. Its lone production facility is adjacent to Fifth Ward Elementary School in St. John the Baptist Parish. *See id.* at 42,964. Children are especially susceptible to chloroprene's harmful effects because it can damage DNA. *Id.* at 43,058.

EPA initially proposed to extend the deadline for existing sources to comply with the ethylene oxide and chloroprene standards to up to two years after the effective date. *See id.* at 42,954. EPA finalized the two-year extension for the ethylene oxide standards. *See id.* For existing sources producing neoprene (that is, Denka's facility in Louisiana), EPA finalized the ninety-day statutory default period for the chloroprene standards, which ends on October 15, 2024. 40 C.F.R. § 63.481(o), (p)(2). EPA provided that an existing source producing neoprene may request an extension under section 7412(f)(4)(B) if it demonstrates the statutory and regulatory prerequisites. 89 Fed. Reg. at 42,955 (citing 42 U.S.C. § 7412(f)(4)(B); 40 C.F.R. § 63.6(*i*)(4)(ii)). EPA acknowledged this "change from the proposed rule" and justified it "due to the EPA's finding that chloroprene emissions from the only [existing neoprene] source pose an imminent and substantial endangerment under [42 U.S.C. § 7603]." *Id.*

## C. Clean Air Act Endangerment Action

In February 2023, the United States, acting at EPA's request, had filed a complaint alleging that carcinogenic chloroprene emissions from Denka's neoprene manufacturing operations in Louisiana present an imminent and substantial endangerment to public health and welfare. Compl. ¶ 1, Opp'n Ex. A.[1] The United States alleges that thousands of infants, young children, and adults living in nearby communities are being exposed to an unacceptably high risk of developing certain cancers because of Denka's chloroprene emissions. *E.g.*, *id.* ¶¶ 6, 11.

The United States seeks injunctive relief that would require Denka immediately to reduce its chloroprene emissions to levels that no longer cause or contribute to unacceptably high cancer risks within neighboring communities, including at the adjacent elementary school. *Id.*

In February 2024, the district court granted the United States' motion to reset the March 2024 trial date considering the forthcoming Rule and continued the trial. Mot. to Continue Trial 1, Opp'n Ex. B; Minute Entry of Feb. 16, 2024, at 1–

---

[1]    All citations in this subsection are to documents filed in *United States v. Denka Performance Elastomer, LLC*, E.D. La. Case No. 2:23-cv-00735, and, for convenience, are exhibits to this Opposition.

2, Opp'n Ex. C. The court set a status conference for July 17 to discuss the effect of the Rule on the endangerment action. Order 1, Opp'n Ex. D.

### D. Denka's Response to the Rule

Before filing the Petition, Denka asked EPA to stay the Rule's chloroprene standard for neoprene producers under the Administrative Procedure Act, 5 U.S.C. § 705. Mot. Ex. V. EPA denied Denka's request without prejudice because Denka had not followed through in requesting an extension of the compliance deadline under the regulations implementing section 7412(f)(4). Mot. Ex. W. In its response, EPA explained that under its regulations, such a request must focus narrowly on the specific measures the applicant intends to pursue to reduce emissions from a specific source. *Id.*

Denka petitioned for review of the Rule without submitting a compliance-extension request to EPA under section 7412(f). Denka and EPA had informal discussions regarding a potential compliance-extension request, in which EPA "made clear . . . that [Denka] must commit to substantial additional actions to obtain relief from the 90-day implementation period." Mot. Ex. X, at 2. Denka did not submit a compliance-extension request before filing this motion, or since.[2]

---

[2] Denka states that it has requested a compliance extension from a Louisiana state agency and suggests it lacked notice that EPA was not delegating authority to states to grant or deny extension requests under 40 C.F.R. § 63.6(*i*)(4)(ii). Mot. 8;

*Cont.*

7

# STANDARD OF REVIEW

Like a preliminary injunction, a stay of a rule is an "extraordinary remedy never awarded as of right." *Winter v. NRDC*, 555 U.S. 7, 24 (2008). Denka shoulders the burden to justify a stay. *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 978 (D.C. Cir. 1985). The Court considers (1) whether Denka made a strong showing that it is likely to succeed on the merits; (2) whether Denka will suffer irreparable harm absent a stay; (3) whether a stay will substantially injure other interested parties; and (4) whether a stay would serve the public interest. *See Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). The third and fourth requirements merge here. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

On the merits, the Court must uphold the compliance deadline in the Rule unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 7607(d)(9)(A); *id.* § 7607(d)(1)(C) (noting that subsection (d) applies to "any standard under section 7412(f)"). In this analysis, the Court applies the same standard of review as under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). *See Allied Loc. & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 68 (D.C. Cir. 2000). Relevant here, Denka shoulders the burden to show EPA

---

*see* 89 Fed. Reg. at 42,955 n.33. Denka offers no argument why EPA's delegation decision is unlawful. Any purported compliance extension granted by a state agency to Denka would be ineffectual.

"offered insufficient reasons for treating similar situations differently." *Cal. Cmtys. Against Toxics v. EPA*, 928 F.3d 1041, 1057 (D.C. Cir. 2019).

## ARGUMENT

The motion should be denied because it does not establish that any criterion for a stay is met.

Denka has not shown a likelihood of success on the merits. EPA did not act arbitrarily or capriciously in requiring Denka to request an extension of the default compliance deadline before deciding whether to grant the extension. Denka is the only neoprene producer affected by the Rule. EPA had alleged in a separate (and still pending) district court action that Denka's chloroprene emissions imminently and substantially endanger public health and welfare. Whether Denka will take steps during an extension period to protect people from imminent endangerment is a relevant consideration under the statutory provision that authorizes extensions.

Denka has not shown it will suffer certain and great irreparable injury from a shorter compliance period, and it fails entirely to argue that it is likely to succeed on a challenge to the substance of the rule. Nor does the balance of equities or the public interest support a stay. EPA found that cancer risk from some of Denka's chloroprene emissions is five times the presumptively acceptable rate, under the Rule's computation. A stay would suspend the critical public health protections the Rule provides for communities who must regularly breathe Denka's chloroprene

emissions, including the children who attend Fifth Ward Elementary School adjacent to the company's facility.

## I.    Denka is Unlikely to Succeed on the Merits.

Denka's motion presents a narrow challenge only to the compliance period for the chloroprene emission standards in the Rule. Denka does not challenge the standards in its motion. The only question here is whether it was reasonable for EPA to impose the default ninety-day compliance period and require Denka, but not other sources, to request an extension. The answer is yes: EPA required Denka to make the request because EPA had investigated and alleged that Denka's chloroprene emissions present an imminent and substantial endangerment to the public. By contrast, no other source covered by the Rule faced a similar endangerment action. Requiring that Denka make an extension request is also consistent with the statute and implementing regulations. Because EPA acted reasonably, the Court should deny the motion.

### A.    EPA Reasonably Required Denka to Submit an Extension Request.

EPA required only Denka to submit an extension request, because only Denka is a defendant in a suit brought by EPA alleging imminent and substantial endangerment to public health from the emissions that are the subject of the Rule. In other words, Denka is not similarly situated to the other sources. *See Cal. Cmtys. Against Toxics*, 928 F.3d at 1057. When EPA finalized the ninety-day

compliance deadline for existing neoprene producers, it provided that those sources

may request a two-year extension under the statute and implementing regulations.

89 Fed. Reg. at 42,955. EPA thus outlined precisely what the applicant needs to

show—that the extension is "necessary for the installation of controls" and steps

will be taken to protect the public from imminent endangerment—to get the

extension. *Id.* (citing 42 U.S.C. § 7412(f)(4)(B); 40 C.F.R. § 63.6(*i*)(4)(ii)).

EPA did not act arbitrarily or capriciously. EPA required this procedural

step of Denka because of EPA's "finding that chloroprene emissions from the only

such source"—meaning Denka—"pose an imminent and substantial endangerment

under CAA section 303, 42 U.S.C. 7603." 89 Fed. Reg. at 42,955 (citing *United

States v. Denka Performance Elastomer, LLC*, No. 23-cv-00735 (E.D. La. filed

Feb. 28, 2023)). In other words, EPA investigated, and, on the Agency's behalf,

the United States commenced a civil action alleging that Denka's chloroprene

emissions present an imminent and substantial endangerment to the public.

To be sure, EPA's allegations have not yet been proven at trial. *See* Mot. 11.

But the endangerment proceeding—concerning the *same* facility and emissions of

the *same* hazardous air pollutant—gave EPA a reasonable basis to interpose the

procedural step that Denka request a compliance extension. *Motor Vehicle Mfrs.

Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 52 (1983) (agency decision

must be upheld where agency offers a "rational connection" between the facts and decision).

