**ORAL ARGUMENT NOT YET SCHEDULED**
No. 24-1249 (consolidated with Nos. 24-1135 (Lead), 24-1228, 24-1246,
24-1250, 24-1251, 24-1252)

―――――――――――――――――

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

―――――――――――――――――

VINYL INSTITUTE, INC.,

*Petitioner,*

v.

ENVIRONMENTAL PROTECTION AGENCY AND
MICHAEL REGAN, ADMINISTRATOR, UNITED
STATES ENVIRONMENTAL PROTECTION AGENCY,

*Respondents,*

AIR ALLIANCE, *et al.*,

*Intervenors for Respondents.*

―――――――――――――――――

On Petition for Review of New Source Performance Standards
for the Synthetic Organic Chemical Manufacturing Industry and
National Emission Standards for Hazardous Air Pollutants for the
Synthetic Organic Chemical Manufacturing Industry and Group I & II
Polymers and Resins Industry
EPA-HQ-OAR-2022-0730

―――――――――――――――――

## PETITIONER VINYL INSTITUTE, INC.'s
## OPENING BRIEF

(counsel listed on following page)

Eric P. Gotting
Gregory A. Clark
Keller and Heckman LLP
1001 G Street, N.W., 500 West
Washington, D.C.  20001
Phone: (202) 434-4100
Facsimile: (202) 434-4646
Email: gotting@khlaw.com
Email: clarkg@khlaw.com
*Counsel for Petitioner*

Dated: January 17, 2025

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), Petitioner Vinyl Institute, through its undersigned counsel, submits this Certificate as to Parties, Rulings, and Related Cases.

## I.    Parties, Intervenors, and Amici

### A. Petitioners

Vinyl Institute, Inc.

### B. Respondents

U.S. Environmental Protection Agency and Michael Regan, in his capacity as EPA Administrator

### C. Intervenors and Amici

Air Alliance Houston; California Communities Against Toxics; Concerned Citizens of St. John; Environmental Defense Fund; Environmental Integrity Project; Louisiana Environmental Action Network; Rise St. James Louisiana; Sierra Club; and Texas Environmental Justice Advocacy Services

## II.    Rulings Under Review

EPA, *New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry,* Docket ID No: EPA-HQ-OAR-2022-0730 (dated May 16, 2024)

## III. Related Cases (consolidated cases)

*Denka Environmental Performance Elastomer LLC v. EPA*, No. 24-1135 (Lead)

*State of Louisiana, et al. v. EPA*, No. 24-1228

*State of Texas, et al. v. EPA*, No. 24-1246

*American Chemistry Council, et al. v. EPA*, No. 24-1250

*Concerned Citizens of St. John, et al. v. EPA*, No. 24-1251

*Huntsman Petrochemical LLC v. EPA*, No. 24-1252

*/s/ Eric P. Gotting*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and Circuit Rule 26.1, Petitioner Vinyl Institute submits this Corporate Disclosure Statement. The Vinyl Institute is a trade association representing the leading manufacturers of vinyl, vinyl chloride monomer, and vinyl additives and modifiers. It is incorporated under the not-for-profit corporation laws of the District of Columbia. Relevant to this case, Vinyl Institute member companies are subject to the challenged rule. The VI has no parent companies and has not issued any shares or debt securities to the public.

/s/ *Eric P. Gotting*

# TABLE OF CONTENTS

TABLE OF CONTENTS .............................................................iv

TABLE OF AUTHORITIES .......................................................vi

GLOSSARY .........................................................................viii

STATEMENT OF JURISDICTION ...........................................1

STATEMENT OF ISSUES........................................................1

STATEMENT OF THE CASE ..................................................2

    I.    EPA's Authority Under CAA Section 112 .............................2

    II.    The Dioxins and Furans Limit ...............................3

SUMMARY OF THE ARGUMENT ........................................6

STANDARD OF REVIEW.......................................................9

STANDING .........................................................................9

ARGUMENT .......................................................................11

    I.    EPA Violated The CAA When It Used Data From Only Two Sources To Set The Dioxins and Furans Emission Limit For Process Vents At Existing Sources ......................11

