**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

DENKA PERFORMANCE ELASTOMER LLC,

*Petitioner*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY *et al.*,

*Respondents*.

On Petition for Review of Final Action of the U.S. Environmental Protection
Agency, 89 Fed. Reg. 42,932 (May 16, 2024)

**ADDENDUM TO PROOF OPENING BRIEF
OF ENVIRONMENTAL AND COMMUNITY PETITIONERS**

Adam Kron
Deena Tumeh
Kathleen L. Riley
Earthjustice
1001 G St. NW, Ste. 1000
Washington, DC 20001
(202) 794-8039
(202) 793-6482
(202) 797-5227
akron@earthjustice.org
dtumeh@earthjustice.org
kriley@earthjustice.org

*Counsel for Concerned Citizens of St.
John, RISE St. James Louisiana,
Louisiana Environmental Action
Network, Texas Environmental Justice
Advocacy Services, Air Alliance
Houston, California Communities
Against Toxics, Environmental Integrity
Project, and Sierra Club*

Patton Dycus
Environmental Integrity Project
919 Millworks Way
Bozeman, MT 59715
(404) 446-6661
pdycus@environmentalintegrity.org

Abel Russ, Environmental Integrity
Project
888 17th St. NW, Ste. 1000
Washington, DC 20006
(802) 482-5379
aruss@environmentalintegrity.org

*Counsel for Environmental Integrity
Project, Air Alliance Houston,
California Communities Against Toxics,
and Sierra Club*

Dated: January 17, 2025

# TABLE OF CONTENTS

**Authority:**                                                                 **Page**

STATUTES

42 U.S.C. § 7412..............................................................ADD001

42 U.S.C. § 7607..............................................................ADD057

REGULATIONS:

40 C.F.R. § 63.108 ...........................................................ADD064

40 C.F.R. § 63.133 ...........................................................ADD073

40 C.F.R. § 63.134 ...........................................................ADD077

40 C.F.R. § 63.135 ...........................................................ADD080

40 C.F.R. § 63.136 ...........................................................ADD083

40 C.F.R. § 63.137 ...........................................................ADD087

40 C.F.R. § 63.139 ...........................................................ADD090

**Declarations:**                                                              **Page**

Jennifer Hadayia ..............................................................DEC001

Sharon Lavigne ...............................................................DEC006

Tammy Newby.................................................................DEC026

Melanie Oldham...............................................................DEC029

Letitia Taylor..................................................................DEC032

Robert Taylor..................................................................DEC038

Jane Williams .................................................................DEC046

# STATUTES

⚑ KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 85. Air Pollution Prevention and Control (Refs & Annos)
      Subchapter I. Programs and Activities
        Part A. Air Quality and Emissions Limitations (Refs & Annos)

42 U.S.C.A. § 7412

§ 7412. Hazardous air pollutants

Effective: August 5, 1999

Currentness

**(a) Definitions**

For purposes of this section, except subsection (r)--

**(1) Major source**

The term "major source" means any stationary source or group of stationary sources located within a contiguous area and under common control that emits or has the potential to emit considering controls, in the aggregate, 10 tons per year or more of any hazardous air pollutant or 25 tons per year or more of any combination of hazardous air pollutants. The Administrator may establish a lesser quantity, or in the case of radionuclides different criteria, for a major source than that specified in the previous sentence, on the basis of the potency of the air pollutant, persistence, potential for bioaccumulation, other characteristics of the air pollutant, or other relevant factors.

**(2) Area source**

The term "area source" means any stationary source of hazardous air pollutants that is not a major source. For purposes of this section, the term "area source" shall not include motor vehicles or nonroad vehicles subject to regulation under subchapter II.

**(3) Stationary source**

The term "stationary source" shall have the same meaning as such term has under section 7411(a) of this title.

**(4) New source**

The term "new source" means a stationary source the construction or reconstruction of which is commenced after the Administrator first proposes regulations under this section establishing an emission standard applicable to such source.

**(5) Modification**

The term "modification" means any physical change in, or change in the method of operation of, a major source which increases the actual emissions of any hazardous air pollutant emitted by such source by more than a de minimis amount or which results in the emission of any hazardous air pollutant not previously emitted by more than a de minimis amount.

**(6) Hazardous air pollutant**

The term "hazardous air pollutant" means any air pollutant listed pursuant to subsection (b).

**(7) Adverse environmental effect**

The term "adverse environmental effect" means any significant and widespread adverse effect, which may reasonably be anticipated, to wildlife, aquatic life, or other natural resources, including adverse impacts on populations of endangered or threatened species or significant degradation of environmental quality over broad areas.

**(8) Electric utility steam generating unit**

The term "electric utility steam generating unit" means any fossil fuel fired combustion unit of more than 25 megawatts that serves a generator that produces electricity for sale. A unit that cogenerates steam and electricity and supplies more than one-third of its potential electric output capacity and more than 25 megawatts electrical output to any utility power distribution system for sale shall be considered an electric utility steam generating unit.

**(9) Owner or operator**

The term "owner or operator" means any person who owns, leases, operates, controls, or supervises a stationary source.

**(10) Existing source**

The term "existing source" means any stationary source other than a new source.

**(11) Carcinogenic effect**

Unless revised, the term "carcinogenic effect" shall have the meaning provided by the Administrator under Guidelines for Carcinogenic Risk Assessment as of the date of enactment. Any revisions in the existing Guidelines shall be subject to notice and opportunity for comment.

**(b) List of pollutants**

**(1) Initial list**

The Congress establishes for purposes of this section a list of hazardous air pollutants as follows:

| CAS | Chemical name |
| --- | --- |

**number**

| | |
|---|---|
| 75070 | Acetaldehyde |
| 60355 | Acetamide |
| 75058 | Acetonitrile |
| 98862 | Acetophenone |
| 53963 | 2-Acetylaminofluorene |
| 107028 | Acrolein |
| 79061 | Acrylamide |
| 79107 | Acrylic acid |
| 107131 | Acrylonitrile |
| 107051 | Allyl chloride |
| 92671 | 4-Aminobiphenyl |
| 62533 | Aniline |
| 90040 | o-Anisidine |
| 1332214 | Asbestos |
| 71432 | Benzene (including benzene from gasoline) |
| 92875 | Benzidine |
| 98077 | Benzotrichloride |
| 100447 | Benzyl chloride |
| 92524 | Biphenyl |
| 117817 | Bis(2-ethylhexyl)phthalate (DEHP) |
| 542881 | Bis(chloromethyl)ether |
| 75252 | Bromoform |
| 106990 | 1,3-Butadiene |
| 156627 | Calcium cyanamide |
| 105602 | Caprolactam |
| 133062 | Captan |
| 63252 | Carbaryl |
| 75150 | Carbon disulfide |

| | |
|---|---|
| 56235 | Carbon tetrachloride |
| 463581 | Carbonyl sulfide |
| 120809 | Catechol |
| 133904 | Chloramben |
| 57749 | Chlordane |
| 7782505 | Chlorine |
| 79118 | Chloroacetic acid |
| 532274 | 2-Chloroacetophenone |
| 108907 | Chlorobenzene |
| 510156 | Chlorobenzilate |
| 67663 | Chloroform |
| 107302 | Chloromethyl methyl ether |
| 126998 | Chloroprene |
| 1319773 | Cresols/Cresylic acid (isomers and mixture) |
| 95487 | o-Cresol |
| 108394 | m-Cresol |
| 106445 | p-Cresol |
| 98828 | Cumene |
| 94757 | 2,4-D, salts and esters |
| 3547044 | DDE |
| 334883 | Diazomethane |
| 132649 | Dibenzofurans |
| 96128 | 1,2-Dibromo-3-chloropropane |
| 84742 | Dibutylphthalate |
| 106467 | 1,4-Dichlorobenzene(p) |
| 91941 | 3,3-Dichlorobenzidene |
| 111444 | Dichloroethyl ether (Bis(2-chloroethyl)ether) |
| 542756 | 1,3-Dichloropropene |
| 62737 | Dichlorvos |

| | |
|---|---|
| 111422 | Diethanolamine |
| 121697 | N,N-Diethyl aniline (N,N-Dimethylaniline) |
| 64675 | Diethyl sulfate |
| 119904 | 3,3-Dimethoxybenzidine |
| 60117 | Dimethyl aminoazobenzene |
| 119937 | 3,3′-Dimethyl benzidine |
| 79447 | Dimethyl carbamoyl chloride |
| 68122 | Dimethyl formamide |
| 57147 | 1,1-Dimethyl hydrazine |
| 131113 | Dimethyl phthalate |
| 77781 | Dimethyl sulfate |
| 534521 | 4,6-Dinitro-o-cresol, and salts |
| 51285 | 2,4-Dinitrophenol |
| 121142 | 2,4-Dinitrotoluene |
| 123911 | 1,4-Dioxane (1,4-Diethyleneoxide) |
| 122667 | 1,2-Diphenylhydrazine |
| 106898 | Epichlorohydrin (1-Chloro-2,3-epoxypropane) |
| 106887 | 1,2-Epoxybutane |
| 140885 | Ethyl acrylate |
| 100414 | Ethyl benzene |
| 51796 | Ethyl carbamate (Urethane) |
| 75003 | Ethyl chloride (Chloroethane) |
| 106934 | Ethylene dibromide (Dibromoethane) |
| 107062 | Ethylene dichloride (1,2-Dichloroethane) |
| 107211 | Ethylene glycol |
| 151564 | Ethylene imine (Aziridine) |
| 75218 | Ethylene oxide |
| 96457 | Ethylene thiourea |
| 75343 | Ethylidene dichloride (1,1-Dichloroethane) |

| | |
|---|---|
| 50000 | Formaldehyde |
| 76448 | Heptachlor |
| 118741 | Hexachlorobenzene |
| 87683 | Hexachlorobutadiene |
| 77474 | Hexachlorocyclopentadiene |
| 67721 | Hexachloroethane |
| 822060 | Hexamethylene-1,6-diisocyanate |
| 680319 | Hexamethylphosphoramide |
| 110543 | Hexane |
| 302012 | Hydrazine |
| 7647010 | Hydrochloric acid |
| 7664393 | Hydrogen fluoride (Hydrofluoric acid) |
| 123319 | Hydroquinone |
| 78591 | Isophorone |
| 58899 | Lindane (all isomers) |
| 108316 | Maleic anhydride |
| 67561 | Methanol |
| 72435 | Methoxychlor |
| 74839 | Methyl bromide (Bromomethane) |
| 74873 | Methyl chloride (Chloromethane) |
| 71556 | Methyl chloroform (1,1,1-Trichloroethane) |
| 78933 | Methyl ethyl ketone (2-Butanone) |
| 60344 | Methyl hydrazine |
| 74884 | Methyl iodide (Iodomethane) |
| 108101 | Methyl isobutyl ketone (Hexone) |
| 624839 | Methyl isocyanate |
| 80626 | Methyl methacrylate |
| 1634044 | Methyl tert butyl ether |
| 101144 | 4,4-Methylene bis(2-chloroaniline) |

| | |
|---|---|
| 75092 | Methylene chloride (Dichloromethane) |
| 101688 | Methylene diphenyl diisocyanate (MDI) |
| 101779 | 4,4′-Methylenedianiline |
| 91203 | Naphthalene |
| 98953 | Nitrobenzene |
| 92933 | 4-Nitrobiphenyl |
| 100027 | 4-Nitrophenol |
| 79469 | 2-Nitropropane |
| 684935 | N-Nitroso-N-methylurea |
| 62759 | N-Nitrosodimethylamine |
| 59892 | N-Nitrosomorpholine |
| 56382 | Parathion |
| 82688 | Pentachloronitrobenzene (Quintobenzene) |
| 87865 | Pentachlorophenol |
| 108952 | Phenol |
| 106503 | p-Phenylenediamine |
| 75445 | Phosgene |
| 7803512 | Phosphine |
| 7723140 | Phosphorus |
| 85449 | Phthalic anhydride |
| 1336363 | Polychlorinated biphenyls (Aroclors) |
| 1120714 | 1,3-Propane sultone |
| 57578 | beta-Propiolactone |
| 123386 | Propionaldehyde |
| 114261 | Propoxur (Baygon) |
| 78875 | Propylene dichloride (1,2-Dichloropropane) |
| 75569 | Propylene oxide |
| 75558 | 1,2-Propylenimine (2-Methyl aziridine) |
| 91225 | Quinoline |

| | |
|---|---|
| 106514 | Quinone |
| 100425 | Styrene |
| 96093 | Styrene oxide |
| 1746016 | 2,3,7,8-Tetrachlorodibenzo-p-dioxin |
| 79345 | 1,1,2,2-Tetrachloroethane |
| 127184 | Tetrachloroethylene (Perchloroethylene) |
| 7550450 | Titanium tetrachloride |
| 108883 | Toluene |
| 95807 | 2,4-Toluene diamine |
| 584849 | 2,4-Toluene diisocyanate |
| 95534 | o-Toluidine |
| 8001352 | Toxaphene (chlorinated camphene) |
| 120821 | 1,2,4-Trichlorobenzene |
| 79005 | 1,1,2-Trichloroethane |
| 79016 | Trichloroethylene |
| 95954 | 2,4,5-Trichlorophenol |
| 88062 | 2,4,6-Trichlorophenol |
| 121448 | Triethylamine |
| 1582098 | Trifluralin |
| 540841 | 2,2,4-Trimethylpentane |
| 108054 | Vinyl acetate |
| 593602 | Vinyl bromide |
| 75014 | Vinyl chloride |
| 75354 | Vinylidene chloride (1,1-Dichloroethylene) |
| 1330207 | Xylenes (isomers and mixture) |
| 95476 | o-Xylenes |
| 108383 | m-Xylenes |
| 106423 | p-Xylenes |
| 0 | Antimony Compounds |

0    Arsenic Compounds (inorganic including arsine)

0    Beryllium Compounds

0    Cadmium Compounds

0    Chromium Compounds

0    Cobalt Compounds

0    Coke Oven Emissions

0    Cyanide Compounds [1]

0    Glycol ethers [2]

0    Lead Compounds

0    Manganese Compounds

0    Mercury Compounds

0    Fine mineral fibers [3]

0    Nickel Compounds

0    Polycylic Organic Matter [4]

0    Radionuclides (including radon) [5]

0    Selenium Compounds

NOTE: For all listings above which contain the word "compounds" and for glycol ethers, the following applies: Unless otherwise specified, these listings are defined as including any unique chemical substance that contains the named chemical (i.e., antimony, arsenic, etc.) as part of that chemical's infrastructure.

[1] X'CN where X = H' or any other group where a formal dissociation may occur. For example KCN or Ca(CN)$_2$

[2] Includes mono- and di- ethers of ethylene glycol, diethylene glycol, and triethylene glycol R-(OCH$_2$CH$_2$)$_n$-OR' where

n = 1, 2, or 3

R = alkyl or aryl groups

R' = R, H, or groups which, when removed, yield glycol ethers with the structure: R-(OCH$_2$CH)$_n$-OH. Polymers are excluded from the glycol category.

[3] Includes mineral fiber emissions from facilities manufacturing or processing glass, rock, or slag fibers (or other mineral derived fibers) of average diameter 1 micrometer or less.

[4] Includes organic compounds with more than one benzene ring, and which have a boiling point greater than or equal to 100°C.

[5] A type of atom which spontaneously undergoes radioactive decay.

**(2) Revision of the list**

The Administrator shall periodically review the list established by this subsection and publish the results thereof and, where appropriate, revise such list by rule, adding pollutants which present, or may present, through inhalation or other routes of exposure, a threat of adverse human health effects (including, but not limited to, substances which are known to be, or may reasonably be anticipated to be, carcinogenic, mutagenic, teratogenic, neurotoxic, which cause reproductive dysfunction, or which are acutely or chronically toxic) or adverse environmental effects whether through ambient concentrations, bioaccumulation, deposition, or otherwise, but not including releases subject to regulation under subsection (r) as a result of emissions to the air. No air pollutant which is listed under section 7408(a) of this title may be added to the list under this section, except that the prohibition of this sentence shall not apply to any pollutant which independently meets the listing criteria of this paragraph and is a precursor to a pollutant which is listed under section 7408(a) of this title or to any pollutant which is in a class of pollutants listed under such section. No substance, practice, process or activity regulated under subchapter VI of this chapter shall be subject to regulation under this section solely due to its adverse effects on the environment.

**(3) Petitions to modify the list**

**(A)** Beginning at any time after 6 months after November 15, 1990, any person may petition the Administrator to modify the list of hazardous air pollutants under this subsection by adding or deleting a substance or, in case of listed pollutants without CAS numbers (other than coke oven emissions, mineral fibers, or polycyclic organic matter) removing certain unique substances. Within 18 months after receipt of a petition, the Administrator shall either grant or deny the petition by publishing a written explanation of the reasons for the Administrator's decision. Any such petition shall include a showing by the petitioner that there is adequate data on the health or environmental defects [1] of the pollutant or other evidence adequate to support the petition. The Administrator may not deny a petition solely on the basis of inadequate resources or time for review.

**(B)** The Administrator shall add a substance to the list upon a showing by the petitioner or on the Administrator's own determination that the substance is an air pollutant and that emissions, ambient concentrations, bioaccumulation or deposition of the substance are known to cause or may reasonably be anticipated to cause adverse effects to human health or adverse environmental effects.

**(C)** The Administrator shall delete a substance from the list upon a showing by the petitioner or on the Administrator's own determination that there is adequate data on the health and environmental effects of the substance to determine that emissions, ambient concentrations, bioaccumulation or deposition of the substance may not reasonably be anticipated to cause any adverse effects to the human health or adverse environmental effects.

**(D)** The Administrator shall delete one or more unique chemical substances that contain a listed hazardous air pollutant not having a CAS number (other than coke oven emissions, mineral fibers, or polycyclic organic matter) upon a showing by the petitioner or on the Administrator's own determination that such unique chemical substances that contain the named chemical of such listed hazardous air pollutant meet the deletion requirements of subparagraph (C). The Administrator must grant or deny a deletion petition prior to promulgating any emission standards pursuant to subsection (d) applicable to any source category or subcategory of a listed hazardous air pollutant without a CAS number listed under subsection (b) for which a deletion petition has been filed within 12 months of November 15, 1990.

**(4) Further information**

If the Administrator determines that information on the health or environmental effects of a substance is not sufficient to make a determination required by this subsection, the Administrator may use any authority available to the Administrator to acquire such information.

**(5) Test methods**

The Administrator may establish, by rule, test measures and other analytic procedures for monitoring and measuring emissions, ambient concentrations, deposition, and bioaccumulation of hazardous air pollutants.

**(6) Prevention of significant deterioration**

The provisions of part C (prevention of significant deterioration) shall not apply to pollutants listed under this section.

**(7) Lead**

The Administrator may not list elemental lead as a hazardous air pollutant under this subsection.

**(c) List of source categories**

**(1) In general**

Not later than 12 months after November 15, 1990, the Administrator shall publish, and shall from time to time, but no less often than every 8 years, revise, if appropriate, in response to public comment or new information, a list of all categories and subcategories of major sources and area sources (listed under paragraph (3)) of the air pollutants listed pursuant to subsection (b). To the extent practicable, the categories and subcategories listed under this subsection shall be consistent with the list of source categories established pursuant to section 7411 of this title and part C. Nothing in the preceding sentence limits the Administrator's authority to establish subcategories under this section, as appropriate.

**(2) Requirement for emissions standards**

For the categories and subcategories the Administrator lists, the Administrator shall establish emissions standards under subsection (d), according to the schedule in this subsection and subsection (e).

**(3) Area sources**

The Administrator shall list under this subsection each category or subcategory of area sources which the Administrator finds presents a threat of adverse effects to human health or the environment (by such sources individually or in the aggregate) warranting regulation under this section. The Administrator shall, not later than 5 years after November 15, 1990, and pursuant to subsection (k)(3)(B), list, based on actual or estimated aggregate emissions of a listed pollutant or pollutants, sufficient categories or subcategories of area sources to ensure that area sources representing 90 percent of the area source emissions of the 30 hazardous air pollutants that present the greatest threat to public health in the largest number of urban areas are subject to regulation under this section. Such regulations shall be promulgated not later than 10 years after November 15, 1990.

**(4) Previously regulated categories**

The Administrator may, in the Administrator's discretion, list any category or subcategory of sources previously regulated under this section as in effect before November 15, 1990.

**(5) Additional categories**

In addition to those categories and subcategories of sources listed for regulation pursuant to paragraphs (1) and (3), the Administrator may at any time list additional categories and subcategories of sources of hazardous air pollutants according to the same criteria for listing applicable under such paragraphs. In the case of source categories and subcategories listed after publication of the initial list required under paragraph (1) or (3), emission standards under subsection (d) for the category or subcategory shall be promulgated within 10 years after November 15, 1990, or within 2 years after the date on which such category or subcategory is listed, whichever is later.

**(6) Specific pollutants**

With respect to alkylated lead compounds, polycyclic organic matter, hexachlorobenzene, mercury, polychlorinated biphenyls, 2,3,7,8-tetrachlorodibenzofurans and 2,3,7,8-tetrachlorodibenzo-p-dioxin, the Administrator shall, not later than 5 years after November 15, 1990, list categories and subcategories of sources assuring that sources accounting for not less than 90 per centum of the aggregate emissions of each such pollutant are subject to standards under subsection (d)(2) or (d)(4). Such standards shall be promulgated not later than 10 years after November 15, 1990. This paragraph shall not be construed to require the Administrator to promulgate standards for such pollutants emitted by electric utility steam generating units.

**(7) Research facilities**

The Administrator shall establish a separate category covering research or laboratory facilities, as necessary to assure the equitable treatment of such facilities. For purposes of this section, "research or laboratory facility" means any stationary source whose primary purpose is to conduct research and development into new processes and products, where such source is operated under the close supervision of technically trained personnel and is not engaged in the manufacture of products for commercial sale in commerce, except in a de minimis manner.

**(8) Boat manufacturing**

When establishing emissions standards for styrene, the Administrator shall list boat manufacturing as a separate subcategory unless the Administrator finds that such listing would be inconsistent with the goals and requirements of this chapter.

**(9) Deletions from the list**

**(A)** Where the sole reason for the inclusion of a source category on the list required under this subsection is the emission of a unique chemical substance, the Administrator shall delete the source category from the list if it is appropriate because of action taken under either subparagraphs (C) or (D) of subsection (b)(3).

**(B)** The Administrator may delete any source category from the list under this subsection, on petition of any person or on the Administrator's own motion, whenever the Administrator makes the following determination or determinations, as applicable:

**(i)** In the case of hazardous air pollutants emitted by sources in the category that may result in cancer in humans, a determination that no source in the category (or group of sources in the case of area sources) emits such hazardous air pollutants in quantities which may cause a lifetime risk of cancer greater than one in one million to the individual in the population who is most exposed to emissions of such pollutants from the source (or group of sources in the case of area sources).

**(ii)** In the case of hazardous air pollutants that may result in adverse health effects in humans other than cancer or adverse environmental effects, a determination that emissions from no source in the category or subcategory concerned (or group of sources in the case of area sources) exceed a level which is adequate to protect public health with an ample margin of safety and no adverse environmental effect will result from emissions from any source (or from a group of sources in the case of area sources).

The Administrator shall grant or deny a petition under this paragraph within 1 year after the petition is filed.

## (d) Emission standards

### (1) In general

The Administrator shall promulgate regulations establishing emission standards for each category or subcategory of major sources and area sources of hazardous air pollutants listed for regulation pursuant to subsection (c) in accordance with the schedules provided in subsections (c) and (e). The Administrator may distinguish among classes, types, and sizes of sources within a category or subcategory in establishing such standards except that, there shall be no delay in the compliance date for any standard applicable to any source under subsection (i) as the result of the authority provided by this sentence.

### (2) Standards and methods

Emissions standards promulgated under this subsection and applicable to new or existing sources of hazardous air pollutants shall require the maximum degree of reduction in emissions of the hazardous air pollutants subject to this section (including a prohibition on such emissions, where achievable) that the Administrator, taking into consideration the cost of achieving such emission reduction, and any non-air quality health and environmental impacts and energy requirements, determines is achievable for new or existing sources in the category or subcategory to which such emission standard applies, through application of measures, processes, methods, systems or techniques including, but not limited to, measures which--

**(A)** reduce the volume of, or eliminate emissions of, such pollutants through process changes, substitution of materials or other modifications,

**(B)** enclose systems or processes to eliminate emissions,

**(C)** collect, capture or treat such pollutants when released from a process, stack, storage or fugitive emissions point,

**(D)** are design, equipment, work practice, or operational standards (including requirements for operator training or certification) as provided in subsection (h), or

**(E)** are a combination of the above.

None of the measures described in subparagraphs (A) through (D) shall, consistent with the provisions of section 7414(c) of this title, in any way compromise any United States patent or United States trademark right, or any confidential business information, or any trade secret or any other intellectual property right.

### (3) New and existing sources

The maximum degree of reduction in emissions that is deemed achievable for new sources in a category or subcategory shall not be less stringent than the emission control that is achieved in practice by the best controlled similar source, as determined by the Administrator. Emission standards promulgated under this subsection for existing sources in a category or subcategory may be less stringent than standards for new sources in the same category or subcategory but shall not be less stringent, and may be more stringent than--

**(A)** the average emission limitation achieved by the best performing 12 percent of the existing sources (for which the Administrator has emissions information), excluding those sources that have, within 18 months before the emission standard is proposed or within 30 months before such standard is promulgated, whichever is later, first achieved a level of emission rate or emission reduction which complies, or would comply if the source is not subject to such standard, with the lowest achievable emission rate (as defined by section 7501 of this title) applicable to the source category and prevailing at the time, in the category or subcategory for categories and subcategories with 30 or more sources, or

**(B)** the average emission limitation achieved by the best performing 5 sources (for which the Administrator has or could reasonably obtain emissions information) in the category or subcategory for categories or subcategories with fewer than 30 sources.

### (4) Health threshold

With respect to pollutants for which a health threshold has been established, the Administrator may consider such threshold level, with an ample margin of safety, when establishing emission standards under this subsection.

### (5) Alternative standard for area sources

With respect only to categories and subcategories of area sources listed pursuant to subsection (c), the Administrator may, in lieu of the authorities provided in paragraph (2) and subsection (f), elect to promulgate standards or requirements applicable to sources in such categories or subcategories which provide for the use of generally available control technologies or management practices by such sources to reduce emissions of hazardous air pollutants.

### (6) Review and revision

The Administrator shall review, and revise as necessary (taking into account developments in practices, processes, and control technologies), emission standards promulgated under this section no less often than every 8 years.

**(7) Other requirements preserved**

No emission standard or other requirement promulgated under this section shall be interpreted, construed or applied to diminish or replace the requirements of a more stringent emission limitation or other applicable requirement established pursuant to section 7411 of this title, part C or D, or other authority of this chapter or a standard issued under State authority.

**(8) Coke ovens**

**(A)** Not later than December 31, 1992, the Administrator shall promulgate regulations establishing emission standards under paragraphs (2) and (3) of this subsection for coke oven batteries. In establishing such standards, the Administrator shall evaluate--

**(i)** the use of sodium silicate (or equivalent) luting compounds to prevent door leaks, and other operating practices and technologies for their effectiveness in reducing coke oven emissions, and their suitability for use on new and existing coke oven batteries, taking into account costs and reasonable commercial door warranties; and

**(ii)** as a basis for emission standards under this subsection for new coke oven batteries that begin construction after the date of proposal of such standards, the Jewell design Thompson non-recovery coke oven batteries and other non-recovery coke oven technologies, and other appropriate emission control and coke production technologies, as to their effectiveness in reducing coke oven emissions and their capability for production of steel quality coke.

Such regulations shall require at a minimum that coke oven batteries will not exceed 8 per centum leaking doors, 1 per centum leaking lids, 5 per centum leaking offtakes, and 16 seconds visible emissions per charge, with no exclusion for emissions during the period after the closing of self-sealing oven doors. Notwithstanding subsection (i), the compliance date for such emission standards for existing coke oven batteries shall be December 31, 1995.

**(B)** The Administrator shall promulgate work practice regulations under this subsection for coke oven batteries requiring, as appropriate--

**(i)** the use of sodium silicate (or equivalent) luting compounds, if the Administrator determines that use of sodium silicate is an effective means of emissions control and is achievable, taking into account costs and reasonable commercial warranties for doors and related equipment; and

**(ii)** door and jam cleaning practices.

Notwithstanding subsection (i), the compliance date for such work practice regulations for coke oven batteries shall be not later than the date 3 years after November 15, 1990.

**(C)** For coke oven batteries electing to qualify for an extension of the compliance date for standards promulgated under subsection (f) in accordance with subsection (i)(8), the emission standards under this subsection for coke oven batteries shall

require that coke oven batteries not exceed 8 per centum leaking doors, 1 per centum leaking lids, 5 per centum leaking offtakes, and 16 seconds visible emissions per charge, with no exclusion for emissions during the period after the closing of self-sealing doors. Notwithstanding subsection (i), the compliance date for such emission standards for existing coke oven batteries seeking an extension shall be not later than the date 3 years after November 15, 1990.

**(9) Sources licensed by the Nuclear Regulatory Commission**

No standard for radionuclide emissions from any category or subcategory of facilities licensed by the Nuclear Regulatory Commission (or an Agreement State) is required to be promulgated under this section if the Administrator determines, by rule, and after consultation with the Nuclear Regulatory Commission, that the regulatory program established by the Nuclear Regulatory Commission pursuant to the Atomic Energy Act for such category or subcategory provides an ample margin of safety to protect the public health. Nothing in this subsection shall preclude or deny the right of any State or political subdivision thereof to adopt or enforce any standard or limitation respecting emissions of radionuclides which is more stringent than the standard or limitation in effect under section 7411 of this title or this section.

**(10) Effective date**

Emission standards or other regulations promulgated under this subsection shall be effective upon promulgation.

**(e) Schedule for standards and review**

**(1) In general**

The Administrator shall promulgate regulations establishing emission standards for categories and subcategories of sources initially listed for regulation pursuant to subsection (c)(1) as expeditiously as practicable, assuring that--

**(A)** emission standards for not less than 40 categories and subcategories (not counting coke oven batteries) shall be promulgated not later than 2 years after November 15, 1990;

**(B)** emission standards for coke oven batteries shall be promulgated not later than December 31, 1992;

**(C)** emission standards for 25 per centum of the listed categories and subcategories shall be promulgated not later than 4 years after November 15, 1990;

**(D)** emission standards for an additional 25 per centum of the listed categories and subcategories shall be promulgated not later than 7 years after November 15, 1990; and

**(E)** emission standards for all categories and subcategories shall be promulgated not later than 10 years after November 15, 1990.

**(2) Priorities**

In determining priorities for promulgating standards under subsection (d), the Administrator shall consider--

**(A)** the known or anticipated adverse effects of such pollutants on public health and the environment;

**(B)** the quantity and location of emissions or reasonably anticipated emissions of hazardous air pollutants that each category or subcategory will emit; and

**(C)** the efficiency of grouping categories or subcategories according to the pollutants emitted, or the processes or technologies used.