Requiring Denka to request an extension is also consistent with the statute and the regulations. Congress set a default period of ninety days for existing sources to comply with section 7412(f) standards and authorized EPA to grant extensions for up to two years. 42 U.S.C. § 7412(f)(4)(A)–(B); 40 C.F.R. § 63.6(*i*)(4)(ii); *Ass'n of Battery Recyclers*, 716 F.3d at 672. EPA promulgated regulations for compliance-extension requests. *See* 40 C.F.R. § 63.6(*i*)(4)(ii). A request must be submitted within ninety days after the effective date of the standard and describe the controls that will be installed and when installation will be completed. *Id.* § 63.6(*i*)(4)(ii), (6)(i). The regulations also set forth EPA's duties after receiving the request. *Id.* § 63.6(*i*)(13)(i), (iv). If EPA denies a request, it must give the grounds for doing so in writing, *id.* § 63.6(*i*)(13)(iv), and its denial is a final action subject to judicial review, *see, e.g.*, *Monsanto Co. v. EPA*, 19 F.3d 1201 (7th Cir. 1994).

Neither the statute nor the regulations entitle any person to an extension, especially absent a request. Whether to grant extensions is discretionary. After all, under the statute, EPA "may"—not must—grant an extension even when certain conditions are met. 42 U.S.C. § 7412(f)(4)(B); *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1401 (D.C. Cir. 1995) ("When a statute uses a permissive term such as

12

'may' rather than a mandatory term such as 'shall,' this choice of language suggests that Congress intends to confer some discretion on the agency, and that courts should accordingly show *deference* to the agency's determination.").

Whatever discretion the Agency has, no court has held that a source is entitled to an extension without making a request. In fact, the only decision about extensions of the compliance deadline of which undersigned counsel is aware is *Monsanto Co. v. EPA*, 19 F.3d 1201 (7th Cir. 1994). But that case does not help Denka, because the regulated source there affirmatively requested an extension— twice. 19 F.3d at 1203.[3] That court held that EPA's denial of the second request was arbitrary and capricious because of specific issues concerning the need to install controls in that case. *Id.* at 1207. *Monsanto* does not, as Denka contends, detract from the reasonableness of requiring Denka to submit a request here. Mot. 5.

However much Denka believes it qualifies for a compliance extension and contests the allegations in the endangerment action, *id.* at 9–10, 13–14, it must submit a compliance-extension request to EPA, which EPA would consider and decide (within thirty days of any additional presentation or argument) whether to grant or deny. 40 C.F.R. § 63.6(*i*)(13)(iv). But today, there is no such agency

---

[3]     The Seventh Circuit applied identical language in section 7412(f)(4)(B)'s predecessor. *See* 42 U.S.C. § 7412(c)(1)(B)(ii) (1988).

decision for the Court to review, and thus no administrative record on which this Court presently can decide whether EPA would likely be arbitrary and capricious if it denied a compliance-extension request.

Denka's contention that EPA must "explain its reasons" for imposing what Denka characterizes as an "impossible-to-meet compliance period" would flip the statute on its head. Mot. 11. The ninety-day compliance period is a default that Congress imposed, and Congress granted EPA discretion in determining whether to grant an extension of that deadline. Because Denka has not submitted an extension request to EPA, EPA understandably has not yet made any "finding" whether to grant or deny Denka an extension. *Id.* at 11–13.[4]

Finally, Denka's assertion that EPA "claims" a certain cancer incidence rate results in "imminent endangerment," and is reversing "policy" on that issue by finalizing the ninety-day compliance period, is wrong. *Id.* at 15–17. EPA made no such claim or reversal. And nowhere in the Rule did EPA equate "imminent endangerment" under section 7412(f)(4)(B) with any specific cancer risk rate.

---

[4]    EPA explained its compliance-deadline decision by reference to the United States' endangerment suit against Denka, but EPA did not thereby "incorporate into the administrative record the entire record" of that litigation. Mot. 12. The Agency referred to the litigation to explain why it was reverting to the ninety-day statutory default in the final rule compared to the proposal—that is, the existence of an endangerment action to abate a public health endangerment caused by the only facility producing neoprene.

Rather, EPA withheld judgment whether to grant Denka a compliance extension because only Denka is subject to an endangerment action resulting from its emissions of chloroprene. The only differential treatment Denka received in the Rule is that it must submit a request for an extension. EPA was justified in requiring this procedural step of Denka.

### B. Denka's Procedural Challenge Fails.

Denka incorrectly asserts that it lacked fair notice that EPA would reduce Denka's compliance time from the proposed to final versions. Mot. 18–19.[5] Denka relies on correspondence during the Office of Management and Budget review process to demonstrate a likelihood of success on this point. *Id.* at 19 (citing Exhibit R). That correspondence is outside the administrative record and thus cannot be considered in the Court's merits review. *See* 42 U.S.C. § 7607(d)(7)(A). But Denka's discussion of the document belies its claim of surprise at the final compliance period. Denka admits it "reviewed" the Office of Management and Budget's comments questioning the appropriateness of the proposed two-year compliance period "when [Denka] prepared comments on the Proposed Rule." *Id.* at 19. Denka cannot now claim to have lacked reasonable notice that EPA might

---

[5] Denka refers to the "APA" in its subheading and cites *Environmental Integrity Project v. EPA*, 425 F.3d 992 (D.C. Cir. 2005), which dealt with the notice-and-comment requirements of the APA. In fact, the notice-and-comment requirements in section 7607(d) apply here.

finalize a different compliance period. Moreover, Denka even commented on the compliance period by advocating that EPA adopt the section 7412(f) standards under a different subsection and set a longer compliance window. Mot. Ex. J, at 107–09.[6]

## II.    Denka Will Not Suffer Certain and Great Irreparable Injury.

Denka fails to demonstrate irreparable harm of "such imminence that there is a clear and present need for equitable relief." *Wis. Gas Co. v. FERC,* 758 F.2d 669, 674 (D.C. Cir. 1985) (cleaned up). Harm must be "both certain and great" and "actual and not theoretical" to justify the extraordinary relief of a stay pending review. *Id.* Consideration of harm is "critical," and "simply showing some possibility of irreparable injury" is insufficient. *Nken*, 556 U.S. at 434–35 (cleaned up).

That Denka does not challenge in its motion the substance of the chloroprene standards narrows the universe of irreparable injury that could entitle

---

[6]     To the extent Denka did *not* comment on the compliance-date issue, its challenge would not be before this Court. Judicial review of the Rule is limited to objections raised with reasonable specificity during the public-comment period, and if it was impracticable to raise an objection during that period or the grounds to object arose afterwards, Denka would have to petition for administrative reconsideration before raising the issue on judicial review. 42 U.S.C. § 7607(d)(7)(B); *see EME Homer City Generation, L.P. v. EPA*, 795 F.3d 118, 137 (D.C. Cir. 2015) (holding that 42 U.S.C. § 7607(d)(7)(B) requires petitioner first to seek reconsideration on issue that EPA violated notice-and-comment requirements by significantly changing final rule from proposal).

it to a stay. Again, Denka argues only that it will succeed on a challenge to the compliance deadline. The only irreparable injury that the Court can consider, then, is that stemming from the compliance date being October 2024 rather than July 2026. True, this Court can be expected to dispose of the petition before July 2026. And if the chloroprene standards are vacated at that time (which they should not be), Denka would not have to comply with them prospectively. But because Denka does not even try to show that vacatur of the standards is the likely outcome, the Court must assume for purposes of this motion that the standards will be upheld. Put another way, when evaluating whether Denka "will be irreparably injured *absent* a stay," *Nken*, 556 U.S. at 434 (emphasis added), the Court must deduct any injuries Denka is expected to suffer even *with* a stay of the ninety-day compliance deadline that is the sole target of its motion.

Denka fails to demonstrate irreparable injury from the earlier compliance deadline. Denka relies on two declarations submitted with its motion. *See* Meyers Decl. ¶¶ 4–44, 50–54 (Mot. Ex. F); Helfrich Decl. ¶¶ 10–27 (Mot. Ex. S). Virtually all the claimed injuries stem from Denka having to comply with the chloroprene standards—irrespective of when. *E.g.*, Meyers Decl. ¶¶ 7, 41; Helfrich Decl. ¶ 8. The uncertain *additional* harm from a shorter compliance deadline is not the kind of certain and great harm required for the Court to issue a stay—as to only the ninety-day compliance deadline. *See Wis. Gas Co.*, 758 F.2d at 674.

17

The only extra cost Denka specifies that it is incurring from a ninety-day, as opposed to a longer, compliance period is the cost of hiring outside consultants. Meyers Decl. ¶ 52. But such costs do not constitute irreparable injury. Economic injury is generally not sufficient, except where the injury "threatens the very existence of the movant's business." *Wis. Gas Co.*, 758 F.2d at 674. Denka does not argue that hiring consultants will threaten its existence. Indeed, Denka's comments to the proposed rule reveal it has already hired many consultants for the installation and operation of many of the same controls the Rule requires. *See, e.g.*, Mot. Ex. J, at 77 ("Since the Proposed Rule was released, [Denka] has consulted with several engineering firms . . . ."); *id.* at 88–90 (discussing proposals Envent Corporation provided to Denka); *id.* at 97, 104 (discussing Montrose Environmental Solutions' advice to Denka). Denka has not established irreparable harm that would warrant a stay.