        A.    Parentheticals Must Be Read Narrowly So As Not To Override Operative Language Of The Statute .............11

        B.    EPA Misapplied Section 112(d)(3)(A)'s Parenthetical...13

    II.    The Dioxins and Furans Emission Limit Would Have Been Higher If EPA Had Used Data From 12 Percent Of Existing Sources.............................................17

CONCLUSION .......................................................................18

CERTIFICATE OF COMPLIANCE..........................................................19

CERTIFICATE OF SERVICE..................................................................20

# TABLE OF AUTHORITIES

Page(s)

## Cases

*AFL-CIO v. Donovan,*
 757 F.2d 330 (D.C. Cir. 1985) ................................................................ 12

*Appalachian Power Co. v. EPA,*
 135 F.3d 791 (D.C. Cir. 1998) ................................................................. 5

*Becerra v. Empire Health Found.,*
 597 U.S. 424 (2022) ....................................................................... 12, 16

*Boechler, P.C. v. Comm'r of Internal Revenue,*
 596 U.S. 199 (2022) ............................................................................ 12

*Burlington Northern and Santa Fe Railway Co. v. Surface Transp. Bd.,*
 403 F.3d 771 (D.C. Cir. 2005) ................................................................ 10

*Chickasaw Nation v. United States,*
 534 U.S. 84 (2001) .............................................................................. 12

*Okla. Dept. Envtl. Quality v. EPA,*
 740 F.3d 185 (D.C. Cir. 2014) ................................................................. 5

*Hearth, Patio & Barbecue Ass'n v. EPA,*
 11 F.4th 791 (D.C. Cir. 2021) ................................................................ 10

*La. Envtl. Action Network v. Environmental Protection Agency,*
 955 F.3d 1088 (D.C. Cir. 2020) ............................................................ 3, 6

*Loper Bright Enters. v. Raimondo,*
 144 S. Ct. 2244 (2024) ...................................................................... 9, 11

*Nat'l Ass'n of Clean Water Agencies v. EPA,*
 734 F.3d 1115 (D.C. Cir. 2013) .............................................................. 14

*Natural Resources Defense Council v. EPA,*
 755 F.3d 1010 (D.C. Cir. 2014) ............................................................... 5

*Sierra Club v. EPA,*
    167 F.3d 658 (D.C. Cir. 1999) .......................................... 14

*Sierra Club v. EPA,*
    292 F.3d 895 (D.C. Cir. 2002) .......................................... 10

*U.S. Sugar Corp. v. EPA,*
    113 F.4th 984 (D.C. Cir. 2024)....................... 6, 9, 11, 12, 15

*U.S. Sugar Corp. v. EPA,*
    830 F.3d 579 (D.C. Cir. 2020) .......................................... 14

*United States v. Bank of Am. Corp.,*
    753 F.3d 1335 (D.C. Cir. 2014) ........................................ 12

## Statutes

42 U.S.C. §7412(a)(4).......................................................... 14
42 U.S.C. §7412(d)(3) ........................................................... 6
42 U.S.C. §7412(d)(3)(A)............................................. 2, 6, 11
42 U.S.C. §7412(d)(3)(B)................................................. 2, 16
42 U.S.C. §7412(d)(6) ........................................................... 3
42 U.S.C. §7414(a)(1)............................................................ 4
42 U.S.C. §7429(a)(2).......................................................... 14
42 U.S.C. §7607(b)(1)............................................................ 1
42 U.S.C. §7607(d)(9)(A), (C)............................................... 9

## Regulations

40 C.F.R. §63.113(a)(5)......................................................... 4
88 Fed. Reg. 25,080 (Apr. 25, 2023) ...................... 3, 5, 13, 17
89 Fed. Reg. 42,932 (May 16, 2024) ............................. 1, 3, 4

# <u>GLOSSARY</u>

CAA       Clean Air Act

EPA       U.S. Environmental Protection Agency

ng/dscm       Nanograms per dry standard cubic meter

PVC       Polyvinyl Chloride

RDL       Representative Detection Limit

SOCMI       Synthetic Organic Chemical Manufacturing Industry

UPL       Upper Predictive Limit

## STATEMENT OF JURISDICTION

Petitioner Vinyl Institute seeks review of the U.S. Environmental Protection Agency's ("EPA") rule, *New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry*, EPA-HQ-OAR-2022-0730 ("Final Rule"). 89 Fed. Reg. 42,932 (May 16, 2024) (Ex. A). The Vinyl Institute timely filed this petition on July 15, 2024. 42 U.S.C. §7607(b)(1). This Court has jurisdiction under 42 U.S.C. §7607(b)(1).