**(3) Published schedule**

Not later than 24 months after November 15, 1990, and after opportunity for comment, the Administrator shall publish a schedule establishing a date for the promulgation of emission standards for each category and subcategory of sources listed pursuant to subsection (c)(1) and (3) which shall be consistent with the requirements of paragraphs (1) and (2). The determination of priorities for the promulgation of standards pursuant to this paragraph is not a rulemaking and shall not be subject to judicial review, except that, failure to promulgate any standard pursuant to the schedule established by this paragraph shall be subject to review under section 7604 of this title.

**(4) Judicial review**

Notwithstanding section 7607 of this title, no action of the Administrator adding a pollutant to the list under subsection (b) or listing a source category or subcategory under subsection (c) shall be a final agency action subject to judicial review, except that any such action may be reviewed under such section 7607 of this title when the Administrator issues emission standards for such pollutant or category.

**(5) Publicly owned treatment works**

The Administrator shall promulgate standards pursuant to subsection (d) applicable to publicly owned treatment works (as defined in title II of the Federal Water Pollution Control Act) not later than 5 years after November 15, 1990.

**(f) Standard to protect health and environment**

**(1) Report**

Not later than 6 years after November 15, 1990, the Administrator shall investigate and report, after consultation with the Surgeon General and after opportunity for public comment, to Congress on--

**(A)** methods of calculating the risk to public health remaining, or likely to remain, from sources subject to regulation under this section after the application of standards under subsection (d);

**(B)** the public health significance of such estimated remaining risk and the technologically and commercially available methods and costs of reducing such risks;

**(C)** the actual health effects with respect to persons living in the vicinity of sources, any available epidemiological or other health studies, risks presented by background concentrations of hazardous air pollutants, any uncertainties in risk assessment methodology or other health assessment technique, and any negative health or environmental consequences to the community of efforts to reduce such risks; and

**(D)** recommendations as to legislation regarding such remaining risk.

**(2) Emission standards**

**(A)** If Congress does not act on any recommendation submitted under paragraph (1), the Administrator shall, within 8 years after promulgation of standards for each category or subcategory of sources pursuant to subsection (d), promulgate standards for such category or subcategory if promulgation of such standards is required in order to provide an ample margin of safety to protect public health in accordance with this section (as in effect before November 15, 1990) or to prevent, taking into consideration costs, energy, safety, and other relevant factors, an adverse environmental effect. Emission standards promulgated under this subsection shall provide an ample margin of safety to protect public health in accordance with this section (as in effect before November 15, 1990), unless the Administrator determines that a more stringent standard is necessary to prevent, taking into consideration costs, energy, safety, and other relevant factors, an adverse environmental effect. If standards promulgated pursuant to subsection (d) and applicable to a category or subcategory of sources emitting a pollutant (or pollutants) classified as a known, probable or possible human carcinogen do not reduce lifetime excess cancer risks to the individual most exposed to emissions from a source in the category or subcategory to less than one in one million, the Administrator shall promulgate standards under this subsection for such source category.

**(B)** Nothing in subparagraph (A) or in any other provision of this section shall be construed as affecting, or applying to the Administrator's interpretation of this section, as in effect before November 15, 1990, and set forth in the Federal Register of September 14, 1989 (54 Federal Register 38044).

**(C)** The Administrator shall determine whether or not to promulgate such standards and, if the Administrator decides to promulgate such standards, shall promulgate the standards 8 years after promulgation of the standards under subsection (d) for each source category or subcategory concerned. In the case of categories or subcategories for which standards under subsection (d) are required to be promulgated within 2 years after November 15, 1990, the Administrator shall have 9 years after promulgation of the standards under subsection (d) to make the determination under the preceding sentence and, if required, to promulgate the standards under this paragraph.

**(3) Effective date**

Any emission standard established pursuant to this subsection shall become effective upon promulgation.

**(4) Prohibition**

No air pollutant to which a standard under this subsection applies may be emitted from any stationary source in violation of such standard, except that in the case of an existing source--

**(A)** such standard shall not apply until 90 days after its effective date, and

**(B)** the Administrator may grant a waiver permitting such source a period of up to 2 years after the effective date of a standard to comply with the standard if the Administrator finds that such period is necessary for the installation of controls and that steps will be taken during the period of the waiver to assure that the health of persons will be protected from imminent endangerment.

**(5) Area sources**

The Administrator shall not be required to conduct any review under this subsection or promulgate emission limitations under this subsection for any category or subcategory of area sources that is listed pursuant to subsection (c)(3) and for which an emission standard is promulgated pursuant to subsection (d)(5).

**(6) Unique chemical substances**

In establishing standards for the control of unique chemical substances of listed pollutants without CAS numbers under this subsection, the Administrator shall establish such standards with respect to the health and environmental effects of the substances actually emitted by sources and direct transformation byproducts of such emissions in the categories and subcategories.

**(g) Modifications**

**(1) Offsets**

**(A)** A physical change in, or change in the method of operation of, a major source which results in a greater than de minimis increase in actual emissions of a hazardous air pollutant shall not be considered a modification, if such increase in the quantity of actual emissions of any hazardous air pollutant from such source will be offset by an equal or greater decrease in the quantity of emissions of another hazardous air pollutant (or pollutants) from such source which is deemed more hazardous, pursuant to guidance issued by the Administrator under subparagraph (B). The owner or operator of such source shall submit a showing to the Administrator (or the State) that such increase has been offset under the preceding sentence.

**(B)** The Administrator shall, after notice and opportunity for comment and not later than 18 months after November 15, 1990, publish guidance with respect to implementation of this subsection. Such guidance shall include an identification, to the extent practicable, of the relative hazard to human health resulting from emissions to the ambient air of each of the pollutants listed under subsection (b) sufficient to facilitate the offset showing authorized by subparagraph (A). Such guidance shall not authorize offsets between pollutants where the increased pollutant (or more than one pollutant in a stream of pollutants) causes adverse effects to human health for which no safety threshold for exposure can be determined unless there are corresponding decreases in such types of pollutant(s).

**(2) Construction, reconstruction and modifications**

**(A)** After the effective date of a permit program under subchapter V in any State, no person may modify a major source of hazardous air pollutants in such State, unless the Administrator (or the State) determines that the maximum achievable control technology emission limitation under this section for existing sources will be met. Such determination shall be made on a case-by-case basis where no applicable emissions limitations have been established by the Administrator.

**(B)** After the effective date of a permit program under subchapter V in any State, no person may construct or reconstruct any major source of hazardous air pollutants, unless the Administrator (or the State) determines that the maximum achievable control technology emission limitation under this section for new sources will be met. Such determination shall be made on a case-by-case basis where no applicable emission limitations have been established by the Administrator.

**(3) Procedures for modifications**

The Administrator (or the State) shall establish reasonable procedures for assuring that the requirements applying to modifications under this section are reflected in the permit.

**(h) Work practice standards and other requirements**

**(1) In general**

For purposes of this section, if it is not feasible in the judgment of the Administrator to prescribe or enforce an emission standard for control of a hazardous air pollutant or pollutants, the Administrator may, in lieu thereof, promulgate a design, equipment, work practice, or operational standard, or combination thereof, which in the Administrator's judgment is consistent with the provisions of subsection (d) or (f). In the event the Administrator promulgates a design or equipment standard under this subsection, the Administrator shall include as part of such standard such requirements as will assure the proper operation and maintenance of any such element of design or equipment.

**(2) Definition**

For the purpose of this subsection, the phrase "not feasible to prescribe or enforce an emission standard" means any situation in which the Administrator determines that--

**(A)** a hazardous air pollutant or pollutants cannot be emitted through a conveyance designed and constructed to emit or capture such pollutant, or that any requirement for, or use of, such a conveyance would be inconsistent with any Federal, State or local law, or

**(B)** the application of measurement methodology to a particular class of sources is not practicable due to technological and economic limitations.

**(3) Alternative standard**

If after notice and opportunity for comment, the owner or operator of any source establishes to the satisfaction of the Administrator that an alternative means of emission limitation will achieve a reduction in emissions of any air pollutant

at least equivalent to the reduction in emissions of such pollutant achieved under the requirements of paragraph (1), the Administrator shall permit the use of such alternative by the source for purposes of compliance with this section with respect to such pollutant.

**(4) Numerical standard required**

Any standard promulgated under paragraph (1) shall be promulgated in terms of an emission standard whenever it is feasible to promulgate and enforce a standard in such terms.

**(i) Schedule for compliance**

**(1) Preconstruction and operating requirements**

After the effective date of any emission standard, limitation, or regulation under subsection (d), (f) or (h), no person may construct any new major source or reconstruct any existing major source subject to such emission standard, regulation or limitation unless the Administrator (or a State with a permit program approved under subchapter V) determines that such source, if properly constructed, reconstructed and operated, will comply with the standard, regulation or limitation.

**(2) Special rule**

Notwithstanding the requirements of paragraph (1), a new source which commences construction or reconstruction after a standard, limitation or regulation applicable to such source is proposed and before such standard, limitation or regulation is promulgated shall not be required to comply with such promulgated standard until the date 3 years after the date of promulgation if--

**(A)** the promulgated standard, limitation or regulation is more stringent than the standard, limitation or regulation proposed; and

**(B)** the source complies with the standard, limitation, or regulation as proposed during the 3-year period immediately after promulgation.

**(3) Compliance schedule for existing sources**

**(A)** After the effective date of any emissions standard, limitation or regulation promulgated under this section and applicable to a source, no person may operate such source in violation of such standard, limitation or regulation except, in the case of an existing source, the Administrator shall establish a compliance date or dates for each category or subcategory of existing sources, which shall provide for compliance as expeditiously as practicable, but in no event later than 3 years after the effective date of such standard, except as provided in subparagraph (B) and paragraphs (4) through (8).

**(B)** The Administrator (or a State with a program approved under subchapter V) may issue a permit that grants an extension permitting an existing source up to 1 additional year to comply with standards under subsection (d) if such additional period is necessary for the installation of controls. An additional extension of up to 3 years may be added for mining waste operations,

if the 4-year compliance time is insufficient to dry and cover mining waste in order to reduce emissions of any pollutant listed under subsection (b).

**(4) Presidential exemption**

The President may exempt any stationary source from compliance with any standard or limitation under this section for a period of not more than 2 years if the President determines that the technology to implement such standard is not available and that it is in the national security interests of the United States to do so. An exemption under this paragraph may be extended for 1 or more additional periods, each period not to exceed 2 years. The President shall report to Congress with respect to each exemption (or extension thereof) made under this paragraph.

**(5) Early reduction**

**(A)** The Administrator (or a State acting pursuant to a permit program approved under subchapter V) shall issue a permit allowing an existing source, for which the owner or operator demonstrates that the source has achieved a reduction of 90 per centum or more in emissions of hazardous air pollutants (95 per centum in the case of hazardous air pollutants which are particulates) from the source, to meet an alternative emission limitation reflecting such reduction in lieu of an emission limitation promulgated under subsection (d) for a period of 6 years from the compliance date for the otherwise applicable standard, provided that such reduction is achieved before the otherwise applicable standard under subsection (d) is first proposed. Nothing in this paragraph shall preclude a State from requiring reductions in excess of those specified in this subparagraph as a condition of granting the extension authorized by the previous sentence.

**(B)** An existing source which achieves the reduction referred to in subparagraph (A) after the proposal of an applicable standard but before January 1, 1994, may qualify under subparagraph (A), if the source makes an enforceable commitment to achieve such reduction before the proposal of the standard. Such commitment shall be enforceable to the same extent as a regulation under this section.

**(C)** The reduction shall be determined with respect to verifiable and actual emissions in a base year not earlier than calendar year 1987, provided that, there is no evidence that emissions in the base year are artificially or substantially greater than emissions in other years prior to implementation of emissions reduction measures. The Administrator may allow a source to use a baseline year of 1985 or 1986 provided that the source can demonstrate to the satisfaction of the Administrator that emissions data for the source reflects verifiable data based on information for such source, received by the Administrator prior to November 15, 1990, pursuant to an information request issued under section 7414 of this title.

**(D)** For each source granted an alternative emission limitation under this paragraph there shall be established by a permit issued pursuant to subchapter V an enforceable emission limitation for hazardous air pollutants reflecting the reduction which qualifies the source for an alternative emission limitation under this paragraph. An alternative emission limitation under this paragraph shall not be available with respect to standards or requirements promulgated pursuant to subsection (f) and the Administrator shall, for the purpose of determining whether a standard under subsection (f) is necessary, review emissions from sources granted an alternative emission limitation under this paragraph at the same time that other sources in the category or subcategory are reviewed.

**(E)** With respect to pollutants for which high risks of adverse public health effects may be associated with exposure to small quantities including, but not limited to, chlorinated dioxins and furans, the Administrator shall by regulation limit the use of

offsetting reductions in emissions of other hazardous air pollutants from the source as counting toward the 90 per centum reduction in such high-risk pollutants qualifying for an alternative emissions limitation under this paragraph.

**(6) Other reductions**

Notwithstanding the requirements of this section, no existing source that has installed--

**(A)** best available control technology (as defined in section 7479(3) of this title), or

**(B)** technology required to meet a lowest achievable emission rate (as defined in section 7501 of this title),

prior to the promulgation of a standard under this section applicable to such source and the same pollutant (or stream of pollutants) controlled pursuant to an action described in subparagraph (A) or (B) shall be required to comply with such standard under this section until the date 5 years after the date on which such installation or reduction has been achieved, as determined by the Administrator. The Administrator may issue such rules and guidance as are necessary to implement this paragraph.

**(7) Extension for new sources**

A source for which construction or reconstruction is commenced after the date an emission standard applicable to such source is proposed pursuant to subsection (d) but before the date an emission standard applicable to such source is proposed pursuant to subsection (f) shall not be required to comply with the emission standard under subsection (f) until the date 10 years after the date construction or reconstruction is commenced.

**(8) Coke ovens**

**(A)** Any coke oven battery that complies with the emission limitations established under subsection (d)(8)(C), subparagraph (B), and subparagraph (C), and complies with the provisions of subparagraph (E), shall not be required to achieve emission limitations promulgated under subsection (f) until January 1, 2020.

**(B)(i)** Not later than December 31, 1992, the Administrator shall promulgate emission limitations for coke oven emissions from coke oven batteries. Notwithstanding paragraph (3) of this subsection, the compliance date for such emission limitations for existing coke oven batteries shall be January 1, 1998. Such emission limitations shall reflect the lowest achievable emission rate as defined in section 7501 of this title for a coke oven battery that is rebuilt or a replacement at a coke oven plant for an existing battery. Such emission limitations shall be no less stringent than--

**(I)** 3 per centum leaking doors (5 per centum leaking doors for six meter batteries);

**(II)** 1 per centum leaking lids;

**(III)** 4 per centum leaking offtakes; and

**(IV)** 16 seconds visible emissions per charge,

with an exclusion for emissions during the period after the closing of self-sealing oven doors (or the total mass emissions equivalent). The rulemaking in which such emission limitations are promulgated shall also establish an appropriate measurement methodology for determining compliance with such emission limitations, and shall establish such emission limitations in terms of an equivalent level of mass emissions reduction from a coke oven battery, unless the Administrator finds that such a mass emissions standard would not be practicable or enforceable. Such measurement methodology, to the extent it measures leaking doors, shall take into consideration alternative test methods that reflect the best technology and practices actually applied in the affected industries, and shall assure that the final test methods are consistent with the performance of such best technology and practices.

**(ii)** If the Administrator fails to promulgate such emission limitations under this subparagraph prior to the effective date of such emission limitations, the emission limitations applicable to coke oven batteries under this subparagraph shall be--

**(I)** 3 per centum leaking doors (5 per centum leaking doors for six meter batteries);

**(II)** 1 per centum leaking lids;

**(III)** 4 per centum leaking offtakes; and

**(IV)** 16 seconds visible emissions per charge,

or the total mass emissions equivalent (if the total mass emissions equivalent is determined to be practicable and enforceable), with no exclusion for emissions during the period after the closing of self-sealing oven doors.

**(C)** Not later than January 1, 2007, the Administrator shall review the emission limitations promulgated under subparagraph (B) and revise, as necessary, such emission limitations to reflect the lowest achievable emission rate as defined in section 7501 of this title at the time for a coke oven battery that is rebuilt or a replacement at a coke oven plant for an existing battery. Such emission limitations shall be no less stringent than the emission limitation promulgated under subparagraph (B). Notwithstanding paragraph (2) of this subsection, the compliance date for such emission limitations for existing coke oven batteries shall be January 1, 2010.

**(D)** At any time prior to January 1, 1998, the owner or operator of any coke oven battery may elect to comply with emission limitations promulgated under subsection (f) by the date such emission limitations would otherwise apply to such coke oven battery, in lieu of the emission limitations and the compliance dates provided under subparagraphs (B) and (C) of this paragraph. Any such owner or operator shall be legally bound to comply with such emission limitations promulgated under subsection (f) with respect to such coke oven battery as of January 1, 2003. If no such emission limitations have been promulgated for such coke oven battery, the Administrator shall promulgate such emission limitations in accordance with subsection (f) for such coke oven battery.

**(E)** Coke oven batteries qualifying for an extension under subparagraph (A) shall make available not later than January 1, 2000, to the surrounding communities the results of any risk assessment performed by the Administrator to determine the appropriate level of any emission standard established by the Administrator pursuant to subsection (f).

**(F)** Notwithstanding the provisions of this section, reconstruction of any source of coke oven emissions qualifying for an extension under this paragraph shall not subject such source to emission limitations under subsection (f) more stringent than those established under subparagraphs (B) and (C) until January 1, 2020. For the purposes of this subparagraph, the term "reconstruction" includes the replacement of existing coke oven battery capacity with new coke oven batteries of comparable or lower capacity and lower potential emissions.

**(j) Equivalent emission limitation by permit**

**(1) Effective date**

The requirements of this subsection shall apply in each State beginning on the effective date of a permit program established pursuant to subchapter V in such State, but not prior to the date 42 months after November 15, 1990.

**(2) Failure to promulgate a standard**

In the event that the Administrator fails to promulgate a standard for a category or subcategory of major sources by the date established pursuant to subsection (e)(1) and (3), and beginning 18 months after such date (but not prior to the effective date of a permit program under subchapter V), the owner or operator of any major source in such category or subcategory shall submit a permit application under paragraph (3) and such owner or operator shall also comply with paragraphs (5) and (6).

**(3) Applications**

By the date established by paragraph (2), the owner or operator of a major source subject to this subsection shall file an application for a permit. If the owner or operator of a source has submitted a timely and complete application for a permit required by this subsection, any failure to have a permit shall not be a violation of paragraph (2), unless the delay in final action is due to the failure of the applicant to timely submit information required or requested to process the application. The Administrator shall not later than 18 months after November 15, 1990, and after notice and opportunity for comment, establish requirements for applications under this subsection including a standard application form and criteria for determining in a timely manner the completeness of applications.

**(4) Review and approval**

Permit applications submitted under this subsection shall be reviewed and approved or disapproved according to the provisions of section 7661d of this title. In the event that the Administrator (or the State) disapproves a permit application submitted under this subsection or determines that the application is incomplete, the applicant shall have up to 6 months to revise the application to meet the objections of the Administrator (or the State).

**(5) Emission limitation**

The permit shall be issued pursuant to subchapter V and shall contain emission limitations for the hazardous air pollutants subject to regulation under this section and emitted by the source that the Administrator (or the State) determines, on a case-by-case basis, to be equivalent to the limitation that would apply to such source if an emission standard had been promulgated in a timely manner under subsection (d). In the alternative, if the applicable criteria are met, the permit may contain an

emissions limitation established according to the provisions of subsection (i)(5). For purposes of the preceding sentence, the reduction required by subsection (i)(5)(A) shall be achieved by the date on which the relevant standard should have been promulgated under subsection (d). No such pollutant may be emitted in amounts exceeding an emission limitation contained in a permit immediately for new sources and, as expeditiously as practicable, but not later than the date 3 years after the permit is issued for existing sources or such other compliance date as would apply under subsection (i).

**(6) Applicability of subsequent standards**

If the Administrator promulgates an emission standard that is applicable to the major source prior to the date on which a permit application is approved, the emission limitation in the permit shall reflect the promulgated standard rather than the emission limitation determined pursuant to paragraph (5), provided that the source shall have the compliance period provided under subsection (i). If the Administrator promulgates a standard under subsection (d) that would be applicable to the source in lieu of the emission limitation established by permit under this subsection after the date on which the permit has been issued, the Administrator (or the State) shall revise such permit upon the next renewal to reflect the standard promulgated by the Administrator providing such source a reasonable time to comply, but no longer than 8 years after such standard is promulgated or 8 years after the date on which the source is first required to comply with the emissions limitation established by paragraph (5), whichever is earlier.

**(k) Area source program**

**(1) Findings and purpose**

The Congress finds that emissions of hazardous air pollutants from area sources may individually, or in the aggregate, present significant risks to public health in urban areas. Considering the large number of persons exposed and the risks of carcinogenic and other adverse health effects from hazardous air pollutants, ambient concentrations characteristic of large urban areas should be reduced to levels substantially below those currently experienced. It is the purpose of this subsection to achieve a substantial reduction in emissions of hazardous air pollutants from area sources and an equivalent reduction in the public health risks associated with such sources including a reduction of not less than 75 per centum in the incidence of cancer attributable to emissions from such sources.

**(2) Research program**

The Administrator shall, after consultation with State and local air pollution control officials, conduct a program of research with respect to sources of hazardous air pollutants in urban areas and shall include within such program--

**(A)** ambient monitoring for a broad range of hazardous air pollutants (including, but not limited to, volatile organic compounds, metals, pesticides and products of incomplete combustion) in a representative number of urban locations;

**(B)** analysis to characterize the sources of such pollution with a focus on area sources and the contribution that such sources make to public health risks from hazardous air pollutants; and

**(C)** consideration of atmospheric transformation and other factors which can elevate public health risks from such pollutants.

Health effects considered under this program shall include, but not be limited to, carcinogenicity, mutagenicity, teratogenicity, neurotoxicity, reproductive dysfunction and other acute and chronic effects including the role of such pollutants as precursors of ozone or acid aerosol formation. The Administrator shall report the preliminary results of such research not later than 3 years after November 15, 1990.

**(3) National strategy**

**(A)** Considering information collected pursuant to the monitoring program authorized by paragraph (2), the Administrator shall, not later than 5 years after November 15, 1990, and after notice and opportunity for public comment, prepare and transmit to the Congress a comprehensive strategy to control emissions of hazardous air pollutants from area sources in urban areas.

**(B)** The strategy shall--

**(i)** identify not less than 30 hazardous air pollutants which, as the result of emissions from area sources, present the greatest threat to public health in the largest number of urban areas and that are or will be listed pursuant to subsection (b), and

**(ii)** identify the source categories or subcategories emitting such pollutants that are or will be listed pursuant to subsection (c). When identifying categories and subcategories of sources under this subparagraph, the Administrator shall assure that sources accounting for 90 per centum or more of the aggregate emissions of each of the 30 identified hazardous air pollutants are subject to standards pursuant to subsection (d).

**(C)** The strategy shall include a schedule of specific actions to substantially reduce the public health risks posed by the release of hazardous air pollutants from area sources that will be implemented by the Administrator under the authority of this or other laws (including, but not limited to, the Toxic Substances Control Act, the Federal Insecticide, Fungicide and Rodenticide Act and the Resource Conservation and Recovery Act) or by the States. The strategy shall achieve a reduction in the incidence of cancer attributable to exposure to hazardous air pollutants emitted by stationary sources of not less than 75 per centum, considering control of emissions of hazardous air pollutants from all stationary sources and resulting from measures implemented by the Administrator or by the States under this or other laws.

**(D)** The strategy may also identify research needs in monitoring, analytical methodology, modeling or pollution control techniques and recommendations for changes in law that would further the goals and objectives of this subsection.

**(E)** Nothing in this subsection shall be interpreted to preclude or delay implementation of actions with respect to area sources of hazardous air pollutants under consideration pursuant to this or any other law and that may be promulgated before the strategy is prepared.

**(F)** The Administrator shall implement the strategy as expeditiously as practicable assuring that all sources are in compliance with all requirements not later than 9 years after November 15, 1990.

**(G)** As part of such strategy the Administrator shall provide for ambient monitoring and emissions modeling in urban areas as appropriate to demonstrate that the goals and objectives of the strategy are being met.

**(4) Areawide activities**

In addition to the national urban air toxics strategy authorized by paragraph (3), the Administrator shall also encourage and support areawide strategies developed by State or local air pollution control agencies that are intended to reduce risks from emissions by area sources within a particular urban area. From the funds available for grants under this section, the Administrator shall set aside not less than 10 per centum to support areawide strategies addressing hazardous air pollutants emitted by area sources and shall award such funds on a demonstration basis to those States with innovative and effective strategies. At the request of State or local air pollution control officials, the Administrator shall prepare guidelines for control technologies or management practices which may be applicable to various categories or subcategories of area sources.

**(5) Report**

The Administrator shall report to the Congress at intervals not later than 8 and 12 years after November 15, 1990, on actions taken under this subsection and other parts of this chapter to reduce the risk to public health posed by the release of hazardous air pollutants from area sources. The reports shall also identify specific metropolitan areas that continue to experience high risks to public health as the result of emissions from area sources.

**(l) State programs**

**(1) In general**

Each State may develop and submit to the Administrator for approval a program for the implementation and enforcement (including a review of enforcement delegations previously granted) of emission standards and other requirements for air pollutants subject to this section or requirements for the prevention and mitigation of accidental releases pursuant to subsection (r). A program submitted by a State under this subsection may provide for partial or complete delegation of the Administrator's authorities and responsibilities to implement and enforce emissions standards and prevention requirements but shall not include authority to set standards less stringent than those promulgated by the Administrator under this chapter.

**(2) Guidance**

Not later than 12 months after November 15, 1990, the Administrator shall publish guidance that would be useful to the States in developing programs for submittal under this subsection. The guidance shall also provide for the registration of all facilities producing, processing, handling or storing any substance listed pursuant to subsection (r) in amounts greater than the threshold quantity. The Administrator shall include as an element in such guidance an optional program begun in 1986 for the review of high-risk point sources of air pollutants including, but not limited to, hazardous air pollutants listed pursuant to subsection (b).

**(3) Technical assistance**

The Administrator shall establish and maintain an air toxics clearinghouse and center to provide technical information and assistance to State and local agencies and, on a cost recovery basis, to others on control technology, health and ecological risk assessment, risk analysis, ambient monitoring and modeling, and emissions measurement and monitoring. The Administrator shall use the authority of section 7403 of this title to examine methods for preventing, measuring, and controlling emissions and evaluating associated health and ecological risks. Where appropriate, such activity shall be conducted with not-for-profit

organizations. The Administrator may conduct research on methods for preventing, measuring and controlling emissions and evaluating associated health and environment risks. All information collected under this paragraph shall be available to the public.

**(4) Grants**

Upon application of a State, the Administrator may make grants, subject to such terms and conditions as the Administrator deems appropriate, to such State for the purpose of assisting the State in developing and implementing a program for submittal and approval under this subsection. Programs assisted under this paragraph may include program elements addressing air pollutants or extremely hazardous substances other than those specifically subject to this section. Grants under this paragraph may include support for high-risk point source review as provided in paragraph (2) and support for the development and implementation of areawide area source programs pursuant to subsection (k).

**(5) Approval or disapproval**

Not later than 180 days after receiving a program submitted by a State, and after notice and opportunity for public comment, the Administrator shall either approve or disapprove such program. The Administrator shall disapprove any program submitted by a State, if the Administrator determines that--

**(A)** the authorities contained in the program are not adequate to assure compliance by all sources within the State with each applicable standard, regulation or requirement established by the Administrator under this section;

**(B)** adequate authority does not exist, or adequate resources are not available, to implement the program;

**(C)** the schedule for implementing the program and assuring compliance by affected sources is not sufficiently expeditious; or

**(D)** the program is otherwise not in compliance with the guidance issued by the Administrator under paragraph (2) or is not likely to satisfy, in whole or in part, the objectives of this chapter.

If the Administrator disapproves a State program, the Administrator shall notify the State of any revisions or modifications necessary to obtain approval. The State may revise and resubmit the proposed program for review and approval pursuant to the provisions of this subsection.

**(6) Withdrawal**

Whenever the Administrator determines, after public hearing, that a State is not administering and enforcing a program approved pursuant to this subsection in accordance with the guidance published pursuant to paragraph (2) or the requirements of paragraph (5), the Administrator shall so notify the State and, if action which will assure prompt compliance is not taken within 90 days, the Administrator shall withdraw approval of the program. The Administrator shall not withdraw approval of any program unless the State shall have been notified and the reasons for withdrawal shall have been stated in writing and made public.

**(7) Authority to enforce**

Nothing in this subsection shall prohibit the Administrator from enforcing any applicable emission standard or requirement under this section.

**(8) Local program**

The Administrator may, after notice and opportunity for public comment, approve a program developed and submitted by a local air pollution control agency (after consultation with the State) pursuant to this subsection and any such agency implementing an approved program may take any action authorized to be taken by a State under this section.

**(9) Permit authority**

Nothing in this subsection shall affect the authorities and obligations of the Administrator or the State under subchapter V.

**(m) Atmospheric deposition to Great Lakes and coastal waters**

**(1) Deposition assessment**

The Administrator, in cooperation with the Under Secretary of Commerce for Oceans and Atmosphere, shall conduct a program to identify and assess the extent of atmospheric deposition of hazardous air pollutants (and in the discretion of the Administrator, other air pollutants) to the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters. As part of such program, the Administrator shall--

**(A)** monitor the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters, including monitoring of the Great Lakes through the monitoring network established pursuant to paragraph (2) of this subsection and designing and deploying an atmospheric monitoring network for coastal waters pursuant to paragraph (4);

**(B)** investigate the sources and deposition rates of atmospheric deposition of air pollutants (and their atmospheric transformation precursors);

**(C)** conduct research to develop and improve monitoring methods and to determine the relative contribution of atmospheric pollutants to total pollution loadings to the Great Lakes, the Chesapeake Bay, Lake Champlain, and coastal waters;

**(D)** evaluate any adverse effects to public health or the environment caused by such deposition (including effects resulting from indirect exposure pathways) and assess the contribution of such deposition to violations of water quality standards established pursuant to the Federal Water Pollution Control Act and drinking water standards established pursuant to the Safe Drinking Water Act; and

**(E)** sample for such pollutants in biota, fish, and wildlife of the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters and characterize the sources of such pollutants.

**(2) Great Lakes monitoring network**

The Administrator shall oversee, in accordance with Annex 15 of the Great Lakes Water Quality Agreement, the establishment and operation of a Great Lakes atmospheric deposition network to monitor atmospheric deposition of hazardous air pollutants (and in the Administrator's discretion, other air pollutants) to the Great Lakes.