## III.   The Balance of Harms and Public Interest Favor Denying a Stay.

EPA determined in the Rule that the cancer risk for thousands of people exposed to chloroprene emissions at levels emitted by Denka's facility is not acceptable. Under EPA precedents, cancer risk from hazardous air pollutants like chloroprene is "presumptively acceptable" where excess lifetime cancer risks are below 100-in-1 million. *NRDC*, 529 F.3d. at 1080–83; 54 Fed. Reg. at 38,044–45. Congress blessed EPA's approach. 42 U.S.C. § 7412(f)(2)(B). In the Rule's

computation, cancer risk from Denka's chloroprene emissions just from producing neoprene is five times higher—500-in-1 million. 89 Fed. Reg. at 42,963 (Table 5). The Rule's standards will reduce that risk to an acceptable level that provides an ample margin of safety to protect public health. Staying Denka's compliance deadline would delay those reductions and prolong unacceptable risks to the public.

Denka wrongly asserts that "a stay pending review will pose virtually no risk to the public." Mot. 22. But when Congress enacted section 7412, it recognized the serious threats to human health posed by toxic air pollutants. *See United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497 (2001) ("Courts of equity cannot, in their discretion, reject the balance that Congress has struck in a statute."). And section 7412(f) in particular focuses on the *risk* of harm, not merely specific incidences of harm. *See* 89 Fed. Reg. at 42,958 (neoprene production risk assessment results); 42 U.S.C. § 7412(f)(2)(A) (discussing "lifetime excess cancer risks"). *Contra* Mot. 22–23.

The standards are thus consistent with the statute. Section 7412(f)(2) requires EPA to assess the residual risk to public health. If the standards for a source category do not provide "an ample margin of safety to protect public health," EPA must promulgate health-based standards for that source category to reduce risk further from hazardous air pollutant emissions and set appropriate

deadlines considering the circumstances of the regulated facilities. 42 U.S.C. § 7412(f)(2)(A). The standards are called "risk-based" or "health-based" because they are based on a medical assessment of a given pollutant's health *risks*. *NRDC*, 529 F.3d at 1080.

In sum, the public is harmed by the increased risk of cancer from excess chloroprene emissions from Denka's facility and will continue to be harmed until Denka's facility complies with the Rule. By postponing reductions of this harmful pollution, Denka's requested stay of the ninety-day deadline would adversely affect the public interest and the health of people who live and work near the facility. And because chloroprene can damage DNA, children are more susceptible to its harmful effects. 89 Fed. Reg. at 43,058. It is hard to imagine that parents of children living and attending school in the shadow of Denka's facility would characterize their EPA-determined cancer risk as "vanishingly small." Mot. 23.

## IV. Remedy

The Court should deny Denka's motion.

If the Court were inclined to grant the motion, however, the Court should limit its stay order to be consistent with the two-year maximum extension that Congress authorized in the statute. *See Ass'n of Battery Recyclers*, 716 F.3d at 672 ("Because Congress clearly intended to grant existing sources no more than two

years to comply with standards promulgated under section [7412(f)], that is the end of the matter.").

If this Court were to grant Denka interim relief, any such order should reflect that Denka challenges only that it received the default ninety-day compliance deadline, not the chloroprene standards themselves. Denka cannot take a stay of the compliance deadline by this Court as license to freeze its compliance efforts during judicial review.

Thus, EPA respectfully proposes that if any interim relief is to be awarded to Denka, it be limited as follows: During judicial review of the Rule, the compliance date in 40 C.F.R. § 63.481(o) and (p)(2) for the section 7412(f) chloroprene standards that apply to Denka is treated as July 16, 2026. Then, if both the chloroprene standards and the October 15, 2024, compliance date are upheld on the merits, Denka would have to comply with the Rule immediately. If the chloroprene standards are upheld on the merits but the October 15, 2024, compliance date is vacated, Denka would have to comply with the Rule as of July 16, 2026.

# CONCLUSION

The Court should deny the motion to stay.

Respectfully submitted,

TODD KIM
*Assistant Attorney General*

*Of Counsel:*                     *s/ Brandon N. Adkins*
MICHAEL THRIFT            BRANDON N. ADKINS
HALI KERR                   *Attorney, Environmental Defense*
  Office of the General Counsel     *Section*
  U.S. Environmental Protection    Environment and Natural Resources
  Agency                    Division
  Washington, D.C.            U.S. Department of Justice
                               P.O. Box 7611
                               Washington, D.C. 20044
                               (202) 616-9174
                               *Brandon.Adkins@usdoj.gov*

JUNE 11, 2024
90-5-2-3-22694

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Opposition complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Times New Roman, a proportionally spaced font.

I further certify that this Opposition complies with the length limit of Fed. R. App. P. 27(d)(2)(A) because it contains 4,817 words, excluding exempted portions, according to the count of Microsoft Word.

*s/ Brandon N. Adkins*
BRANDON N. ADKINS


## CERTIFICATE OF SERVICE

I hereby certify that on June 11, 2024, I electronically filed Respondent's Opposition to Motion to Stay Final Rule with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

*s/ Brandon N. Adkins*
BRANDON N. ADKINS

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

_____

UNITED STATES OF AMERICA,      )
                               )
                               )
            Plaintiff,         )      Civil Action No.  2:23-cv-735
                               )
        v.                     )
                               )
DENKA PERFORMANCE ELASTOMER,   )
LLC and DUPONT SPECIALTY       )
PRODUCTS USA, LLC,             )
                               )
            Defendants.        )
_____)

## COMPLAINT

Plaintiff, the United States of America ("United States"), by authority of the Attorney

General of the United States and through the undersigned attorneys, acting at the request of the

Administrator of the United States Environmental Protection Agency ("EPA"), files this

Complaint and alleges:

## NATURE OF ACTION

1.      This is a civil action alleging that carcinogenic chloroprene emissions from

Defendant Denka Performance Elastomer, LLC's ("Denka's") neoprene manufacturing

operations at the Pontchartrain Works Site in St. John the Baptist Parish, Louisiana (the

"Facility") present an imminent and substantial endangerment to public health and welfare.  The

Facility's address is in LaPlace, Louisiana, but its chloroprene emissions also travel into other

nearby communities in the Parish, such as Reserve and Edgard, Louisiana.  People living in these

communities are being exposed to an unacceptably high risk of developing certain cancers

because of Denka's chloroprene emissions.  The United States seeks injunctive relief under

Clean Air Act Section 303, 42 U.S.C. § 7603, requiring that Denka immediately reduce its chloroprene emissions to levels that no longer cause or contribute to unacceptably high cancer risks within the communities surrounding the Facility.

2.      This civil action also seeks relief from DuPont Specialty Products USA, LLC ("DuPont Specialty Products") based on Fed. R. Civ. P. 19(a) and the All Writs Act, 28 U.S.C. § 1651.  DuPont Specialty Products owns the land at the Pontchartrain Works Site on which Denka's neoprene manufacturing operations are located.  DuPont Specialty Products is Denka's landlord and leases that land on which the neoprene manufacturing operations are located to Denka pursuant to a "Ground Lease."  Accordingly, Denka may need DuPont Specialty Products' permission or cooperation to comply with the Court's orders in this matter.  The Ground Lease requires Denka to obtain DuPont Specialty Products' consent before undertaking certain construction activities or equipment modifications involving the neoprene manufacturing operations.

3.      Chloroprene is a liquid raw material that is used to produce neoprene.  It is colorless, flammable, and readily evaporates at room temperature.  Chloroprene is produced using toxic substances, including 1,3-butadiene and chlorine.  And it is, itself, defined by the Clean Air Act as a hazardous air pollutant.  *See* 42 U.S.C. § 7412(b)(1).

4.      Chloroprene is hazardous, in part, because it is a likely human carcinogen. Breathing chloroprene increases the risk of developing cancers, such as lung and liver cancer, over the course of a lifetime.  Chloroprene acts via a mutagenic "mode of action," meaning that when a person breathes chloroprene, it causes mutations in the body's cells.  These mutations increase the likelihood that a person who breathes chloroprene will develop certain cancers over the course of their lifetime.

5.      Infants and children younger than 16 are likely to be especially susceptible to chloroprene's cancer-causing effects.  Chloroprene exposure during a person's early years is therefore particularly significant to their lifetime risk of developing cancer.

6.      The concentrations of airborne chloroprene in the communities surrounding the Facility are exposing thousands of people living there, including children younger than 16, to lifetime cancer risks that are multiples higher than what is typically considered acceptable by several United States regulatory agencies charged with protecting human health.  And the only source of chloroprene emissions in St. John the Baptist Parish is Denka's neoprene manufacturing operations at the Facility.

7.      A 1-in-10,000 cancer risk is a generally accepted threshold for demarcating the ceiling for acceptable excess cancer risk, and it is a benchmark for the level of cancer risk that is considered important to address in most instances by regulatory agencies.  For example, the EPA's policy for setting national emission standards for hazardous air pollutants, like chloroprene, that are emitted by industrial source categories uses a presumptive 1-in-10,000 upper threshold for acceptable excess lifetime cancer risk.  *See* 54 Fed. Reg. 38,044, 38,045 (Sept. 14, 1989) (the EPA's "1989 Residual Risk Policy").  Congress subsequently endorsed this policy in amendments to the Clean Air Act.  *See* 42 U.S.C. § 7412(f)(2)(B).  Other EPA non-air programs also rely on a 1-in-10,000 excess cancer risk as a presumptive risk management standard.  *See* 40 C.F.R. § 300.430(e)(2)(i)(A)(2) (explaining Superfund remedial action cleanup goals).  And other federal agencies, like the National Institute for Occupational Safety and Health ("NIOSH"), also use a 1-in-10,000 excess cancer risk as a threshold for taking action to address cancer risk.  *See* Current Intelligence Bulletin 68 - NIOSH Chemical Carcinogen Policy (July 2017).