## STATEMENT OF ISSUES

Under the Clean Air Act ("CAA" or "Act"), the Final Rule requires that existing sources reduce emissions of dioxins and furans to meet a stringent 0.054 ng/dscm limit. This case raises the following issue:

1.     Did EPA violate the CAA when it calculated a process vent emission limit for dioxins and furans using data from only two sources instead of the top 12% of sources in the source category?

## STATEMENT OF THE CASE

### I.     EPA's Authority Under CAA Section 112

This case turns on whether EPA has authority under CAA Section 112(d)(3)(A) to use data from only two sources to calculate a numeric emission limit for over 600 sources in the Synthetic Organic Chemical Manufacturing Industry ("SOCMI") source category.

EPA sets emission limits under Section 112 for hazardous air pollutants ("HAPs").  EPA calculates the limit based on the average emission limitation achieved by the best performing sources in the source category (the "MACT floor").  For existing sources, if the category comprises fewer than 30 sources, EPA calculates "the average emission limitation achieved by the best performing 5 sources (for which [EPA] has or could reasonably obtain emissions information)."  42 U.S.C. §7412(d)(3)(B).  As relevant here, for a category with 30 or more sources, EPA calculates "the average emission limitation achieved by the best performing 12 percent of the existing sources (for which [EPA] has emissions information)."  42 U.S.C. §7412(d)(3)(A).

Under CAA Section 112(d)(6), EPA is required to review and revise Section 112 standards to account for advances in emission control technologies at least every eight years ("technology review").  42 U.S.C. §7412(d)(6).  Such reviews must adopt emission limits for HAPs emitted by the source category that are not currently regulated.  *La. Envtl. Action Network v. EPA*, 955 F.3d 1088, 1091 (D.C. Cir. 2020) ("*LEAN*").  In 1994, EPA first promulgated emission standards for SOCMI affected sources.  88 Fed. Reg. 25,080, 25,083 (Apr. 25, 2023) (proposed rule).  The Final Rule challenged here resulted from a recent, second technology review of the SOCMI source category.

## II.    The Dioxins and Furans Limit

The Final Rule included an emission limit for chlorinated dioxins and dibenzofurans ("dioxins and furans"), HAPs listed under Section 112(b)(1), which were not regulated in prior versions of the SOCMI rule. 89 Fed. Reg. at 42,950.

During the second technology review, EPA estimated there are 634 sources in the SOCMI source category.  88 Fed. Reg. at 25,162. EPA issued an information request to eight companies using its Section

114(a)(1) authority, requiring them to perform stack testing for various HAP emissions. 42 U.S.C. §7414(a)(1). However, EPA did not request data on dioxins and furans emissions despite intending to regulate those HAPs. Instead, EPA used a sparse pool of data, comprised of dioxins and furans data for nine sources, collected in prior rulemakings for overlapping source categories, including the Polyvinyl Chloride ("PVC") MACT rule. [EPA-HQ-OAR-2022-0730-0084 at 8-9].

EPA proposed and finalized an emission limit of 0.054 nanograms per dry standard cubic meter (ng/dscm)[1] of dioxins and furans that applies to sources with process vents containing chlorine, hydrogen chloride, or any other chlorinated compound. 89 Fed. Reg at 43,177; 40 C.F.R. §63.113(a)(5). In calculating the average emission limitation for the best performing sources, EPA multiplied 12% by the nine sources with emissions data (yielding two "best" performing sources after

_____

[1] EPA calculates the Upper Predictive Limit ("UPL") "to account for the expected variability in emissions levels" and which "allows [EPA] to set a [MACT] floor that is continuously achievable." *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 598 (D.C. Cir. 2020). But here, because the UPL was less than three times the representative detection limit ("RDL"), EPA used three times the RDL. [EPA-HQ-OAR-2022-0730-0084 at 11].

rounding up) instead of the total 634 "existing sources" (which yields 77 "best performing" sources or nine with available data). 88 Fed. Reg. at 25,162. EPA did not explain how the plain language of Section 112(d)(3)(A) supports this approach; rather, it merely assumed that its interpretation was correct.