**(A)** As part of the network provided for in this paragraph, and not later than December 31, 1991, the Administrator shall establish in each of the 5 Great Lakes at least 1 facility capable of monitoring the atmospheric deposition of hazardous air pollutants in both dry and wet conditions.

**(B)** The Administrator shall use the data provided by the network to identify and track the movement of hazardous air pollutants through the Great Lakes, to determine the portion of water pollution loadings attributable to atmospheric deposition of such pollutants, and to support development of remedial action plans and other management plans as required by the Great Lakes Water Quality Agreement.

**(C)** The Administrator shall assure that the data collected by the Great Lakes atmospheric deposition monitoring network is in a format compatible with databases sponsored by the International Joint Commission, Canada, and the several States of the Great Lakes region.

**(3) Monitoring for the Chesapeake Bay and Lake Champlain**

The Administrator shall establish at the Chesapeake Bay and Lake Champlain atmospheric deposition stations to monitor deposition of hazardous air pollutants (and in the Administrator's discretion, other air pollutants) within the Chesapeake Bay and Lake Champlain watersheds. The Administrator shall determine the role of air deposition in the pollutant loadings of the Chesapeake Bay and Lake Champlain, investigate the sources of air pollutants deposited in the watersheds, evaluate the health and environmental effects of such pollutant loadings, and shall sample such pollutants in biota, fish and wildlife within the watersheds, as necessary to characterize such effects.

**(4) Monitoring for coastal waters**

The Administrator shall design and deploy atmospheric deposition monitoring networks for coastal waters and their watersheds and shall make any information collected through such networks available to the public. As part of this effort, the Administrator shall conduct research to develop and improve deposition monitoring methods, and to determine the relative contribution of atmospheric pollutants to pollutant loadings. For purposes of this subsection, "coastal waters" shall mean estuaries selected pursuant to section 320(a)(2)(A) of the Federal Water Pollution Control Act or listed pursuant to section 320(a)(2)(B) of such Act or estuarine research reserves designated pursuant to section 1461 of Title 16.

**(5) Report**

Within 3 years of November 15, 1990, and biennially thereafter, the Administrator, in cooperation with the Under Secretary of Commerce for Oceans and Atmosphere, shall submit to the Congress a report on the results of any monitoring, studies, and investigations conducted pursuant to this subsection. Such report shall include, at a minimum, an assessment of--

**(A)** the contribution of atmospheric deposition to pollution loadings in the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters;

**(B)** the environmental and public health effects of any pollution which is attributable to atmospheric deposition to the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters;

**(C)** the source or sources of any pollution to the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters which is attributable to atmospheric deposition;

**(D)** whether pollution loadings in the Great Lakes, the Chesapeake Bay, Lake Champlain or coastal waters cause or contribute to exceedances of drinking water standards pursuant to the Safe Drinking Water Act or water quality standards pursuant to the Federal Water Pollution Control Act or, with respect to the Great Lakes, exceedances of the specific objectives of the Great Lakes Water Quality Agreement; and

**(E)** a description of any revisions of the requirements, standards, and limitations pursuant to this chapter and other applicable Federal laws as are necessary to assure protection of human health and the environment.

**(6) Additional regulation**

As part of the report to Congress, the Administrator shall determine whether the other provisions of this section are adequate to prevent serious adverse effects to public health and serious or widespread environmental effects, including such effects resulting from indirect exposure pathways, associated with atmospheric deposition to the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters of hazardous air pollutants (and their atmospheric transformation products). The Administrator shall take into consideration the tendency of such pollutants to bioaccumulate. Within 5 years after November 15, 1990, the Administrator shall, based on such report and determination, promulgate, in accordance with this section, such further emission standards or control measures as may be necessary and appropriate to prevent such effects, including effects due to bioaccumulation and indirect exposure pathways. Any requirements promulgated pursuant to this paragraph with respect to coastal waters shall only apply to the coastal waters of the States which are subject to section 7627(a) of this title.

**(n) Other provisions**

**(1) Electric utility steam generating units**

**(A)** The Administrator shall perform a study of the hazards to public health reasonably anticipated to occur as a result of emissions by electric utility steam generating units of pollutants listed under subsection (b) after imposition of the requirements of this chapter. The Administrator shall report the results of this study to the Congress within 3 years after November 15, 1990. The Administrator shall develop and describe in the Administrator's report to Congress alternative control strategies for emissions which may warrant regulation under this section. The Administrator shall regulate electric utility steam generating units under this section, if the Administrator finds such regulation is appropriate and necessary after considering the results of the study required by this subparagraph.

**(B)** The Administrator shall conduct, and transmit to the Congress not later than 4 years after November 15, 1990, a study of mercury emissions from electric utility steam generating units, municipal waste combustion units, and other sources, including area sources. Such study shall consider the rate and mass of such emissions, the health and environmental effects of such emissions, technologies which are available to control such emissions, and the costs of such technologies.

**(C)** The National Institute of Environmental Health Sciences shall conduct, and transmit to the Congress not later than 3 years after November 15, 1990, a study to determine the threshold level of mercury exposure below which adverse human health effects are not expected to occur. Such study shall include a threshold for mercury concentrations in the tissue of fish which may be consumed (including consumption by sensitive populations) without adverse effects to public health.

**(2) Coke oven production technology study**

**(A)** The Secretary of the Department of Energy and the Administrator shall jointly undertake a 6-year study to assess coke oven production emission control technologies and to assist in the development and commercialization of technically practicable and economically viable control technologies which have the potential to significantly reduce emissions of hazardous air pollutants from coke oven production facilities. In identifying control technologies, the Secretary and the Administrator shall consider the range of existing coke oven operations and battery design and the availability of sources of materials for such coke ovens as well as alternatives to existing coke oven production design.

**(B)** The Secretary and the Administrator are authorized to enter into agreements with persons who propose to develop, install and operate coke production emission control technologies which have the potential for significant emissions reductions of hazardous air pollutants provided that Federal funds shall not exceed 50 per centum of the cost of any project assisted pursuant to this paragraph.

**(C)** On completion of the study, the Secretary shall submit to Congress a report on the results of the study and shall make recommendations to the Administrator identifying practicable and economically viable control technologies for coke oven production facilities to reduce residual risks remaining after implementation of the standard under subsection (d).

**(D)** There are authorized to be appropriated $5,000,000 for each of the fiscal years 1992 through 1997 to carry out the program authorized by this paragraph.

**(3) Publicly owned treatment works**

The Administrator may conduct, in cooperation with the owners and operators of publicly owned treatment works, studies to characterize emissions of hazardous air pollutants emitted by such facilities, to identify industrial, commercial and residential discharges that contribute to such emissions and to demonstrate control measures for such emissions. When promulgating any standard under this section applicable to publicly owned treatment works, the Administrator may provide for control measures that include pretreatment of discharges causing emissions of hazardous air pollutants and process or product substitutions or limitations that may be effective in reducing such emissions. The Administrator may prescribe uniform sampling, modeling and risk assessment methods for use in implementing this subsection.

**(4) Oil and gas wells; pipeline facilities**

**(A)** Notwithstanding the provisions of subsection (a), emissions from any oil or gas exploration or production well (with its associated equipment) and emissions from any pipeline compressor or pump station shall not be aggregated with emissions from other similar units, whether or not such units are in a contiguous area or under common control, to determine whether such units or stations are major sources, and in the case of any oil or gas exploration or production well (with its associated equipment), such emissions shall not be aggregated for any purpose under this section.

**(B)** The Administrator shall not list oil and gas production wells (with its associated equipment) as an area source category under subsection (c), except that the Administrator may establish an area source category for oil and gas production wells located in any metropolitan statistical area or consolidated metropolitan statistical area with a population in excess of 1 million, if the Administrator determines that emissions of hazardous air pollutants from such wells present more than a negligible risk of adverse effects to public health.

**(5) Hydrogen sulfide**

The Administrator is directed to assess the hazards to public health and the environment resulting from the emission of hydrogen sulfide associated with the extraction of oil and natural gas resources. To the extent practicable, the assessment shall build upon and not duplicate work conducted for an assessment pursuant to section 8002(m) of the Solid Waste Disposal Act and shall reflect consultation with the States. The assessment shall include a review of existing State and industry control standards, techniques and enforcement. The Administrator shall report to the Congress within 24 months after November 15, 1990, with the findings of such assessment, together with any recommendations, and shall, as appropriate, develop and implement a control strategy for emissions of hydrogen sulfide to protect human health and the environment, based on the findings of such assessment, using authorities under this chapter including sections [3] 7411 of this title and this section.

**(6) Hydrofluoric acid**

Not later than 2 years after November 15, 1990, the Administrator shall, for those regions of the country which do not have comprehensive health and safety regulations with respect to hydrofluoric acid, complete a study of the potential hazards of hydrofluoric acid and the uses of hydrofluoric acid in industrial and commercial applications to public health and the environment considering a range of events including worst-case accidental releases and shall make recommendations to the Congress for the reduction of such hazards, if appropriate.

**(7) RCRA facilities**

In the case of any category or subcategory of sources the air emissions of which are regulated under subtitle C of the Solid Waste Disposal Act, the Administrator shall take into account any regulations of such emissions which are promulgated under such subtitle and shall, to the maximum extent practicable and consistent with the provisions of this section, ensure that the requirements of such subtitle and this section are consistent.

**(o) National Academy of Sciences study**

**(1) Request of the Academy**

Within 3 months of November 15, 1990, the Administrator shall enter into appropriate arrangements with the National Academy of Sciences to conduct a review of--

**(A)** risk assessment methodology used by the Environmental Protection Agency to determine the carcinogenic risk associated with exposure to hazardous air pollutants from source categories and subcategories subject to the requirements of this section; and

**(B)** improvements in such methodology.

**(2) Elements to be studied**

In conducting such review, the National Academy of Sciences should consider, but not be limited to, the following--

**(A)** the techniques used for estimating and describing the carcinogenic potency to humans of hazardous air pollutants; and

**(B)** the techniques used for estimating exposure to hazardous air pollutants (for hypothetical and actual maximally exposed individuals as well as other exposed individuals).

**(3) Other health effects of concern**

To the extent practicable, the Academy shall evaluate and report on the methodology for assessing the risk of adverse human health effects other than cancer for which safe thresholds of exposure may not exist, including, but not limited to, inheritable genetic mutations, birth defects, and reproductive dysfunctions.

**(4) Report**

A report on the results of such review shall be submitted to the Senate Committee on Environment and Public Works, the House Committee on Energy and Commerce, the Risk Assessment and Management Commission established by section 303 of the Clean Air Act Amendments of 1990 and the Administrator not later than 30 months after November 15, 1990.

**(5) Assistance**

The Administrator shall assist the Academy in gathering any information the Academy deems necessary to carry out this subsection. The Administrator may use any authority under this chapter to obtain information from any person, and to require any person to conduct tests, keep and produce records, and make reports respecting research or other activities conducted by such person as necessary to carry out this subsection.

**(6) Authorization**

Of the funds authorized to be appropriated to the Administrator by this chapter, such amounts as are required shall be available to carry out this subsection.

**(7) Guidelines for carcinogenic risk assessment**

The Administrator shall consider, but need not adopt, the recommendations contained in the report of the National Academy of Sciences prepared pursuant to this subsection and the views of the Science Advisory Board, with respect to such report. Prior to the promulgation of any standard under subsection (f), and after notice and opportunity for comment, the Administrator shall publish revised Guidelines for Carcinogenic Risk Assessment or a detailed explanation of the reasons that any recommendations contained in the report of the National Academy of Sciences will not be implemented. The publication of such revised Guidelines shall be a final Agency action for purposes of section 7607 of this title.

## (p) Mickey Leland National Urban Air Toxics Research Center

### (1) Establishment

The Administrator shall oversee the establishment of a National Urban Air Toxics Research Center, to be located at a university, a hospital, or other facility capable of undertaking and maintaining similar research capabilities in the areas of epidemiology, oncology, toxicology, pulmonary medicine, pathology, and biostatistics. The center shall be known as the Mickey Leland National Urban Air Toxics Research Center. The geographic site of the National Urban Air Toxics Research Center should be further directed to Harris County, Texas, in order to take full advantage of the well developed scientific community presence on-site at the Texas Medical Center as well as the extensive data previously compiled for the comprehensive monitoring system currently in place.

### (2) Board of Directors

The National Urban Air Toxics Research Center shall be governed by a Board of Directors to be comprised of 9 members, the appointment of which shall be allocated pro rata among the Speaker of the House, the Majority Leader of the Senate and the President. The members of the Board of Directors shall be selected based on their respective academic and professional backgrounds and expertise in matters relating to public health, environmental pollution and industrial hygiene. The duties of the Board of Directors shall be to determine policy and research guidelines, submit views from center sponsors and the public and issue periodic reports of center findings and activities.

### (3) Scientific Advisory Panel

The Board of Directors shall be advised by a Scientific Advisory Panel, the 13 members of which shall be appointed by the Board, and to include eminent members of the scientific and medical communities. The Panel membership may include scientists with relevant experience from the National Institute of Environmental Health Sciences, the Center for Disease Control, the Environmental Protection Agency, the National Cancer Institute, and others, and the Panel shall conduct peer review and evaluate research results. The Panel shall assist the Board in developing the research agenda, reviewing proposals and applications, and advise on the awarding of research grants.

### (4) Funding

The center shall be established and funded with both Federal and private source funds.

## (q) Savings provision

### (1) Standards previously promulgated

Any standard under this section in effect before the date of enactment of the Clean Air Act Amendments of 1990 shall remain in force and effect after such date unless modified as provided in this section before the date of enactment of such Amendments or under such Amendments. Except as provided in paragraph (4), any standard under this section which has been promulgated, but has not taken effect, before such date shall not be affected by such Amendments unless modified as provided in this section before such date or under such Amendments. Each such standard shall be reviewed and, if appropriate, revised, to comply with the requirements of subsection (d) within 10 years after the date of enactment of the Clean Air Act Amendments of 1990. If a timely petition for review of any such standard under section 7607 of this title is pending on such date of enactment, the standard shall be upheld if it complies with this section as in effect before that date. If any such standard is remanded to the Administrator, the Administrator may in the Administrator's discretion apply either the requirements of this section, or those of this section as in effect before the date of enactment of the Clean Air Act Amendments of 1990.

**(2) Special rule**

Notwithstanding paragraph (1), no standard shall be established under this section, as amended by the Clean Air Act Amendments of 1990, for radionuclide emissions from (A) elemental phosphorous plants, (B) grate calcination elemental phosphorous plants, (C) phosphogypsum stacks, or (D) any subcategory of the foregoing. This section, as in effect prior to the date of enactment of the Clean Air Act Amendments of 1990, shall remain in effect for radionuclide emissions from such plants and stacks.

**(3) Other categories**

Notwithstanding paragraph (1), this section, as in effect prior to the date of enactment of the Clean Air Act Amendments of 1990, shall remain in effect for radionuclide emissions from non-Department of Energy Federal facilities that are not licensed by the Nuclear Regulatory Commission, coal-fired utility and industrial boilers, underground uranium mines, surface uranium mines, and disposal of uranium mill tailings piles, unless the Administrator, in the Administrator's discretion, applies the requirements of this section as modified by the Clean Air Act Amendments of 1990 to such sources of radionuclides.

**(4) Medical facilities**

Notwithstanding paragraph (1), no standard promulgated under this section prior to November 15, 1990, with respect to medical research or treatment facilities shall take effect for two years following November 15, 1990, unless the Administrator makes a determination pursuant to a rulemaking under subsection (d)(9). If the Administrator determines that the regulatory program established by the Nuclear Regulatory Commission for such facilities does not provide an ample margin of safety to protect public health, the requirements of this section shall fully apply to such facilities. If the Administrator determines that such regulatory program does provide an ample margin of safety to protect the public health, the Administrator is not required to promulgate a standard under this section for such facilities, as provided in subsection (d)(9).

**(r) Prevention of accidental releases**

**(1) Purpose and general duty**

It shall be the objective of the regulations and programs authorized under this subsection to prevent the accidental release and to minimize the consequences of any such release of any substance listed pursuant to paragraph (3) or any other extremely hazardous substance. The owners and operators of stationary sources producing, processing, handling or storing such substances have a general duty in the same manner and to the same extent as section 654 of Title 29 to identify hazards

which may result from such releases using appropriate hazard assessment techniques, to design and maintain a safe facility taking such steps as are necessary to prevent releases, and to minimize the consequences of accidental releases which do occur. For purposes of this paragraph, the provisions of section 7604 of this title shall not be available to any person or otherwise be construed to be applicable to this paragraph. Nothing in this section shall be interpreted, construed, implied or applied to create any liability or basis for suit for compensation for bodily injury or any other injury or property damages to any person which may result from accidental releases of such substances.

**(2) Definitions**

**(A)** The term "accidental release" means an unanticipated emission of a regulated substance or other extremely hazardous substance into the ambient air from a stationary source.

**(B)** The term "regulated substance" means a substance listed under paragraph (3).

**(C)** The term "stationary source" means any buildings, structures, equipment, installations or substance emitting stationary activities (i) which belong to the same industrial group, (ii) which are located on one or more contiguous properties, (iii) which are under the control of the same person (or persons under common control), and (iv) from which an accidental release may occur.

**(D)** The term "retail facility" means a stationary source at which more than one-half of the income is obtained from direct sales to end users or at which more than one-half of the fuel sold, by volume, is sold through a cylinder exchange program.

**(3) List of substances**

The Administrator shall promulgate not later than 24 months after November 15, 1990, an initial list of 100 substances which, in the case of an accidental release, are known to cause or may reasonably be anticipated to cause death, injury, or serious adverse effects to human health or the environment. For purposes of promulgating such list, the Administrator shall use, but is not limited to, the list of extremely hazardous substances published under the Emergency Planning and Community Right-to-Know [6] Act of 1986, with such modifications as the Administrator deems appropriate. The initial list shall include chlorine, anhydrous ammonia, methyl chloride, ethylene oxide, vinyl chloride, methyl isocyanate, hydrogen cyanide, ammonia, hydrogen sulfide, toluene diisocyanate, phosgene, bromine, anhydrous hydrogen chloride, hydrogen fluoride, anhydrous sulfur dioxide, and sulfur trioxide. The initial list shall include at least 100 substances which pose the greatest risk of causing death, injury, or serious adverse effects to human health or the environment from accidental releases. Regulations establishing the list shall include an explanation of the basis for establishing the list. The list may be revised from time to time by the Administrator on the Administrator's own motion or by petition and shall be reviewed at least every 5 years. No air pollutant for which a national primary ambient air quality standard has been established shall be included on any such list. No substance, practice, process, or activity regulated under subchapter VI shall be subject to regulations under this subsection. The Administrator shall establish procedures for the addition and deletion of substances from the list established under this paragraph consistent with those applicable to the list in subsection (b).

**(4) Factors to be considered**

In listing substances under paragraph (3), the Administrator--

**(A)** shall consider--

**(i)** the severity of any acute adverse health effects associated with accidental releases of the substance;

**(ii)** the likelihood of accidental releases of the substance; and

**(iii)** the potential magnitude of human exposure to accidental releases of the substance; and

**(B)** shall not list a flammable substance when used as a fuel or held for sale as a fuel at a retail facility under this subsection solely because of the explosive or flammable properties of the substance, unless a fire or explosion caused by the substance will result in acute adverse health effects from human exposure to the substance, including the unburned fuel or its combustion byproducts, other than those caused by the heat of the fire or impact of the explosion.

**(5) Threshold quantity**

At the time any substance is listed pursuant to paragraph (3), the Administrator shall establish by rule, a threshold quantity for the substance, taking into account the toxicity, reactivity, volatility, dispersibility, combustibility, or flammability of the substance and the amount of the substance which, as a result of an accidental release, is known to cause or may reasonably be anticipated to cause death, injury or serious adverse effects to human health for which the substance was listed. The Administrator is authorized to establish a greater threshold quantity for, or to exempt entirely, any substance that is a nutrient used in agriculture when held by a farmer.

**(6) Chemical Safety Board**

**(A)** There is hereby established an independent safety board to be known as the Chemical Safety and Hazard Investigation Board.

**(B)** The Board shall consist of 5 members, including a Chairperson, who shall be appointed by the President, by and with the advice and consent of the Senate. Members of the Board shall be appointed on the basis of technical qualification, professional standing, and demonstrated knowledge in the fields of accident reconstruction, safety engineering, human factors, toxicology, or air pollution regulation. The terms of office of members of the Board shall be 5 years. Any member of the Board, including the Chairperson, may be removed for inefficiency, neglect of duty, or malfeasance in office. The Chairperson shall be the Chief Executive Officer of the Board and shall exercise the executive and administrative functions of the Board.

**(C)** The Board shall--

**(i)** investigate (or cause to be investigated), determine and report to the public in writing the facts, conditions, and circumstances and the cause or probable cause of any accidental release resulting in a fatality, serious injury or substantial property damages;

**(ii)** issue periodic reports to the Congress, Federal, State and local agencies, including the Environmental Protection Agency and the Occupational Safety and Health Administration, concerned with the safety of chemical production, processing, handling and storage, and other interested persons recommending measures to reduce the likelihood or the consequences of accidental releases and proposing corrective steps to make chemical production, processing, handling and storage as safe and free from risk of injury as is possible and may include in such reports proposed rules or orders which should be issued by the Administrator under the authority of this section or the Secretary of Labor under the Occupational Safety and Health Act to prevent or minimize the consequences of any release of substances that may cause death, injury or other serious adverse effects on human health or substantial property damage as the result of an accidental release; and

**(iii)** establish by regulation requirements binding on persons for reporting accidental releases into the ambient air subject to the Board's investigatory jurisdiction. Reporting releases to the National Response Center, in lieu of the Board directly, shall satisfy such regulations. The National Response Center shall promptly notify the Board of any releases which are within the Board's jurisdiction.

**(D)** The Board may utilize the expertise and experience of other agencies.

**(E)** The Board shall coordinate its activities with investigations and studies conducted by other agencies of the United States having a responsibility to protect public health and safety. The Board shall enter into a memorandum of understanding with the National Transportation Safety Board to assure coordination of activities and to limit duplication of activities which shall designate the National Transportation Safety Board as the lead agency for the investigation of releases which are transportation related. The Board shall not be authorized to investigate marine oil spills, which the National Transportation Safety Board is authorized to investigate. The Board shall enter into a memorandum of understanding with the Occupational Safety and Health Administration so as to limit duplication of activities. In no event shall the Board forego an investigation where an accidental release causes a fatality or serious injury among the general public, or had the potential to cause substantial property damage or a number of deaths or injuries among the general public.

**(F)** The Board is authorized to conduct research and studies with respect to the potential for accidental releases, whether or not an accidental release has occurred, where there is evidence which indicates the presence of a potential hazard or hazards. To the extent practicable, the Board shall conduct such studies in cooperation with other Federal agencies having emergency response authorities, State and local governmental agencies and associations and organizations from the industrial, commercial, and nonprofit sectors.

**(G)** No part of the conclusions, findings, or recommendations of the Board relating to any accidental release or the investigation thereof shall be admitted as evidence or used in any action or suit for damages arising out of any matter mentioned in such report.

**(H)** Not later than 18 months after November 15, 1990, the Board shall publish a report accompanied by recommendations to the Administrator on the use of hazard assessments in preventing the occurrence and minimizing the consequences of accidental releases of extremely hazardous substances. The recommendations shall include a list of extremely hazardous substances which are not regulated substances (including threshold quantities for such substances) and categories of stationary sources for which hazard assessments would be an appropriate measure to aid in the prevention of accidental releases and to minimize the consequences of those releases that do occur. The recommendations shall also include a description of the information and analysis which would be appropriate to include in any hazard assessment. The Board shall also make

recommendations with respect to the role of risk management plans as required by paragraph (8)(B) [4] in preventing accidental releases. The Board may from time to time review and revise its recommendations under this subparagraph.

**(I)** Whenever the Board submits a recommendation with respect to accidental releases to the Administrator, the Administrator shall respond to such recommendation formally and in writing not later than 180 days after receipt thereof. The response to the Board's recommendation by the Administrator shall indicate whether the Administrator will--

**(i)** initiate a rulemaking or issue such orders as are necessary to implement the recommendation in full or in part, pursuant to any timetable contained in the recommendation; [7]

**(ii)** decline to initiate a rulemaking or issue orders as recommended.

Any determination by the Administrator not to implement a recommendation of the Board or to implement a recommendation only in part, including any variation from the schedule contained in the recommendation, shall be accompanied by a statement from the Administrator setting forth the reasons for such determination.

**(J)** The Board may make recommendations with respect to accidental releases to the Secretary of Labor. Whenever the Board submits such recommendation, the Secretary shall respond to such recommendation formally and in writing not later than 180 days after receipt thereof. The response to the Board's recommendation by the Administrator [8] shall indicate whether the Secretary will--

**(i)** initiate a rulemaking or issue such orders as are necessary to implement the recommendation in full or in part, pursuant to any timetable contained in the recommendation; [7]

**(ii)** decline to initiate a rulemaking or issue orders as recommended.

Any determination by the Secretary not to implement a recommendation or to implement a recommendation only in part, including any variation from the schedule contained in the recommendation, shall be accompanied by a statement from the Secretary setting forth the reasons for such determination.

**(K)** Within 2 years after November 15, 1990, the Board shall issue a report to the Administrator of the Environmental Protection Agency and to the Administrator of the Occupational Safety and Health Administration recommending the adoption of regulations for the preparation of risk management plans and general requirements for the prevention of accidental releases of regulated substances into the ambient air (including recommendations for listing substances under paragraph (3)) and for the mitigation of the potential adverse effect on human health or the environment as a result of accidental releases which should be applicable to any stationary source handling any regulated substance in more than threshold amounts. The Board may include proposed rules or orders which should be issued by the Administrator under authority of this subsection or by the Secretary of Labor under the Occupational Safety and Health Act. Any such recommendations shall be specific and shall identify the regulated substance or class of regulated substances (or other substances) to which the recommendations apply. The Administrator shall consider such recommendations before promulgating regulations required by paragraph (7)(B).

**(L)** The Board, or upon authority of the Board, any member thereof, any administrative law judge employed by or assigned to the Board, or any officer or employee duly designated by the Board, may for the purpose of carrying out duties authorized by subparagraph (C)--

**(i)** hold such hearings, sit and act at such times and places, administer such oaths, and require by subpoena or otherwise attendance and testimony of such witnesses and the production of evidence and may require by order that any person engaged in the production, processing, handling, or storage of extremely hazardous substances submit written reports and responses to requests and questions within such time and in such form as the Board may require; and

**(ii)** upon presenting appropriate credentials and a written notice of inspection authority, enter any property where an accidental release causing a fatality, serious injury or substantial property damage has occurred and do all things therein necessary for a proper investigation pursuant to subparagraph (C) and inspect at reasonable times records, files, papers, processes, controls, and facilities and take such samples as are relevant to such investigation.

Whenever the Administrator or the Board conducts an inspection of a facility pursuant to this subsection, employees and their representatives shall have the same rights to participate in such inspections as provided in the Occupational Safety and Health Act.

**(M)** In addition to that described in subparagraph (L), the Board may use any information gathering authority of the Administrator under this chapter, including the subpoena power provided in section 7607(a)(1) of this title.

**(N)** The Board is authorized to establish such procedural and administrative rules as are necessary to the exercise of its functions and duties. The Board is authorized without regard to section 6101 of Title 41 to enter into contracts, leases, cooperative agreements or other transactions as may be necessary in the conduct of the duties and functions of the Board with any other agency, institution, or person.

**(O)** After the effective date of any reporting requirement promulgated pursuant to subparagraph (C)(iii) it shall be unlawful for any person to fail to report any release of any extremely hazardous substance as required by such subparagraph. The Administrator is authorized to enforce any regulation or requirements established by the Board pursuant to subparagraph (C)(iii) using the authorities of sections 7413 and 7414 of this title. Any request for information from the owner or operator of a stationary source made by the Board or by the Administrator under this section shall be treated, for purposes of sections 7413, 7414, 7416, 7420, 7603, 7604 and 7607 of this title and any other enforcement provisions of this chapter, as a request made by the Administrator under section 7414 of this title and may be enforced by the Chairperson of the Board or by the Administrator as provided in such section.

**(P)** The Administrator shall provide to the Board such support and facilities as may be necessary for operation of the Board.

**(Q)** Consistent with subsection (G)[5] and section 7414(c) of this title any records, reports or information obtained by the Board shall be available to the Administrator, the Secretary of Labor, the Congress and the public, except that upon a showing satisfactory to the Board by any person that records, reports, or information, or particular part thereof (other than release or emissions data) to which the Board has access, if made public, is likely to cause substantial harm to the person's competitive position, the Board shall consider such record, report, or information or particular portion thereof confidential in accordance with section 1905 of Title 18, except that such record, report, or information may be disclosed to other officers, employees,

and authorized representatives of the United States concerned with carrying out this chapter or when relevant under any proceeding under this chapter. This subparagraph does not constitute authority to withhold records, reports, or information from the Congress.

**(R)** Whenever the Board submits or transmits any budget estimate, budget request, supplemental budget request, or other budget information, legislative recommendation, prepared testimony for congressional hearings, recommendation or study to the President, the Secretary of Labor, the Administrator, or the Director of the Office of Management and Budget, it shall concurrently transmit a copy thereof to the Congress. No report of the Board shall be subject to review by the Administrator or any Federal agency or to judicial review in any court. No officer or agency of the United States shall have authority to require the Board to submit its budget requests or estimates, legislative recommendations, prepared testimony, comments, recommendations or reports to any officer or agency of the United States for approval or review prior to the submission of such recommendations, testimony, comments or reports to the Congress. In the performance of their functions as established by this chapter, the members, officers and employees of the Board shall not be responsible to or subject to supervision or direction, in carrying out any duties under this subsection, of any officer or employee or agent of the Environmental Protection Agency, the Department of Labor or any other agency of the United States except that the President may remove any member, officer or employee of the Board for inefficiency, neglect of duty or malfeasance in office. Nothing in this section shall affect the application of Title 5 to officers or employees of the Board.

**(S)** The Board shall submit an annual report to the President and to the Congress which shall include, but not be limited to, information on accidental releases which have been investigated by or reported to the Board during the previous year, recommendations for legislative or administrative action which the Board has made, the actions which have been taken by the Administrator or the Secretary of Labor or the heads of other agencies to implement such recommendations, an identification of priorities for study and investigation in the succeeding year, progress in the development of risk-reduction technologies and the response to and implementation of significant research findings on chemical safety in the public and private sector.