8.      The EPA estimates that breathing chloroprene at concentrations averaging 0.2 micrograms of chloroprene per cubic meter (0.2 μg/m$^3$) over a 70-year lifetime increases a person's risk of developing cancer by 1-in-10,000.  And the greater the average chloroprene concentration that a person is exposed to, the faster their chloroprene related cancer risk accumulates.  As people breathe chloroprene at long-term average concentrations greater than 0.2 μg/m$^3$, their risk of developing cancer as a result of that exposure will reach and exceed 1-in-10,000 sooner than 70 years.

9.      Average concentrations of airborne chloroprene near the Facility have been consistently greater than 0.2 μg/m$^3$ since at least 2016, and likely for years before then.  Two sets of air monitoring stations were installed in 2016 at several locations near the Facility – one set was installed by the EPA, the other by Denka.  Each set of air monitors measured chloroprene concentrations in the ambient air.  Air monitors were installed in residential neighborhoods near the Facility and near schools close to the Facility, including the Fifth Ward Elementary School and East St. John High School.

10.     Both sets of air monitors detected chloroprene at average concentrations that were consistently much greater than 0.2 μg/m$^3$.  The air monitors located in the residential neighborhoods just west of the Facility detected some of the highest chloroprene levels.

11.     At the average chloroprene concentrations currently being detected, people are being exposed to risks of developing chloroprene-related cancers that are as much as an order of magnitude greater than multiple federal agencies' presumptive benchmark for acceptable excess lifetime cancer risk.  At the average chloroprene concentrations currently being detected, people exposed to these concentrations will reach unacceptably high cancer risks much sooner than over a 70-year lifetime.  For example, infants born today in the communities surrounding the Facility

4

who are exposed to the highest measured levels of chloroprene from Denka's neoprene manufacturing operations will exceed an estimated *lifetime* of acceptable excess cancer risk within approximately their first two years of life.

12.     Many people living near Denka's neoprene manufacturing operations already have been exposed to unacceptably high excess cancer risks.  The neoprene manufacturing operations at the Pontchartrain Works Site have existed for decades, and people have lived there just as long.  Those people have been breathing the air there for decades, and the Facility historically emitted even higher levels of chloroprene than it does today.  Those individuals' cancer risk increases every day they continue to breathe Denka's chloroprene emissions.

13.     The increased cancer risk that the communities near the Facility are currently being exposed to because of Denka's chloroprene emissions presents an imminent and substantial endangerment to public health and welfare.  The endangerment is imminent because Denka emits chloroprene at levels that are producing unacceptably high risks of cancer to the people, including children, that are regularly exposed to the Facility's emissions.  Hundreds of children attend school near the Facility and currently breathe the air there.  Many of them likely also live in the neighborhoods surrounding the Facility.

14.     The endangerment is substantial because Denka's emissions of chloroprene cause ambient levels of chloroprene in nearby communities to be many times greater than the generally accepted threshold for demarcating unacceptably high cancer risks, and because children living in these communities and attending the schools close to the Facility are likely to be especially susceptible to the cancer risks posed by chloroprene.  Denka's chloroprene emissions are the cause of this endangerment.

15.     The United States seeks injunctive relief, pursuant to 42 U.S.C. § 7603, to stop

Denka from emitting chloroprene at levels that present an imminent and substantial

endangerment to public health and welfare in the communities surrounding the Facility.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over the subject matter of this action pursuant to 42

U.S.C. § 7603, and 28 U.S.C. §§ 1331 and 1345.

17.     This Court has personal jurisdiction over Denka.  Denka is incorporated in the

State of Louisiana and does business here, including via its neoprene manufacturing operations at

the Facility, which is located in St. John the Baptist Parish at 586 Highway 44, LaPlace,

Louisiana, 70068.

18.     This Court has personal jurisdiction over DuPont Specialty Products.  DuPont

Specialty Products conducts business in LaPlace, Louisiana at the Facility.

19.     Venue is proper in this District pursuant to 42 U.S.C. § 7603, and 28 U.S.C.

§ 1391(b) and (c).  Denka does business in this District and the chloroprene emissions from its

neoprene manufacturing operations are occurring in this District.

## NOTICE

20.     Pursuant to 42 U.S.C. § 7603, the United States has provided notice of the

commencement of this action to, and has consulted with representatives of, the Louisiana

Department of Environmental Quality ("Louisiana DEQ") to attempt to confirm the accuracy of

the information upon which the United States is basing this action.  The United States has

provided notice of the commencement of this civil action to the Louisiana DEQ.

**PARTIES**

21.     Plaintiff, the United States of America, is acting by authority of the Attorney General of the United States and through the undersigned attorneys, on behalf of the Administrator of the EPA.  Authority to bring this action is vested in the Attorney General of the United States by 42 U.S.C. § 7605, and pursuant to 28 U.S.C. §§ 516 and 519.

22.     Denka is a privately owned limited liability company formed under the laws of the State of Delaware, headquartered in LaPlace, Louisiana, and authorized to do business in the State of Louisiana.  Denka is a joint venture between majority owner Denka Company Limited and minority owner Mitsui & Co. Ltd., both of which are Japanese companies.  Denka is the current owner and operator, as defined by 42 U.S.C. § 7412(a)(9), of the neoprene manufacturing operations at the Facility.  At all times relevant to the Complaint, Denka has been a corporate entity and therefore a "person" within the meaning of 42 U.S.C. §§ 7602(e) and 7603.

23.     Formed in 2018, DuPont Specialty Products is a privately owned limited liability company that is headquartered in Delaware and maintains its principal place of business in Delaware.  At all times relevant to the Complaint, DuPont Specialty Products has been a corporate entity and therefore a "person" within the meaning of 42 U.S.C. §§ 7602(e) and 7603.

24.     Subject to a reasonable opportunity for investigation and discovery, DuPont Specialty Products owns the land upon which the Facility is located.  Subject to a reasonable opportunity for investigation and discovery, DuPont Specialty Products leases to Denka the land upon which the neoprene manufacturing operations are located.  The Ground Lease documents this lessor/lessee relationship.  The Ground Lease has an effective date of approximately October 30, 2015 and lasts for a 99-year term.

25.     The Ground Lease retains certain rights for DuPont Specialty Products (either directly or as an assignee) that can affect Denka's neoprene manufacturing operations.  Under the Ground Lease, DuPont Specialty Products (either directly or as an assignee) retains rights over certain assets at the Facility.  These assets include fixtures, improvements, and easements, such as: certain of the well injection pumps, carbon beds, wastewater sampling equipment, tanks, process and service lines, sewer lines, electrical equipment, and rights-of-way on certain roadways.  The Ground Lease also requires Denka to obtain DuPont Specialty Products' consent before undertaking certain construction activities or equipment modifications involving the neoprene manufacturing operations.

26.     In order for complete relief to be afforded in this matter, the Court may need to involve DuPont Specialty Products.  DuPont Specialty Products maintains rights or interests under the Ground Lease and as the owner of the land upon which Denka's neoprene manufacturing operations are located.  These rights and interests may be impacted in this matter because the relief that the United States seeks from Denka may, for example, require onsite construction or other work that requires DuPont Specialty Products' consent under the Ground Lease.  DuPont Specialty Products is therefore a required party pursuant to Fed. R. Civ. P. 19(a) and the All Writs Act, 28 U.S.C. § 1651.

## GENERAL ALLEGATIONS

### Denka's Neoprene Manufacturing Operations

27.     Neoprene (*a.k.a.* "chloroprene rubber" or "polychloroprene") is a flexible, synthetic rubber used to produce common goods like wetsuits, beverage cozies, orthopedic braces, and automotive belts and hoses.  Denka began manufacturing neoprene at the Facility on approximately November 1, 2015.  Denka purchased the neoprene manufacturing operations at

the Facility in 2014 from E.I. DuPont de Nemours and Company.  E.I. DuPont de Nemours and

Company (or a predecessor-in-interest) owned and operated the original neoprene manufacturing

operations at the Facility from about 1968 until the sale to Denka.

28.     Since about 2008, neoprene has been manufactured at only one place in the

United States: the Facility.  According to the EPA's Toxic Release Inventory database, Denka's

manufacturing operations at the Facility are the sole source of chloroprene emissions in St. John

the Baptist Parish, Louisiana.

29.     Denka's neoprene manufacturing operations consist primarily of three chemical

manufacturing process units: the Chloroprene Unit, the Neoprene Unit, and the HCl Recovery

Unit.  Each of these three units emits chloroprene as well as other hazardous air pollutants.

30.     At all times relevant to the Complaint, chloroprene has been an "air pollutant"

within the meaning of 42 U.S.C. § 7602(g).  At all times relevant to the Complaint, chloroprene

has also been defined as a "hazardous air pollutant" by 42 U.S.C. § 7412(b)(1).  The Clean Air

Act classifies hazardous air pollutants as substances that, through inhalation or other exposure

pathways, present or may present a threat of adverse effects to human health or the environment.