Finally, the Vinyl Institute argued in public comments that the dioxins and furans emission limit must be recalculated, and EPA relied on too narrow a dataset by using information from only two facilities. [EPA-HQ-OAR-2022-0730-0170 at 20-24]. Other commenters also objected to the emission limit and the dataset used. [EPA-HQ-OAR-2022-0730-0148 at 4-5]; [EPA-HQ-OAR-2022-0730-0168 at 119-20].

In any event, this Court may consider EPA's interpretation of its statutory authority under Section 112(d)(3)(A) as that goes to a "key assumption" underlying the challenged emission limit, an interpretation EPA never explained or justified in the record; rather, it simply assumed such authority. *See*, *e.g.*, *Natural Resources Defense Council v. EPA*, 755 F.3d 1010, 1022-23 (D.C. Cir 2014); *Okla. Dept. Envtl. Quality v. EPA*, 740 F.3d 185, 192 (D.C. Cir. 2014); *Appalachian*

*Power Co. v. EPA*, 135 F.3d 791, 818 (D.C. Cir. 1998). As this Court held in *LEAN*, gap-filling emission limits are a "core demand" and "necessary" in any Section 112(d)(6) review. *LEAN*, 955 F.3d at 1097.

## SUMMARY OF THE ARGUMENT

This appeal seeks to hold EPA to the best interpretation of CAA Section 112(d)(3)(A) when it sets emission limits for existing sources. Where a source category has 30 or more sources, as is the case here, EPA must calculate "the average emission limitation achieved by the best performing 12 percent of the existing sources (for which [EPA] has emissions information)." 42 U.S.C. §7412(d)(3)(A).

Indeed, holding existing sources to the average performance level of a larger set of sources makes sense. New sources must meet the emission control achieved by the single best performer. 42 U.S.C. §7412(d)(3). However, as this Court recently observed, "EPA itself has explained that retrofitting older sources to comply with increasingly stringent modern standards may be 'draconian' if not 'impossible.'" *U.S. Sugar Corp. v. EPA*, 113 F.4th 984, 994 (D.C. Cir. 2024) ("*U.S. Sugar Corp. III*") (citations omitted) ("[I]t is more difficult to retrofit [existing

sources] to meet modern, state-of-the-art standards than it is to construct new [sources] from the beginning.").

Under a plain reading of Section 112(d)(3)(A), therefore, EPA would multiply 12% by the total number of "existing sources" (a term that is broadly defined under Section 112 to mean all sources that had been built before the limit was proposed) in the source category. EPA would then, based on the parenthetical, consider emission data already available from sources within that 12%, thus giving EPA a relatively large set of best performing sources to work from when setting an emission limit. EPA, however, did not follow this approach.

Courts typically treat parentheticals as only playing a minor role in clarifying the preceding statutory language. Consistent with this approach, the parenthetical in Section 112(d)(3)(A) simply means that EPA does not have to collect emission data from additional sources before calculating the limit. Without explanation, however, EPA instead read the parenthetical as dramatically reducing the potential number of sources from which an average performance level would be determined. EPA only multiplied 12% by the number of sources for

which it had data—i.e., nine sources—and in the process reduced the sources upon which it based the limit to just two.  This resulted in a much more stringent emission control when compared to a limitation based on 12% of 634 existing sources.

This places too much weight on the parenthetical and thus violates the CAA.  EPA's reading of Section 112(d)(3)(A) is inconsistent with how the Supreme Court and this Court have interpreted parentheticals, namely as minor explications of the statute's primary language.  It also cannot be reconciled with a similar parenthetical appearing in the following subsection which simply instructs EPA on when it must gather additional emissions data.  Indeed, it conflicts with this Court's previous characterization of Section 112(d)(3)(A)'s parenthetical as merely indicating that EPA does not need to collect information from more sources before setting the limitation.

Accordingly, this Court should vacate and remand the emission limitation for dioxins and furans.

## STANDARD OF REVIEW

Judicial review is "essentially the same" under the CAA as under the Administrative Procedure Act. *U.S. Sugar Corp. III,* 113 F.4th at 991 n.7. The Act requires this Court to reverse any action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 42 U.S.C. §§7607(d)(9)(A), (C). "To determine whether an agency has acted within its statutory authority," a court must use "the traditional tools of statutory construction." *U.S. Sugar Corp. III*, 113 F.4th at 997 (quoting *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024)).