**(7) Accident prevention**

**(A)** In order to prevent accidental releases of regulated substances, the Administrator is authorized to promulgate release prevention, detection, and correction requirements which may include monitoring, record-keeping, reporting, training, vapor recovery, secondary containment, and other design, equipment, work practice, and operational requirements. Regulations promulgated under this paragraph may make distinctions between various types, classes, and kinds of facilities, devices and systems taking into consideration factors including, but not limited to, the size, location, process, process controls, quantity of substances handled, potency of substances, and response capabilities present at any stationary source. Regulations promulgated pursuant to this subparagraph shall have an effective date, as determined by the Administrator, assuring compliance as expeditiously as practicable.

**(B)(i)** Within 3 years after November 15, 1990, the Administrator shall promulgate reasonable regulations and appropriate guidance to provide, to the greatest extent practicable, for the prevention and detection of accidental releases of regulated substances and for response to such releases by the owners or operators of the sources of such releases. The Administrator shall utilize the expertise of the Secretaries of Transportation and Labor in promulgating such regulations. As appropriate, such regulations shall cover the use, operation, repair, replacement, and maintenance of equipment to monitor, detect, inspect, and control such releases, including training of persons in the use and maintenance of such equipment and in the conduct of periodic inspections. The regulations shall include procedures and measures for emergency response after an accidental release of a regulated substance in order to protect human health and the environment. The regulations shall cover storage, as well as operations. The regulations shall, as appropriate, recognize differences in size, operations, processes, class and categories of sources and the voluntary actions of such sources to prevent such releases and respond to such releases. The

regulations shall be applicable to a stationary source 3 years after the date of promulgation, or 3 years after the date on which a regulated substance present at the source in more than threshold amounts is first listed under paragraph (3), whichever is later.

**(ii)** The regulations under this subparagraph shall require the owner or operator of stationary sources at which a regulated substance is present in more than a threshold quantity to prepare and implement a risk management plan to detect and prevent or minimize accidental releases of such substances from the stationary source, and to provide a prompt emergency response to any such releases in order to protect human health and the environment. Such plan shall provide for compliance with the requirements of this subsection and shall also include each of the following:

**(I)** a hazard assessment to assess the potential effects of an accidental release of any regulated substance. This assessment shall include an estimate of potential release quantities and a determination of downwind effects, including potential exposures to affected populations. Such assessment shall include a previous release history of the past 5 years, including the size, concentration, and duration of releases, and shall include an evaluation of worst case accidental releases;

**(II)** a program for preventing accidental releases of regulated substances, including safety precautions and maintenance, monitoring and employee training measures to be used at the source; and

**(III)** a response program providing for specific actions to be taken in response to an accidental release of a regulated substance so as to protect human health and the environment, including procedures for informing the public and local agencies responsible for responding to accidental releases, emergency health care, and employee training measures.

At the time regulations are promulgated under this subparagraph, the Administrator shall promulgate guidelines to assist stationary sources in the preparation of risk management plans. The guidelines shall, to the extent practicable, include model risk management plans.

**(iii)** The owner or operator of each stationary source covered by clause (ii) shall register a risk management plan prepared under this subparagraph with the Administrator before the effective date of regulations under clause (i) in such form and manner as the Administrator shall, by rule, require. Plans prepared pursuant to this subparagraph shall also be submitted to the Chemical Safety and Hazard Investigation Board, to the State in which the stationary source is located, and to any local agency or entity having responsibility for planning for or responding to accidental releases which may occur at such source, and shall be available to the public under section 7414(c) of this title. The Administrator shall establish, by rule, an auditing system to regularly review and, if necessary, require revision in risk management plans to assure that the plans comply with this subparagraph. Each such plan shall be updated periodically as required by the Administrator, by rule.

**(C)** Any regulations promulgated pursuant to this subsection shall to the maximum extent practicable, consistent with this subsection, be consistent with the recommendations and standards established by the American Society of Mechanical Engineers (ASME), the American National Standards Institute (ANSI) or the American Society of Testing Materials (ASTM). The Administrator shall take into consideration the concerns of small business in promulgating regulations under this subsection.

**(D)** In carrying out the authority of this paragraph, the Administrator shall consult with the Secretary of Labor and the Secretary of Transportation and shall coordinate any requirements under this paragraph with any requirements established for comparable purposes by the Occupational Safety and Health Administration or the Department of Transportation. Nothing in this subsection shall be interpreted, construed or applied to impose requirements affecting, or to grant the Administrator, the

Chemical Safety and Hazard Investigation Board, or any other agency any authority to regulate (including requirements for hazard assessment), the accidental release of radionuclides arising from the construction and operation of facilities licensed by the Nuclear Regulatory Commission.

**(E)** After the effective date of any regulation or requirement imposed under this subsection, it shall be unlawful for any person to operate any stationary source subject to such regulation or requirement in violation of such regulation or requirement. Each regulation or requirement under this subsection shall for purposes of sections 7413, 7414, 7416, 7420, 7604, and 7607 of this title and other enforcement provisions of this chapter, be treated as a standard in effect under subsection (d).

**(F)** Notwithstanding the provisions of subchapter V or this section, no stationary source shall be required to apply for, or operate pursuant to, a permit issued under such subchapter solely because such source is subject to regulations or requirements under this subsection.

**(G)** In exercising any authority under this subsection, the Administrator shall not, for purposes of section 653(b)(1) of Title 29, be deemed to be exercising statutory authority to prescribe or enforce standards or regulations affecting occupational safety and health.

**(H) Public access to off-site consequence analysis information**

**(i) Definitions**

In this subparagraph:

**(I) Covered person**

The term "covered person" means--

**(aa)** an officer or employee of the United States;

**(bb)** an officer or employee of an agent or contractor of the Federal Government;

**(cc)** an officer or employee of a State or local government;

**(dd)** an officer or employee of an agent or contractor of a State or local government;

**(ee)** an individual affiliated with an entity that has been given, by a State or local government, responsibility for preventing, planning for, or responding to accidental releases;

**(ff)** an officer or employee or an agent or contractor of an entity described in item (ee); and

**(gg)** a qualified researcher under clause (vii).

**(II) Official use**

The term "official use" means an action of a Federal, State, or local government agency or an entity referred to in subclause (I)(ee) intended to carry out a function relevant to preventing, planning for, or responding to accidental releases.

**(III) Off-site consequence analysis information**

The term "off-site consequence analysis information" means those portions of a risk management plan, excluding the executive summary of the plan, consisting of an evaluation of 1 or more worst-case release scenarios or alternative release scenarios, and any electronic data base created by the Administrator from those portions.

**(IV) Risk management plan**

The term "risk management plan" means a risk management plan submitted to the Administrator by an owner or operator of a stationary source under subparagraph (B)(iii).

**(ii) Regulations**

Not later than 1 year after August 5, 1999, the President shall--

**(I)** assess--

**(aa)** the increased risk of terrorist and other criminal activity associated with the posting of off-site consequence analysis information on the Internet; and

**(bb)** the incentives created by public disclosure of off-site consequence analysis information for reduction in the risk of accidental releases; and

**(II)** based on the assessment under subclause (I), promulgate regulations governing the distribution of off-site consequence analysis information in a manner that, in the opinion of the President, minimizes the likelihood of accidental releases and the risk described in subclause (I)(aa) and the likelihood of harm to public health and welfare, and--

**(aa)** allows access by any member of the public to paper copies of off-site consequence analysis information for a limited number of stationary sources located anywhere in the United States, without any geographical restriction;

**(bb)** allows other public access to off-site consequence analysis information as appropriate;

**(cc)** allows access for official use by a covered person described in any of items (cc) through (ff) of clause (i)(I) (referred to in this subclause as a "State or local covered person") to off-site consequence analysis information relating to stationary sources located in the person's State;

**(dd)** allows a State or local covered person to provide, for official use, off-site consequence analysis information relating to stationary sources located in the person's State to a State or local covered person in a contiguous State; and

**(ee)** allows a State or local covered person to obtain for official use, by request to the Administrator, off-site consequence analysis information that is not available to the person under item (cc).

## (iii) Availability under freedom of information act

### (I) First year

Off-site consequence analysis information, and any ranking of stationary sources derived from the information, shall not be made available under section 552 of Title 5 during the 1-year period beginning on August 5, 1999.

### (II) After first year

If the regulations under clause (ii) are promulgated on or before the end of the period described in subclause (I), off-site consequence analysis information covered by the regulations, and any ranking of stationary sources derived from the information, shall not be made available under section 552 of Title 5 after the end of that period.

### (III) Applicability

Subclauses (I) and (II) apply to off-site consequence analysis information submitted to the Administrator before, on, or after August 5, 1999.

## (iv) Availability of information during transition period

The Administrator shall make off-site consequence analysis information available to covered persons for official use in a manner that meets the requirements of items (cc)through (ee) of clause (ii)(II), and to the public in a form that does not make available any information concerning the identity or location of stationary sources, during the period--

### (I) beginning on August 5, 1999; and

### (II) ending on the earlier of the date of promulgation of the regulations under clause (ii) or the date that is 1 year after August 5, 1999.

## (v) Prohibition on unauthorized disclosure of information by covered persons

**(I) In general**

Beginning on August 5, 1999, a covered person shall not disclose to the public off-site consequence analysis information in any form, or any statewide or national ranking of identified stationary sources derived from such information, except as authorized by this subparagraph (including the regulations promulgated under clause (ii)). After the end of the 1-year period beginning on August 5, 1999, if regulations have not been promulgated under clause (ii), the preceding sentence shall not apply.

**(II) Criminal penalties**

Notwithstanding section 7413 of this title, a covered person that willfully violates a restriction or prohibition established by this subparagraph (including the regulations promulgated under clause (ii)) shall, upon conviction, be fined for an infraction under section 3571 of Title 18 (but shall not be subject to imprisonment) for each unauthorized disclosure of off-site consequence analysis information, except that subsection (d) of such section 3571 shall not apply to a case in which the offense results in pecuniary loss unless the defendant knew that such loss would occur. The disclosure of off-site consequence analysis information for each specific stationary source shall be considered a separate offense. The total of all penalties that may be imposed on a single person or organization under this item shall not exceed $1,000,000 for violations committed during any 1 calendar year.

**(III) Applicability**

If the owner or operator of a stationary source makes off-site consequence analysis information relating to that stationary source available to the public without restriction--

**(aa)** subclauses (I) and (II) shall not apply with respect to the information; and

**(bb)** the owner or operator shall notify the Administrator of the public availability of the information.

**(IV) List**

The Administrator shall maintain and make publicly available a list of all stationary sources that have provided notification under subclause (III)(bb).

**(vi) Notice**

The Administrator shall provide notice of the definition of official use as provided in clause (i)(III) [9] and examples of actions that would and would not meet that definition, and notice of the restrictions on further dissemination and the penalties established by this chapter to each covered person who receives off-site consequence analysis information under clause (iv) and each covered person who receives off-site consequence analysis information for an official use under the regulations promulgated under clause (ii).

**(vii) Qualified researchers**

**(I) In general**

Not later than 180 days after August 5, 1999, the Administrator, in consultation with the Attorney General, shall develop and implement a system for providing off-site consequence analysis information, including facility identification, to any qualified researcher, including a qualified researcher from industry or any public interest group.

**(II) Limitation on dissemination**

The system shall not allow the researcher to disseminate, or make available on the Internet, the off-site consequence analysis information, or any portion of the off-site consequence analysis information, received under this clause.

**(viii) Read-only information technology system**

In consultation with the Attorney General and the heads of other appropriate Federal agencies, the Administrator shall establish an information technology system that provides for the availability to the public of off-site consequence analysis information by means of a central data base under the control of the Federal Government that contains information that users may read, but that provides no means by which an electronic or mechanical copy of the information may be made.

**(ix) Voluntary industry accident prevention standards**

The Environmental Protection Agency, the Department of Justice, and other appropriate agencies may provide technical assistance to owners and operators of stationary sources and participate in the development of voluntary industry standards that will help achieve the objectives set forth in paragraph (1).

**(x) Effect on State or local law**

**(I) In general**

Subject to subclause (II), this subparagraph (including the regulations promulgated under this subparagraph) shall supersede any provision of State or local law that is inconsistent with this subparagraph (including the regulations).

**(II) Availability of information under State law**

Nothing in this subparagraph precludes a State from making available data on the off-site consequences of chemical releases collected in accordance with State law.

**(xi) Report**

**(I) In general**

Not later than 3 years after August 5, 1999, the Attorney General, in consultation with appropriate State, local, and Federal Government agencies, affected industry, and the public, shall submit to Congress a report that describes the extent to which regulations promulgated under this paragraph have resulted in actions, including the design and

maintenance of safe facilities, that are effective in detecting, preventing, and minimizing the consequences of releases of regulated substances that may be caused by criminal activity. As part of this report, the Attorney General, using available data to the extent possible, and a sampling of covered stationary sources selected at the discretion of the Attorney General, and in consultation with appropriate State, local, and Federal governmental agencies, affected industry, and the public, shall review the vulnerability of covered stationary sources to criminal and terrorist activity, current industry practices regarding site security, and security of transportation of regulated substances. The Attorney General shall submit this report, containing the results of the review, together with recommendations, if any, for reducing vulnerability of covered stationary sources to criminal and terrorist activity, to the Committee on Commerce of the United States House of Representatives and the Committee on Environment and Public Works of the United States Senate and other relevant committees of Congress.

**(II) Interim report**

Not later than 12 months after August 5, 1999, the Attorney General shall submit to the Committee on Commerce of the United States House of Representatives and the Committee on Environment and Public Works of the United States Senate, and other relevant committees of Congress, an interim report that includes, at a minimum--

**(aa)** the preliminary findings under subclause (I);

**(bb)** the methods used to develop the findings; and

**(cc)** an explanation of the activities expected to occur that could cause the findings of the report under subclause (I) to be different than the preliminary findings.

**(III) Availability of information**

Information that is developed by the Attorney General or requested by the Attorney General and received from a covered stationary source for the purpose of conducting the review under subclauses(I) and (II) shall be exempt from disclosure under section 552 of Title 5 if such information would pose a threat to national security.

**(xii) Scope**

This subparagraph--

**(I)** applies only to covered persons; and

**(II)** does not restrict the dissemination of off-site consequence analysis information by any covered person in any manner or form except in the form of a risk management plan or an electronic data base created by the Administrator from off-site consequence analysis information.

**(xiii) Authorization of appropriations**

There are authorized to be appropriated to the Administrator and the Attorney General such sums as are necessary to carry out this subparagraph (including the regulations promulgated under clause (ii)), to remain available until expended.

**(8) Research on hazard assessments**

The Administrator may collect and publish information on accident scenarios and consequences covering a range of possible events for substances listed under paragraph (3). The Administrator shall establish a program of long-term research to develop and disseminate information on methods and techniques for hazard assessment which may be useful in improving and validating the procedures employed in the preparation of hazard assessments under this subsection.

**(9) Order authority**

**(A)** In addition to any other action taken, when the Administrator determines that there may be an imminent and substantial endangerment to the human health or welfare or the environment because of an actual or threatened accidental release of a regulated substance, the Administrator may secure such relief as may be necessary to abate such danger or threat, and the district court of the United States in the district in which the threat occurs shall have jurisdiction to grant such relief as the public interest and the equities of the case may require. The Administrator may also, after notice to the State in which the stationary source is located, take other action under this paragraph including, but not limited to, issuing such orders as may be necessary to protect human health. The Administrator shall take action under section 7603 of this title rather than this paragraph whenever the authority of such section is adequate to protect human health and the environment.

**(B)** Orders issued pursuant to this paragraph may be enforced in an action brought in the appropriate United States district court as if the order were issued under section 7603 of this title.

**(C)** Within 180 days after November 15, 1990, the Administrator shall publish guidance for using the order authorities established by this paragraph. Such guidance shall provide for the coordinated use of the authorities of this paragraph with other emergency powers authorized by section 9606 of this title, sections 311(c), 308, 309 and 504(a) of the Federal Water Pollution Control Act, sections 3007, 3008, 3013, and 7003 of the Solid Waste Disposal Act, sections 1445 and 1431 of the Safe Drinking Water Act, sections 5 and 7 of the Toxic Substances Control Act, and sections 7413, 7414, and 7603 of this title.

**(10) Presidential review**

The President shall conduct a review of release prevention, mitigation and response authorities of the various Federal agencies and shall clarify and coordinate agency responsibilities to assure the most effective and efficient implementation of such authorities and to identify any deficiencies in authority or resources which may exist. The President may utilize the resources and solicit the recommendations of the Chemical Safety and Hazard Investigation Board in conducting such review. At the conclusion of such review, but not later than 24 months after November 15, 1990, the President shall transmit a message to the Congress on the release prevention, mitigation and response activities of the Federal Government making such recommendations for change in law as the President may deem appropriate. Nothing in this paragraph shall be interpreted, construed or applied to authorize the President to modify or reassign release prevention, mitigation or response authorities otherwise established by law.

**(11) State authority**

Nothing in this subsection shall preclude, deny or limit any right of a State or political subdivision thereof to adopt or enforce any regulation, requirement, limitation or standard (including any procedural requirement) that is more stringent than a regulation, requirement, limitation or standard in effect under this subsection or that applies to a substance not subject to this subsection.

**(s) Periodic report**

Not later than January 15, 1993 and every 3 years thereafter, the Administrator shall prepare and transmit to the Congress a comprehensive report on the measures taken by the Agency and by the States to implement the provisions of this section. The Administrator shall maintain a database on pollutants and sources subject to the provisions of this section and shall include aggregate information from the database in each annual report. The report shall include, but not be limited to--

**(1)** a status report on standard-setting under subsections (d) and (f);

**(2)** information with respect to compliance with such standards including the costs of compliance experienced by sources in various categories and subcategories;

**(3)** development and implementation of the national urban air toxics program; and

**(4)** recommendations of the Chemical Safety and Hazard Investigation Board with respect to the prevention and mitigation of accidental releases.

<div align="center">

**CREDIT(S)**

</div>

(July 14, 1955, c. 360, Title I, § 112, as added Pub.L. 91-604, § 4(a), Dec. 31, 1970, 84 Stat. 1685; amended Pub.L. 95-95, Title I, §§ 109(d)(2), 110, Title IV, § 401(c), Aug. 7, 1977, 91 Stat. 701, 703, 791; Pub.L. 95-623, § 13(b), Nov. 9, 1978, 92 Stat. 3458; Pub.L. 101-549, Title III, § 301, Nov. 15, 1990, 104 Stat. 2531; Pub.L. 102-187, Dec. 4, 1991, 105 Stat. 1285; Pub.L. 105-362, Title IV, § 402(b), Nov. 10, 1998, 112 Stat. 3283; Pub.L. 106-40, §§ 2, 3(a), Aug. 5, 1999, 113 Stat. 207.)

<div align="center">

**MEMORANDA OF PRESIDENT**

**DELEGATION OF AUTHORITY TO REVIEW EMERGENCY RELEASE AUTHORITIES AND PREPARE AND TRANSMIT TO THE CONGRESS A MESSAGE CONCERNING SUCH AUTHORITIES**

<Aug. 19, 1993, 58 F.R. 52397>

</div>

Memorandum for the Administrator of the Environmental Protection Agency

WHEREAS, the Environmental Protection Agency, the agencies and departments that are members of the National Response Team (authorized under Executive Order No. 12580, 52 Fed.Reg. 2923 (1987)) [set out as a note under section 9615 of this title], and other Federal agencies and departments undertake emergency release prevention, mitigation, and response activities pursuant to various authorities;

By the authority vested in me as President by the Constitution and the laws of the United States of America, including section 112(r)(10) of the Clean Air Act (the "Act") (section 7412(r)(10) of title 42 of the United States Code) [subsec. (r)(10) of this

section] and section 301 of title 3 of the United States Code [section 301 of Title 3, The President], and in order to provide for the delegation of certain functions under the Act [42 U.S.C.A. § 7401 et seq.], I hereby:

**(1)** Authorize you, in coordination with agencies and departments that are members of the National Response Team and other appropriate agencies and departments, to conduct a review of release prevention, mitigation, and response authorities of Federal agencies in order to assure the most effective and efficient implementation of such authorities and to identify any deficiencies in authority or resources that may exist, to the extent such review is required by section 112(r)(10) of the Act; and

**(2)** Authorize you, in coordination with agencies and departments that are members of the National Response Team and other appropriate agencies and departments, to prepare and transmit a message to the Congress concerning the release prevention, mitigation, and response activities of the Federal Government with such recommendations for change in law as you deem appropriate, to the extent such message is required by section 112(r)(10) of the Act.

The authority delegated by this memorandum may be further redelegated within the Environmental Protection Agency.

You are hereby authorized and directed to publish this memorandum in the **Federal Register.**

<div align="right">WILLIAM J. CLINTON</div>

### DELEGATION OF AUTHORITY TO CONDUCT ASSESSMENTS AND PROMULGATE REGULATIONS ON PUBLIC ACCESS TO OFF-SITE CONSEQUENCE ANALYSIS INFORMATION

<div align="center">&lt;Jan. 27, 2000, 65 F.R. 8631&gt;</div>

Memorandum for the Attorney General[,] the Administrator of the Environmental Protection Agency[,] and the Director of the Office of Management and Budget

By the authority vested in me as President by the Constitution and laws of the United States of America, including section 112(r)(7)(H) of the Clean Air Act ("Act") (42 U.S.C. 7412(r)(7)(H)) [subsec. (r)(7)(H) of this section], as added by section 3 of the Chemical Safety Information, Site Security and Fuels Regulatory Relief Act (Public Law 106-40), and section 301 of title 3, United States Code, I hereby delegate to:

**(1)** the Attorney General the authority vested in the President under section 112(r)(7)(H)(i)(II)(aa) of the Act [subsec. (r)(7)(H) (i)(II)(aa) of this section] to assess the increased risk of terrorist and other criminal activity associated with the posting of off-site consequence analysis information on the Internet;

**(2)** the Administrator of the Environmental Protection Agency (EPA) the authority vested in the President under section 112(r) (7)(H)(ii)(I)(bb) of the Act [subsec. (r)(7)(H)(ii)(I)(bb) of this section] to assess the incentives created by public disclosure of off-site consequence analysis information for reduction in the risk of accidental releases; and

**(3)** the Attorney General and the Administrator of EPA, jointly, the authority vested in the President under section 112(r)(7) (H)(ii)(II) of the Act [subsec. (r)(7)(H)(ii)(II) of this section] to promulgate regulations, based on these assessments, governing the distribution of off-site consequence analysis information. These regulations, in proposed and final form, shall be subject to review and approval by the Director of the Office of Management and Budget.

The Administrator of EPA is authorized and directed to publish this memorandum in the Federal Register.

<div align="right">WILLIAM J. CLINTON</div>

### FLEXIBLE IMPLEMENTATION OF THE MERCURY AND AIR TOXICS STANDARDS RULE

<Dec. 21, 2011, 76 F.R. 80727>

Memorandum for the Administrator of the Environmental Protection Agency

Today's issuance, by the Environmental Protection Agency (EPA), of the final Mercury and Air Toxics Standards rule for power plants (the "MATS Rule") represents a major step forward in my Administration's efforts to protect public health and the environment.

This rule, issued after careful consideration of public comments, prescribes standards under section 112 of the Clean Air Act to control emissions of mercury and other toxic air pollutants from power plants, which collectively are among the largest sources of such pollution in the United States. The EPA estimates that by substantially reducing emissions of pollutants that contribute to neurological damage, cancer, respiratory illnesses, and other health risks, the MATS Rule will produce major health benefits for millions of Americans_including children, older Americans, and other vulnerable populations. Consistent with Executive Order 13563 (Improving Regulation and Regulatory Review), the estimated benefits of the MATS Rule far exceed the estimated costs.

The MATS Rule can be implemented through the use of demonstrated, existing pollution control technologies. The United States is a global market leader in the design and manufacture of these technologies, and it is anticipated that U.S. firms and workers will provide much of the equipment and labor needed to meet the substantial investments in pollution control that the standards are expected to spur.

These new standards will promote the transition to a cleaner and more efficient U.S. electric power system. This system as a whole is critical infrastructure that plays a key role in the functioning of all facets of the U.S. economy, and maintaining its stability and reliability is of critical importance. It is therefore crucial that implementation of the MATS Rule proceed in a cost-effective manner that ensures electric reliability.

Analyses conducted by the EPA and the Department of Energy (DOE) indicate that the MATS Rule is not anticipated to compromise electric generating resource adequacy in any region of the country. The Clean Air Act offers a number of implementation flexibilities, and the EPA has a long and successful history of using those flexibilities to ensure a smooth transition to cleaner technologies.

The Clean Air Act provides 3 years from the effective date of the MATS Rule for sources to comply with its requirements. In addition, section 112(i)(3)(B) of the Act allows the issuance of a permit granting a source up to one additional year where necessary for the installation of controls. As you stated in the preamble to the MATS Rule, this additional fourth year should be broadly available to sources, consistent with the requirements of the law.

The EPA has concluded that 4 years should generally be sufficient to install the necessary emission control equipment, and DOE has issued analysis consistent with that conclusion. While more time is generally not expected to be needed, the Clean Air Act offers other important flexibilities as well. For example, section 113(a) of the Act provides the EPA with flexibility to bring sources into compliance over the course of an additional year, should unusual circumstances arise that warrant such flexibility.

To address any concerns with respect to electric reliability while assuring MATS' public health benefits, I direct you to take the following actions:

**1.** Building on the information and guidance that you have provided to the public, relevant stakeholders, and permitting authorities in the preamble of the MATS Rule, work with State and local permitting authorities to make the additional year for compliance with the MATS Rule provided under section 112(i)(3)(B) of the Clean Air Act broadly available to sources, consistent with law, and to invoke this flexibility expeditiously where justified.

**2.** Promote early, coordinated, and orderly planning and execution of the measures needed to implement the MATS Rule while maintaining the reliability of the electric power system. Consistent with Executive Order 13563, this process should be designed to "promote predictability and reduce uncertainty," and should include engagement and coordination with DOE, the Federal Energy Regulatory Commission, State utility regulators, Regional Transmission Organizations, the North American Electric Reliability Corporation and regional electric reliability organizations, other grid planning authorities, electric utilities, and other stakeholders, as appropriate.

**3.** Make available to the public, including relevant stakeholders, information concerning any anticipated use of authorities: (a) under section 112(i)(3)(B) of the Clean Air Act in the event that additional time to comply with the MATS Rule is necessary for the installation of technology; and (b) under section 113(a) of the Clean Air Act in the event that additional time to comply with the MATS Rule is necessary to address a specific and documented electric reliability issue. This information should describe the process for working with entities with relevant expertise to identify circumstances where electric reliability concerns might justify allowing additional time to comply.

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

You are hereby authorized and directed to publish this memorandum in the Federal Register.

BARACK OBAMA

Notes of Decisions (159)

## Footnotes

| 1 | So in original. Probably should be "effects". |
|---|---|

1    So in original. Probably should be "effects".

2    So in original.

3    So in original. Probably should be "section".

4    So in original. Probably should be paragraph "(7)(B)".

5    So in original. Probably should be "subparagraph".

6    So in original. Probably should be "Right-To-Know".

7    So in original. The word "or" probably should appear.

8    So in original. The word "Administrator" probably should be "Secretary".

9    So in original. Probably should be "(i)(II)".

42 U.S.C.A. § 7412, 42 USCA § 7412
Current through P.L. 118-106. Some statute sections may be more current, see credits for details.

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 85. Air Pollution Prevention and Control (Refs & Annos)
      Subchapter III. General Provisions

42 U.S.C.A. § 7607

§ 7607. Administrative proceedings and judicial review

Currentness

### (a) Administrative subpenas; confidentiality; witnesses

In connection with any determination under section 7410(f) of this title, or for purposes of obtaining information under section 7521(b)(4) [1] or 7545(c)(3) of this title, any investigation, monitoring, reporting requirement, entry, compliance inspection, or administrative enforcement proceeding under the [2] chapter (including but not limited to section 7413, section 7414, section 7420, section 7429, section 7477, section 7524, section 7525, section 7542, section 7603, or section 7606 of this title),, [3] the Administrator may issue subpenas for the attendance and testimony of witnesses and the production of relevant papers, books, and documents, and he may administer oaths. Except for emission data, upon a showing satisfactory to the Administrator by such owner or operator that such papers, books, documents, or information or particular part thereof, if made public, would divulge trade secrets or secret processes of such owner or operator, the Administrator shall consider such record, report, or information or particular portion thereof confidential in accordance with the purposes of section 1905 of Title 18, except that such paper, book, document, or information may be disclosed to other officers, employees, or authorized representatives of the United States concerned with carrying out this chapter, to persons carrying out the National Academy of Sciences' study and investigation provided for in section 7521(c) of this title, or when relevant in any proceeding under this chapter. Witnesses summoned shall be paid the same fees and mileage that are paid witnesses in the courts of the United States. In case of contumacy or refusal to obey a subpena served upon any person under this subparagraph [4], the district court of the United States for any district in which such person is found or resides or transacts business, upon application by the United States and after notice to such person, shall have jurisdiction to issue an order requiring such person to appear and give testimony before the Administrator to appear and produce papers, books, and documents before the Administrator, or both, and any failure to obey such order of the court may be punished by such court as a contempt thereof.

### (b) Judicial review

(1) A petition for review of action of the Administrator in promulgating any national primary or secondary ambient air quality standard, any emission standard or requirement under section 7412 of this title, any standard of performance or requirement under section 7411 of this title,, [3] any standard under section 7521 of this title (other than a standard required to be prescribed under section 7521(b)(1) of this title), any determination under section 7521(b)(5) [1] of this title, any control or prohibition under section 7545 of this title, any standard under section 7571 of this title, any rule issued under section 7413, 7419, or under section 7420 of this title, or any other nationally applicable regulations promulgated, or final action taken, by the Administrator under this chapter may be filed only in the United States Court of Appeals for the District of Columbia. A petition for review

of the Administrator's action in approving or promulgating any implementation plan under section 7410 of this title or section 7411(d) of this title, any order under section 7411(j) of this title, under section 7412 of this title, under section 7419 of this title, or under section 7420 of this title, or his action under section 1857c-10(c)(2)(A), (B), or (C) of this title (as in effect before August 7, 1977) or under regulations thereunder, or revising regulations for enhanced monitoring and compliance certification programs under section 7414(a)(3) of this title, or any other final action of the Administrator under this chapter (including any denial or disapproval by the Administrator under subchapter I) which is locally or regionally applicable may be filed only in the United States Court of Appeals for the appropriate circuit. Notwithstanding the preceding sentence a petition for review of any action referred to in such sentence may be filed only in the United States Court of Appeals for the District of Columbia if such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination. Any petition for review under this subsection shall be filed within sixty days from the date notice of such promulgation, approval, or action appears in the Federal Register, except that if such petition is based solely on grounds arising after such sixtieth day, then any petition for review under this subsection shall be filed within sixty days after such grounds arise. The filing of a petition for reconsideration by the Administrator of any otherwise final rule or action shall not affect the finality of such rule or action for purposes of judicial review nor extend the time within which a petition for judicial review of such rule or action under this section may be filed, and shall not postpone the effectiveness of such rule or action.