*See* 42 U.S.C. § 7412(b)(2).

31.     Chloroprene is routinely emitted into the air at various stages of Denka's

neoprene manufacturing operations.  Chloroprene is emitted through vents from the

manufacturing operations that discharge directly to the atmosphere.  Chloroprene is emitted

when tanks and other process vessels are opened, during both normal operations and

maintenance work.  Chloroprene is also emitted through more diffuse ("fugitive") sources, like

equipment leaks and evaporative emissions from wastewater generated during neoprene

manufacturing.

32.     For example, Denka uses a series of three open-to-the-air, brick-lined pits (collectively called the "Outside Brine Pit") to treat reactive chloroprene-containing sludge, wastewater, and solid waste material generated by the neoprene manufacturing process.  These wastes, which are chemically reactive and volatilize high levels of chloroprene into the air, are skimmed from strainers at the polymerization kettles and poured into open, wheeled bins several times per day.  Liquid wastewater is hosed into open grated trenches that eventually empty into the Outside Brine Pit.  The wastes are wheeled in the open bins to the Outside Brine Pit.  There, employees dump the wastes into the Outside Brine Pit where they are left to finish their chemical reactions.  By design, these wastes volatilize chloroprene to the open air before they are collected for off-site disposal.

33.     Denka's chloroprene emissions drift beyond the Facility's property line and into the ambient air of the surrounding communities in LaPlace, Reserve, and Edgard, Louisiana. Thousands of people, including children, who live, work, and go to school in these communities breathe that air.

34.     Pursuant to a January 6, 2017 Administrative Order on Consent issued by the Louisiana DEQ, Denka agreed to reduce chloroprene emissions from its neoprene manufacturing operations.  Denka upgraded equipment and installed emission control devices, including a Regenerative Thermal Oxidizer which became fully operational in March of 2018.  These actions reduced the Facility's chloroprene emissions.

35.     Despite these emission reductions, Denka continues to emit approximately 18 tons of chloroprene each year.  And despite Denka's emission reductions, chloroprene concentrations in the communities surrounding the Facility have averaged between approximately 0.4 and 2.9 $\mu g/m^3$ since April 2018, depending on the monitoring location – all

significantly exceeding 0.2 µg/m³.  Without further emission reductions, Denka's chloroprene

emissions will continue to cause average chloroprene levels to exceed 0.2 µg/m³ in the

communities surrounding the Facility.

**The Communities Living Near the Facility**

36.     According to United States census data, between approximately 15,000 to 17,000

people live within two-and-a-half miles of Denka's Facility.  Over 20% of that population

(roughly 3,000-4,000) is under the age of 18.  Of those 3,000-4,000 young people, approximately

800-1,000 are young children under the age of 5.

37.     The Fifth Ward Elementary School, which is attended by more than 300 children,

is located about half-a-mile from the center of Denka's Facility.  Approximately 1,200 students

are enrolled at East St. John High School, which is roughly a mile-and-a-half north of Denka's

neoprene manufacturing operations.

**Chloroprene's Carcinogenic Effects**

38.     Chloroprene is a likely human carcinogen that acts via a mutagenic mode of

action.

39.     Infants and children are more susceptible than adults to the cancer risks posed by

mutagens like chloroprene.  This is because more rapid cell division during early life results in

less time for the body to repair DNA mutations before the damaged cells replicate.  The more

rapid replication of mutated cells increases the risk of developing cancer.  Infants and children

are also more susceptible to chloroprene's cancer-causing risks because, for physiological

reasons, they will likely have higher and more persistent blood concentrations of chloroprene or

its metabolites than adults exposed to the same air concentrations of chloroprene.

40.     The EPA's Integrated Risk Information System ("IRIS") program identifies and characterizes the health hazards of chemicals found in the environment.  The EPA develops IRIS assessments to characterize the risks to human health posed by specific environmental hazards. IRIS assessments are conducted by experts in various scientific disciplines such as toxicology, epidemiology, and pharmacokinetics.  Developing an IRIS assessment for a particular chemical involves identifying health hazards associated with human exposure to that chemical, then quantifying the relationship between exposure to the chemical and the related health hazards to arrive at an estimate of cancer potency.

41.     In 2010, the EPA IRIS program published its peer-reviewed assessment of chloroprene (the "2010 IRIS Assessment").  In the 2010 IRIS Assessment, the EPA concluded that chloroprene is "likely to be carcinogenic to humans" and determined that it acts through a mutagenic mode of action.  The 2010 IRIS Assessment also provided a quantitative estimate of carcinogenic risk from breathing (*a.k.a.* "inhalation exposure") chloroprene.  The 2010 IRIS Assessment was based on a comprehensive review of the available evidence on chloroprene toxicity, including animal toxicology data, evidence of chloroprene's mutagenic properties, and human epidemiological data.  The 2010 IRIS Assessment was subject to a rigorous review process within the EPA, by other federal agencies and White House offices, and the public.  The conclusions of the 2010 IRIS Assessment were subsequently confirmed by an independent external peer review panel.

42.     In the 2010 IRIS Assessment, the EPA also quantified the cancer risks associated with long-term chronic inhalation exposure to chloroprene.  Breathing is the primary pathway by which people living near the Facility are exposed to chloroprene.  The EPA's 2010 IRIS Assessment establishes 0.2 $\mu g/m^3$ as the average concentration of chloroprene that a person may

breathe over a 70-year lifetime without being expected to exceed a 1-in-10,000 risk of

contracting chloroprene-linked cancers.  1.2 µg/m$^3$ is the average chloroprene concentration a

child may regularly breathe from birth to their second birthday without being expected to exceed

a 1-in-10,000 lifetime risk of contracting chloroprene related cancers.

## Denka Consistently Emits Chloroprene at Levels That Cause Unacceptably High Cancer Risk in the Surrounding Communities

43.     The EPA has determined that Denka's chloroprene emissions are presenting an

imminent and substantial endangerment because the average chloroprene concentrations in the

ambient air near the Facility from the period of April 2018 through January 2023 at Denka's

monitoring stations are 2.89, 2.21, 1.26, 1.06 and 0.89 µg/m$^3$ for the five closest monitors to the

Facility, and 0.41 µg/m$^3$ for the monitor located approximately two-and-a-half miles away in

Edgard, Louisiana.  Even the lowest measured average value for the five closest monitors is

more than four times greater than 0.2 µg/m$^3$, and the highest average is more than 14 times

higher.  In the aggregate, the thousands of people breathing this air are incurring a significantly

higher cancer risk than would be typically allowed, and they are being exposed to a much greater

cancer risk from Denka's air pollution than the majority of United States residents face.

44.     In 2016, the EPA and Denka both began monitoring chloroprene concentrations in

the air around the Facility.  This air monitoring was intended to better understand the amount of

chloroprene that people living near the Facility were exposed to and to better characterize the

associated health risks.

45.     The air monitoring data from both monitoring systems consistently show average

airborne chloroprene concentrations in the communities surrounding Denka's neoprene

manufacturing operations that are multiples greater than 0.2 µg/m$^3$.  People living in the

13

residential area closest to the Facility are currently exposed to average levels of chloroprene that are more than 14 times greater than 0.2 µg/m$^3$.

***Denka's Air Monitoring Shows Chloroprene Levels that Indicate Excessive Cancer Risk***

46.     Beginning in August 2016, Denka commenced regular air sampling at several locations near the Facility.  Samples are taken roughly once every three to six days, and measure average chloroprene concentrations over a 24-hour period.  Denka's monitors are identified as:

      a.  The "Entergy" monitor, located at or near the Entergy Substation,

      b.  The "Railroad" monitor, located at or near the intersection of Highway 44 and the Illinois Central Railroad tracks,

      c.  The "Western" monitor, located at or near the Western Edge of the Facility,

      d.  The "Levee" monitor, located at or near the Mississippi River Levee on the south side of the Facility,

      e.  The "Ochsner Hospital" monitor located at or near the Ochsner Hospital, and

      f.  The "Edgard" monitor, located at or near the St. John the Baptist Parish Courthouse in Edgard.

47.     The Western monitor is located near a residential neighborhood that begins only about 50 feet from the Facility's western property line.  The Fifth Ward Elementary School is approximately 1,000 feet from the Western monitor.  The Railroad monitor is located near a residential area and the closest home sits approximately 500 feet from the monitor.  The Levee monitor is located about 2,000 feet from the nearest home.  The Edgard monitor is located approximately two-and-a-half miles southwest of the Facility, across the Mississippi River.  The Entergy, Ochsner Hospital, and Railroad monitors are respectively located approximately one mile north, northeast, and east of the Facility.