## STANDING

The Vinyl Institute has "associational" standing to challenge the Final Rule on behalf of its member companies. In this Court, such standing exists if: (i) at least one member has standing to sue on its own behalf; (ii) the interests the group seeks to protect are germane to the organization's purpose; and (iii) neither the claim asserted nor the relief requested requires participation of individual members in the lawsuit.

*Hearth, Patio & Barbecue Ass'n v. EPA*, 11 F.4th 791, 801-02 (D.C. Cir. 2021) (citation and internal quotations omitted).

First, Vinyl Institute members are subject to the challenged emission limit and will be forced to incur costs complying with an unlawful rule. Monroe Decl. ¶6 (Ex. B). Each will suffer an injury-in-fact directly traceable to the Final Rule that would be redressed by remand and vacatur. *Burlington Northern and Santa Fe Railway Co. v. Surface Transp. Bd.*, 403 F.3d 771, 775-76 (D.C. Cir. 2005). Regulated entities almost always have standing. *Sierra Club v. EPA*, 292 F.3d 895, 899-900 (D.C. Cir. 2002).

Second, this challenge goes to the heart of the Vinyl Institute's organizational purposes. Monroe Decl. ¶4. The Vinyl Institute represents the interests of manufacturers of 1,2-dichloroethane, vinyl chloride, and other chlorinated compounds subject to the dioxins and furans emission limit. Monroe Decl. ¶5.

Third, the underlying claim and relief sought do not require participation of individual members in the lawsuit. Each company is

impacted in the same manner—complying with an unlawful rule. No member seeks unique relief or damages. Monroe Decl. ¶6.

## ARGUMENT

I.  **EPA Violated The CAA When It Used Data From Only Two Sources To Set The Dioxins and Furans Emission Limit For Process Vents At Existing Sources**

The CAA specifies how EPA calculates HAP emission limits for existing sources. Indeed, the plain language of Section 112(d)(3)(A) is determinative here. Where a source category has 30 or more sources, the limit is based on the "average limitation achieved by the best performing 12 percent of the existing sources (for which [EPA] has emissions information)." 42 U.S.C. §7412(d)(3)(A). As shown below, however, EPA misread the parenthetical and applied the 12% to an incorrect number of sources. EPA based the dioxins and furans limit on just two sources for a category with over 600 sources.

A.  **Parentheticals Must Be Read Narrowly So As Not To Override Operative Language Of The Statute**

Courts review issues of statutory interpretation *de novo*. *Loper*, 144 S. Ct. at 2261 n.4 (2024). Accordingly, when interpreting CAA

Section 112, this Court is obligated to apply the "best" reading of the statute. *Id.* at 2266; *U.S. Sugar Corp. III* at 991 n.7.

Significantly, courts view parentheticals in statutory provisions as "typically used to convey an aside or afterthought." *Boechler, P.C. v. Comm'r of Internal Revenue*, 596 U.S. 199, 206 (2022) (quoting B. Garner, Modern English Usage 1020 (4th ed. 2016)). When Congress includes a parenthetical in a statutory provision, it is often to provide an example or explanation; it does not do so to "transform" the meaning of the words outside the parentheses. *Becerra v. Empire Health Found.*, 597 U.S. 424, 435 (2022). Nor can a parenthetical "overcome the operative terms of the statute." *Chickasaw Nation v. United States*, 534 U.S. 84, 95 (2001) (citation omitted).

This Court has echoed the Supreme Court's treatment of parentheticals. *See United States v. Bank of Am. Corp.*, 753 F.3d 1335, 1338 (D.C. Cir. 2014) ("The parenthetical . . . cannot sweep any further than the . . . language it illuminates."); *AFL-CIO v. Donovan*, 757 F.2d 330, 345 (D.C. Cir. 1985) (reading parenthetical consistent with "plain thrust" of statutory language).