**(2)** Action of the Administrator with respect to which review could have been obtained under paragraph (1) shall not be subject to judicial review in civil or criminal proceedings for enforcement. Where a final decision by the Administrator defers performance of any nondiscretionary statutory action to a later time, any person may challenge the deferral pursuant to paragraph (1).

**(c) Additional evidence**

In any judicial proceeding in which review is sought of a determination under this chapter required to be made on the record after notice and opportunity for hearing, if any party applies to the court for leave to adduce additional evidence, and shows to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the proceeding before the Administrator, the court may order such additional evidence (and evidence in rebuttal thereof) to be taken before the Administrator, in such manner and upon such terms and conditions as to [5] the court may deem proper. The Administrator may modify his findings as to the facts, or make new findings, by reason of the additional evidence so taken and he shall file such modified or new findings, and his recommendation, if any, for the modification or setting aside of his original determination, with the return of such additional evidence.

**(d) Rulemaking**

**(1)** This subsection applies to--

    **(A)** the promulgation or revision of any national ambient air quality standard under section 7409 of this title,

    **(B)** the promulgation or revision of an implementation plan by the Administrator under section 7410(c) of this title,

    **(C)** the promulgation or revision of any standard of performance under section 7411 of this title, or emission standard or limitation under section 7412(d) of this title, any standard under section 7412(f) of this title, or any regulation under section 7412(g)(1)(D) and (F) of this title, or any regulation under section 7412(m) or (n) of this title,

**(D)** the promulgation of any requirement for solid waste combustion under section 7429 of this title,

**(E)** the promulgation or revision of any regulation pertaining to any fuel or fuel additive under section 7545 of this title,

**(F)** the promulgation or revision of any aircraft emission standard under section 7571 of this title,

**(G)** the promulgation or revision of any regulation under subchapter IV-A (relating to control of acid deposition),

**(H)** promulgation or revision of regulations pertaining to primary nonferrous smelter orders under section 7419 of this title (but not including the granting or denying of any such order),

**(I)** promulgation or revision of regulations under subchapter VI of (relating to stratosphere and ozone protection),

**(J)** promulgation or revision of regulations under part C of subchapter I (relating to prevention of significant deterioration of air quality and protection of visibility),

**(K)** promulgation or revision of regulations under section 7521 of this title and test procedures for new motor vehicles or engines under section 7525 of this title, and the revision of a standard under section 7521(a)(3) of this title,

**(L)** promulgation or revision of regulations for noncompliance penalties under section 7420 of this title,

**(M)** promulgation or revision of any regulations promulgated under section 7541 of this title (relating to warranties and compliance by vehicles in actual use),

**(N)** action of the Administrator under section 7426 of this title (relating to interstate pollution abatement),

**(O)** the promulgation or revision of any regulation pertaining to consumer and commercial products under section 7511b(e) of this title,

**(P)** the promulgation or revision of any regulation pertaining to field citations under section 7413(d)(3) of this title,

**(Q)** the promulgation or revision of any regulation pertaining to urban buses or the clean-fuel vehicle, clean-fuel fleet, and clean fuel programs under part C of subchapter II,

**(R)** the promulgation or revision of any regulation pertaining to nonroad engines or nonroad vehicles under section 7547 of this title,

**(S)** the promulgation or revision of any regulation relating to motor vehicle compliance program fees under section 7552 of this title,

**(T)** the promulgation or revision of any regulation under subchapter IV-A (relating to acid deposition),

**(U)** the promulgation or revision of any regulation under section 7511b(f) of this title pertaining to marine vessels, and

**(V)** such other actions as the Administrator may determine.

The provisions of section 553 through 557 and section 706 of Title 5 shall not, except as expressly provided in this subsection, apply to actions to which this subsection applies. This subsection shall not apply in the case of any rule or circumstance referred to in subparagraphs (A) or (B) of subsection 553(b) of Title 5.

**(2)** Not later than the date of proposal of any action to which this subsection applies, the Administrator shall establish a rulemaking docket for such action (hereinafter in this subsection referred to as a "rule"). Whenever a rule applies only within a particular State, a second (identical) docket shall be simultaneously established in the appropriate regional office of the Environmental Protection Agency.

**(3)** In the case of any rule to which this subsection applies, notice of proposed rulemaking shall be published in the Federal Register, as provided under section 553(b) of Title 5, shall be accompanied by a statement of its basis and purpose and shall specify the period available for public comment (hereinafter referred to as the "comment period"). The notice of proposed rulemaking shall also state the docket number, the location or locations of the docket, and the times it will be open to public inspection. The statement of basis and purpose shall include a summary of--

**(A)** the factual data on which the proposed rule is based;

**(B)** the methodology used in obtaining the data and in analyzing the data; and

**(C)** the major legal interpretations and policy considerations underlying the proposed rule.

The statement shall also set forth or summarize and provide a reference to any pertinent findings, recommendations, and comments by the Scientific Review Committee established under section 7409(d) of this title and the National Academy of Sciences, and, if the proposal differs in any important respect from any of these recommendations, an explanation of the reasons for such differences. All data, information, and documents referred to in this paragraph on which the proposed rule relies shall be included in the docket on the date of publication of the proposed rule.

**(4)(A)** The rulemaking docket required under paragraph (2) shall be open for inspection by the public at reasonable times specified in the notice of proposed rulemaking. Any person may copy documents contained in the docket. The Administrator shall provide copying facilities which may be used at the expense of the person seeking copies, but the Administrator may waive or reduce such expenses in such instances as the public interest requires. Any person may request copies by mail if the person pays the expenses, including personnel costs to do the copying.

**(B)(i)** Promptly upon receipt by the agency, all written comments and documentary information on the proposed rule received from any person for inclusion in the docket during the comment period shall be placed in the docket. The transcript of public hearings, if any, on the proposed rule shall also be included in the docket promptly upon receipt from the person who transcribed such hearings. All documents which become available after the proposed rule has been published and which the Administrator determines are of central relevance to the rulemaking shall be placed in the docket as soon as possible after their availability.

**(ii)** The drafts of proposed rules submitted by the Administrator to the Office of Management and Budget for any interagency review process prior to proposal of any such rule, all documents accompanying such drafts, and all written comments thereon by other agencies and all written responses to such written comments by the Administrator shall be placed in the docket no later than the date of proposal of the rule. The drafts of the final rule submitted for such review process prior to promulgation and all such written comments thereon, all documents accompanying such drafts, and written responses thereto shall be placed in the docket no later than the date of promulgation.

**(5)** In promulgating a rule to which this subsection applies (i) the Administrator shall allow any person to submit written comments, data, or documentary information; (ii) the Administrator shall give interested persons an opportunity for the oral presentation of data, views, or arguments, in addition to an opportunity to make written submissions; (iii) a transcript shall be kept of any oral presentation; and (iv) the Administrator shall keep the record of such proceeding open for thirty days after completion of the proceeding to provide an opportunity for submission of rebuttal and supplementary information.

**(6)(A)** The promulgated rule shall be accompanied by (i) a statement of basis and purpose like that referred to in paragraph (3) with respect to a proposed rule and (ii) an explanation of the reasons for any major changes in the promulgated rule from the proposed rule.

**(B)** The promulgated rule shall also be accompanied by a response to each of the significant comments, criticisms, and new data submitted in written or oral presentations during the comment period.

**(C)** The promulgated rule may not be based (in part or whole) on any information or data which has not been placed in the docket as of the date of such promulgation.

**(7)(A)** The record for judicial review shall consist exclusively of the material referred to in paragraph (3), clause (i) of paragraph (4)(B), and subparagraphs (A) and (B) of paragraph (6).

**(B)** Only an objection to a rule or procedure which was raised with reasonable specificity during the period for public comment (including any public hearing) may be raised during judicial review. If the person raising an objection can demonstrate to the Administrator that it was impracticable to raise such objection within such time or if the grounds for such objection arose after the period for public comment (but within the time specified for judicial review) and if such objection is of central relevance to the outcome of the rule, the Administrator shall convene a proceeding for reconsideration of the rule and provide the same procedural rights as would have been afforded had the information been available at the time the rule was proposed. If the Administrator refuses to convene such a proceeding, such person may seek review of such refusal in the United States court of appeals for the appropriate circuit (as provided in subsection (b)). Such reconsideration shall not postpone the effectiveness of the rule. The effectiveness of the rule may be stayed during such reconsideration, however, by the Administrator or the court for a period not to exceed three months.

**(8)** The sole forum for challenging procedural determinations made by the Administrator under this subsection shall be in the United States court of appeals for the appropriate circuit (as provided in subsection (b)) at the time of the substantive review of the rule. No interlocutory appeals shall be permitted with respect to such procedural determinations. In reviewing alleged procedural errors, the court may invalidate the rule only if the errors were so serious and related to matters of such central relevance to the rule that there is a substantial likelihood that the rule would have been significantly changed if such errors had not been made.

**(9)** In the case of review of any action of the Administrator to which this subsection applies, the court may reverse any such action found to be--

   **(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

   **(B)** contrary to constitutional right, power, privilege, or immunity;

   **(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or

   **(D)** without observance of procedure required by law, if (i) such failure to observe such procedure is arbitrary or capricious, (ii) the requirement of paragraph (7)(B) has been met, and (iii) the condition of the last sentence of paragraph (8) is met.

**(10)** Each statutory deadline for promulgation of rules to which this subsection applies which requires promulgation less than six months after date of proposal may be extended to not more than six months after date of proposal by the Administrator upon a determination that such extension is necessary to afford the public, and the agency, adequate opportunity to carry out the purposes of this subsection.

**(11)** The requirements of this subsection shall take effect with respect to any rule the proposal of which occurs after ninety days after August 7, 1977.

**(e) Other methods of judicial review not authorized**

Nothing in this chapter shall be construed to authorize judicial review of regulations or orders of the Administrator under this chapter, except as provided in this section.

**(f) Costs**

In any judicial proceeding under this section, the court may award costs of litigation (including reasonable attorney and expert witness fees) whenever it determines that such award is appropriate.

**(g) Stay, injunction, or similar relief in proceedings relating to noncompliance penalties**

In any action respecting the promulgation of regulations under section 7420 of this title or the administration or enforcement of section 7420 of this title no court shall grant any stay, injunctive, or similar relief before final judgment by such court in such action.

**(h) Public participation**

It is the intent of Congress that, consistent with the policy of subchapter II of chapter 5 of Title 5, the Administrator in promulgating any regulation under this chapter, including a regulation subject to a deadline, shall ensure a reasonable period for public participation of at least 30 days, except as otherwise expressly provided in section [6] 7407(d), 7502(a), 7511(a) and (b), and 7512(a) and (b) of this title.

<div align="center">

**CREDIT(S)**

</div>

(July 14, 1955, c. 360, Title III, § 307, as added Pub.L. 91-604, § 12(a), Dec. 31, 1970, 84 Stat. 1707; amended Pub.L. 92-157, Title III, § 302(a), Nov. 18, 1971, 85 Stat. 464; Pub.L. 93-319, § 6(c), June 22, 1974, 88 Stat. 259; Pub.L. 95-95, Title III, §§ 303(d), 305(a), (c), (f) to (h), Aug. 7, 1977, 91 Stat. 772, 776, 777; Pub.L. 95-190, § 14(a)(79), (80), Nov. 16, 1977, 91 Stat. 1404; Pub.L. 101-549, Title I, §§ 108(p), 110(5), Title III, § 302(g), (h), Title VII, §§ 702(c), 703, 706, 707(h), 710(b), Nov. 15, 1990, 104 Stat. 2469, 2470, 2574, 2681-2684.)

Notes of Decisions (412)

---

<div align="center">

**Footnotes**

</div>

1       Repealed. See References in Text notes set out under this section.

2       So in original. Probably should be "this".

3       So in original.

4       So in original. Probably should be "subsection,".

5       So in original. The word "to" probably should not appear.

6       So in original. Probably should be "sections".

42 U.S.C.A. § 7607, 42 USCA § 7607
Current through P.L. 118-106. Some statute sections may be more current, see credits for details.

**End of Document** <span style="float:right">© 2024 Thomson Reuters. No claim to original U.S. Government Works.</span>

# REGULATIONS

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter I. Environmental Protection Agency (Refs & Annos)
      Subchapter C. Air Programs
        Part 63. National Emission Standards for Hazardous Air Pollutants for Source Categories (Refs & Annos)
          Subpart F. National Emission Standards for Hazardous Air Pollutants from the Synthetic Organic Chemical Manufacturing Industry (Refs & Annos)

40 C.F.R. § 63.108

§ 63.108 Flare requirements.

Currentness

(a) For any flare that is used to reduce organic HAP emissions from a chemical manufacturing process unit, the owner or operator may elect to comply with the requirements in this section in lieu of the requirements of § 63.11(b) and the requirements referenced therein. The owner or operator may also elect to comply with the requirements in this section pursuant to the overlap provisions provided in § 63.110(j). However, for each source as defined in § 63.101 and for each source as defined in § 63.191, beginning no later than the compliance dates specified in § 63.100(k)(10), the provisions specified in paragraphs (a)(1) through (22) of this section no longer apply. Instead, if an owner or operator reduces organic HAP emissions from a chemical manufacturing process unit by venting emissions through a closed-vent system to a steam-assisted, air-assisted, non-assisted, or pressure-assisted multi-point flare, then the owner or operator must meet the applicable requirements for flares as specified in §§ 63.670 and 63.671, including the provisions in tables 12 and 13 to subpart CC of this part, except as specified in paragraphs (b) through (o) of this section. This requirement also applies to any flare using fuel gas from a fuel gas system, of which 50 percent or more of the fuel gas is derived from a chemical manufacturing process unit, as determined on an annual average basis. For purposes of compliance with this paragraph, the following terms are defined in § 63.641: Assist air, assist steam, center steam, combustion zone, combustion zone gas, flare, flare purge gas, flare supplemental gas, flare sweep gas, flare vent gas, lower steam, net heating value, perimeter assist air, pilot gas, premix assist air, total steam, and upper steam.

(1) Section 63.107(i) related to criteria in § 63.11(b);

(2) Section 63.113(a)(1);

(3) Section 63.114(a)(2);

(4) Section 63.116(a)(1) through (3);

(5) Section 63.117(a)(5)(i) through (iii);

(6) Section 63.118(f)(5);

(7) The last sentence in § 63.119(e)(1) related to flares;

(8) Section 63.120(e)(1) through (6);

(9) Section 63.122(c)(2) and (g)(3);

(10) Section 63.126(b)(2)(i);

(11) Section 63.127(a)(2);

(12) Section 63.128(b)(1) through (3);

(13) Section 63.129(a)(5)(i) through (iii);

(14) Section 63.130(a)(2)(i), (c), and (d)(5);

(15) Section 63.139(c)(3) and (d)(3);

(16) Section 63.145(j)(1) through (3);

(17) Section 63.146(b)(7)(i)(A) through (C);

(18) V63.147(d)(1);

(19) Section 63.172(d);

(20) Section 63.180(e)(1) through (3);

(21) Section 63.181(g)(1)(iii); and

(22) The phrase "including periods when a flare pilot light system does not have a flame" in § 63.181(g)(2)(i) of subpart H of this part.

(b) When determining compliance with the pilot flame requirements specified in § 63.670(b) and (g), substitute "pilot flame or flare flame" for each occurrence of "pilot flame."

(c) When determining compliance with the flare tip velocity and combustion zone operating limits specified in § 63.670(d) and (e), the requirement effectively applies starting with the 15–minute block that includes a full 15 minutes of the flaring event.

The owner or operator is required to demonstrate compliance with the velocity and NHVcz requirements starting with the block that contains the fifteenth minute of a flaring event. The owner or operator is not required to demonstrate compliance for the previous 15–minute block in which the event started and contained only a fraction of flow.

(d) Instead of complying with § 63.670(o)(2)(i), owners and operators must develop and implement the flare management plan no later than the compliance dates specified in § 63.100(k)(10).

(e) Instead of complying with § 63.670(o)(2)(iii), if required to develop a flare management plan and submit it to the Administrator, then owners and operators must also submit all versions of the plan in portable document format (PDF) to the EPA following the procedure specified in § 63.9(k), except any medium submitted through mail must be sent to the attention of the Hazardous Organic Chemical Manufacturing Sector Lead.

(f) Section 63.670(o)(3)(ii) and all references to it do not apply. Instead, the owner or operator must comply with the maximum flare tip velocity operating limit at all times.

(g) Substitute "chemical manufacturing process unit" for each occurrence of "petroleum refinery."

(h) Each occurrence of "refinery" does not apply.

(i) If a pressure-assisted multi-point flare is used as a control device, then owners and operators must meet the following conditions:

(1) The owner or operator is not required to comply with the flare tip velocity requirements in § 63.670(d) and (k);

(2) The NHVcz for pressure-assisted mulit-point flares is 800 Btu/scf;

(3) Owners and operators must determine the 15–minute block average NHVvg using only the direct calculation method specified in § 63.670(l)(5)(ii);

(4) Instead of complying with § 63.670(b) and (g), if a pressure-assisted multi-point flare uses cross-lighting on a stage of burners rather than having an individual pilot flame on each burner, then owners and operators must operate each stage of the pressure-assisted multi-point flare with a flame present at all times when regulated material is routed to that stage of burners. Each stage of burners that cross-lights in the pressure-assisted multi-point flare must have at least two pilots with at least one continuously lit and capable of igniting all regulated material that is routed to that stage of burners. Each 15–minute block during which there is at least one minute where no pilot flame is present on a stage of burners when regulated material is routed to the flare is a violation of the standard. Violations in different 15–minute blocks from the same event are considered separate violations. The pilot flame(s) on each stage of burners that use cross-lighting must be continuously monitored by a thermocouple or any other equivalent device used to detect the presence of a flame;

(5) Unless the owner or operator chooses to conduct a cross-light performance demonstration as specified in this paragraph, owners and operators must ensure that if a stage of burners on the flare uses cross-lighting, that the distance between

any two burners in series on that stage is no more than 6 feet when measured from the center of one burner to the next burner. A distance greater than 6 feet between any two burners in series may be used provided the owner or operator conducts a performance demonstration that confirms the pressure-assisted multi-point flare will cross-light a minimum of three burners and the spacing between the burners and location of the pilot flame must be representative of the projected installation. The compliance demonstration must be approved by the permitting authority and a copy of this approval must be maintained onsite. The compliance demonstration report must include: a protocol describing the test methodology used, associated test method QA/QC parameters, the waste gas composition and NHVcz of the gas tested, the velocity of the waste gas tested, the pressure-assisted multi-point flare burner tip pressure, the time, length, and duration of the test, records of whether a successful cross-light was observed over all of the burners and the length of time it took for the burners to cross-light, records of maintaining a stable flame after a successful cross-light and the duration for which this was observed, records of any smoking events during the cross-light, waste gas temperature, meteorological conditions (e.g., ambient temperature, barometric pressure, wind speed and direction, and relative humidity), and whether there were any observed flare flameouts; and

(6) Owners and operators must install and operate pressure monitor(s) on the main flare header, as well as a valve position indicator monitoring system for each staging valve to ensure that the flare operates within the proper range of conditions as specified by the manufacturer. The pressure monitor must meet the requirements in table 13 to subpart CC of this part.

(7) If a pressure-assisted multi-point flare is operating under the requirements of an approved alternative means of emission limitations, owners and operators must either continue to comply with the terms of the alternative means of emission limitations or comply with the provisions in paragraphs (i)(1) through (6) of this section.

(j) If an owner or operator chooses to determine compositional analysis for net heating value with a continuous process mass spectrometer, then the owner or operator must comply with the requirements specified in paragraphs (j)(1) through (7) of this section.

(1) Owners and operators must meet the requirements in § 63.671(e)(2). The owner or operator may augment the minimum list of calibration gas components found in § 63.671(e)(2) with compounds found during a pre-survey or known to be in the gas through process knowledge.

(2) Calibration gas cylinders must be certified to an accuracy of 2 percent and traceable to National Institute of Standards and Technology (NIST) standards.

(3) For unknown gas components that have similar analytical mass fragments to calibration compounds, the owner or operator may report the unknowns as an increase in the overlapped calibration gas compound. For unknown compounds that produce mass fragments that do not overlap calibration compounds, the owner or operator may use the response factor for the nearest molecular weight hydrocarbon in the calibration mix to quantify the unknown component's NHVvg.

(4) The owner or operator may use the response factor for n-pentane to quantify any unknown components detected with a higher molecular weight than n-pentane.

(5) Owners and operators must perform an initial calibration to identify mass fragment overlap and response factors for the target compounds.

(6) Owners and operators must meet applicable requirements in Performance Specification 9 in appendix B to part 60 of this chapter for continuous monitoring system acceptance including, but not limited to, performing an initial multi-point calibration check at three concentrations following the procedure in section 10.1 and performing the periodic calibration requirements listed for gas chromatographs in table 13 to subpart CC of this part, for the process mass spectrometer. The owner or operator may use the alternative sampling line temperature allowed under Net Heating Value by Gas Chromatograph in table 13 to subpart CC of this part.

(7) The average instrument calibration error (CE) for each calibration compound at any calibration concentration must not differ by more than 10 percent from the certified cylinder gas value. The CE for each component in the calibration blend must be calculated using equation 1 to this paragraph.

**Equation 1 to Paragraph (j)(7)**

$$CE = \frac{C_m - C_a}{C_a} \; x \; 100 \; (Eq. \; 1)$$

Where:

$C_m$ = Average instrument response (ppm)

$C_a$ = Certified cylinder gas value (ppm)

(k) If an owner or operator use a gas chromatograph or mass spectrometer for compositional analysis for net heating value, then the owner or operator may choose to use the CE of $NHV_{measured}$ versus the cylinder tag value NHV as the measure of agreement for daily calibration and quarterly audits in lieu of determining the compound-specific CE. The CE for NHV at any calibration level must not differ by more than 10 percent from the certified cylinder gas value. The CE for must be calculated using equation 2 to this paragraph.

**Equation 2 to Paragraph (k)**

$$CE = \frac{NHV_{measured} - NHV_a}{NHV_a} \; x \; 100 \; (Eq. \; 2)$$

Where:

$NHV_{measured}$ = Average instrument response (Btu/scf)

$NHV_a$ = Certified cylinder gas value (Btu/scf)

(l) Instead of complying with § 63.670(q), owners and operators must comply with the reporting requirements specified in paragraphs (l)(1) and (2) of this section.

(1) The initial notification requirements specified in § 63.152(b)(7).

(2) The Periodic Report required by § 63.152(c) must include the items specified in paragraphs (l)(2)(i) through (vi) of this section.

(i) Records as specified in paragraph (m)(1) of this section for each 15–minute block during which there was at least one minute when regulated material is routed to a flare and no pilot flame or flare flame is present. Include the start and stop time and date of each 15–minute block.

(ii) Visible emission records as specified in paragraph (m)(2)(iv) of this section for each period of 2 consecutive hours during which visible emissions exceeded a total of 5 minutes. Indicate the date and start and end times for each period.

(iii) The periods specified in paragraph (m)(6) of this section. Indicate the date and start and end times for each period, and the net heating value operating parameter(s) determined following the methods in § 63.670(k) through (n) as applicable.

(iv) For flaring events meeting the criteria in § 63.670(o)(3) and paragraph (f) of this section:

(A) The start and stop time and date of the flaring event.

(B) The length of time in minutes for which emissions were visible from the flare during the event.

(C) For steam-assisted, air-assisted, and non-assisted flares, the start date, start time, and duration in minutes for periods of time that the flare tip velocity exceeds the maximum flare tip velocity determined using the methods in § 63.670(d)(2) and the maximum 15–minute block average flare tip velocity in ft/sec recorded during the event.

(D) Results of the root cause and corrective actions analysis completed during the reporting period, including the corrective actions implemented during the reporting period and, if applicable, the implementation schedule for planned corrective actions to be implemented subsequent to the reporting period.

(v) For pressure-assisted multi-point flares, the periods of time when the pressure monitor(s) on the main flare header show the burners operating outside the range of the manufacturer's specifications. Indicate the date and start and end times for each period.

(vi) For pressure-assisted multi-point flares, the periods of time when the staging valve position indicator monitoring system indicates a stage should not be in operation and is or when a stage should be in operation and is not. Indicate the date and start and end times for each period.

(m) Instead of complying with § 63.670(p), owners and operators must keep the flare monitoring records specified in paragraphs (m)(1) through (14) of this section.

(1) Retain records of the output of the monitoring device used to detect the presence of a pilot flame or flare flame as required in § 63.670(b) and the presence of a pilot flame as required in paragraph (i)(4) of this section for a minimum of 2 years. Retain records of each 15–minute block during which there was at least one minute that no pilot flame or flare flame is present when regulated material is routed to a flare for a minimum of 5 years. For a pressure-assisted multi-point flare that uses cross-lighting, retain records of each 15–minute block during which there was at least one minute that no pilot flame is present on each stage when regulated material is routed to a flare for a minimum of 5 years. The owner or operator may reduce the collected minute-by-minute data to a 15–minute block basis with an indication of whether there was at least one minute where no pilot flame or flare flame was present.

(2) Retain records of daily visible emissions observations as specified in paragraphs (m)(2)(i) through (iv) of this section, as applicable, for a minimum of 3 years.

(i) To determine when visible emissions observations are required, the record must identify all periods when regulated material is vented to the flare.

(ii) If visible emissions observations are performed using Method 22 in appendix A–7 to part 60 of this chapter, then the record must identify whether the visible emissions observation was performed, the results of each observation, total duration in minutes of observed visible emissions, and whether it was a 5–minute or 2–hour observation. Record the date and start time of each visible emissions observation.

(iii) If a video surveillance camera is used pursuant to § 63.670(h)(2), then the record must include all video surveillance images recorded, with time and date stamps.

(iv) For each 2–hour period for which visible emissions are observed for more than 5 minutes in 2 consecutive hours, then the record must include the date and start and end time of the 2–hour period and an estimate of the cumulative number of minutes in the 2–hour period for which emissions were visible.

(3) The 15–minute block average cumulative flows for flare vent gas and, if applicable, total steam, perimeter assist air, and premix assist air specified to be monitored under § 63.670(i), along with the date and time interval for the 15–minute block. If multiple monitoring locations are used to determine cumulative vent gas flow, total steam, perimeter assist air, and premix assist air, then retain records of the 15–minute block average flows for each monitoring location for a minimum of 2 years and retain the 15–minute block average cumulative flows that are used in subsequent calculations for a minimum of 5 years. If pressure and temperature monitoring is used, then retain records of the 15–minute block average temperature, pressure, and molecular weight of the flare vent gas or assist gas stream for each measurement location used to determine the 15–minute block average cumulative flows for a minimum of 2 years, and retain the 15–minute block average cumulative flows that are used in subsequent calculations for a minimum of 5 years.

(4) The flare vent gas compositions specified to be monitored under § 63.670(j). Retain records of individual component concentrations from each compositional analysis for a minimum of 2 years. If an NHVvg analyzer is used, retain records of the 15–minute block average values for a minimum of 5 years.

(5) Each 15–minute block average operating parameter calculated following the methods specified in § 63.670(k) through (n) as applicable.

(6) All periods during which operating values are outside of the applicable operating limits specified in § 63.670(d) through (f) and paragraph (i) of this section when regulated material is being routed to the flare.

(7) All periods during which the owner or operator does not perform flare monitoring according to the procedures in § 63.670(g) through (j).

(8) For pressure-assisted multi-point flares, if a stage of burners on the flare uses cross-lighting, then a record of any changes made to the distance between burners.

(9) For pressure-assisted multi-point flares, all periods when the pressure monitor(s) on the main flare header show burners are operating outside the range of the manufacturer's specifications. Indicate the date and time for each period, the pressure measurement, the stage(s) and number of burners affected, and the range of manufacturer's specifications.

(10) For pressure-assisted multi-point flares, all periods when the staging valve position indicator monitoring system indicates a stage of the pressure-assisted multi-point flare should not be in operation and when a stage of the pressure-assisted multi-point flare should be in operation and is not. Indicate the date and time for each period, whether the stage was supposed to be open, but was closed or vice versa, and the stage(s) and number of burners affected.

(11) Records of periods when there is flow of vent gas to the flare, but when there is no flow of regulated material to the flare, including the start and stop time and dates of periods of no regulated material flow.

(12) Records when the flow of vent gas exceeds the smokeless capacity of the flare, including start and stop time and dates of the flaring event.

(13) Records of the root cause analysis and corrective action analysis conducted as required in § 63.670(o)(3) and paragraph (f) of this section, including an identification of the affected flare, the date and duration of the event, a statement noting whether the event resulted from the same root cause(s) identified in a previous analysis and either a description of the recommended corrective action(s) or an explanation of why corrective action is not necessary under § 63.670(o)(5)(i).

(14) For any corrective action analysis for which implementation of corrective actions are required in § 63.670(o)(5), a description of the corrective action(s) completed within the first 45 days following the discharge and, for action(s) not already completed, a schedule for implementation, including proposed commencement and completion dates.

(n) The owner or operator may elect to comply with the alternative means of emissions limitation requirements specified in § 63.670(r) in lieu of the requirements in § 63.670(d) through (f), as applicable. However, instead of complying with § 63.670(r) (3)(iii), owners and operators must also submit the alternative means of emissions limitation request to the following address: U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards, Sector Policies and Programs Division,

U.S. EPA Mailroom (C404–02), Attention: Hazardous Organic Chemical Manufacturing Sector Lead, 4930 Old Page Rd., Durham, NC 27703.

(o) The referenced provisions specified in paragraphs (o)(1) through (4) of this section do not apply when demonstrating compliance with this section.

(1) Section 63.670(o)(4)(iv) of subpart CC of this part.

(2) The last sentence of § 63.670(o)(6).

(3) The phrase "that were not caused by a force majeure event" in § 63.670(o)(7)(ii).

(4) The phrase "that were not caused by a force majeure event" in § 63.670(o)(7)(iv).

**Credits**

[89 FR 43169, May 16, 2024]

SOURCE: 57 FR 61992, Dec. 29, 1992; 59 FR 19454, April 22, 1994; 89 FR 43153, May 16, 2024, unless otherwise noted.

AUTHORITY: 42 U.S.C. 7401 et seq.

Current through January 14, 2025, 90 FR 3563. Some sections may be more current. See credits for details.

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter I. Environmental Protection Agency (Refs & Annos)
      Subchapter C. Air Programs
        Part 63. National Emission Standards for Hazardous Air Pollutants for Source Categories (Refs & Annos)
          Subpart G. National Emission Standards for Hazardous Air Pollutants from the Synthetic Organic Chemical Manufacturing Industry for Process Vents, Storage Vessels, Transfer Operations, and Wastewater (Refs & Annos)

40 C.F.R. § 63.133

§ 63.133 Process wastewater provisions—wastewater tanks.