48.     Air monitoring data collected at each of Denka's monitoring sites since April 2018 – reflecting air quality after the Regenerative Thermal Oxidizer commenced stable operations – shows that the average chloroprene concentration across all six Denka sampling sites from April 2018 through January 2023 was approximately 1.46 $\mu g/m^3$— more than 7 times higher than 0.2 $\mu g/m^3$.  The worst of Denka's sampling locations (the Western monitor, which is closest to the residential neighborhood west of the Facility) showed average concentrations of 2.89 $\mu g/m^3$, more than 14 times higher than 0.2 $\mu g/m^3$.  *See* Table 1 below:

| Table 1: Denka Air Monitoring Results, April 2018 – January 2023 | |
|---|---|
| **Denka Monitoring Site** | **Average Monitored Chloroprene Concentration from April 2018 – January 2023** |
| Western | 2.89 $\mu g/m^3$ |
| Levee | 2.21 $\mu g/m^3$ |
| Railroad | 1.26 $\mu g/m^3$ |
| Ochsner Hospital | 1.06 $\mu g/m^3$ |
| Entergy | 0.89 $\mu g/m^3$ |
| Edgard | 0.41 $\mu g/m^3$ |
| **Average Monitored Chloroprene Concentration Across All Denka Monitoring Sites from April 2018 – January 2023** | **1.46 $\mu g/m^3$** |

49.     In January 2022, Denka deployed 18 diffusion tube air monitors – a different type of monitor than the six 24-hour canisters – around the Facility's fenceline.  Three additional diffusion tube monitors were installed later that year (for a total of 21 diffusion tube monitors). These new monitors measure the ambient air concentration of chloroprene over a two-week sampling period.  Consistent with the results of the EPA's and Denka's 24-hour air sampling, through late December 2022, 19 of 21 diffusion tube sampling locations are measuring average chloroprene concentrations greater than 0.2 $\mu g/m^3$.  And two-week average concentrations of chloroprene significantly greater than 0.2 $\mu g/m^3$ continue to occur near residential areas.

***EPA's Air Monitoring Showed Chloroprene Levels that Indicate Excessive Cancer Risk***

50.    From May 2016 through September 2020, the EPA also regularly collected 24-hour air samples from six locations near the Facility.  The EPA's monitoring sites, which were near, but not exactly where Denka's monitors are located, were identified as:

a.   The "Acorn and Highway 44" monitor, located at or near the intersection of Acorn Street and Highway 44,

b.   The "Levee" monitor, located at or near the Mississippi River Levee on the south side of the Facility,

c.   The "Fifth Ward Elementary School" monitor, located at or near the Fifth Ward Elementary School,

d.   The "Ochsner Hospital" monitor located at or near Ochsner Hospital,

e.   The "Chad Baker" monitor, located at or near a residence on Chad Baker Street, and

f.   The "East St. John High School" monitor located at or near East St. John High School.

51.    Air monitoring data collected at each of the EPA's monitoring sites, starting in April 2018, show that the average chloroprene concentration across all the EPA's sampling sites from April 2018 through September 2020 was 1.43 $\mu g/m^3$—7 times higher than 0.2 $\mu g/m^3$.  The worst of EPA's sampling locations (the Chad Baker site, in the residential neighborhood west of the Facility) showed average concentrations of 2.22 $\mu g/m^3$, more than 11 times higher than 0.2 $\mu g/m^3$.  *See* Table 2 below:

| Table 2: EPA Air Monitoring Results, April 2018 – September 2020 | |
|---|---|
| **EPA Monitoring Site** | **Average Monitored Chloroprene Concentration from April 2018 – September 2020** |
| Chad Baker | 2.22 µg/m$^3$ |
| Levee | 1.90 µg/m$^3$ |
| Fifth Ward Elementary School | 1.73 µg/m$^3$ |
| Acorn and Hwy 44 | 1.17 µg/m$^3$ |
| Ochsner Hospital | 1.15 µg/m$^3$ |
| East St. John High School | 0.44 µg/m$^3$ |
| **Average Monitored Chloroprene Concentration Across All EPA Monitoring Sites from April 2018 – September 2020** | **1.43 µg/m$^3$** |

***Infants and Young Children Will Exceed Unacceptable Lifetime Cancer Risk Levels Much More Quickly Than Adults***

52.    Current chloroprene concentrations near the Facility present a risk that is especially grave for infants and children under the age of 16.  For example, infants and children who begin consistently breathing chloroprene starting in infancy at the average concentrations measured near the Western and Chad Baker air monitors (listed in Tables 1 and 2) will surpass their lifetime 1-in-10,000 excess cancer risk within approximately two years after their exposure begins (68 years sooner than the 70-year period over which lifetime excess cancer risks are determined).  Adolescents and adults who consistently breathe Denka's current chloroprene emissions will similarly surpass a 1-in-10,000 excess cancer risk in far less time than the 70-year timeframe that the EPA uses to identify "lifetime" cancer risks.

***The Cancer Risks from the Facility's Chloroprene Emissions are Cumulative***

53.    Chloroprene has been released into the environment for decades as a result of neoprene manufacturing operations at the Pontchartrain Works Site.  Historical sampling,

emission data, and air modeling show that, before April 2018 and during the decades when the

Facility was owned and operated by E.I. DuPont de Nemours and Company (and its predecessors

in interest), people living near the Facility were exposed to chloroprene at average concentrations

multiples higher than current levels.  Until recently, the neoprene manufacturing operations often

emitted more than one hundred tons of chloroprene each year.

54.     Residents in communities surrounding the Facility have been and continue to be

chronically exposed to unacceptably high levels of chloroprene and the consequent cancer risk.

**Clean Air Act Section 303**

55.     Congress enacted the Clean Air Act "to protect and enhance the quality of the

Nation's air resources so as to promote the public health and welfare and the productive capacity

of its population." 42 U.S.C. § 7401(b)(1).

56.     Section 303 of the Clean Air Act, 42 U.S.C. § 7603, provides:

> Notwithstanding any other provision of this chapter, the Administrator, upon
> receipt of evidence that a pollution source or combination of sources (including
> moving sources) is presenting an imminent and substantial endangerment to
> public health or welfare, or the environment, may bring suit on behalf of the
> United States in the appropriate United States district court to immediately
> restrain any person causing or contributing to the alleged pollution to stop the
> emission of air pollutants causing or contributing to such pollution or to take such
> other action as may be necessary.

57.     The increased cancer risks to people living near Denka's neoprene manufacturing

operations that are being caused by long-term exposure to Denka's chloroprene emissions

represent an "endangerment to public health [and] welfare" within the meaning of 42 U.S.C.

§ 7603.  The Clean Air Act explains that effects on welfare include, but are not limited to, harm

to "personal comfort and well-being, whether caused by transformation, conversion, or

combination with other air pollutants." 42 U.S.C. § 7602(h).

58.     The endangerment posed by Denka's chloroprene emissions is "imminent" in that the conditions giving rise to it – the currently measured average concentrations of airborne chloroprene – are present now.  The endangerment is also "substantial" given the proximity of the surrounding communities to Denka's chloroprene emissions, the number and age distribution of the exposed population, the magnitude of Denka's current chloroprene emissions and the communities' ongoing exposure to them, and the consequent greater than 1-in-10,000 lifetime excess cancer risk.  Based on these circumstances, Denka's current chloroprene emissions represent a serious threat of harm to public health and welfare.

59.     The serious threats to public health and welfare caused by Denka's chloroprene emissions will continue until Denka significantly reduces its emissions.  Even after Denka's more recent efforts to reduce its chloroprene emissions, chloroprene concentrations in the ambient air around the Facility still average well above 0.2 $\mu g/m^3$.  If Denka continues to emit chloroprene at its current levels, chloroprene concentrations in the communities surrounding the Facility will continue to present an imminent and substantial endangerment.

## CLAIM FOR RELIEF
### (Injunctive Relief under 42 U.S.C. § 7603)

60.     Paragraphs 1 through 59 are re-alleged and incorporated herein by reference.

61.     At all times relevant to the Complaint, Denka's neoprene manufacturing operations at the Pontchartrain Works Site have been a "pollution source" within the meaning of 42 U.S.C. § 7603.  The Chloroprene Unit, Neoprene Unit, and HCl Recovery Unit constitute a "combination of sources" within the meaning of 42 U.S.C. § 7603.

62.     Emissions of chloroprene from Denka's neoprene manufacturing operations are "pollution" within the meaning of 42 U.S.C. § 7603.

63.     At all times relevant to this Complaint, Denka has caused and continues to cause the observed concentrations of chloroprene in the air in, around, and outside of the Facility's property line at the air monitoring locations listed in Tables 1 and 2.

64.     Based on the information described in Paragraphs 3 - 54, the EPA has received evidence that the current concentrations of chloroprene in the air in and around the Facility present an imminent and substantial endangerment to public health or welfare, including but not limited to unacceptably high lifetime excess cancer risks to residents of LaPlace and Reserve, Louisiana.

65.     Based on the terms of the Ground Lease, Denka may need permission or cooperation from DuPont Specialty Products in order to take the necessary actions to abate the imminent and substantial endangerment posed by its current chloroprene emissions.