## B.    EPA Misapplied Section 112(d)(3)(A)'s Parenthetical

EPA found the SOCMI source category has 634 existing sources and stated it had stack test data on dioxins and furans for nine of those sources.  88 Fed. Reg. at 25,162.  As discussed below, under a straight-forward reading of Section 112(b)(3)(A), EPA would multiply 12% by 634 to get 77 facilities.  EPA would then calculate a limit based on the average performance of the nine facilities within those 77 for which it had emissions data.[2]  But EPA did not follow this approach. EPA instead only applied the 12% to the nine facilities—thus resulting in only two facilities (after rounding up from 1.08).  *Id.*  In doing so, EPA read too much into Section 112(d)(3)(A)'s parenthetical.

The "best" interpretation of Section 112(d)(3)(A) is that the 12% must be applied to the total number of sources in the entire source category as determined by EPA.  Consider the meaning of Section 112(d)(3)(A) without the parenthetical—"Emission standards…shall not

_____

[2] EPA could use its expertise and available information to determine that some of these sources for which it has data definitively were not a best performer.  But EPA made no such attempt here because its initial move was to unlawfully narrow the dataset.

be less stringent than… the average emission limitation achieved by the best performing 12 percent of the existing sources."  The only way to read this provision is that EPA must multiply the 12% by the number of "existing sources."  The term "existing source," in turn, is broadly defined in Section 112 to simply mean "any stationary source other than a new source." 42 U.S.C. §7412(a)(10).[3]

Indeed, without the parenthetical, Section 112(d)(3)(A) is nearly identical to Section 129(a)(2), which governs the calculation of HAP emission limits for incinerators.  42 U.S.C. §7429(a)(2) ("average emissions limitation achieved by the best performing 12 percent of units in the category").  This Court interpreted Section 129(a)(2) to mean EPA multiplies the 12% by all existing incinerator units, holding that when EPA does not have data from all of the best performing 12 percent that it must reasonably estimate the performance of those remaining sources.  *Nat'l Ass'n of Clean Water Agencies v. EPA*, 734 F.3d 1115, 1151-52 (D.C. Cir. 2013); *Sierra Club v. EPA*, 167 F.3d 658, 661 (D.C.

---

[3] "New source" means a source that was constructed or reconstructed after the emission standard was proposed.  42 U.S.C. §7412(a)(4).

Cir. 1999) (EPA multiplying "total population" of existing sources by 12% under Section 129(a)(2)). The same holds true here. EPA must apply 12% to all "existing sources"—i.e., 634.

Now for the parenthetical. This Court has already suggested a more modest role. In *U.S. Sugar Corp. III*, the D.C. Circuit rejected a petitioner's interpretation painting the parenthetical as the operative language in Section 112(d)(3)(A)—that it identifies the group of sources EPA must consider when setting an emission limit. 113 F.4th at 1000. Conversely, EPA argued the parenthetical allows EPA to promulgate emission limits "even where it does not have emissions data from every single source in a category." *Id.* at 998. Indeed, without the parenthetical, any standard where EPA did not have data from the full set of the best performing 12 percent of existing sources would be legally vulnerable, as is the case under Section 129(a)(2).

Moreover, this reading comports with a similar parenthetical appearing in the next subsection. Section 112(d)(3)(B), which governs emission limits for categories with fewer than 30 sources, is keyed to the "average emission limitation achieved by the best performing 5

sources (for which the Administrator has or *could reasonably obtain emissions information*)." 42 U.S.C. §7412(d)(3)(B) (emphasis added). Clearly, Congress inserted this parenthetical to merely indicate when EPA should seek additional information (i.e., when EPA does not have emissions data from the five sources), thus further supporting the proposition that Section 112(d)(3)(A)'s parenthetical simply goes to EPA's information gathering obligations. Nothing more.

EPA's interpretation, however, gives Section 112(d)(3)(A)'s parenthetical an outsized role. It substantially changes the number of sources with relevant information that is used to average emission limitations over a large source category—in this case, from nine to two. But there is nothing in Section 112(d)(3)(A) clearly indicating Congress intended for the parenthetical to alter the plain reading of the primary language coming before it. *Becerra*, 597 U.S. at 440 (Congress does not "upend the settled meaning" of language "through so subtle, indirect, and opaque a mechanism"). If Congress wanted to take EPA's approach, it could have removed the parenthetical and based the

emission limit on "the best performing 12% of sources for which EPA has emissions data."[4]  It did not.