Currentness

(a) For each wastewater tank that receives, manages, or treats a Group 1 wastewater stream or a residual removed from a Group 1 wastewater stream, the owner or operator shall comply with the requirements of either paragraph (a)(1) or (a)(2) of this section as specified in table 10 of this subpart.

(1) The owner or operator shall operate and maintain a fixed roof except that if the wastewater tank is used for heating wastewater, or treating by means of an exothermic reaction or the contents of the tank is sparged, the owner or operator shall comply with the requirements specified in paragraph (a)(2) of this section.

(2) The owner or operator shall comply with the requirements in paragraphs (b) through (h) of this section and shall operate and maintain one of the emission control techniques listed in paragraphs (a)(2)(i) through (a)(2)(iv) of this section.

(i) A fixed roof and a closed vent system that routes the organic hazardous air pollutants vapors vented from the wastewater tank to a control device.

(ii) A fixed roof and an internal floating roof that meets the requirements specified in § 63.119(b) of this subpart;

(iii) An external floating roof that meets the requirements specified in §§ 63.119(c), 63.120(b)(5), and 63.120(b)(6) of this subpart; or

(iv) An equivalent means of emission limitation. Determination of equivalence to the reduction in emissions achieved by the requirements of paragraphs (a)(2)(i) through (a)(2)(iii) of this section will be evaluated according to § 63.102(b) of subpart F of this part. The determination will be based on the application to the Administrator which shall include the information specified in either paragraph (a)(2)(iv)(A) or (a)(2)(iv)(B) of this section.

(A) Actual emissions tests that use full-size or scale-model wastewater tanks that accurately collect and measure all organic hazardous air pollutants emissions from a given control technique, and that accurately simulate wind and account for other emission variables such as temperature and barometric pressure, or

(B) An engineering evaluation that the Administrator determines is an accurate method of determining equivalence.

(b) If the owner or operator elects to comply with the requirements of paragraph (a)(2)(i) of this section, the fixed roof shall meet the requirements of paragraph (b)(1) of this section, the control device shall meet the requirements of paragraph (b)(2) of this section, and the closed vent system shall meet the requirements of paragraph (b)(3) of this section.

(1) The fixed-roof shall meet the following requirements:

(i) Except as provided in paragraph (b)(4) of this section, the fixed roof and all openings (e.g., access hatches, sampling ports, and gauge wells) shall be maintained in accordance with the requirements specified in § 63.148 of this subpart.

(ii) Each opening shall be maintained in a closed position (e.g., covered by a lid) at all times that the wastewater tank contains a Group 1 wastewater stream or residual removed from a Group 1 wastewater stream except when it is necessary to use the opening for wastewater sampling, removal, or for equipment inspection, maintenance, or repair.

(2) The control device shall be designed, operated, and inspected in accordance with the requirements of § 63.139 of this subpart.

(3) Except as provided in paragraph (b)(4) of this section, the closed vent system shall be inspected in accordance with the requirements of § 63.148.

(4) For any fixed roof tank and closed vent system that is operated and maintained under negative pressure, the owner or operator is not required to comply with the requirements specified in § 63.148.

(c) If the owner or operator elects to comply with the requirements of paragraph (a)(2)(ii) of this section, the floating roof shall be inspected according to the procedures specified in § 63.120(a)(2) and (a)(3) of this subpart.

(d) Except as provided in paragraph (e) of this section, if the owner or operator elects to comply with the requirements of paragraph (a)(2)(iii) of this section, seal gaps shall be measured according to the procedures specified in § 63.120(b)(2)(i) through (b)(4) of this subpart and the wastewater tank shall be inspected to determine compliance with § 63.120(b)(5) and (b)(6) of this subpart.

(e) If the owner or operator determines that it is unsafe to perform the seal gap measurements specified in § 63.120(b)(2)(i) through (b)(4) of this subpart or to inspect the wastewater tank to determine compliance with § 63.120(b)(5) and (b)(6) of this subpart because the floating roof appears to be structurally unsound and poses an imminent or potential danger to inspecting personnel, the owner or operator shall comply with the requirements in either paragraph (e)(1) or (e)(2) of this section.

(1) The owner or operator shall measure the seal gaps or inspect the wastewater tank within 30 calendar days of the determination that the floating roof is unsafe, or

(2) The owner or operator shall empty and remove the wastewater tank from service within 45 calendar days of determining that the roof is unsafe. If the wastewater tank cannot be emptied within 45 calendar days, the owner or operator may utilize up to two extensions of up to 30 additional calendar days each. Documentation of a decision to utilize an extension shall include an explanation of why it was unsafe to perform the inspection or seal gap measurement, shall document that alternate storage capacity is unavailable, and shall specify a schedule of actions that will ensure that the wastewater tank will be emptied as soon as practical.

(f) Except as provided in paragraph (e) of this section, each wastewater tank shall be inspected initially, and semi-annually thereafter, for improper work practices in accordance with § 63.143 of this subpart. For wastewater tanks, improper work practice includes, but is not limited to, leaving open any access door or other opening when such door or opening is not in use.

(g) Except as provided in paragraph (e) of this section, each wastewater tank shall be inspected for control equipment failures as defined in paragraph (g)(1) of this section according to the schedule in paragraphs (g)(2) and (g)(3) of this section.

(1) Control equipment failures for wastewater tanks include, but are not limited to, the conditions specified in paragraphs (g)(1)(i) through (g)(1)(ix) of this section.

(i) The floating roof is not resting on either the surface of the liquid or on the leg supports.

(ii) There is stored liquid on the floating roof.

(iii) A rim seal is detached from the floating roof.

(iv) There are holes, tears, cracks or gaps in the rim seal or seal fabric of the floating roof.

(v) There are visible gaps between the seal of an internal floating roof and the wall of the wastewater tank.

(vi) There are gaps between the metallic shoe seal or the liquid mounted primary seal of an external floating roof and the wall of the wastewater tank that exceed 212 square centimeters per meter of tank diameter or the width of any portion of any gap between the primary seal and the tank wall exceeds 3.81 centimeters.

(vii) There are gaps between the secondary seal of an external floating roof and the wall of the wastewater tank that exceed 21.2 square centimeters per meter of tank diameter or the width of any portion of any gap between the secondary seal and the tank wall exceeds 1.27 centimeters.

(viii) Where a metallic shoe seal is used on an external floating roof, one end of the metallic shoe does not extend into the stored liquid or one end of the metallic shoe does not extend a minimum vertical distance of 61 centimeters above the surface of the stored liquid.

(ix) A gasket, joint, lid, cover, or door has a crack or gap, or is broken.

(2) The owner or operator shall inspect for the control equipment failures in paragraphs (g)(1)(i) through (g)(1)(viii) of this section according to the schedule specified in paragraphs (c) and (d) of this section.

(3) The owner or operator shall inspect for the control equipment failures in paragraph (g)(1)(ix) of this section initially, and semi-annually thereafter.

(h) Except as provided in § 63.140 of this subpart, when an improper work practice or a control equipment failure is identified, first efforts at repair shall be made no later than 5 calendar days after identification and repair shall be completed within 45 calendar days after identification. If a failure that is detected during inspections required by this section cannot be repaired within 45 calendar days and if the vessel cannot be emptied within 45 calendar days, the owner or operator may utilize up to 2 extensions of up to 30 additional calendar days each. Documentation of a decision to utilize an extension shall include a description of the failure, shall document that alternate storage capacity is unavailable, and shall specify a schedule of actions that will ensure that the control equipment will be repaired or the vessel will be emptied as soon as practical.

**Credits**

[62 FR 2751, 2753, Jan. 17, 1997; 64 FR 20191, April 26, 1999; 89 FR 43202, May 16, 2024]

SOURCE: 57 FR 61992, Dec. 29, 1992; 59 FR 19468, April 22, 1994; 89 FR 43175, May 16, 2024, unless otherwise noted.

AUTHORITY: 42 U.S.C. 7401 et seq.

Current through January 14, 2025, 90 FR 3563. Some sections may be more current. See credits for details.

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations

  Title 40. Protection of Environment

    Chapter I. Environmental Protection Agency (Refs & Annos)

      Subchapter C. Air Programs

        Part 63. National Emission Standards for Hazardous Air Pollutants for Source Categories (Refs & Annos)

          Subpart G. National Emission Standards for Hazardous Air Pollutants from the Synthetic Organic Chemical Manufacturing Industry for Process Vents, Storage Vessels, Transfer Operations, and Wastewater (Refs & Annos)

40 C.F.R. § 63.134

§ 63.134 Process wastewater provisions—surface impoundments.

Currentness

(a) For each surface impoundment that receives, manages, or treats a Group 1 wastewater stream or a residual removed from a Group 1 wastewater stream, the owner or operator shall comply with the requirements of paragraphs (b), (c), and (d) of this section.

(b) The owner or operator shall operate and maintain on each surface impoundment either a cover (e.g., air-supported structure or rigid cover) and a closed vent system that routes the organic hazardous air pollutants vapors vented from the surface impoundment to a control device in accordance with paragraph (b)(1) of this section, or a floating flexible membrane cover as specified in paragraph (b)(2) of this section.

(1) The cover and all openings shall meet the following requirements:

(i) Except as provided in paragraph (b)(4) of this section, the cover and all openings (e.g., access hatches, sampling ports, and gauge wells) shall be maintained in accordance with the requirements specified in § 63.148 of this subpart.

(ii) Each opening shall be maintained in a closed position (e.g., covered by a lid) at all times that a Group 1 wastewater stream or residual removed from a Group 1 wastewater stream is in the surface impoundment except when it is necessary to use the opening for sampling, removal, or for equipment inspection, maintenance, or repair.

(iii) The cover shall be used at all times that a Group 1 wastewater stream or residual removed from a Group 1 wastewater stream is in the surface impoundment except during removal of treatment residuals in accordance with 40 CFR 268.4 or closure of the surface impoundment in accordance with 40 CFR 264.228.

(2) Floating flexible membrane covers shall meet the requirements specified in paragraphs (b)(2)(i) through (b)(2)(vii) of this section.

(i) The floating flexible cover shall be designed to float on the liquid surface during normal operations, and to form a continuous barrier over the entire surface area of the liquid.

(ii) The cover shall be fabricated from a synthetic membrane material that is either:

(A) High density polyethylene (HDPE) with a thickness no less than 2.5 millimeters (100 mils); or

(B) A material or a composite of different materials determined to have both organic permeability properties that are equivalent to those of the material listed in paragraph (b)(2)(ii)(A) of this section, and chemical and physical properties that maintain the material integrity for the intended service life of the material.

(iii) The cover shall be installed in a manner such that there are no visible cracks, holes, gaps, or other open spaces between cover section seams or between the interface of the cover edge and its foundation mountings.

(iv) Except as provided for in paragraph (b)(2)(v) of this section, each opening in the floating membrane cover shall be equipped with a closure device designed to operate such that when the closure device is secured in the closed position there are no visible cracks, holes, gaps, or other open spaces in the closure device or between the perimeter of the cover opening and the closure device.

(v) The floating membrane cover may be equipped with one or more emergency cover drains for removal of stormwater. Each emergency cover drain shall be equipped with a slotted membrane fabric cover that covers at least 90 percent of the area of the opening or a flexible fabric sleeve seal.

(vi) The closure devices shall be made of suitable materials that will minimize exposure of organic hazardous air pollutants to the atmosphere, to the extent practical, and will maintain the integrity of the equipment throughout its intended service life. Factors to be considered in designing the closure devices shall include: The effects of any contact with the liquid and its vapor managed in the surface impoundment; the effects of outdoor exposure to wind, moisture, and sunlight; and the operating practices used for the surface impoundment on which the floating membrane cover is installed.

(vii) Whenever a Group 1 wastewater stream or residual from a Group 1 wastewater stream is in the surface impoundment, the floating membrane cover shall float on the liquid and each closure device shall be secured in the closed position. Opening of closure devices or removal of the cover is allowed to provide access to the surface impoundment for performing routine inspection, maintenance, or other activities needed for normal operations and/or to remove accumulated sludge or other residues from the bottom of surface impoundment. Openings shall be maintained in accordance with § 63.148 of this subpart.

(3) The control device shall be designed, operated, and inspected in accordance with § 63.139 of this subpart.

(4) Except as provided in paragraph (b)(5) of this section, the closed vent system shall be inspected in accordance with § 63.148.

(5) For any cover and closed vent system that is operated and maintained under negative pressure, the owner or operator is not required to comply with the requirements specified in § 63.148.

(c) Each surface impoundment shall be inspected initially, and semi-annually thereafter, for improper work practices and control equipment failures in accordance with § 63.143 of this subpart.

(1) For surface impoundments, improper work practice includes, but is not limited to, leaving open any access hatch or other opening when such hatch or opening is not in use.

(2) For surface impoundments, control equipment failure includes, but is not limited to, any time a joint, lid, cover, or door has a crack or gap, or is broken.

(d) Except as provided in § 63.140 of this subpart, when an improper work practice or a control equipment failure is identified, first efforts at repair shall be made no later than 5 calendar days after identification and repair shall be completed within 45 calendar days after identification.

**Credits**

[62 FR 2751, 2754, Jan. 17, 1997; 64 FR 20191, April 26, 1999; 89 FR 43202, May 16, 2024]

SOURCE: 57 FR 61992, Dec. 29, 1992; 59 FR 19468, April 22, 1994; 89 FR 43175, May 16, 2024, unless otherwise noted.

AUTHORITY: 42 U.S.C. 7401 et seq.

Current through January 14, 2025, 90 FR 3563. Some sections may be more current. See credits for details.

---

**End of Document**　　　　　　　　　　　　　　© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter I. Environmental Protection Agency (Refs & Annos)
      Subchapter C. Air Programs
        Part 63. National Emission Standards for Hazardous Air Pollutants for Source Categories (Refs & Annos)
          Subpart G. National Emission Standards for Hazardous Air Pollutants from the Synthetic Organic Chemical Manufacturing Industry for Process Vents, Storage Vessels, Transfer Operations, and Wastewater (Refs & Annos)

40 C.F.R. § 63.135

§ 63.135 Process wastewater provisions—containers.

Currentness

(a) For each container that receives, manages, or treats a Group 1 wastewater stream or a residual removed from a Group 1 wastewater stream, the owner or operator shall comply with the requirements of paragraphs (b) through (f) of this section.

(b) The owner or operator shall operate and maintain a cover on each container used to handle, transfer, or store a Group 1 wastewater stream or residual removed from a Group 1 wastewater stream in accordance with the following requirements:

(1) Except as provided in paragraph (d)(4) of this section, if the capacity of the container is greater than $0.42 \, \text{m}^3$, the cover and all openings (e.g., bungs, hatches, sampling ports, and pressure relief devices) shall be maintained in accordance with the requirements specified in § 63.148 of this subpart.

(2) If the capacity of the container is less than or equal to $0.42 \, \text{m}^3$, the owner or operator shall comply with either paragraph (b)(2)(i) or (b)(2)(ii) of this section.

(i) The container must meet existing Department of Transportation specifications and testing requirements under 49 CFR part 178; or

(ii) Except as provided in paragraph (d)(4) of this section, the cover and all openings shall be maintained without leaks as specified in § 63.148 of this subpart.

(3) Except as specified in paragraph (b)(4) of this section, the cover and all openings shall be maintained in a closed position (e.g., covered by a lid) at all times that a Group 1 wastewater stream or residual removed from a Group 1 wastewater stream is in the container except when it is necessary to use the opening for filling, removal, inspection, sampling, or pressure relief events related to safety considerations.

(4) For each source as defined in § 63.101, beginning no later than the compliance dates specified in § 63.100(k)(10), pressure relief devices are subject to the requirements specified in § 63.165(e) of subpart H of this part.

(c) For containers with a capacity greater than or equal to 0.42 m$^3$, a submerged fill pipe shall be used when a container is being filled by pumping with a Group 1 wastewater stream or residual removed from a Group 1 wastewater stream.

    (1) The submerged fill pipe outlet shall extend to no more than 6 inches or within two fill pipe diameters of the bottom of the container while the container is being filled.

    (2) The cover shall remain in place and all openings shall be maintained in a closed position except for those openings required for the submerged fill pipe and for venting of the container to prevent physical damage or permanent deformation of the container or cover.

(d) During treatment of a Group 1 wastewater stream or residual removed from a Group 1 wastewater stream, including aeration, thermal or other treatment, in a container, whenever it is necessary for the container to be open, the container shall be located within an enclosure with a closed vent system that routes the organic hazardous air pollutants vapors vented from the container to a control device.

    (1) Except as provided in paragraph (d)(4) of this section, the enclosure and all openings (e.g., doors, hatches) shall be maintained in accordance with the requirements specified in § 63.148 of this subpart.

    (2) The control device shall be designed, operated, and inspected in accordance with § 63.139 of this subpart.

    (3) Except as provided in paragraph (d)(4) of this section, the closed vent system shall be inspected in accordance with § 63.148 of this subpart.

    (4) For any enclosure and closed vent system that is operated and maintained under negative pressure, the owner or operator is not required to comply with the requirements specified in § 63.148 of this subpart.

(e) Each container shall be inspected initially, and semi-annually thereafter, for improper work practices and control equipment failures in accordance with § 63.143 of this subpart.

    (1) For containers, improper work practice includes, but is not limited to, leaving open any access hatch or other opening when such hatch or opening is not in use.

    (2) For containers, control equipment failure includes, but is not limited to, any time a cover or door has a gap or crack, or is broken.

(f) Except as provided in § 63.140 of this subpart, when an improper work practice or a control equipment failure is identified, first efforts at repair shall be made no later than 5 calendar days after identification and repair shall be completed within 15 calendar days after identification.

**Credits**

[62 FR 2751, 2755, Jan. 17, 1997; 89 FR 43202, May 16, 2024]

SOURCE: 57 FR 61992, Dec. 29, 1992; 59 FR 19468, April 22, 1994; 89 FR 43175, May 16, 2024, unless otherwise noted.

AUTHORITY: 42 U.S.C. 7401 et seq.

Current through January 14, 2025, 90 FR 3563. Some sections may be more current. See credits for details.

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
    Title 40. Protection of Environment
        Chapter I. Environmental Protection Agency (Refs & Annos)
            Subchapter C. Air Programs
                Part 63. National Emission Standards for Hazardous Air Pollutants for Source Categories (Refs & Annos)
                    Subpart G. National Emission Standards for Hazardous Air Pollutants from the Synthetic Organic Chemical Manufacturing Industry for Process Vents, Storage Vessels, Transfer Operations, and Wastewater (Refs & Annos)

40 C.F.R. § 63.136

§ 63.136 Process wastewater provisions—individual drain systems.

Currentness

(a) For each individual drain system that receives or manages a Group 1 wastewater stream or a residual removed from a Group 1 wastewater stream, the owner or operator shall comply with the requirements of paragraphs (b), (c), and (d) or with paragraphs (e), (f), and (g) of this section.

(b) If the owner or operator elects to comply with this paragraph, the owner or operator shall operate and maintain on each opening in the individual drain system a cover and if vented, route the vapors to a process or through a closed vent system to a control device. The owner or operator shall comply with the requirements of paragraphs (b)(1) through (b)(5) of this section.

(1) The cover and all openings shall meet the following requirements:

(i) Except as provided in paragraph (b)(4) of this section, the cover and all openings (e.g., access hatches, sampling ports) shall be maintained in accordance with the requirements specified in § 63.148 of this subpart.

(ii) The cover and all openings shall be maintained in a closed position at all times that a Group 1 wastewater stream or residual removed from a Group 1 wastewater stream is in the drain system except when it is necessary to use the opening for sampling or removal, or for equipment inspection, maintenance, or repair.

(2) The control device shall be designed, operated, and inspected in accordance with § 63.139 of this subpart.

(3) Except as provided in paragraph (b)(4) of this section, the closed vent system shall be inspected in accordance with § 63.148.

(4) For any cover and closed vent system that is operated and maintained under negative pressure, the owner or operator is not required to comply with the requirements specified in § 63.148.

(5) The individual drain system shall be designed and operated to segregate the vapors within the system from other drain systems and the atmosphere.

(c) Each individual drain system shall be inspected initially, and semi- annually thereafter, for improper work practices and control equipment failures, in accordance with the inspection requirements specified in table 11 of this subpart.

(1) For individual drain systems, improper work practice includes, but is not limited to, leaving open any access hatch or other opening when such hatch or opening is not in use for sampling or removal, or for equipment inspection, maintenance, or repair.

(2) For individual drain systems, control equipment failure includes, but is not limited to, any time a joint, lid, cover, or door has a gap or crack, or is broken.

(d) Except as provided in § 63.140 of this subpart, when an improper work practice or a control equipment failure is identified, first efforts at repair shall be made no later than 5 calendar days after identification and repair shall be completed within 15 calendar days after identification.

(e) If the owner or operator elects to comply with this paragraph, the owner or operator shall comply with the requirements in paragraphs (e)(1) through (e)(3) of this section:

(1) Each drain shall be equipped with water seal controls or a tightly fitting cap or plug. The owner or operator shall comply with paragraphs (e)(1)(i) and (e)(1)(ii) of this section.

(i) For each drain equipped with a water seal, the owner or operator shall ensure that the water seal is maintained. For example, a flow-monitoring device indicating positive flow from a main to a branch water line supplying a trap or water being continuously dripped into the trap by a hose could be used to verify flow of water to the trap. Visual observation is also an acceptable alternative.

(ii) If a water seal is used on a drain receiving a Group 1 wastewater, the owner or operator shall either extend the pipe discharging the wastewater below the liquid surface in the water seal of the receiving drain, or install a flexible shield (or other enclosure which restricts wind motion across the open area between the pipe and the drain) that encloses the space between the pipe discharging the wastewater to the drain receiving the wastewater. (Water seals which are used on hubs receiving Group 2 wastewater for the purpose of eliminating cross ventilation to drains carrying Group 1 wastewater are not required to have a flexible cap or extended subsurface discharging pipe.)

(2) Each junction box shall be equipped with a tightly fitting solid cover (i.e., no visible gaps, cracks, or holes) which shall be kept in place at all times except during inspection and maintenance. If the junction box is vented, the owner or operator shall comply with the requirements in paragraph (e)(2)(i) or (e)(2)(ii) of this section.

(i) The junction box shall be vented to a process or through a closed vent system to a control device. The closed vent system shall be inspected in accordance with the requirements of § 63.148 and the control device shall be designed, operated, and inspected in accordance with the requirements of § 63.139.

(ii) If the junction box is filled and emptied by gravity flow (i.e., there is no pump) or is operated with no more than slight fluctuations in the liquid level, the owner or operator may vent the junction box to the atmosphere provided that the junction box complies with the requirements in paragraphs (e)(2)(ii)(A) and (e)(2)(ii)(B) of this section.

(A) The vent pipe shall be at least 90 centimeters in length and no greater than 10.2 centimeters in nominal inside diameter.

(B) Water seals shall be installed and maintained at the wastewater entrance(s) to or exit from the junction box restricting ventilation in the individual drain system and between components in the individual drain system. The owner or operator shall demonstrate (e.g., by visual inspection or smoke test) upon request by the Administrator that the junction box water seal is properly designed and restricts ventilation.

(3) Each sewer line shall not be open to the atmosphere and shall be covered or enclosed in a manner so as to have no visible gaps or cracks in joints, seals, or other emission interfaces.

(f) Equipment used to comply with paragraphs (e)(1), (e)(2), or (e)(3) of this section shall be inspected as follows:

(1) Each drain using a tightly fitting cap or plug shall be visually inspected initially, and semi-annually thereafter, to ensure caps or plugs are in place and that there are no gaps, cracks, or other holes in the cap or plug.

(2) Each junction box shall be visually inspected initially, and semi-annually thereafter, to ensure that there are no gaps, cracks, or other holes in the cover.

(3) The unburied portion of each sewer line shall be visually inspected initially, and semi-annually thereafter, for indication of cracks or gaps that could result in air emissions.

(g) Except as provided in § 63.140 of this subpart, when a gap, hole, or crack is identified in a joint or cover, first efforts at repair shall be made no later than 5 calendar days after identification, and repair shall be completed within 15 calendar days after identification.

**Credits**
[62 FR 2751, 2755, Jan. 17, 1997; 89 FR 43202, May 16, 2024]

SOURCE: 57 FR 61992, Dec. 29, 1992; 59 FR 19468, April 22, 1994; 89 FR 43175, May 16, 2024, unless otherwise noted.

AUTHORITY: 42 U.S.C. 7401 et seq.

Current through January 14, 2025, 90 FR 3563. Some sections may be more current. See credits for details.

**End of Document**                          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter I. Environmental Protection Agency (Refs & Annos)
      Subchapter C. Air Programs
        Part 63. National Emission Standards for Hazardous Air Pollutants for Source Categories (Refs & Annos)
          Subpart G. National Emission Standards for Hazardous Air Pollutants from the Synthetic Organic Chemical Manufacturing Industry for Process Vents, Storage Vessels, Transfer Operations, and Wastewater (Refs & Annos)

40 C.F.R. § 63.137

§ 63.137 Process wastewater provisions—oil-water separators.

Currentness

(a) For each oil-water separator that receives, manages, or treats a Group 1 wastewater stream or a residual removed from a Group 1 wastewater stream, the owner or operator shall comply with the requirements of paragraphs (c) and (d) of this section and shall operate and maintain one of the following:

(1) A fixed roof and a closed vent system that routes the organic hazardous air pollutants vapors vented from the oil-water separator to a control device. The fixed roof, closed vent system, and control device shall meet the requirements specified in paragraph (b) of this section;

(2) A floating roof meeting the requirements in 40 CFR part 60, subpart QQQ § 60.693–2(a)(1)(i), (a)(1)(ii), (a)(2), (a)(3), and (a)(4). For portions of the oil-water separator where it is infeasible to construct and operate a floating roof, such as over the weir mechanism, the owner or operator shall operate and maintain a fixed roof, closed vent system, and control device that meet the requirements specified in paragraph (b) of this section.

(3) An equivalent means of emission limitation. Determination of equivalence to the reduction in emissions achieved by the requirements of paragraphs (a)(1) and (a)(2) of this section will be evaluated according to § 63.102(b) of subpart F of this part. The determination will be based on the application to the Administrator which shall include the information specified in either paragraph (a)(3)(i) or (a)(3)(ii) of this section.

(i) Actual emissions tests that use full-size or scale-model oil-water separators that accurately collect and measure all organic hazardous air pollutants emissions from a given control technique, and that accurately simulate wind and account for other emission variables such as temperature and barometric pressure, or

(ii) An engineering evaluation that the Administrator determines is an accurate method of determining equivalence.

(b) If the owner or operator elects to comply with the requirements of paragraphs (a)(1) or (a)(2) of this section, the fixed roof shall meet the requirements of paragraph (b)(1) of this section, the control device shall meet the requirements of paragraph (b)(2) of this section, and the closed vent system shall meet the requirements of paragraph (b)(3) of this section.

(1) The fixed-roof shall meet the following requirements:

(i) Except as provided in paragraph (b)(4) of this section, the fixed roof and all openings (e.g., access hatches, sampling ports, and gauge wells) shall be maintained in accordance with the requirements specified in § 63.148 of this subpart.

(ii) Each opening shall be maintained in a closed, sealed position (e.g., covered by a lid that is gasketed and latched) at all times that the oil-water separator contains a Group 1 wastewater stream or residual removed from a Group 1 wastewater stream except when it is necessary to use the opening for sampling or removal, or for equipment inspection, maintenance, or repair.

(2) The control device shall be designed, operated, and inspected in accordance with the requirements of § 63.139 of this subpart.

(3) Except as provided in paragraph (b)(4) of this section, the closed vent system shall be inspected in accordance with the requirements of § 63.148.

(4) For any fixed roof and closed vent system that is operated and maintained under negative pressure, the owner or operator is not required to comply with the requirements of § 63.148.

(c) If the owner or operator elects to comply with the requirements of paragraph (a)(2) of this section, seal gaps shall be measured according to the procedures specified in 40 CFR part 60, subpart QQQ § 60.696(d)(1) and the schedule specified in paragraphs (c)(1) and (c)(2) of this section.

(1) Measurement of primary seal gaps shall be performed within 60 calendar days after installation of the floating roof and introduction of a Group 1 wastewater stream or residual removed from a Group 1 wastewater stream and once every 5 years thereafter.

(2) Measurement of secondary seal gaps shall be performed within 60 calendar days after installation of the floating roof and introduction of a Group 1 wastewater stream or residual removed from a Group 1 wastewater stream and once every year thereafter.

(d) Each oil-water separator shall be inspected initially, and semi-annually thereafter, for improper work practices in accordance with § 63.143 of this subpart. For oil-water separators, improper work practice includes, but is not limited to, leaving open or ungasketed any access door or other opening when such door or opening is not in use.

(e) Each oil-water separator shall be inspected for control equipment failures as defined in paragraph (e)(1) of this section according to the schedule specified in paragraphs (e)(2) and (e)(3) of this section.

(1) For oil-water separators, control equipment failure includes, but is not limited to, the conditions specified in paragraphs (e)(1)(i) through (e)(1)(vii) of this section.

(i) The floating roof is not resting on either the surface of the liquid or on the leg supports.

(ii) There is stored liquid on the floating roof.

(iii) A rim seal is detached from the floating roof.

(iv) There are holes, tears, or other open spaces in the rim seal or seal fabric of the floating roof.

(v) There are gaps between the primary seal and the separator wall that exceed 67 square centimeters per meter of separator wall perimeter or the width of any portion of any gap between the primary seal and the separator wall exceeds 3.8 centimeters.

(vi) There are gaps between the secondary seal and the separator wall that exceed 6.7 square centimeters per meter of separator wall perimeter or the width of any portion of any gap between the secondary seal and the separator wall exceeds 1.3 centimeters.

(vii) A gasket, joint, lid, cover, or door has a gap or crack, or is broken.

(2) The owner or operator shall inspect for the control equipment failures in paragraphs (e)(1)(i) through (e)(1)(vi) of this section according to the schedule specified in paragraph (c) of this section.

(3) The owner or operator shall inspect for control equipment failures in paragraph (e)(1)(vii) of this section initially, and semi-annually thereafter.

(f) Except as provided in § 63.140 of this subpart, when an improper work practice or a control equipment failure is identified, first efforts at repair shall be made no later than 5 calendar days after identification and repair shall be completed within 45 calendar days after identification.

**Credits**

[62 FR 2751, 2756, Jan. 17, 1997; 89 FR 43202, May 16, 2024]

SOURCE: 57 FR 61992, Dec. 29, 1992; 59 FR 19468, April 22, 1994; 89 FR 43175, May 16, 2024, unless otherwise noted.

AUTHORITY: 42 U.S.C. 7401 et seq.

Current through January 14, 2025, 90 FR 3563. Some sections may be more current. See credits for details.