66.     Any delay or refusal by DuPont Specialty Products to authorize Denka under the Ground Lease to comply with the requirements of any order of this Court will contribute to the emission of air pollutants within the meaning of 42 U.S.C. §§ 7602(g) and 7603.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff the United States of America respectfully requests that the Court provide the following relief:

1.     Order Denka to immediately take all necessary measures to eliminate the imminent and substantial endangerment posed by chloroprene emissions from the Facility;

2.     Order Denka to take all other actions as may be necessary to address and mitigate the harm to public health and welfare that Denka's chloroprene emissions have caused;

3.      Order DuPont Specialty Products to authorize and not impede, under the terms of

the Ground Lease, all construction and other necessary measures for Denka to comply with any

order issued by the Court in this matter; and

4.      Award Plaintiff such other and further relief as the Court deems just and proper.

Respectfully submitted,

**FOR THE UNITED STATES OF AMERICA**

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

Trial Attorney:      STEVEN D. SHERMER
Senior Attorney
District of Columbia Bar No. 486394
DAVIS H. FORSYTHE
Senior Counsel
HANNAH L. FRAZIER
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, DC 20044-7611
(202) 514-1134
Steven.Shermer@usdoj.gov

OF COUNSEL:

ROBERT PARRISH
Attorney-Advisor
U.S. Environmental Protection Agency
Office of Civil Enforcement, Air Enforcement Division
1200 Pennsylvania Avenue, NW (2242A)
Washington, D.C. 20460

JUSTIN LANNEN
Assistant Regional Counsel
U.S. Environmental Protection Agency, Region 6
1201 Elm Street, Suite 500 (ORCEA)
Dallas, TX 75270

# Exhibit B

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     *Plaintiff*,<br><br>     v.<br><br>DENKA PERFORMANCE ELASTOMER,<br>LLC, and DUPONT SPECIALTY<br>PRODUCTS USA, LLC,<br><br>     *Defendants*. | Civ. No. 2:23-cv-735<br><br>Judge Barbier (Section: "J" (5))<br><br>Magistrate Judge North |

## <u>UNITED STATES' MOTION TO CONTINUE TRIAL</u>

     The United States of America ("United States") respectfully moves for a short continuance of the current March 11, 2024 trial date. *See* Scheduling Order ¶ 8 (ECF No. 103). The United States has conferred with the other defendants about this motion. Counsel for Denka Performance Elastomer, LLC ("Denka") informed the United States that it takes no position on the motion. Counsel for DuPont Specialty Products USA, LLC indicated that it "concurs" with Denka's position.

     No previous continuances of the trial have been sought. This motion is made in good faith and not for purposes of undue delay.

     **WHEREFORE**, the United States respectfully requests that this motion be granted and the March 11 trial date be reset for the earliest possible two-week period on the Court's schedule that provides the parties with sufficient time to prepare for trial after the Final Rule is published.

                         Respectfully submitted,

                         **FOR THE UNITED STATES OF AMERICA**

                         TODD KIM
                         Assistant Attorney General

Environment and Natural Resources Division
United States Department of Justice


_____ s/ Steven D. Shermer _____

Trial Attorney:    STEVEN D. SHERMER
                   Senior Attorney
                   District of Columbia Bar No. 486394
                   DAVIS H. FORSYTHE
                   DANIEL S. SMITH
                   Senior Counsel
                   HANNAH L. FRAZIER
                   Trial Attorney
                   Environmental Enforcement Section
                   Environment and Natural Resources Division
                   United States Department of Justice
                   P.O. Box 7611
                   Washington, DC 20044-7611
                   (202) 514-1134
                   Steven.Shermer@usdoj.gov

OF COUNSEL:

ROBERT PARRISH
Attorney-Advisor
U.S. Environmental Protection Agency
Office of Civil Enforcement, Air Enforcement Division
1200 Pennsylvania Avenue, NW (2242A)
Washington, D.C. 20460
JUSTIN LANNEN
Assistant Regional Counsel
U.S. Environmental Protection Agency, Region 6
1201 Elm Street, Suite 500 (ORCEA)
Dallas, TX 75270

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on February 12, 2024, a true and correct copy of the foregoing motion, supporting memorandum, notice of submission, and proposed order were filed with the U.S. District Court for the Eastern District of Louisiana using the Court's CM/ECF system. Notice of this Electronic Filing will be sent to all parties by operation of the Court's Electronic Filing System.

s/Steven Shermer
<u> </u>
Steven D. Shermer

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
|     *Plaintiff*, | Civ. No. 2:23-cv-735 |
|     v. | Judge Barbier (Section: "J" (5)) |
| DENKA PERFORMANCE ELASTOMER, LLC, and DUPONT SPECIALTY PRODUCTS USA, LLC, | Magistrate Judge North |
|     *Defendants*. | |

**UNITED STATES' MEMORANDUM IN SUPPORT OF
<u>MOTION TO CONTINUE TRIAL</u>**

In the interest of judicial economy (including, ultimately, a swifter path to resolution), the United States asks that the trial of this matter be reset for the earliest possible two-week period on the Court's schedule that provides the parties with sufficient time to consider the requirements of the soon-to-be-finalized New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry ("Final Rule") prior to trial.[1]   After the Final Rule is publicly available, the parties will be able to present arguments about the Final Rule's actual requirements, which may differ from the Proposed Rule.   The Court will then have a concrete record on which to make its determinations, including whether Denka Performance Elastomer, LLC's ("Denka's") summary judgment arguments remain relevant.[2]   If the Final Rule meaningfully differs from the Proposed

---

[1] The "Proposed Rule" was published at 88 Fed. Reg. 25,080 (April 25, 2023).

[2] The Court set oral argument for several pending motions, including Denka's summary judgment motion, for February 22, 2024.   *See* Order (ECF No. 161).

Rule, it is all but certain that the Court will face requests for, at a minimum, additional briefing to address those differences.   Judicial economy will therefore be served if the Court is able to decide issues raised by the parties' pre-trial briefing and at trial in light of the Final Rule's provisions, rather than considering proposed requirements that may be moot.

The parties' preliminary injunction briefing and more recent summary judgment briefing spend a substantial amount of time discussing whether the Proposed Rule affects this case. Indeed, Denka has made the Proposed Rule a focus of its summary judgment motion and proposed findings of fact and conclusions of law, referencing it dozens of times in both filings. *See, e.g.*, Denka's Mem. In Supp. of Mot. for Summ. J. ("Denka's Mot. for Summ. J.") at 2–3, 5–9, 11–16, and 18 (ECF No. 131-2) and Denka's Proposed Findings of Fact and Conclusions of Law at 12–16, 79, 95–96, 102–104, 181–185, 187, 189, 191, 194–196, and 205 (ECF No. 156). Furthermore, in its summary judgment motion, Denka questioned why the Court should "bother" holding a trial "only days before the final rule is issued."   *See* Denka's Mot. for Summ. J. at 2 (ECF No. 131-2).   Now, in its summary judgment reply brief, Denka claims it is ready to go to trial, while trying to smoke out the contents of the Final Rule.   *See* Reply in Supp. of Denka's Mot. for Summ. J. at 10 (ECF No. 157).   Having built a case around a non-final agency proposal, Denka understands this strategy is on precarious footing.

The United States has contested the Proposed Rule's relevance to this imminent and substantial endangerment action and believes that the factual issues in this case require a trial. And part of the reason why this case is set for trial is because the United States and Denka have firmly opposing views about the significance – indeed, the relevance – of the Proposed Rule. Now, EPA has sent a draft Final Rule to the White House Office of Management and Budget (OMB), where it will undergo interagency review.   *See*, OMB, Office of Information and

Regulatory Affairs, Reginfo.gov (Jan. 25, 2024, 4:17 PM),

https://www.reginfo.gov/public/Forward?SearchTarget=RegReview&textfield=2060-AV71;

Executive Order 12,866 § 6 (Oct. 4, 1993); *see also* United States' Opp. to Denka Performance

Elastomer LLC's Mot. For Summ. J, Ex. A n.2 (ECF No. 150).

 The United States is not in a position to assert whether anything has changed, or will

change, from the Proposed Rule to the Final Rule.   Rules often change in response to comments

on the proposal; in this instance, EPA received thousands of public comments, including on the

issue of compliance timelines – an issue which Denka's summary judgment motion focuses on.

*See* https://www.regulations.gov/docket/EPA-HQ-OAR-2022-0730.   Likewise, rules undergoing

interagency review under Executive Order 12,866 are subject to change, and frequently do

change as a result of this review.   The Executive Branch's deliberations with respect to the Final

Rule are ongoing and will be ongoing until the OMB's review concludes and the Final Rule is

posted.   The deliberative process privilege, which is a component of Executive privilege,

protects the "'decision making processes of government agencies.'"   *NLRB v. Sears, Roebuck &

Co.*, 421 U.S. 132, 150 (1975) (citations omitted).   The privilege allows the United States to

withhold documents and information "that would reveal advisory opinions, recommendations

and deliberations comprising part of a process by which governmental decisions and policies are

formulated."   *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997) (quotation omitted).   The

privilege protects not merely documents, but also the integrity of the deliberative process itself.

*See Schell v. Dep't of Health & Human Servs.*, 843 F.2d 933, 939-40 (6th Cir. 1988).   Since the

draft Final Rule is now in the interagency review process, the United States is still deliberating

about its contents, and the EPA may revise the draft until it publishes the Final Rule.   Because

that process remains ongoing and the contents of the Final Rule have not been finalized, information about its contents is protected by the deliberative process privilege.

Regardless of whose view may ultimately prevail about the relevance of the Proposed Rule's requirements, the issues are best decided after the Final Rule is published, its terms are settled, and they are known to the parties and the Court.    Because it now appears probable that the Final Rule will be signed within roughly two weeks of the current trial date, the United States concludes that requesting a short continuance is appropriate so that the Final Rule's contents are available to the parties and the Court.