Accordingly, the parenthetical is best interpreted as clarifying that EPA need not have data from every source in the top 12%.

## II.    The Dioxins and Furans Emission Limit Would Have Been Higher If EPA Had Used Data From 12 Percent Of Existing Sources

The record shows EPA had dioxins and furans data from nine sources.  [EPA-HQ-OAR-2022-0730-0084 at 10 & Table 2].  Because EPA did not further reduce this number by explaining what it considered to be the best performers within that subset, EPA was obligated to rely on data from all nine sources.  Using this data would result in a significantly higher emission limit: even calculating the arithmetic mean of the nine sources would yield a limit more than four

---

[4] Curiously, that is exactly what EPA did when describing its approach in the Final Rule's preamble.  88 Fed. Reg. at 25,162 ("[F]or categories with 30 or more sources, the MACT floor for existing sources must be at least as stringent as the average emissions limitation achieved by the best performing 12 percent of existing sources for which the EPA has emissions information.").

times higher (0.24 ng/dscm) (note the UPL is typically even higher than the mean because it accounts for variability).  *Supra* at 4 n.1.

## CONCLUSION

Based on the foregoing, this Court should vacate and remand the dioxins and furans emission limit.

Dated: January 17, 2025

/s/ *Eric P. Gotting*
Eric P. Gotting
Gregory A. Clark
Keller and Heckman LLP
1001 G Street, N.W.
Suite 500 West
Washington, D.C.  20001
Phone: (202) 434-4100
Facsimile: (202) 434-4646
Email: gotting@khlaw.com
Email: clarkg@khlaw.com
*Counsel for Petitioner*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) and Circuit Rule 32(e) because it contains 3092 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook (14-point).

*/s/ Eric P. Gotting*

# **CERTIFICATE OF SERVICE**

I certify that, on January 17, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit through the CM/ECF system, which will serve all parties electronically.

/s/ *Eric P. Gotting*

## <u>INDEX</u>

Exhibit A - CAA Section 112(d)

Exhibit B - Declaration of Ned Monroe

# EXHIBIT A

in the case of area sources) exceed a level which is adequate to protect public health with an ample margin of safety and no adverse environmental effect will result from emissions from any source (or from a group of sources in the case of area sources).

The Administrator shall grant or deny a petition under this paragraph within 1 year after the petition is filed.

**(d) Emission standards**

**(1) In general**

The Administrator shall promulgate regulations establishing emission standards for each category or subcategory of major sources and area sources of hazardous air pollutants listed for regulation pursuant to subsection (c) of this section in accordance with the schedules provided in subsections (c) and (e) of this section. The Administrator may distinguish among classes, types, and sizes of sources within a category or subcategory in establishing such standards except that, there shall be no delay in the compliance date for any standard applicable to any source under subsection (i) of this section as the result of the authority provided by this sentence.

**(2) Standards and methods**

Emissions standards promulgated under this subsection and applicable to new or existing sources of hazardous air pollutants shall require the maximum degree of reduction in emissions of the hazardous air pollutants subject to this section (including a prohibition on such emissions, where achievable) that the Administrator, taking into consideration the cost of achieving such emission reduction, and any non-air quality health and environmental impacts and energy requirements, determines is achievable for new or existing sources in the category or subcategory to which such emission standard applies, through application of measures, processes, methods, systems or techniques including, but not limited to, measures which—

　(A) reduce the volume of, or eliminate emissions of, such pollutants through process changes, substitution of materials or other modifications,

　(B) enclose systems or processes to eliminate emissions,

　(C) collect, capture or treat such pollutants when released from a process, stack, storage or fugitive emissions point,

　(D) are design, equipment, work practice, or operational standards (including requirements for operator training or certification) as provided in subsection (h) of this section, or

　(E) are a combination of the above.

None of the measures described in subparagraphs (A) through (D) shall, consistent with the provisions of section 7414(c) of this title, in any way compromise any United States patent or United States trademark right, or any confidential business information, or any trade secret or any other intellectual property right.