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter I. Environmental Protection Agency (Refs & Annos)
      Subchapter C. Air Programs
        Part 63. National Emission Standards for Hazardous Air Pollutants for Source Categories (Refs & Annos)
          Subpart G. National Emission Standards for Hazardous Air Pollutants from the Synthetic Organic Chemical Manufacturing Industry for Process Vents, Storage Vessels, Transfer Operations, and Wastewater (Refs & Annos)

40 C.F.R. § 63.139

§ 63.139 Process wastewater provisions—control devices.

Currentness

(a) For each control device or combination of control devices used to comply with the provisions in §§ 63.133 through 63.138 of this subpart, the owner or operator shall operate and maintain the control device or combination of control devices in accordance with the requirements of paragraphs (b) through (f) of this section.

(b) Whenever organic hazardous air pollutants emissions are vented to a control device which is used to comply with the provisions of this subpart, such control device shall be operating.

(c) The control device shall be designed and operated in accordance with paragraph (c)(1), (2), (3), (4), or (5) of this section.

(1) An enclosed combustion device (including but not limited to a vapor incinerator, boiler, or process heater) shall meet the conditions in paragraph (c)(1)(i), (ii), or (iii) of this section, alone or in combination with other control devices. If a boiler or process heater is used as the control device, then the vent stream shall be introduced into the flame zone of the boiler or process heater.

(i) Reduce the total organic compound emissions, less methane and ethane, or total organic hazardous air pollutants emissions vented to the control device by 95 percent by weight or greater;

(ii) Achieve an outlet total organic compound concentration, less methane and ethane, or total organic hazardous air pollutants concentration of 20 parts per million by volume on a dry basis corrected to 3 percent oxygen. The owner or operator shall use either Method 18 of appendix A–6 to part 60 of this chapter, any other method or data that has been validated according to the applicable procedures in Method 301 of appendix A of this part, or ASTM D6420–18 (incorporated by reference, see § 63.14) may also be used in lieu of Method 18, if the target compounds are all known and are all listed in Section 1.1 of ASTM D6420–18 as measurable; ASTM D6420–18 must not be used for methane and ethane; and ASTM D6420–18 may not be used as a total VOC method; or

(iii) Provide a minimum residence time of 0.5 seconds at a minimum temperature of 760 °C.

(2) A vapor recovery system (including but not limited to a carbon adsorption system or condenser), alone or in combination with other control devices, shall reduce the total organic compound emissions, less methane and ethane, or total organic hazardous air pollutants emissions vented to the control device of 95 percent by weight or greater or achieve an outlet total organic compound concentration, less methane and ethane, or total organic hazardous air pollutants concentration of 20 parts per million by volume. The 20 parts per million by volume performance standard is not applicable to compliance with the provisions of § 63.134 or § 63.135.

(3) Except as specified in paragraph (a) of § 63.108, a flare shall comply with the requirements of § 63.11(b).

(4) A scrubber, alone or in combination with other control devices, shall reduce the total organic compound emissions, less methane and ethane, or total organic hazardous air pollutants emissions in such a manner that 95 weight-percent is either removed, or destroyed by chemical reaction with the scrubbing liquid or achieve an outlet total organic compound concentration, less methane and ethane, or total organic hazardous air pollutants concentration of 20 parts per million by volume. The 20 parts per million by volume performance standard is not applicable to compliance with the provisions of § 63.134 or § 63.135.

(5) Any other control device used shall, alone or in combination with other control devices, reduce the total organic compound emissions, less methane and ethane, or total organic hazardous air pollutants emissions vented to the control device by 95 percent by weight or greater or achieve an outlet total organic compound concentration, less methane and ethane, or total organic hazardous air pollutants concentration of 20 parts per million by volume. The 20 parts per million by volume performance standard is not applicable to compliance with the provisions of § 63.134 or § 63.135.

(d) Except as provided in paragraphs (d)(4) and (5) of this section, an owner or operator shall demonstrate that each control device or combination of control devices achieves the appropriate conditions specified in paragraph (c) of this section by using one or more of the methods specified in paragraphs (d)(1), (2), or (3) of this section.

(1) Performance tests conducted using the test methods and procedures specified in § 63.145(i) for control devices other than flares; or

(2) A design evaluation that addresses the vent stream characteristics and control device operating parameters specified in paragraphs (d)(2)(i) through (vii) of this section.

(i) For a thermal vapor incinerator, the design evaluation shall consider the vent stream composition, constituent concentrations, and flow rate and shall establish the design minimum and average temperature in the combustion zone and the combustion zone residence time.

(ii) For a catalytic vapor incinerator, the design evaluation shall consider the vent stream composition, constituent concentrations, and flow rate and shall establish the design minimum and average temperatures across the catalyst bed inlet and outlet.

(iii) For a boiler or process heater, the design evaluation shall consider the vent stream composition, constituent concentrations, and flow rate; shall establish the design minimum and average flame zone temperatures and combustion zone residence time; and shall describe the method and location where the vent stream is introduced into the flame zone.

(iv) For a condenser, the design evaluation shall consider the vent stream composition, constituent concentrations, flow rate, relative humidity, and temperature and shall establish the design outlet organic compound concentration level, design average temperature of the condenser exhaust vent stream, and the design average temperatures of the coolant fluid at the condenser inlet and outlet.

(v) For a carbon adsorption system that regenerates the carbon bed directly on-site in the control device such as a fixed-bed adsorber, the design evaluation shall consider the vent stream composition, constituent concentrations, flow rate, relative humidity, and temperature and shall establish the design exhaust vent stream organic compound concentration level, adsorption cycle time, number and capacity of carbon beds, type and working capacity of activated carbon used for carbon beds, design total regeneration stream mass or volumetric flow over the period of each complete carbon bed regeneration cycle, design carbon bed temperature after regeneration, design carbon bed regeneration time, and design service life of carbon.

(vi) For a carbon adsorption system that does not regenerate the carbon bed directly on-site in the control device such as a carbon canister, the design evaluation shall consider the vent stream composition, constituent concentrations, mass or volumetric flow rate, relative humidity, and temperature and shall establish the design exhaust vent stream organic compound concentration level, capacity of carbon bed, type and working capacity of activated carbon used for carbon bed, and design carbon replacement interval based on the total carbon working capacity of the control device and source operating schedule.

(vii) For a scrubber, the design evaluation shall consider the vent stream composition; constituent concentrations; liquid-to-vapor ratio; scrubbing liquid flow rate and concentration; temperature; and the reaction kinetics of the constituents with the scrubbing liquid. The design evaluation shall establish the design exhaust vent stream organic compound concentration level and will include the additional information in paragraphs (d)(2)(vii)(A) and (B) of this section for trays and a packed column scrubber.

(A) Type and total number of theoretical and actual trays;

(B) Type and total surface area of packing for entire column, and for individual packed sections if column contains more than one packed section.

(3) For flares, except as specified in paragraph (a) of § 63.108, the compliance determination specified in § 63.11(b) and § 63.145(j) of this subpart.

(4) An owner or operator using any control device specified in paragraphs (d)(4)(i) through (iv) of this section is exempt from the requirements in paragraphs (d)(1) through (3) of this section and from the requirements in § 63.6(f), and from the requirements of paragraph (e) of this section.

(i) A boiler or process heater with a design heat input capacity of 44 megawatts or greater.

(ii) A boiler or process heater into which the emission stream is introduced with the primary fuel.

(iii) A boiler or process heater burning hazardous waste for which the owner or operator:

(A) Has been issued a final permit under part 270 of this chapter and complies with the requirements of part 266, subpart H of this chapter;

(B) Has certified compliance with the interim status requirements of part 266, subpart H of this chapter;

(C) Has submitted a Notification of Compliance under § 63.1207(j) and complies with the requirements of subpart EEE of this part; or

(D) Complies with subpart EEE of this part and will submit a Notification of Compliance under § 63.1207(j) by the date the owner or operator would have been required to submit the initial performance test report for this subpart.

(iv) A hazardous waste incinerator for which the owner or operator:

(A) Has been issued a final permit under part 270 of this chapter and complies with the requirements of part 264, subpart O of this chapter;

(B) Has certified compliance with the interim status requirements of part 265, subpart O of this chapter;

(C) Has submitted a Notification of Compliance under § 63.1207(j) and complies with the requirements subpart EEE of this part; or

(D) Complies with the requirements subpart EEE of this part and will submit a Notification of Compliance under § 63.1207(j) by the date the owner or operator would have been required to submit the initial performance test report for this subpart.

(5) For each source as defined in § 63.101, beginning no later than the compliance dates specified in § 63.100(k)(10), if the owner or operator vents emissions through a closed vent system to an adsorber(s) that cannot be regenerated or a regenerative adsorber(s) that is regenerated offsite, then the requirements specified in paragraphs (d)(1) and (2) of this section do not apply. Instead, the owner or operator must install a system of two or more adsorber units in series and comply with the requirements specified in paragraphs (d)(5)(i) through (iii) of this section.

(i) Conduct an initial performance test or design evaluation of the adsorber and establish the breakthrough limit and adsorber bed life.

(ii) Monitor the HAP or total organic compound (TOC) concentration through a sample port at the outlet of the first adsorber bed in series according to the schedule in paragraph (d)(5)(iii)(B) of this section. The owner or operator must measure the concentration of HAP or TOC using either a portable analyzer, in accordance with Method 21 of appendix A–7 to 40 CFR part 60, using methane, propane, isobutylene, or the primary HAP being controlled as the calibration gas or Method 25A of appendix A–7 to 40 CFR part 60, using methane, propane, or the primary HAP being controlled as the calibration gas.

(iii) Comply with paragraph (d)(5)(iii)(A) of this section, and comply with the monitoring frequency according to paragraph (d)(5)(iii)(B) of this section.

(A) The first adsorber in series must be replaced immediately when breakthrough, as defined in § 63.101, is detected between the first and second adsorber. The original second adsorber (or a fresh canister) will become the new first adsorber and a fresh adsorber will become the second adsorber. For purposes of this paragraph, "immediately" means within 8 hours of the detection of a breakthrough for adsorbers of 55 gallons or less, and within 24 hours of the detection of a breakthrough for adsorbers greater than 55 gallons. The owner or operator must monitor at the outlet of the first adsorber within 3 days of replacement to confirm it is performing properly.

(B) Based on the adsorber bed life established according to paragraph (d)(5)(i) of this section and the date the adsorbent was last replaced, conduct monitoring to detect breakthrough at least monthly if the adsorbent has more than 2 months of life remaining, at least weekly if the adsorbent has between 2 months and 2 weeks of life remaining, and at least daily if the adsorbent has 2 weeks or less of life remaining.

(e) The owner or operator of a control device that is used to comply with the provisions of this section shall monitor the control device in accordance with § 63.143 of this subpart.

(f) Except as provided in § 63.140 of this subpart, if gaps, cracks, tears, or holes are observed in ductwork, piping, or connections to covers and control devices during an inspection, a first effort to repair shall be made as soon as practical but no later than 5 calendar days after identification. Repair shall be completed no later than 15 calendar days after identification or discovery of the defect.

**Credits**

[62 FR 2751, 2760, Jan. 17, 1997; 64 FR 20192, April 26, 1999; 89 FR 43203, May 16, 2024]

SOURCE: 57 FR 61992, Dec. 29, 1992; 59 FR 19468, April 22, 1994; 89 FR 43175, May 16, 2024, unless otherwise noted.

AUTHORITY: 42 U.S.C. 7401 et seq.

Current through January 14, 2025, 90 FR 3563. Some sections may be more current. See credits for details.

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# DECLARATIONS

# DECLARATION OF JENNIFER HADAYIA

1.      I am the Executive Director of Air Alliance Houston (AAH), founded over

30 years ago, and I have served in this role since November 15, 2021. I have a

master's degree in public policy and administration. Previously, I worked for

Legacy Community Health Services, Inc., the largest Federally Qualified Health

Center (FQHC) in the state of Texas, as the director of their public health

department. Before that, I oversaw health equity initiatives for Harris County

Public Health, the governmental public health department for Harris County,

Texas. Through this work, I have gained knowledge of the impacts of air pollution

on health and of the state of air quality in Houston and Harris County. I have also

gained experience working with community members, groups, and policymakers

concerned about air quality.

2.      AAH is a non-profit advocacy organization whose mission is to reduce the

public health impacts of air pollution in the Houston area. This includes the

pollution from the many Synthetic Organic Chemical Manufacturing Industry

(SOCMI) facilities and Group I and II Polymer and Resins (P&R) facilities in

Harris County subject to the new emissions and performance standards. According

to EPA ECHO, these facilities include:

- Arkema Clear Lake (9502b Bayport Blvd # B, Pasadena, TX)
- Bayport Chemical Plant (13441 Bay Area Blvd, Pasadena, TX)
- Bayport Eo Plant (5761 Underwood Rd, Pasadena, TX)
- Celanese Clear Lake Plant (9502 Bayport Blvd, Pasadena, TX)

1

- Deer Park Oil Refinery (5900 Highway 225, Deer Park, TX)
- Deer Park Vcm Plant (5900 Highway 225, Deer Park, TX)
- Enron Methanol Company (Hwy 225 Pasadena, Pasadena, TX)
- Equistar Chemicals Channelview Complex (8280 Sheldon Rd, Channelview, TX)
- Exxon Mobil Chemical Baytown Olefins Plant (3525 Decker Dr, Baytown, TX)
- Exxonmobil Baytown Refinery (2800 Decker Dr, Baytown, TX)
- Exxonmobil Chemical Baytown Chemical Plant (5000 Bayway Dr, Baytown, TX)
- Geo Specialty Chemicals (739 Independence Pkwy S, La Porte, TX)
- Goodyear Houston Chemical Plant (2000 Goodyear Dr, Houston TX)
- Houston Plant (8600 Park Place Blvd, Houston, TX)
- Houston Refining (12000 Lawndale St, Houston, TX)
- Ineos Americas Pasadena Site (3503 Pasadena Fwy, Pasadena, TX)
- Kuraray La Porte (12342 Strang Rd, La Porte, TX)
- La Porte Vcm Plant (2400 Miller Cut Off Rd, La Porte, TX)
- Lyondell Chemical Bayport Choate Plant (10801 Choate Rd, Pasadena, TX)
- Lyondell Chemical Channelview (2502 Sheldon Rd, Channelview, TX)
- Lyondellbasell Acetyls (1350 Miller Cut Off Rd, La Porte, TX)
- Lyondellbasell Syngas (11603b Strang Rd, La Porte, TX)
- Rohm And Haas Texas Deer Park Plant (1900 Tidal Rd, Deer Park, TX)
- Sekisui Specialty Chemicals America Pasadena Plant (1423 Pasadena Fwy, Pasadena, TX)
- Shell Deer Park Chemicals (5900 Highway 225, Deer Park, TX)
- Sunoco Bayport Bpt1 (5761 Underwood Rd, Pasadena, TX)
- Westlake Epoxy Deer Park (5900 Highway 225, Deer Park, TX)

Some of these facilities will be required to conduct fenceline monitoring under the new rule, but most will not.

3.    Air pollution is also a concern for me personally, due to my and my family's exposure. I was born and raised in Houston, and my family includes three

2

DEC002

generations of people who have worked at the Houston Ship Channel and related petrochemical facilities. Air pollution is thus a concern for me personally due to my family's multi-generational exposure. I also personally spend time near these facilities, as often as several times a month, to visit family members and for various work purposes, and I am aware of the pollution in the air there due to observing smells, flares, and smoke.

4.     AAH pursues our mission by conducting applied research on air pollution, educating the community about the harms of air pollution and its sources, and advocating for improvements at the local, state, and national levels. We work closely with constituents to provide the training and technical assistance they need to address air pollution in their daily lives.

5.     Through our research, we have observed that air pollution exposure is concentrated in communities in Houston and Harris County that are predominantly people of color and lower income. This is due to the presence of multiple air pollution sources being historically and consistently located in these communities, such as refineries, chemical plants, and major highways. Populations of color and lower income populations are also more susceptible to the health effects associated with poor air quality and have less access to health care. Working to remedy this type of unfairness is a core part of AAH's mission.

DEC003

6.    AAH routinely avails itself of opportunities to participate in public rule-making processes to address air pollution that harms health in the Houston area. We regularly testify on proposed rules and regulations that may have impacts on air quality and, consequently, public health. I am often the person who provides such testimony on behalf of AAH. I also write talking points and otherwise provide guidance to AAH staff and community members who also provide written or oral testimony. We also engage in the permitting processes for local facilities by submitting public comments, participate on regional air quality committees, and weigh in at the federal and state levels on plans to limit air pollution.

7.    For example, AAH provided comment on EPA's proposed emission and performance standards for SOCMI and P&R facilities. AAH has also provided comment on, challenged, and intervened in defense of similar chemical facility rules, like for Miscellaneous Organic Chemical Manufacturers (which also includes facilities that emit the potent carcinogen, ethylene oxide) and the EPA's chemical disaster prevention rules.

8.    If the air pollution in the areas I work and visit were further reduced, including emissions of ethylene oxide and other pollutants from pollutants from SOCMI and P&R facilities, my health and wellbeing as well as the health and wellbeing of my family members, co-workers, AAH's supporters, and the Houston area as a whole would improve—particularly because we have so many chemical

4

facilities here. Fenceline monitoring is especially important to me and AAH's constituents and supporters, as it prevents leaks through detection and provides information about the air pollution in our area. Fenceline monitoring information is also important to AAH's education and advocacy work. A stronger rule will reduce the risks to my health and wellbeing, and to that of my family members, co-workers, and AAH's constituents and supporters, including from equipment leaks at certain facilities. Requiring fenceline monitoring for all facilities—and requiring that information be publicly available—will also provide me, my family members, co-workers, and AAH's constituents and supporters with useful and necessary information about the pollution in our community.

I declare under the penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed in Houston, Texas, on December 3 , 2024.

*Jennifer Hadayia*
_____
Jennifer M. Hadayia, MPA

# DECLARATION OF SHARON C. LAVIGNE

1. My name is Sharon Cayette Lavigne. I live in St. James, Louisiana, in an area known as Brookstown. I am a lifelong resident of St. James.

2. My house is on the same road and the same stretch of the Mississippi River where Formosa Plastics plans to build a 1,500-acre plastics complex.

3. The complex proposed by FG LA, LLC, an entity that is part of Formosa Plastics Group ("Formosa Plastics" or "Formosa Petrochemical Corporation") would include sources within the Synthetic Organic Chemical Manufacturing Industry ("SOCMI") source category, which are subject to the improved Hazardous Organic NESHAP ("HON") standards that EPA newly finalized in May 2024.

4. I also live in a part of Louisiana known as Cancer Alley, which runs from New Orleans to Baton Rouge and that we now call Death Alley, locally, due to the high number of community members getting sick and dying from cancer. In this area there are already over a dozen other existing chemical plants that are HON sources on EPA's list including: Americas Styrenics, LLC; Koch Methanol, located in the 5th district of St. James; Westlake Vinyls; BASF Corporation; Methanex USA, LLC; Hexion Inc.; Shell Chemical; Occidental Chemical Corporation; Praxair Inc; and Rubicon, LLC in Geismar; Denka Performance Elastomer in St. John the Baptist Parish

(which is also a Neoprene Production source subject to the new Group I Polymers and Resins standards finalized as part of the HON rule); as well as Exxon Mobil Chemical Plant in Baton Rouge. I live and visit areas near, and within a few miles of, these chemical plants regularly. My granddaughter attends Southern University Laboratory School and must pass Exxon Mobil in Baton Rouge every day to get to and from school. The school and university is located within 2 miles of the Exxon Mobil Chemical Plant.

5.    I was a special education teacher for 38 years at St. James High School. I retired in 2019. This is the high school from which I graduated and my father, Milton Cayette, Sr., integrated in 1966. Three of my children graduated from St. James High School as well.

6.    I am the Director/Founder, and a member of RISE St. James Louisiana, which I founded on October 20, 2018. RISE St. James is a faith-based organization focusing on protecting the air, water, soil, and environment of St. James Parish and other river parishes from toxic pollution emitted by the petrochemical industry. We are a small but mighty group of neighbors who live in the shadows of current petrochemical facilities; our homes are surrounded by places where new facilities, including Formosa Plastics and the recently canceled Mitsubishi Chemical America facility, have been proposed. RISE St. James Louisiana is working toward racial, social, and

DEC007

environmental justice for all residents of St. James Parish and throughout other river parishes

7.    I have lived in St. James Parish my whole life. I grew up in an area known as Chatman Town. I have fond childhood memories of playing softball with my friends and watching my siblings play football in our yards, exploring the fields around us, fishing for crawfish in the pond, and picking blackberries and pecans. The land was healthy, and the air was clean. We often saw rabbits, deer, and sometimes coyotes on our property. My grandfather caught fish and shrimp in the Mississippi River. My father raised cattle and grew sugar cane to sell to the local sugar mills. We grew our own food and lived off the land.

8.    I became more aware of the changes happening in St. James Parish and how toxic pollution is threatening our community when I started attending community meetings run by a local group called the H.E.L.P. (Humanitarian Enterprise of Loving People) Association of St. James. I learned more about the link between the petrochemical industry and our health problems and started to ask myself how we could stop additional polluting industries from coming.

9.    When I heard about Formosa Plastics' plans to locate in St. James' 5th district, just two miles from my home, I felt angry, depressed, and

DEC008

powerless. One of the biggest plastics producing facilities in the world would be located on 2,300 acres just down the road from me, next to the town known as Welcome and across the river from Union, which are both predominately  black communities. I expected that Formosa Plastics' toxic mega-facility would be another nail in our coffin, maybe the last one we could withstand. I felt strongly that we as a community could not survive any more toxic pollution, but I kept hearing "it's a done deal."

10.    That did not sit well with me. I prayed and prayed. I was fatigued by the stress of it. One day as I sat praying on my porch, I saw a very rare sight— two bright red birds flying from one tree to the next, which my daughter told me meant change was coming. I felt God's presence with me, and I asked God, "Should I sell my home, the home that you gave me?" And then I heard God's voice as clear as if I were having a conversation with a friend, and He said no. Then I asked, "Do you want me to sell my land, the land that you gave me?" Again, He said no. Finally, I asked Him, "What do you want me to do?" He said, "FIGHT." I was overcome with emotion and had tears rolling down my face. That is when I decided to form RISE St. James, which is what I did in my den in October 2018.

11.    RISE St. James Louisiana's membership is made up of lifelong residents of St. James, Ascension, Iberville, St. John the Baptist, and East Baton Rouge

4

Parishes along the Mississippi River who love this community, as did our parents, grandparents, and great-grandparents. We share a common concern that the petrochemical industry threatens our health and our future. The majority of our members are women, retirees, and individuals who trace their family roots in the region back to the end of antebellum slavery.

12. While I am responsible for the day-to-day operations and overall strategy of RISE St. James Louisiana, we have an Advisory Board made up of additional members, including myself, a Board President, and board members.

13. RISE St. James Louisiana educates residents about the harmful impacts of living in one of the most industrialized areas in the country and organizes to hold our elected officials accountable. We hold monthly meetings at the Welcome Park Senior Center in St. James where we make decisions around actions we plan to take (for example, marches, letter-writing campaigns, town halls, and participation in public meetings and hearings). We have members who regularly attend RISE St. James Louisiana meetings and many more supporters who participate in events when they can. We utilize several social media platforms to communicate with our members and supporters.

14. RISE St. James Louisiana has organized several marches in Cancer Alley; hosted workshops and other convenings to help educate members of the

DEC010

public and decision-makers about our community and the threat Formosa Plastics and other facilities like Denka Performance Elastomer pose to our health and well-being; testified at St. James Parish Council hearings on Formosa Plastics, South Louisiana Methanol, and Koch Methanol St. James, LLC; provided public comment to the Louisiana Department of Environmental Quality on Koch Methanol St. James, LLC's request to expand and Mitsubishi Chemical America's proposed construction permit and operating permit; and filed a lawsuit against St. James Parish to request a parish-wide moratorium on new petrochemical facilities and the expansion of existing facilities.

15. RISE St. James Louisiana's goal is to keep Formosa Plastics, Koch Methanol, Americas Styrenics, LLC, Denka Performance Elastomer, and other facilities from polluting and further degrading our community throughout the river parishes. We are fighting permits for these facilities and want stronger national protection in regulations and oversight from EPA and other agencies. We have to try every possible way to prevent the harm that these new facilities would cause and to reduce and mitigate the harm that the existing facilities are already causing.

DEC011

16.    The Formosa Plastics Petrochemical plant (if built) would have to comply with EPA's HON air toxics standards, which became final in May 2024. The other existing HON sources near me are also covered by this new rule.

17.    The new HON rule includes several important improvements over the previous standards. The rule will reduce toxic pollution from these sources and harms to our communities. These improvements include fenceline monitoring requirements; removing malfunction loopholes that allowed facilities to release unlimited pollution during startup, shutdown, and malfunction events; and health-based standards that EPA set for facilities that release ethylene oxide and chloroprene.

18.    I am submitting this declaration in support of the intervention and litigation of RISE St. James Louisiana to help show why the national HON rule should not be weakened and instead should be strengthened to protect our health from Formosa Plastics, Denka Performance Elastomer, and all of the other HON and Polymers and Resins sources in our area, and to prevent and reduce the serious harm that my community and I are facing from these sources' pollution.

19.    Industry has already harmed our land, air, and water, and Formosa Plastics would significantly increase these harms if allowed to build – especially if it is not subject to stronger national standards. I know so many people here

DEC012

who either have cancer or who know someone with cancer. My brother had cancer, and his wife died from cancer in 2001. There are funerals just about every other week for another person who has lost their life to cancer – and I go to as many as I can. Due to COVID-19 and the pollution, there were more than a dozen funerals in 2020 alone for my friends and neighbors. In 2019, two members of RISE St. James Louisiana died, from cancer or other illnesses. One of our members who retired from one of the plants was diagnosed with colon cancer just this year. I do not want any more of our members to get cancer or die of cancer from toxic air pollution.

20. I am concerned about getting cancer personally based on the pollution proposed from Formosa Plastics and other HON chemical plants. I already have health issues, including auto-immune hepatitis, which affects my liver. I will not feel safe or enjoy the life I want to be able to live if Formosa Plastics and other HON sources are allowed to release more cancer-causing and other toxic air pollution into my neighborhood and do not have to comply with the HON rule and its compliance deadlines. I would feel even worse if the rule were to be weakened.

21. Scientists are reporting that air pollution makes us more vulnerable to sickness, including COVID-19, and Formosa Plastics' petrochemical complex is expected to more than double our air pollution. This will

8

negatively impact my health, my family's health, and the health of my community; reduce my quality of life and enjoyment of nature in St. James; and harm us in additional ways, such as causing emotional distress, trauma, health care burdens, and financial burdens. Formosa Plastics is also going to change our community for the worse – especially if it is not required to meet stronger national pollution standards. My property value has dropped by approximately $100,000 since 1987 with the other polluting sources in our area. If Formosa Plastics is built and not required to meet stronger standards, I am concerned that my home value will go down even more.

22.     My fruit trees no longer produce fruit at all, or not as often as they used to. My lemon tree is soft, the lemons are mushy. Orange trees and mulberry trees died. I can't grow blackberries anymore. Fig trees have died. I love figs. I don't want to have to go to the store to buy figs. My pecan trees used to bear every year, and now it's maybe every other year because of the pollution we have now. I love persimmons also, but now our tree only bears once a week, which is less often than it used to. I want to be able to sit down and eat my own homegrown pecans and persimmons again without worrying about the pollution. We need stronger standards so Formosa Plastics, Koch Methanol, Americas Styrenics, LLC and other HON sources cannot release more pollution that builds up in our food. I am concerned that I will lose

DEC014

even more of my trees and won't be able to get more pecans or grow other food if Formosa Plastics is built and emissions from Formosa and existing HON sources are not strictly regulated under the improved standards of the new HON, as needed to protect our health and the environment.

23.   Children in  my family and community have trouble breathing and they are experiencing skin rashes, nose bleeds, respiratory ailments, and cancer. If built and not regulated properly, the Formosa Plastics plant will join the other HON polluting facilities surrounding my community and make our environment even more unlivable.

24.   The serious harms Formosa Plastics will bring keep me up at night, especially if we don't have adequate EPA standards in place to protect our health. Odors from Formosa Plastics' facility will also disturb my enjoyment of my home and property. I love to spend time on my porch. I sit in my chair, read my Bible, take calls out there, visit with family and friends, and watch the birds fly from one tree to the next. I can smell the odors of industry, especially early in the morning and late in the afternoon, which sends me indoors. Formosa Plastics will substantially decrease my enjoyment of my outdoor space by contributing to this air and odor pollution, and I expect it will also drive the birds I enjoy away if it is allowed to be built and not regulated sufficiently. The pollution Formosa

DEC015

Plastics would be allowed to release would diminish the pleasure I take living where I do, in the community where I have always lived.

25. Also, I am very concerned that we will not have enough protection from pollution spikes or worse from Formosa Plastics, Americas Styrenics, Koch Methanol and the other HON chemical plants covered by EPA's rule. I know how storms and flooding put us at even greater risk of chemical releases from this type of plant, and EPA is not doing enough to prevent or assure protection if this happens. Instead, its new rule allows uncontrolled releases of pollution from pressure relief devices and flares under the new "three strikes" rule. We can't let Formosa Plastics be built with exemptions letting this facility get away with uncontrolled toxic pollution releases. EPA did the right thing by removing previous malfunction loopholes from the rule, and it must remove this new three strikes rule as well, so HON chemical plants in our area must control their pollution at all times.

26. I worry for good reason that our water and air will be even dirtier and will make us sicker. Honestly, I do not know if we can survive if Formosa Plastics' mega-facility is constructed and if EPA's HON rule is weakened or delayed, and industries are allowed to emit hazardous chemicals. If Formosa Plastics is allowed to build, I believe we will die off one by one. We need more protection, not weak rules.

DEC016

27. And it is not just me I am worried about. Three of my children and six of my grandchildren live in St. James. I want them to have clean air to breathe, clean water to drink, and a healthy environment. Inadequate national standards will continue to put their health and safety at greater risk, increase their exposure to air and water pollution, and make our home an expansive industrial zone. Existing HON facilities like Koch Methanol and Americas Styrenics have violated their current air permits.

28. Right now, we still have pockets of green and beautiful agricultural land and rich wetlands. Formosa Plastics would pollute a huge area of that, including wetlands, to make plastic. I pass by the Formosa and Americas Styrenics sites about three or four times a week in usual times—including every Sunday after church to go to Adoration, another place of worship. I want to give God an extra hour. I drive by to go grocery shopping in Donaldsonville and when going to visit friends who live nearby. I used to stop along the Formosa site to think about my community's ancestors who worked and suffered in the plantation fields and to pay my respects. I want to be able to continue visiting to connect with my community's ancestors. I also want to be able to continue seeing birds and wildlife I have regularly enjoyed seeing, like rabbits, frogs, grasshoppers, butterflies, and dragonflies.