Consistent with our claim that conditions at Denka's Neoprene manufacturing facility pose an imminent and substantial endangerment, the United States has sought a swift resolution to this matter, moving for a preliminary injunction and resisting Denka's proposed scheduling delays.[3]   Nevertheless, good cause exists to grant this continuance given the now-aligned timing of the rulemaking and the currently scheduled trial.   The United States expects that the Final Rule will be signed by the EPA's Administrator on or before March 29, 2024, as required by consent decree, and will be made publicly available shortly thereafter.   *See Envt'l Integrity Project et al. v. Michael Regan*, Case 1:20-cv-03119; *Concerned Citizens of St. John et al. v. Michael Regan*, Case 1:21-cv-03063, Joint Consent Decree Regarding Group I Polymers and Resins Claims (Aug. 24, 2022).   Before the EPA submitted the proposed Final Rule for

---

[3] Denka has again wrongly claimed that the United States' motion is a concession that Denka's chloroprene emissions do not present an imminent and substantial endangerment to public health.   *Cf.* ECF No. 164 at 2 (noting the "blistering pace" at which the United States has pursued the litigation for this endangerment claim).   The fact that the United States is requesting a short continuance so that the Court has a complete record upon which to decide the relevant issues, as well as so that Denka cannot claim unfair surprise once the Final Rule is published, is a matter of basic fairness and judicial efficiency that has no bearing on the merits of the United States' allegations about the public health risks that Denka's chloroprene emissions present.

interagency review under Executive Order 12,866, the specific timing of the Final Rule's publication remained unclear. *Texas Envt'l Justice Advocacy Servs. et al. v. Regan*, Civ. No. 1:20-cv-03733, Consent Decree (Feb. 24, 2022), at 5 (p. 6).   Now that the EPA has transmitted the Final Rule to the OMB, there is more certainty that the Final Rule will be signed on or before March 29, 2024, providing good reason to continue the trial until after the Final Rule is signed and published.

The parties have completed the discovery deadlines set by the Court in its October 23, 2023 Scheduling Order, and are diligently preparing for trial.

No previous continuances of the trial have been sought.   This motion is made in good faith and not for purposes of undue delay.

**WHEREFORE**, the United States respectfully requests that this motion be granted and the March 11 trial date be reset for the earliest possible two-week period on the Court's schedule that provides the parties with sufficient time to prepare for trial after the Final Rule is published.

Respectfully submitted,

**FOR THE UNITED STATES OF AMERICA**

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

Trial Attorney:

_____s/ Steven D. Shermer_____
STEVEN D. SHERMER
Senior Attorney
District of Columbia Bar No. 486394
DAVIS H. FORSYTHE
DANIEL S. SMITH
Senior Counsel
HANNAH L. FRAZIER
Trial Attorney

5

Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, DC 20044-7611
(202) 514-1134
Steven.Shermer@usdoj.gov

OF COUNSEL:

ROBERT PARRISH
Attorney-Advisor
U.S. Environmental Protection Agency
Office of Civil Enforcement, Air Enforcement Division
1200 Pennsylvania Avenue, NW (2242A)
Washington, D.C. 20460
JUSTIN LANNEN
Assistant Regional Counsel
U.S. Environmental Protection Agency, Region 6
1201 Elm Street, Suite 500 (ORCEA)
Dallas, TX 75270

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 2:23-cv-735 |
| v. | ) | |
| | ) | Judge Barbier (Section: "J" (5)) |
| DENKA PERFORMANCE ELASTOMER, LLC | ) | |
| and DUPONT SPECIALTY PRODUCTS USA, | ) | Magistrate Judge North |
| LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**[PROPOSED] ORDER**

Having considered the United States of America's Motion To Continue Trial (ECF No.

165):

IT IS HEREBY ORDERED that the United States' Motion is GRANTED.  Trial of this

matter is continued from March 11, 2024 until _____.

IT IS FURTHER ORDERED that the Final Pretrial Conference is continued from

February 29, 2024 until _____.

This _____ day of _____, 2024.

_____
THE HONORABLE JUDGE CARL J. BARBIER
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF LOUISIANA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
|     *Plaintiff*, | |
|     v. | |
| DENKA PERFORMANCE ELASTOMER, LLC, | Civ. No. 2:23-cv-735 |
| | Judge Barbier (Section: "J" (5)) |
|     *and* | Magistrate Judge North |
| DUPONT SPECIALTY PRODUCTS USA, LLC, | |
|     *Defendants*. | |

<u>**UNITED STATES' NOTICE OF SUBMISSION OF MOTION TO CONTINUE TRIAL**</u>

The United States of America ("United States"), by and through the undersigned attorneys, hereby provides notice under Local Rule 7.2 that it has filed a motion to continue to the current March 11, 2024 trial date for this case (ECF No. 165). The United States has separately requested expedited consideration of its motion (ECF No. 166).

PLEASE TAKE NOTICE that this motion will be submitted to this Court on March 6, 2024 at 9:30 a.m. before the Honorable Carl J. Barbier, at the U.S. Courthouse, 500 Poydras Street, Room C268, in New Orleans, Louisiana.

Dated: February 12, 2024.                Respectfully submitted,

                                     **FOR THE UNITED STATES OF AMERICA**

                                     TODD KIM
                                     Assistant Attorney General
                                     Environment and Natural Resources Division
                                     United States Department of Justice

                                      _s/Steven D. Shermer_
Trial Attorney:                  STEVEN D. SHERMER
                                     Senior Attorney
                                     District of Columbia Bar No. 486394
                                     DAVIS H. FORSYTHE
                                     DANIEL S. SMITH
                                     Senior Counsel
                                     HANNAH L. FRAZIER
                                     Trial Attorney
                                     Environmental Enforcement Section
                                     Environment and Natural Resources Division
                                     United States Department of Justice
                                     P.O. Box 7611
                                     Washington, DC  20044-7611
                                     (202) 514-1134
                                     Steven.Shermer@usdoj.gov

OF COUNSEL:

ROBERT PARRISH
Attorney-Advisor
U.S. Environmental Protection Agency
Office of Civil Enforcement, Air Enforcement Division
1200 Pennsylvania Avenue, NW (2242A)
Washington, D.C. 20460


JUSTIN LANNEN
Assistant Regional Counsel
U.S. Environmental Protection Agency, Region 6
1201 Elm Street, Suite 500 (ORCEA)
Dallas, TX 75270

# Exhibit C

MINUTE ENTRY
BARBIER, J.
February 16, 2024

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA                    CIVIL ACTION


VERSUS                                       NO: 23-735


DENKA PERFORMANCE                            SECTION: "J"(3)
ELASTOMER LLC AND DUPONT
SPECIALTY PRODUCTS USA, LLC


The Court held a status conference on zoom with the following parties in attendance: Steven Shermer, Daniel Smith, Davis Hoskins Forsythe, Hannah Lee Frazier, Heather E. Gange, and Scott Cernich representing the United States of America; David A. Super, Brett S. Venn and, Jason B. Hutt representing Denka Performance Elastomer LLC ("Denka"); and Eric Earl Jarrell and Robert J. Burvant representing DuPont Specialty Products USA, LLC ("DuPont"). At the conference, the Court **ORDERED** as follows:

1. The Court **GRANTED** the United States of America's *Motion to Continue Trial* **(Rec. Doc. 165)** and *Motion to Expedite Consideration of the Motion to Continue Trial* **(Rec. Doc. 166).** The trial set for March 11, 2024 and the pre-trial conference set for February 29, 2024 are hereby continued and shall be reset at another date.

1

2.  The parties shall advise the Court when the Final Rule is published at which time the Court shall set a status conference to discuss what, if any, additional briefing is necessary, the deadlines for any such contemplated briefing, and new dates for the trial and pre-trial conference.

3.  The Court also ordered that the Oral Argument set for February 22, 2024 at 10:00 a.m. is **CANCELLED**, to be reset at a later date if the Court deems it necessary.

* * * * * * * * * * * * * * * * *

JS-10: 38 mins.

CARL J. BARBIER
UNITED STATES DISTRICT JUDGE

# Exhibit D

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA

CIVIL ACTION

VERSUS

NO. 23-735

DENKA PERFORMANCE
ELASTOMER, LLC and DUPONT
SPECIALTY PRODUCTS USA, LLC

SECTION: "J"(5)

## ORDER

**IT IS HEREBY ORDERED** that the parties are to attend a status conference on **July 17, 2024 at 10:00 a.m.** to discuss the impact of the Final Rule on this litigation. The status conference will be held in-person, but out-of-town counsel may attend via Zoom if they so choose. Any out-of-town counsel wishing to attend via Zoom should inform the Court by **July 10, 2024**.

**IT IS FURTHER ORDERED** that the parties are to submit a status report to the Court by **July 10, 2024**, informing the Court of the status of this litigation and of the litigation proceeding before the D.C. Circuit and what impact, if any, that action has on the instant matter.

New Orleans, Louisiana, this 29th day of May, 2024.

CARL J. BARBIER
UNITED STATES DISTRICT JUDGE