**(3) New and existing sources**

The maximum degree of reduction in emissions that is deemed achievable for new sources in a category or subcategory shall not be less stringent than the emission control that is achieved in practice by the best controlled similar source, as determined by the Administrator. Emission standards promulgated under this subsection for existing sources in a category or subcategory may be less stringent than standards for new sources in the same category or subcategory but shall not be less stringent, and may be more stringent than—

　(A) the average emission limitation achieved by the best performing 12 percent of the existing sources (for which the Administrator has emissions information), excluding those sources that have, within 18 months before the emission standard is proposed or within 30 months before such standard is promulgated, whichever is later, first achieved a level of emission rate or emission reduction which complies, or would comply if the source is not subject to such standard, with the lowest achievable emission rate (as defined by section 7501 of this title) applicable to the source category and prevailing at the time, in the category or subcategory for categories and subcategories with 30 or more sources, or

　(B) the average emission limitation achieved by the best performing 5 sources (for which the Administrator has or could reasonably obtain emissions information) in the category or subcategory for categories or subcategories with fewer than 30 sources.

**(4) Health threshold**

With respect to pollutants for which a health threshold has been established, the Administrator may consider such threshold level, with an ample margin of safety, when establishing emission standards under this subsection.

**(5) Alternative standard for area sources**

With respect only to categories and subcategories of area sources listed pursuant to subsection (c) of this section, the Administrator may, in lieu of the authorities provided in paragraph (2) and subsection (f) of this section, elect to promulgate standards or requirements applicable to sources in such categories or subcategories which provide for the use of generally available control technologies or management practices by such sources to reduce emissions of hazardous air pollutants.

**(6) Review and revision**

The Administrator shall review, and revise as necessary (taking into account developments in practices, processes, and control technologies), emission standards promulgated under this section no less often than every 8 years.

**(7) Other requirements preserved**

No emission standard or other requirement promulgated under this section shall be interpreted, construed or applied to diminish or replace the requirements of a more stringent emission limitation or other applicable requirement established pursuant to section 7411 of this title, part C or D of this subchapter, or

# EXHIBIT B

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

VINYL INSTITUTE, INC.,      )
       )
     Petitioner,      )
       )
v.      ) Case No. 24-1249
       )
ENVIRONMENTAL      ) (consolidated with Case
PROTECTION AGENCY AND      ) Nos. 24-1135 (Lead), 24-
MICHAEL REGAN,      ) 1228, 24-1246, 24-1250, 24-
ADMINISTRATOR, UNITED      ) 1251, 24-1252)
STATES ENVIRONMENTAL      )
PROTECTION AGENCY,      )
       )
     Respondents,      )
       )
and      )
       )
AIR ALLIANCE HOUSTON, *et al.*,      )
       )
     Intervenors for Respondent.      )
       )

## <u>DECLARATION OF EDWARD MONROE</u>

1.      I, Edward ("Ned") Monroe, hereby state as follows:

2.      This declaration is based on my personal knowledge, on information contained in the records of the Vinyl Institute, Inc. ("Vinyl Institute"), and/or supplied to me by Vinyl Institute employees under my supervision.

1

3. I am the President and CEO of the Vinyl Institute. I have held this position since October 24, 2018.

4. The Vinyl Institute is a 501(c)(6) trade association incorporated under the laws of the District of Columbia that represents, among others, the leading manufacturers of vinyl, vinyl chloride monomer, polyvinyl chloride ("PVC") resin, and vinyl additives and modifiers. The purpose of the Vinyl Institute is to represent the interests of its individual members in the marketplace, before government agencies, and in litigation.

5. The Vinyl Institute counts among its member companies Formosa Plastics Corporation, U.S.A.; Oxy Vinyls, LP; Shintech Inc.; and Westlake Corporation. These companies are manufacturers of 1,2-dichloroethane, vinyl chloride, and other chlorinated compounds.

6. On May 16, 2024, the United States Environmental Protection Agency ("EPA") promulgated the final rule *New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins*

*Industry*, Docket Identification Number: EPA-HQ-OAR-2022-0730

("Final Rule"). The Final Rule applies to companies that own or operate

facilities that manufacture 1,2-dichloroethane and vinyl chloride,

among other substances. All companies who manufacture these

substances will be required by the Final Rule to install, use, and

maintain pollution control equipment to limit emissions of dioxins and

furans, in addition to conducting initial and periodic testing for dioxins

and furans.


I declare under penalty of perjury that the foregoing is true and

correct.


Executed this January 17, 2025

By: _____
Edward Monroe