DEC017

29. Formosa Plastics will also release air pollution that will fall into our waterways, like the St. James Canal, which my community uses for fishing, as well as into the Mississippi River, which is an important source of drinking water for St. James and supports the seafood industry in our state. We rely on these local resources, but Formosa Plastics is going to increase toxic pollution and degradation to our waterways and wetlands that is already impacted by existing HON facilities. I don't think the fish will survive. We need stronger EPA standards so that we do not have to be concerned about eating fish and crawfish. We need to reduce the chemicals in our air and our fish, not increase them.

30. I was greatly distressed to learn that Formosa Plastics plans to release over 800 tons of toxic chemicals into the air every year, including ethylene oxide, benzene, and hexane. The new HON rule applies to ethylene oxide and benzene, two highly carcinogenic chemicals. The proposed Formosa Plastics plant's permit would allow it to emit 7.7 tons of ethylene oxide per year, and it would be the largest emitter of ethylene oxide in the state. Allowing so much pollution to be released would harm our health and well-being. HON polluting industries have already given my parish the statistic of having more cancer-causing chemicals than 99 percent of the industrialized areas of this country. We are on the list of communities that already have extremely

DEC018

high cancer risk, above 100-in-1 million, according to EPA's recent national air toxics assessment.[1] I find it unacceptable that Formosa Plastics will double the air pollution I breathe, which will injure my vital, basic interests in breathing clean air and living a long, healthy life. Weakening the HON rule will impact the EPA's ability to protect residents and decrease pollution.

31. It also concerns me that Formosa Plastics would produce about 13.6 million tons of greenhouse gases every year, contributing to climate change. We in Louisiana know about intense weather events, flooding, and land loss. I value my home and my health, and do not want them damaged by intense storms and flooding. I also do not know how we will get out if we need to if Formosa Plastics is built and we face a flood. Formosa Plastics, Koch Methanol, Americas Styrenics, and the state have still not given us an acceptable evacuation route, and if there is a flood, there is no good way out for St. James Parish residents. Highway 3127 is the state-sponsored evacuation route, but there is no easy way to get there from my house if all of the through roads are now closed to residents because they have been purchased by private entities and are often gated and locked.

32. Formosa Plastics will also increase my risk of having to face chemical spills and other industrial accidents. We are already at risk of spills and explosions

---

[1] https://theintercept.com/2019/02/24/epa-response-air-pollution-crisis-toxic-racial-divide/.

DEC019

by the existing HON facilities in St. James Parish. The state closes Highway 18 during emergencies, and Burton Lane, which is a privately owned road residents used to be able to use to reach Highway 3127, now has a chained gate blocking access. We have to go all the way down to Moonshine to access Highway 3127 via 3219. In fact, when my neighbor had a heart attack and called an ambulance, it took the ambulance an hour instead of 10 minutes to reach her because of the locked gate.

33. In 2019, I was shocked to learn that the Formosa Plastics project site includes at least two cemeteries likely to contain the remains of people enslaved on the plantations where Formosa Plastics wants to build; these are our ancestors and friends. The cemeteries are the Buena Vista and Acadia cemeteries. Since learning about these cemeteries, I have wanted to visit the Buena Vista site with other members of RISE St. James to pray, sing, bring flowers, and share the message of this discovery's significance with our friends and supporters. I asked permission of Formosa Plastics to visit on Juneteenth while following social distance guidelines, but my request was denied even though the Army Corps said the public would have access to it. Thankfully, a judge in Louisiana granted our request for a temporary restraining order for access to the site for one hour on Juneteenth. We held a beautiful commemoration ceremony. I do believe my ancestors are beneath

15

the soil of the proposed Formosa Plastics site and are calling out to me to honor and protect them. It sickens me to know that Formosa Plastics and the Army Corps have still not done a proper evaluation of these cemeteries and that the company disturbed the burial ground on site. There are no words to express how disrespectful it is to me that Formosa Plastics may be allowed to start construction activities. We need to be able to visit these sacred places, without desecration by Formosa Plastics and its toxic pollution. Since learning of the unmarked burial of our enslaved ancestors at the Formosa site, we have learned that unmarked burials of the enslaved are all along the Mississippi River and are located where proposed HON facilities plan to build.

34. Hearing again and again that we need not worry because Formosa Plastics will get all the necessary state and federal permits does not address my concerns or the impacts of this project on me and my community. The standards in those permits are simply not strong enough, and industry is trying to weaken the standards that apply.

35. I was born here in St. James Parish when Jim Crow still ruled. Even though more than five decades have passed, Formosa Plastics and existing HON facilities show me that democracy has still not arrived in my parish nor throughout the other river parishes. Black residents' views are regularly

DEC021

dismissed as unimportant or uninformed if they're even sought. In 2018, I learned that my community—areas around homes and churches—was designated as "industrial" and "future industrial" in St. James' first-ever land use plan in 2014. Although some parts of the 5th district were re-zoned back to residential, there are other industries still trying to build in a district that is already overburdened by industry. To think that multi-national petrochemical companies like Formosa Plastics, Koch Methanol, and Mitsubishi Chemical America can move in, take over, and leave us with more pollution and illness, lower property values, desecrated historic cemeteries, and fewer services without even EPA requiring protection for our health and environment is hard to understand. To see that our own local and state government is encouraging and supporting this transition is even harder to understand. It is as if they are sacrificing us for the petrochemical industry. It is mind-boggling to me that industry is trying to attack the health science and weaken the HON rule standards for Formosa Plastics and other HON source facilities.

36.     If my community had a true say, the State would not be spending $1.5 billion to attract foreign polluters like Formosa. If my community had a true say, the Army Corps would not allow Formosa Plastics to bulldoze nearly four square miles of wetlands, cemeteries, and sugarcane fields. If my

17

community had a say, industry would not be able to weaken the HON rule that would apply to Formosa Plastics, Westlake Vinyls, BASF Corp, Methanex USA LLC, Hexion Inc., Shell Chemical, and Occidental Chemical Corp in Geismar, Louisiana. If my community had a say, we would have stronger national standards set by EPA that truly protect our health, so no one else ever gets cancer from air pollution, or any other illness, and so we don't have to live in fear of this pollution. And we would have fenceline monitoring at all chemical plants in our community that release dangerous pollution. Federal laws are supposed to protect us from bad decisions. More work remains to be done here by EPA to make sure that happens, and we can only get there by ensuring that the HON rule's protections and compliance deadlines remain in place and are not weakened or overturned by industry lawsuits.

37. I live in the shadow of Formosa Plastics' planned complex. I will be here for the rest of my life. My life will be cut short if Formosa Plastics builds this project and there are inadequate national standards to protect us. We need stronger national air toxics standards to prevent this project and other projects from harming my health and my spiritual and aesthetic enjoyment of the land where I raised my children. I am fighting so that our children and

18

DEC023

grandchildren may have the opportunity to call this land home. I am fighting for environmental justice and to save our future.

38. I want the world to know what's going on—what is happening in St. James and throughout the river parishes is wrong. We need Formosa Plastics not to be built at all. As these companies try to move forward, we are marching, we are writing letters, we are trying to call attention.

39. We need EPA's new HON rule in place now—and to stay in place. We need to prevent industry from undoing the science on cancer that EPA used and from weakening the regulations or we will lose important protections that Formosa Plastics and other HON chemical plants near me should have to comply with. My community, my family, and I can't afford to breathe and face more exposure to toxic air pollution. If anything, we need stronger standards for HON and Polymers and Resins facilities, such as fenceline monitoring requirements that apply to all facilities, better requirements to find and fix equipment leaks, and strong health-based standards for ethylene oxide and chloroprene. If HON and Polymers and Resins facilities are not required to meet the improved emission standards of the new rule, my family and I will have to breathe even more toxic air pollution. Formosa Plastics and other HON chemical plants will not be required to meet more protective rules than it is currently including in its proposed permits. These facilities

DEC024

must be required to comply with the rule because it is simply not right to allow them to sacrifice our lives to make plastic.

I declare under penalty and perjury that the foregoing is true and correct to the best of my knowledge.

Dated: January 16, 2025

_Sharon Lavigne_

Sharon Lavigne

DEC025

# DECLARATION OF TAMMY NEWBY

1.  I am 63 years old and I'm a retired licensed vocational nurse. I am a Sierra Club member, and I have been for about five years.

2.  I live in Beaumont, Texas. I've lived here for about 20 years. I have four kids and twelve grandkids. My daughter and granddaughter live not far from me.

3.  There are many industrial facilities in Beaumont, including several facilities covered by EPA's new chemical plant standards. For example, the ExxonMobil chemical plant is about six miles from my home.[1] I see their flares often, sometimes smoking or burning odd colors. Beaumont is also northeast of Port Neches, Nederland, and Port Arthur, where there are many more of these types of chemical plants. In the summer, the wind usually carries their pollution up into Beaumont, too.

4.  I spend a lot of time outside, whether running, riding my bike, walking, or gardening. I run on average two to three times a week, sometimes from my home and sometimes on local running trails. One trail I run at with a group about three or four times a year is directly next to the ExxonMobil Beaumont chemical plant fenceline. I like to ride bikes two to three times a week. Sometimes my biking takes me down close to the port, not far from

---

[1] https://echo.epa.gov/detailed-facility-report?fid=110000464131.

ExxonMobil. Gardening is also important to me because I care about the pollinators. My yard is certified as a wildlife habitat for the pollinators, and I've planted milkweed to create a way station for migrating monarchs. I'm outside gardening and enjoying my yard almost every day.

5.   As I retired nurse, I've seen the effects pollution has on people. I worry about the effect of the pollution on my granddaughter in particular. She lives not far from me and has a heart condition. I'm healthy, but I avoid exposure when there is a release at one of these facilities. If there is a release I know about, I stay in and turn off the AC if I can and use fans to try to minimize pollutants getting into the house. I avoid going outdoors, to run, bike, or garden, until it has cleared. I also avoid spending time outdoors when we have poor air quality, such as an ozone action day, or when I can smell the pollution.

6.   The worry about incidents and releases at these facilities is always in the back of my mind. There was a big explosion in Port Neches a couple of years ago, and now when I hear a boom, I check and see if a release has been reported at one of the facilities.

7.   I'm glad that EPA has strengthened the standards for these types of chemical plants and has required fenceline monitoring at many facilities—but I did not see the Exxonmobil facility on EPA's list of facilities that will need to do

2

fenceline monitoring.[2] Fenceline monitoring helps detect releases of hazardous air pollution, and provides the public with important information about pollution in the air they breathe. We need a stronger rule that requires fenceline monitoring, especially because these chemical facilities are getting bigger and bigger. I would enjoy my outdoor activities more if the new standards were strengthened and the air here was cleaner. I would be less worried about air pollution where I live if the standards were strengthened. It's important to me that I leave a better world for my grandkids, and I support Sierra Club's challenge to strengthen the new air standards.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: November 21, 2024

Tammy Newby

---

[2] https://www.regulations.gov/document/EPA-HQ-OAR-2022-0730-0091 (Appendix C).

DEC028

# DECLARATION OF MELANIE OLDHAM

1.  I am 65 years old, and I live in Freeport, Texas. I am a Sierra Club member and have been for about ten years now. I serve as chair of Sierra Club's Houston executive committee, and I'm an at large member of the Austin executive committee. I also founded Better Brazoria: Clean Air & Water, a community group that advocates for clean air and water in Brazoria County. I also serve on the Freeport Main Street Historical Board, and I work part time as a physical therapist.

2.  I have dedicated a lot of time researching the health threats posed by nearby industrial facilities, including facilities near my home that are covered by EPA's new chemical plant air standards. I joined Sierra Club and founded Better Brazoria because of how concerned I was about the health effects the hazardous air pollution from these facilities was having on my body and my patients' health.

3.  I am aware that there are several chemical plants in Freeport covered by EPA's new standards, including Olin Blue Cube, Corteva Freeport, and Dow Freeport. These facilities are about three miles from my home, and will be required to conduct fenceline monitoring, for just one or two pollutants each. Another covered chemical plant, BASF Freeport, is about five miles from

1

my home. According to EPA's list,[1] this facility will be required to monitor emissions at the fenceline under the new standards.

4. As a health care provider, I understand that air pollution causes illnesses, including cancer, so I am very concerned about the effects of these facilities' emissions on my health and my community. A few years back, Brazosport High School, my neighborhood high school, was ranked in the top 1 percent for having some of the worst air quality in the nation. I've noticed that I get colds and coughs pretty often, which I attribute to air pollution in my area. I enjoy walking outdoors, including with my dog, but I don't do that as often due to air pollution. I would enjoy walking outdoors more with less air pollution.

5. I also like to fish and go several times a year, but there is a state health sign at the river near me warning children or pregnant women to limit their intake. I would enjoy fishing more and feel better eating what I caught with less pollution in my area.

6. Many of the facilities near me have had accidental releases, and they have not always notified the community of the releases. EPA's new air standards for chemical plants and polymers and resins facilities are important to me

---

[1] https://www.regulations.gov/document/EPA-HQ-OAR-2022-0730-0091 (Appendix C).

because they will reduce hazardous air pollution and also because they will require fenceline monitoring at many facilities, which will help detect releases, and because that data will be publicly available on a quarterly basis.

7.    I understand that EPA's new standards will reduce hazardous air pollution from the chemical facilities near my home. We need these stronger standards to clean up our air and water, and hopefully improve rates of cancer, COPD, asthma, and other illnesses. We also need these improvements to feel safer living and working near the chemical facilities, to enjoy our time outdoors, and to have a better quality of life.

8.    I am submitting this statement in support of Sierra Club's challenge to the weak parts of EPA's new chemical plant standards. With a stronger rule, I would worry less about my health and wellbeing. We need more protections, not less, to reduce the pollution from these facilities and help us feel safer enjoying time outdoors.

I declare under penalty and perjury that the foregoing is true and correct to the best of my knowledge.

Executed on November  21 , 2024

*Melinda22*

box SIGN         13KY?VVV-4Q9RPRZQ

Melanie Oldham

# DECLARATION OF LETITIA TAYLOR

1.    My name is Letitia Taylor. I am 60 years old. I was born and raised in Reserve, St. John the Baptist Parish, Louisiana. Since 1994, I have lived in neighboring LaPlace, also in St. John the Baptist Parish. My current home is about one mile from Denka Performance Elastomer's neoprene plant. The plant emits a dangerous chemical, chloroprene, into the air we breathe.

2.    My father founded Concerned Citizens of St. John in 2016, and I joined the organization the next year. I got involved to help advocate for clean air and to protect the next generation. I am now the program manager. One of the things that I do in this role is to update and share information about plant emissions.

3.    In about 1969, the plant started producing neoprene and emitting a dangerous chemical, chloroprene, just a few blocks away from my family's home in Reserve. Many of my other relatives also lived close to the plant.

4.    Eventually, it seemed that nearly everybody in town started getting sick. The community started suspecting that there was something unusual and unnatural going on.

5.    For example, in the early 1980s, my grandmother, who lived by the plant, was diagnosed with bone cancer, which she died from years later. My uncle,

cousin, and multiple neighbors, all of whom lived by the plant, also died of cancer.

6.    I have two children, and one grandchild. They were all born in Reserve. My grandchild was born very prematurely, with respiratory issues. He has developmental delays.

7.    My family and community have seen other widespread health problems. My late mother suffered from breast cancer, multiple sclerosis, and a rare blood disease. My sister was diagnosed with an extremely rare autoimmune disease, for which she takes infusions every week. My brother has kidney disease, and a year after he moved back to Reserve from living 20 years in California, he had a heart attack, followed by a second heart attack the next year, and was also diagnosed with diabetes (which we do not have a family history of).

8.    I have observed many ailments in my family and community. Many members of my family have eczema, asthma, sinus infections and other respiratory problems. Many members of my community suffer from Attention Deficit Hyperactivity Disorder and migraines.

9.    I understand the cause of such a high rate of health problems to be our community's exposure to the emissions from Denka.

DEC033

10. During the early months of the COVID-19 crisis, St. John the Baptist Parish had the highest death rate per capita from COVID-19in the nation. Studies show that toxic air pollution can worsen the effects of COVID-19. I believe that we had such extremely high death rates because our residents' immune systems were compromised by the pollution.

11. My father's home in Reserve, about half a mile from Denka, has been a place of refuge and restoration for generations of my family. But the plant makes it much harder to feel that way because the air isn't safe to breathe.

12. The flares from the plant are frequent, especially at night. They light up the sky. Some weeks, the flares may go on for three days. We do not know what is happening when we see this. The company never warns or informs us about the flares.

13. I vividly recall an explosion at the plant when I was younger. My family heard a huge boom, and we thought at first that a plane had crashed. We had a hard time fleeing because we lived on a dead-end street, and we and the other people fleeing were stuck in traffic that stretched all the way to Baton Rouge.

14. I love to garden in my yard, and I try to garden outside a few hours in the evening every other day. However, while I am gardening, I am always aware of the Denka plant and the fact that I'm breathing its chemical emissions.

DEC034

Because of the emissions, I go out less to garden, and when I do go out, I spend less time outside.

15. I'm sure our property prices have been impacted by the plant, especially as the problems it causes are now known nationwide. But I don't want anyone to move here and get sick.

16. For years, our community could rely only on our own observations of how the plant affected us. But in 2016, we began to learn a lot more information, when EPA came here and told us about the plant's emissions. We learned that a census tract in St. John the Baptist Parish had the highest risk of cancer from toxic air pollution in the country.

17. It was very difficult to learn that everything my father and I talked about when we were younger—that it had to be the plant that was causing harm to our community—was true.

18. Our bodies have been exposed to over 50 years of toxins from the plant that have not been appropriately regulated. For many years, this pollution has attacked my community at every level, physically and emotionally. We have lost our homes. We have lost our loved ones. It is a terrible feeling, to watch our people die and feel that there is nothing we can do about it. And while we grieve those who have died, we also dread test results that may tell us we ourselves have been diagnosed with something new. It can feel very helpless

4

DEC035

and hopeless, particularly as we think about the next generation and the harms they may endure.

19. I have been diagnosed with clinical depression, and in recent years my medication has been increased significantly. I believe that Denka's effects on my home, life, and community have contributed to my depression.

20. Though we felt for a long time that we had no control over this situation, in fact, this is something that could be stopped. It was an overwhelmingly good feeling to see EPA's regulation with emission limits for chloroprene and ethylene oxide go into effect. In St. John, we're exposed to both of those chemicals. The regulation is a breath of clean air and is also our only hope because Denka has not and will not act to protect us. This rule regulates not only Denka, but also other facilities in Cancer Alley, including some facilities in a neighboring parish, St. James Parish.

21. The rule needs to require even stronger protections for communities near facilities like Denka, which is why I support Concerned Citizens of St. John suing for stronger protection in this rule. The rule allows Denka to emit emissions greater than what EPA said is needed to protect public health. The rule should require Denka and other facilities to use more pollution controls and further reduce their emissions until it is safe for us to breathe. The rule also requires only some facilities to do fenceline monitoring. Although it

DEC036

requires Denka to do fenceline monitoring, it might not require other facilities in Cancer Alley to monitor emissions. Fenceline monitoring is important because it shows if there are leaks or other problems at facilities that can cause increases in emissions. Communities like mine need to know what is in the air we breathe, and we need fenceline monitoring to know that.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 13, 2025

Letitia Taylor

DEC037

# DECLARATION OF ROBERT TAYLOR

1.      My name is Robert Taylor, and I am 83 years old. I was born in and have lived my whole life in Reserve, Louisiana.

2.      I was an air conditioner contractor and have retired.

3.      I built my current home in Reserve in 1968 and lived here until Hurricane Ida destroyed the roof of my home. I currently live with my daughter in LaPlace, Louisiana, about a ten-minute drive away.

4.      My late wife and I had 4 children, 15 grandchildren, and 10 great-grandchildren. They were all were born and raised in St. John the Baptist Parish. Most of them still live in this Parish.

5.      My house in Reserve is about half of a mile from Denka, a neoprene production facility that emits chloroprene into the air. I can see the plant from my balcony. My daughter's house in LaPlace is about one mile away from Denka.

6.      I am the founder and Executive Director of Concerned Citizens of St. John. I founded the group in 2016, when EPA visited St. John and informed the community that Denka's chloroprene emissions were causing an extremely high cancer risk. EPA eventually told us that census tract 708 in St. John had a cancer risk from toxic air pollution of over 1,500-in-one million, the highest in the country. This was the first time I was made aware of how

these air emissions were impacting us. I was shocked, so much so that I created Concerned Citizens of St. John.

7.     As the executive director, I engage with EPA and state and local government to advocate for improving air quality. We fight for clean air so that we can survive.

8.     Denka was previously owned by Dupont. Dupont started operating its neoprene facility in St. John in about 1969. The facility was built on a former plantation. When the plant was being built, the white residents left and moved north of Airline Highway because they had been warned about the pollution. I mistook that phenomenon for the white flight that was happening all over the country as a result of desegregation laws. By the time the plant started operating, almost everyone living in Reserve was Black.

9.     In the 1970s and 1980s, I started realizing that something was wrong. Something unnatural was going on. After Dupont moved in, kids started saying they couldn't play outside because there was a bad odor and they had trouble breathing. Certain vegetation started dying. Eventually, people in my community started getting sick and dying. I've watched my whole family and community suffer from the same health issues: cancer, respiratory issues, and autoimmune disease.

10.    My family has suffered and died from many health issues as a result of

DEC039

inhaling toxic air. My mother died of bone cancer. She was the first person in her family to be diagnosed with cancer. My uncle and two of my cousins died from cancer. My brother died of lung cancer. Multiple of my neighbors, including my next-door neighbors on both sides of my home, have died of cancer.

11. My late wife had breast cancer, multiple sclerosis, and a rare blood disease. She also had kidney and heart problems.

12. We moved my wife and one of my daughters out of the community because of how toxic emissions were hurting their health. The air pollution is so bad in St. John that it has separated me from my family.

13. My other daughter, who was born and raised in Reserve, has a very rare autoimmune disease that she needs infusions for every week. She was diagnosed while receiving specialized treatment for gastroparesis.

14. My son has kidney disease and lived for many years in California. He moved back to Reserve eventually, and a year after he moved back home, he had a heart attack, followed by another one the next year.

15. When my kids or grandkids have come inside from playing outside, they have complained of their noses burning and chests hurting. Many of my grandchildren have asthma, upper respiratory issues, and eczema. My great-grandson was born two years ago very prematurely. He is showing signs of

DEC040

respiratory issues and developmental delay.

16. The toxic chemicals we breathe every day compromise our immune systems. St. John the Baptist Parish suffered the highest per capita death rate from COVID-19 in the beginning of the pandemic because of how much toxic air pollution compromises our immune systems.

17. Since the neoprene plant moved in, I have also noticed that the natural vegetation and even some insects have changed dramatically. Trees are dying. The tops of trees are dead. Many plants that grew fruits and vegetables are now dead. Some insects my children and I grew up with— fireflies, locusts—are gone.

18. Living near Denka has also changed my daily routines and how I spend time outside. I used to like to take walks and sit outside and watch nature. I grew up walking a lot. But eventually I started noticing that the pollution was getting worse. There's no place I can walk in my community that's safe from Denka's emissions because we're right on the fenceline. So I stopped taking walks in my community. The only way to get away from these emissions is to drive out of the community to take a walk somewhere else.

19. I can't avoid Denka's emissions because no matter where I drive, I have to drive past the plant. Even if my car windows are closed, the outside air comes in through the air conditioning system.

DEC041

20. I am not safe from these emissions even in my own home, even when I shut the doors and close the windows, because the air comes in through the vents.

21. We're exposed to various toxins from Denka and other facilities, and many of these pollutants cause significant odors. The odor is often worse in the late night or early evening. The odors are also worse right before it's going to rain and when it rains. Sometimes, the odor from the air pollution has been so strong that I've had to go inside. But going inside doesn't fully protect us because we still have to rely on the air coming into our house or car. Sometimes, these odors have been so bad at night that, even when I've been inside my house asleep, they've woken me up.

22. I've seen huge flares come from Denka and heard emergency sirens. When I've asked local government if there is an evacuation plan for the community in case of an emergency at Denka, I've been told that there is no plan. Eventually, I was told to shelter in place if there's a disaster at the plant. But sheltering in place won't protect us because the emissions come into our homes. We need clean air to breathe.

23. No words can fully describe the emotional and psychological pain this relentless pollution has caused me. Seeing my family and community, especially the young kids, get sick and die is so painful, especially because this is all preventable. This is all unconscionable. It is difficult for me to

DEC042

really describe what I'm going through. This plant is a part of my daily life.

24. When I pass Fifth Ward Elementary School located right next to Denka, it's hard for me to look at those kids playing in the playground. I know being inside the school building isn't enough protection either. They spend hours a day at this school. And a significant number of those school kids go back home just a block away. They never leave the pollution. They live in census tract 708, so they're constantly bombarded with pollution. The kids who are bussed in to school might be fortunate enough to live somewhere where they're exposed to a lower level of chloroprene, but there's nowhere in St. John that is safe from chloroprene. A study showed that there was no location in St. John subject to lower than 0.2 micrograms of chloroprene per cubic meter, which is the level of chloroprene that EPA says causes an unsafe risk of cancer.

25. I have been fighting to reduce chloroprene emissions and for clean air for nine years.

26. I am heartbroken that, after all these years and all this work, children are still being bussed into that hellhole. We have marched from Fifth Ward Elementary School to Baton Rouge. We've picketed at the school board. The science shows that children are more vulnerable to chloroprene than adults. How many of these children are we sending to an early death? That's been

6

DEC043

traumatic for me.

27. Denka has caused significant economic problems for St. John's residents, including me, by drastically hurting our property values. I hired a state-licensed appraiser to apprise my property. He told me that my home's proximity to Denka nearly halved the value of my home.

28. These companies, worth billions of dollars, talk about giving us jobs, but most of Denka's employees are not from St. John. And even if Denka employees include some St. John residents, it is in exchange for harming the over 40,000 people who live here, including thousands of young people. How many jobs are worth the life of one child? Whose life should be sacrificed for someone to have a job? Or to make billions of dollars?

29. I don't want to sell my home because my conscience wouldn't let me sell this death trap to another family. I couldn't in good conscience see another family move into this area knowing that I played a part in allowing them to come here, get sick, and die.

30. We've waited for years for this rule requiring Denka and other facilities to reduce emissions. Parts of the rule are good, but parts of the rule are weak. The rule allows Denka to get away with emissions causing levels of chloroprene in the air over 0.2, even though EPA already concluded that causes an unsafe risk of cancer. EPA's rule needs to require stronger

DEC044

pollution controls to reduce pollution and protect the air we breathe. If the rule is stronger, I would worry less about my health and wellbeing and the health and wellbeing of my family and community, especially the children. And we would all feel safer being outside. That's why I support Concerned Citizens of St. John suing to get a stronger rule.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 13, 2025

Robert Taylor

Robert Taylor

DEC045

# DECLARATION OF JANE WILLIAMS

1. My name is Jane Williams, and I am a member of California Communities Against Toxics ("CCAT") and have served as CCAT's executive director since 1997.

2. In addition, I am also a years-long member of the Sierra Club and serve on the Sierra Club's national Air Grassroots Network Team.

3. My position as executive director of CCAT requires me to be familiar with CCAT's purposes, its activities, and the nature and scope of its membership. CCAT is a nonprofit organization that uses public education, advocacy, and community organizing to: (a) educate communities, policy makers, and elected officials about the adverse health and environmental impacts of air, water, and soil pollution; and (b) advance environmental justice and pollution prevention efforts by advocating in legislative, administrative, educational, and legal arenas. I am familiar with and knowledgeable about CCAT's purpose and activities concerning toxic air pollution control.

4. CCAT has more than 25 organizational members and many individual members across California. CCAT also represents and works on behalf of thousands of individuals and constituents who are members of CCAT's organizational members.

5. I have decades of experience working to reduce people's exposure to toxic air

pollution, including from the Synthetic Organic Chemical Manufacturing Industry ("SOCMI") and polymers and resins facilities. In my roles at CCAT and Sierra Club's Air Grassroots Network Team, I have participated in dozens (if not hundreds) of proceedings at the local, state, and federal level to address toxic pollution, particularly toxic air pollution under the Clean Air Act. I routinely direct and participate in the drafting of comments on Clean Air Act rulemakings. I meet regularly with career staff and political appointees at EPA on Clean Air Act issues. Similarly, I regularly engage with environmental regulators in California.

6.     As a result of my work, I understand how toxic air pollution—including air pollution from fugitive emissions, flares, startups, shutdowns, and malfunctions—impacts human health and the environment. I know how different fenceline monitoring technologies and pollution controls work. I am also very familiar with the Clean Air Act's provisions for regulating hazardous air pollutants and EPA's implementing regulations.

7.     For decades, CCAT has worked to reduce toxic air pollution from industrial sources across the country and to protect our members' and local communities' health, recreational, and other interests. CCAT has invested substantial resources in advocating for EPA to strengthen Clean Air Act emissions and performance standards and to remove unlawful exemptions,

like exemptions during periods of startup, shutdown, and malfunction. These efforts include filing public comments on EPA proposals, educating members about such rules and the dangers posed by toxic air pollution, and litigating when necessary to defend EPA's rules or to compel EPA to strengthen the rules. We also do extensive public education, including circulating sign-on letters, organizing and participating in teach-ins, and other activities regarding toxic air pollution and its impacts.

8. Weak emissions standards and performance standards allow pollution that harms our members' health and wellbeing. Weak air toxics regulations also make it more difficult for CCAT to carry out its mission because they often require that less information be made public.

9. I am aware that EPA finalized the National Emissions Standards for Hazardous Organic Pollutants from SOCMI and Groups I and II Polymers and Resins, along with New Source Performance Standards for SOCMI. I know that this rule requires regulated facilities to install pollution controls that are critical to protecting community and environmental health, and removes an affirmative defense and exemptions covering startup, shutdown, and malfunction events. This rule also requires some facilities to conduct fenceline monitoring but does not require many others to conduct fenceline monitoring. Fenceline monitoring is critical because it tells CCAT, EPA, and

DEC048

fenceline communities how much of a hazardous air pollutant is actually in the air. In doing so, it increases transparency and compliance with emissions standards.

10. I am aware that CCAT members live, work, recreate, and spend time near facilities regulated under the SOCMI and Polymers and Resins standards. These facilities expose CCAT members to significant quantities of air pollution and harm their health and quality of life.

11. Because toxic air pollution from these facilities harm CCAT and its members, this rule requiring stronger emissions standards accordingly benefits CCAT and its members. But there are shortcomings in the rule, too. For example, it does not require any facilities in California to use fenceline monitoring. A stronger rule that requires all facilities to conduct fenceline monitoring would benefit CCAT members' health and wellbeing by addressing leaks at these facilities and giving members' more information about emissions of hazardous air pollutants where they live. More information through fenceline monitoring would also advance CCAT's education and advocacy work. A stronger rule with stronger controls and without exemptions would also reduce the hazardous air pollution emitted by these facilities and thus benefit CCAT members' health and wellbeing.

DEC049

I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 13, 2025

Jane Williams

DEC050