No. 24-1135
(consolidated with Nos. 24-1228, 24-1246, 24-1249, 24-1250, 24-1251, 24-1252)

# In The United States Court of Appeals
# for the District of Columbia Circuit

_____

DENKA PERFORMANCE ELASTOMER LLC, *ET AL.*,
*Petitioners,*
v.

ENVIRONMENTAL PROTECTION AGENCY, *ET AL.*,
*Respondents.*

and

AIR ALLIANCE HOUSTON, *ET AL.*,
*Intervenors for Respondent.*
_____

On Petition for Review of a Final Agency Action
of the Environmental Protection Agency

**ADDENDUM TO PETITIONERS' OPENING BRIEF**

Dated: January 17, 2025

*Counsel Listed on Inside Cover*

James C. Percy
JONES WALKER LLP
445 N. Boulevard, Suite 800
Baton Rouge, LA 70802
Telephone: (225) 248-2130
jpercy@joneswalker.com

Robert E. Holden
Brett S. Venn
JONES WALKER LLP
201 St. Charles Avenue
New Orleans, LA 70170
Telephone: (504) 582-8000
bholden@joneswalker.com
bvenn@joneswalker.com

Jeffrey R. Holmstead
David A. Super
Jason B. Hutt
Kevin M. Voelkel
Stephen C. Wald
BRACEWELL LLP
2001 M Street NW, Suite 900
Washington, DC 20036
Telephone: (202) 828-5800
Facsimile: (800) 404-3970
jeff.holmstead@bracewell.com
jason.hutt@bracewell.com
kevin.voelkel@bracewell.com
stephen.wald@bracewell.com

***Counsel for Petitioner Denka Performance Elastomer LLC***

NOAH HOGGATT
EXECUTIVE COUNSEL

LOUISIANA DEPARTMENT OF
ENVIRONMENTAL QUALITY
602 North Fifth Street
Baton Rouge, LA 70802
(225) 219-3985
Noah.Hoggatt@la.gov

ELIZABETH B. MURRILL
ATTORNEY GENERAL OF LOUISIANA

KELSEY L. SMITH
DEPUTY SOLICITOR GENERAL

OFFICE OF THE ATTORNEY GENERAL
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 428-7432
SmithKel@ag.louisiana.gov

***Counsel for Intervenors the State of Louisiana and***
***the Louisiana Department of Environmental Quality***

# ADDENDUM
## TABLE OF CONTENTS

| **FEDERAL STATUTES** | **Page** |
|---|---|
| 42 U.S.C. § 7401 | Add.1 |
| 42 U.S.C. § 7412 | Add.4 |
| 42 U.S.C. § 7603 | Add.8 |
| **FEDERAL REGULATIONS** | |
| 40 C.F.R. § 63.6 | Add.9 |
| 40 C.F.R. § 63.99 | Add.25 |
| 40 C.F.R. § 63.153 | Add.40 |
| 40 C.F.R. § 63.507 | Add.42 |

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 85. Air Pollution Prevention and Control (Refs & Annos)
      Subchapter I. Programs and Activities
        Part A. Air Quality and Emissions Limitations (Refs & Annos)

42 U.S.C.A. § 7401

§ 7401. Congressional findings and declaration of purpose

Currentness

**(a) Findings**

The Congress finds--

**(1)** that the predominant part of the Nation's population is located in its rapidly expanding metropolitan and other urban areas, which generally cross the boundary lines of local jurisdictions and often extend into two or more States;

**(2)** that the growth in the amount and complexity of air pollution brought about by urbanization, industrial development, and the increasing use of motor vehicles, has resulted in mounting dangers to the public health and welfare, including injury to agricultural crops and livestock, damage to and the deterioration of property, and hazards to air and ground transportation;

**(3)** that air pollution prevention (that is, the reduction or elimination, through any measures, of the amount of pollutants produced or created at the source) and air pollution control at its source is the primary responsibility of States and local governments; and

**(4)** that Federal financial assistance and leadership is essential for the development of cooperative Federal, State, regional, and local programs to prevent and control air pollution.

**(b) Declaration**

The purposes of this subchapter are--

**(1)** to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population;

**(2)** to initiate and accelerate a national research and development program to achieve the prevention and control of air pollution;

**(3)** to provide technical and financial assistance to State and local governments in connection with the development and execution of their air pollution prevention and control programs; and

**(4)** to encourage and assist the development and operation of regional air pollution prevention and control programs.

**(c) Pollution prevention**

A primary goal of this chapter is to encourage or otherwise promote reasonable Federal, State, and local governmental actions, consistent with the provisions of this chapter, for pollution prevention.

**CREDIT(S)**

(July 14, 1955, c. 360, Title I, § 101, formerly § 1, as added Pub.L. 88-206, § 1, Dec. 17, 1963, 77 Stat. 392, and renumbered § 101 and amended Pub.L. 89-272, Title I, § 101(2), (3), Oct. 20, 1965, 79 Stat. 992; Pub.L. 90-148, § 2, Nov. 21, 1967, 81 Stat. 485; Pub.L. 101-549, Title I, § 108(k), Nov. 15, 1990, 104 Stat. 2468.)

**EXECUTIVE ORDERS**

**EXECUTIVE ORDER NO. 10779**

Ex. Ord. No. 10779, Aug. 21, 1958, 23 F.R. 6487, which related to cooperation of Federal agencies with State and local authorities, was superseded by Ex. Ord. No. 11282, May 26, 1966, 31 F.R. 7663, formerly set out under section 7418 of this title.

**EXECUTIVE ORDER NO. 11507**

Ex. Ord. No. 11507, Feb. 4, 1970, 35 F.R. 2573, which provided for the prevention, control, and abatement of air pollution at Federal facilities was superseded by Ex. Ord. No. 11752, Dec. 17, 1973, 38 F.R. 34793, formerly set out as a note under section 4331 of this title.

**EXECUTIVE ORDER NO. 11752**

Ex. Ord. No. 11752, Dec. 17, 1973, 38 F.R. 34793, formerly set out as a note under section 4331 of this title, provided for the prevention, control, and abatement of environmental pollution at Federal facilities.

**MEMORANDA OF PRESIDENT**

**PRESIDENTIAL MEMORANDUM**

Memorandum of President of the United States, Apr. 12, 2018, 83 F.R. 16761, which related to State Implementation Plans for the Regional Haze Program, was revoked by Ex. Ord. No. 13990, § 7(d), Jan. 20, 2021, 86 F.R. 7042.

Notes of Decisions (57)

42 U.S.C.A. § 7401, 42 USCA § 7401

**Add.2**

Current through P.L. 118-158. Some statute sections may be more current, see credits for details.

**End of Document**                                          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Add.3**

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

United States Code Annotated

  Title 42. The Public Health and Welfare

    Chapter 85. Air Pollution Prevention and Control (Refs & Annos)

      Subchapter I. Programs and Activities

        Part A. Air Quality and Emissions Limitations (Refs & Annos)

42 U.S.C.A. § 7412

§ 7412. Hazardous air pollutants

Currentness

**(a) Definitions**

For purposes of this section, except subsection (r)--

**(1) Major source**

The term "major source" means any stationary source or group of stationary sources located within a contiguous area and under common control that emits or has the potential to emit considering controls, in the aggregate, 10 tons per year or more of any hazardous air pollutant or 25 tons per year or more of any combination of hazardous air pollutants. The Administrator may establish a lesser quantity, or in the case of radionuclides different criteria, for a major source than that specified in the previous sentence, on the basis of the potency of the air pollutant, persistence, potential for bioaccumulation, other characteristics of the air pollutant, or other relevant factors.

**(2) Area source**

The term "area source" means any stationary source of hazardous air pollutants that is not a major source. For purposes of this section, the term "area source" shall not include motor vehicles or nonroad vehicles subject to regulation under subchapter II.

**(3) Stationary source**

The term "stationary source" shall have the same meaning as such term has under section 7411(a) of this title.

**(4) New source**

The term "new source" means a stationary source the construction or reconstruction of which is commenced after the Administrator first proposes regulations under this section establishing an emission standard applicable to such source.

**(5) Modification**

Add.4

**(4) Areawide activities**

In addition to the national urban air toxics strategy authorized by paragraph (3), the Administrator shall also encourage and support areawide strategies developed by State or local air pollution control agencies that are intended to reduce risks from emissions by area sources within a particular urban area. From the funds available for grants under this section, the Administrator shall set aside not less than 10 per centum to support areawide strategies addressing hazardous air pollutants emitted by area sources and shall award such funds on a demonstration basis to those States with innovative and effective strategies. At the request of State or local air pollution control officials, the Administrator shall prepare guidelines for control technologies or management practices which may be applicable to various categories or subcategories of area sources.

**(5) Report**

The Administrator shall report to the Congress at intervals not later than 8 and 12 years after November 15, 1990, on actions taken under this subsection and other parts of this chapter to reduce the risk to public health posed by the release of hazardous air pollutants from area sources. The reports shall also identify specific metropolitan areas that continue to experience high risks to public health as the result of emissions from area sources.

**(l) State programs**

**(1) In general**

Each State may develop and submit to the Administrator for approval a program for the implementation and enforcement (including a review of enforcement delegations previously granted) of emission standards and other requirements for air pollutants subject to this section or requirements for the prevention and mitigation of accidental releases pursuant to subsection (r). A program submitted by a State under this subsection may provide for partial or complete delegation of the Administrator's authorities and responsibilities to implement and enforce emissions standards and prevention requirements but shall not include authority to set standards less stringent than those promulgated by the Administrator under this chapter.

**(2) Guidance**

Not later than 12 months after November 15, 1990, the Administrator shall publish guidance that would be useful to the States in developing programs for submittal under this subsection. The guidance shall also provide for the registration of all facilities producing, processing, handling or storing any substance listed pursuant to subsection (r) in amounts greater than the threshold quantity. The Administrator shall include as an element in such guidance an optional program begun in 1986 for the review of high-risk point sources of air pollutants including, but not limited to, hazardous air pollutants listed pursuant to subsection (b).

**(3) Technical assistance**

The Administrator shall establish and maintain an air toxics clearinghouse and center to provide technical information and assistance to State and local agencies and, on a cost recovery basis, to others on control technology, health and ecological risk assessment, risk analysis, ambient monitoring and modeling, and emissions measurement and monitoring. The Administrator shall use the authority of section 7403 of this title to examine methods for preventing, measuring, and controlling emissions and evaluating associated health and ecological risks. Where appropriate, such activity shall be conducted with not-for-profit

**Add.5**

organizations. The Administrator may conduct research on methods for preventing, measuring and controlling emissions and evaluating associated health and environment risks. All information collected under this paragraph shall be available to the public.

**(4) Grants**

Upon application of a State, the Administrator may make grants, subject to such terms and conditions as the Administrator deems appropriate, to such State for the purpose of assisting the State in developing and implementing a program for submittal and approval under this subsection. Programs assisted under this paragraph may include program elements addressing air pollutants or extremely hazardous substances other than those specifically subject to this section. Grants under this paragraph may include support for high-risk point source review as provided in paragraph (2) and support for the development and implementation of areawide area source programs pursuant to subsection (k).

**(5) Approval or disapproval**

Not later than 180 days after receiving a program submitted by a State, and after notice and opportunity for public comment, the Administrator shall either approve or disapprove such program. The Administrator shall disapprove any program submitted by a State, if the Administrator determines that--

**(A)** the authorities contained in the program are not adequate to assure compliance by all sources within the State with each applicable standard, regulation or requirement established by the Administrator under this section;

**(B)** adequate authority does not exist, or adequate resources are not available, to implement the program;

**(C)** the schedule for implementing the program and assuring compliance by affected sources is not sufficiently expeditious; or

**(D)** the program is otherwise not in compliance with the guidance issued by the Administrator under paragraph (2) or is not likely to satisfy, in whole or in part, the objectives of this chapter.

If the Administrator disapproves a State program, the Administrator shall notify the State of any revisions or modifications necessary to obtain approval. The State may revise and resubmit the proposed program for review and approval pursuant to the provisions of this subsection.

**(6) Withdrawal**

Whenever the Administrator determines, after public hearing, that a State is not administering and enforcing a program approved pursuant to this subsection in accordance with the guidance published pursuant to paragraph (2) or the requirements of paragraph (5), the Administrator shall so notify the State and, if action which will assure prompt compliance is not taken within 90 days, the Administrator shall withdraw approval of the program. The Administrator shall not withdraw approval of any program unless the State shall have been notified and the reasons for withdrawal shall have been stated in writing and made public.

Add.6

**(7) Authority to enforce**

Nothing in this subsection shall prohibit the Administrator from enforcing any applicable emission standard or requirement under this section.

**(8) Local program**

The Administrator may, after notice and opportunity for public comment, approve a program developed and submitted by a local air pollution control agency (after consultation with the State) pursuant to this subsection and any such agency implementing an approved program may take any action authorized to be taken by a State under this section.

**(9) Permit authority**

Nothing in this subsection shall affect the authorities and obligations of the Administrator or the State under subchapter V.

**(m) Atmospheric deposition to Great Lakes and coastal waters**

**(1) Deposition assessment**

The Administrator, in cooperation with the Under Secretary of Commerce for Oceans and Atmosphere, shall conduct a program to identify and assess the extent of atmospheric deposition of hazardous air pollutants (and in the discretion of the Administrator, other air pollutants) to the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters. As part of such program, the Administrator shall--

**(A)** monitor the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters, including monitoring of the Great Lakes through the monitoring network established pursuant to paragraph (2) of this subsection and designing and deploying an atmospheric monitoring network for coastal waters pursuant to paragraph (4);

**(B)** investigate the sources and deposition rates of atmospheric deposition of air pollutants (and their atmospheric transformation precursors);

**(C)** conduct research to develop and improve monitoring methods and to determine the relative contribution of atmospheric pollutants to total pollution loadings to the Great Lakes, the Chesapeake Bay, Lake Champlain, and coastal waters;

**(D)** evaluate any adverse effects to public health or the environment caused by such deposition (including effects resulting from indirect exposure pathways) and assess the contribution of such deposition to violations of water quality standards established pursuant to the Federal Water Pollution Control Act and drinking water standards established pursuant to the Safe Drinking Water Act; and

**(E)** sample for such pollutants in biota, fish, and wildlife of the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters and characterize the sources of such pollutants.

**Add.7**

United States Code Annotated
Title 42. The Public Health and Welfare
Chapter 85. Air Pollution Prevention and Control (Refs & Annos)
Subchapter III. General Provisions

42 U.S.C.A. § 7603

§ 7603. Emergency powers

Currentness

Notwithstanding any other provision of this chapter, the Administrator, upon receipt of evidence that a pollution source or combination of sources (including moving sources) is presenting an imminent and substantial endangerment to public health or welfare, or the environment, may bring suit on behalf of the United States in the appropriate United States district court to immediately restrain any person causing or contributing to the alleged pollution to stop the emission of air pollutants causing or contributing to such pollution or to take such other action as may be necessary. If it is not practicable to assure prompt protection of public health or welfare or the environment by commencement of such a civil action, the Administrator may issue such orders as may be necessary to protect public health or welfare or the environment. Prior to taking any action under this section, the Administrator shall consult with appropriate State and local authorities and attempt to confirm the accuracy of the information on which the action proposed to be taken is based. Any order issued by the Administrator under this section shall be effective upon issuance and shall remain in effect for a period of not more than 60 days, unless the Administrator brings an action pursuant to the first sentence of this section before the expiration of that period. Whenever the Administrator brings such an action within the 60-day period, such order shall remain in effect for an additional 14 days or for such longer period as may be authorized by the court in which such action is brought.

**CREDIT(S)**

(July 14, 1955, c. 360, Title III, § 303, as added Pub.L. 91-604, § 12(a), Dec. 31, 1970, 84 Stat. 1705; amended Pub.L. 95-95, Title III, § 302(a), Aug. 7, 1977, 91 Stat. 770; Pub.L. 101-549, Title VII, § 704, Nov. 15, 1990, 104 Stat. 2681.)

Notes of Decisions (1)

42 U.S.C.A. § 7603, 42 USCA § 7603
Current through P.L. 118-158. Some statute sections may be more current, see credits for details.

    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted  Prior Version Held Invalid  Sierra Club v. E.P.A.,  D.C.Cir.,  Dec. 19, 2008

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter I. Environmental Protection Agency (Refs & Annos)
      Subchapter C. Air Programs
        Part 63. National Emission Standards for Hazardous Air Pollutants for Source Categories (Refs & Annos)
          Subpart A. General Provisions (Refs & Annos)

40 C.F.R. § 63.6

§ 63.6 Compliance with standards and maintenance requirements.

Currentness

(a) Applicability.

(1) The requirements in this section apply to the owner or operator of affected sources for which any relevant standard has been established pursuant to section 112 of the Act and the applicability of such requirements is set out in accordance with § 63.1(a)(4) unless—

(i) The Administrator (or a State with an approved permit program) has granted an extension of compliance consistent with paragraph (i) of this section; or

(ii) The President has granted an exemption from compliance with any relevant standard in accordance with section 112(i)(4) of the Act.

(2) If an area source that otherwise would be subject to an emission standard or other requirement established under this part if it were a major source subsequently increases its emissions of hazardous air pollutants (or its potential to emit hazardous air pollutants) such that the source is a major source, such source shall be subject to the relevant emission standard or other requirement.

(b) Compliance dates for new and reconstructed sources.

(1) Except as specified in paragraphs (b)(3) and (4) of this section, the owner or operator of a new or reconstructed affected source for which construction or reconstruction commences after proposal of a relevant standard that has an initial startup before the effective date of a relevant standard established under this part pursuant to section 112(d), (f), or (h) of the Act must comply with such standard not later than the standard's effective date.

Add.9

(2) Except as specified in paragraphs (b)(3) and (4) of this section, the owner or operator of a new or reconstructed affected source that has an initial startup after the effective date of a relevant standard established under this part pursuant to section 112(d), (f), or (h) of the Act must comply with such standard upon startup of the source.

(3) The owner or operator of an affected source for which construction or reconstruction is commenced after the proposal date of a relevant standard established under this part pursuant to section 112(d), 112(f), or 112(h) of the Act but before the effective date (that is, promulgation) of such standard shall comply with the relevant emission standard not later than the date 3 years after the effective date if:

(i) The promulgated standard (that is, the relevant standard) is more stringent than the proposed standard; for purposes of this paragraph, a finding that controls or compliance methods are "more stringent" must include control technologies or performance criteria and compliance or compliance assurance methods that are different but are substantially equivalent to those required by the promulgated rule, as determined by the Administrator (or his or her authorized representative); and

(ii) The owner or operator complies with the standard as proposed during the 3–year period immediately after the effective date.

(4) The owner or operator of an affected source for which construction or reconstruction is commenced after the proposal date of a relevant standard established pursuant to section 112(d) of the Act but before the proposal date of a relevant standard established pursuant to section 112(f) shall not be required to comply with the section 112(f) emission standard until the date 10 years after the date construction or reconstruction is commenced, except that, if the section 112(f) standard is promulgated more than 10 years after construction or reconstruction is commenced, the owner or operator must comply with the standard as provided in paragraphs (b)(1) and (2) of this section.

(5) The owner or operator of a new source that is subject to the compliance requirements of paragraph (b)(3) or (4) of this section must notify the Administrator in accordance with § 63.9(d).

(6) [Reserved]

(7) When an area source increases its emissions of (or its potential to emit) hazardous air pollutants such that the source becomes a major source, the portion of the facility that meets the definition of a new affected source must comply with all requirements of that standard applicable to new sources. The source owner or operator must comply with the relevant standard upon startup.

(c) Compliance dates for existing sources.

(1) After the effective date of a relevant standard established under this part pursuant to section 112(d) or 112(h) of the Act, the owner or operator of an existing source shall comply with such standard by the compliance date established by the Administrator in the applicable subpart(s) of this part, except as provided in § 63.1(c)(6)(i). Except as otherwise provided for in section 112 of the Act, in no case will the compliance date established for an existing source in an applicable subpart of this part exceed 3 years after the effective date of such standard.

Add.10

(2) If an existing source is subject to a standard established under this part pursuant to section 112(f) of the Act, the owner or operator must comply with the standard by the date 90 days after the standard's effective date, or by the date specified in an extension granted to the source by the Administrator under paragraph (i)(4)(ii) of this section, whichever is later.

(3), (4) [Reserved]

(5) Except as provided in paragraph (b)(7) of this section, the owner or operator of an area source that increases its emissions of (or its potential to emit) hazardous air pollutants such that the source becomes a major source and meets the definition of an existing source in the applicable major source standard shall be subject to relevant standards for existing sources. Except as provided in paragraph § 63.1(c)(6)(i)(B), such sources must comply by the date specified in the standards for existing area sources that become major sources. If no such compliance date is specified in the standards, the source shall have a period of time to comply with the relevant emission standard that is equivalent to the compliance period specified in the relevant standard for existing sources in existence at the time the standard becomes effective.

(d) [Reserved]

(e) Operation and maintenance requirements.

(1)(i) At all times, including periods of startup, shutdown, and malfunction, the owner or operator must operate and maintain any affected source, including associated air pollution control equipment and monitoring equipment, in a manner consistent with safety and good air pollution control practices for minimizing emissions. During a period of startup, shutdown, or malfunction, this general duty to minimize emissions requires that the owner or operator reduce emissions from the affected source to the greatest extent which is consistent with safety and good air pollution control practices. The general duty to minimize emissions during a period of startup, shutdown, or malfunction does not require the owner or operator to achieve emission levels that would be required by the applicable standard at other times if this is not consistent with safety and good air pollution control practices, nor does it require the owner or operator to make any further efforts to reduce emissions if levels required by the applicable standard have been achieved. Determination of whether such operation and maintenance procedures are being used will be based on information available to the Administrator which may include, but is not limited to, monitoring results, review of operation and maintenance procedures (including the startup, shutdown, and malfunction plan required in paragraph (e)(3) of this section), review of operation and maintenance records, and inspection of the source.

(ii) Malfunctions must be corrected as soon as practicable after their occurrence. To the extent that an unexpected event arises during a startup, shutdown, or malfunction, an owner or operator must comply by minimizing emissions during such a startup, shutdown, and malfunction event consistent with safety and good air pollution control practices.

(iii) Operation and maintenance requirements established pursuant to section 112 of the Act are enforceable independent of emissions limitations or other requirements in relevant standards.

(2) [Reserved]

(3) Startup, shutdown, and malfunction plan.

Add.11

(i) The owner or operator of an affected source must develop a written startup, shutdown, and malfunction plan that describes, in detail, procedures for operating and maintaining the source during periods of startup, shutdown, and malfunction; and a program of corrective action for malfunctioning process, air pollution control, and monitoring equipment used to comply with the relevant standard. The startup, shutdown, and malfunction plan does not need to address any scenario that would not cause the source to exceed an applicable emission limitation in the relevant standard. This plan must be developed by the owner or operator by the source's compliance date for that relevant standard. The purpose of the startup, shutdown, and malfunction plan is to—

(A) Ensure that, at all times, the owner or operator operates and maintains each affected source, including associated air pollution control and monitoring equipment, in a manner which satisfies the general duty to minimize emissions established by paragraph (e)(1)(i) of this section;

(B) Ensure that owners or operators are prepared to correct malfunctions as soon as practicable after their occurrence in order to minimize excess emissions of hazardous air pollutants; and

(C) Reduce the reporting burden associated with periods of startup, shutdown, and malfunction (including corrective action taken to restore malfunctioning process and air pollution control equipment to its normal or usual manner of operation).

(ii) [Reserved]

(iii) When actions taken by the owner or operator during a startup or shutdown (and the startup or shutdown causes the source to exceed any applicable emission limitation in the relevant emission standards), or malfunction (including actions taken to correct a malfunction) are consistent with the procedures specified in the affected source's startup, shutdown, and malfunction plan, the owner or operator must keep records for that event which demonstrate that the procedures specified in the plan were followed. These records may take the form of a "checklist," or other effective form of recordkeeping that confirms conformance with the startup, shutdown, and malfunction plan and describes the actions taken for that event. In addition, the owner or operator must keep records of these events as specified in paragraph 63.10(b), including records of the occurrence and duration of each startup or shutdown (if the startup or shutdown causes the source to exceed any applicable emission limitation in the relevant emission standards), or malfunction of operation and each malfunction of the air pollution control and monitoring equipment. Furthermore, the owner or operator shall confirm that actions taken during the relevant reporting period during periods of startup, shutdown, and malfunction were consistent with the affected source's startup, shutdown and malfunction plan in the semiannual (or more frequent) startup, shutdown, and malfunction report required in § 63.10(d)(5).

(iv) If an action taken by the owner or operator during a startup, shutdown, or malfunction (including an action taken to correct a malfunction) is not consistent with the procedures specified in the affected source's startup, shutdown, and malfunction plan, and the source exceeds any applicable emission limitation in the relevant emission standard, then the owner or operator must record the actions taken for that event and must report such actions within 2 working days after commencing actions inconsistent with the plan, followed by a letter within 7 working days after the end of the event, in accordance with § 63.10(d)(5) (unless the owner or operator makes alternative reporting arrangements, in advance, with the Administrator).

**Add.12**

(v) The owner or operator must maintain at the affected source a current startup, shutdown, and malfunction plan and must make the plan available upon request for inspection and copying by the Administrator. In addition, if the startup, shutdown, and malfunction plan is subsequently revised as provided in paragraph (e)(3)(viii) of this section, the owner or operator must maintain at the affected source each previous (i.e., superseded) version of the startup, shutdown, and malfunction plan, and must make each such previous version available for inspection and copying by the Administrator for a period of 5 years after revision of the plan. If at any time after adoption of a startup, shutdown, and malfunction plan the affected source ceases operation or is otherwise no longer subject to the provisions of this part, the owner or operator must retain a copy of the most recent plan for 5 years from the date the source ceases operation or is no longer subject to this part and must make the plan available upon request for inspection and copying by the Administrator. The Administrator may at any time request in writing that the owner or operator submit a copy of any startup, shutdown, and malfunction plan (or a portion thereof) which is maintained at the affected source or in the possession of the owner or operator. Upon receipt of such a request, the owner or operator must promptly submit a copy of the requested plan (or a portion thereof) to the Administrator. The owner or operator may elect to submit the required copy of any startup, shutdown, and malfunction plan to the Administrator in an electronic format. If the owner or operator claims that any portion of such a startup, shutdown, and malfunction plan is confidential business information entitled to protection from disclosure under section 114(c) of the Act or 40 CFR 2.301, the material which is claimed as confidential must be clearly designated in the submission.

(vi) To satisfy the requirements of this section to develop a startup, shutdown, and malfunction plan, the owner or operator may use the affected source's standard operating procedures (SOP) manual, or an Occupational Safety and Health Administration (OSHA) or other plan, provided the alternative plans meet all the requirements of this section and are made available for inspection or submitted when requested by the Administrator.

(vii) Based on the results of a determination made under paragraph (e)(1)(i) of this section, the Administrator may require that an owner or operator of an affected source make changes to the startup, shutdown, and malfunction plan for that source. The Administrator must require appropriate revisions to a startup, shutdown, and malfunction plan, if the Administrator finds that the plan:

(A) Does not address a startup, shutdown, or malfunction event that has occurred;

(B) Fails to provide for the operation of the source (including associated air pollution control and monitoring equipment) during a startup, shutdown, or malfunction event in a manner consistent with the general duty to minimize emissions established by paragraph (e)(1)(i) of this section;

(C) Does not provide adequate procedures for correcting malfunctioning process and/or air pollution control and monitoring equipment as quickly as practicable; or

(D) Includes an event that does not meet the definition of startup, shutdown, or malfunction listed in § 63.2.

(viii) The owner or operator may periodically revise the startup, shutdown, and malfunction plan for the affected source as necessary to satisfy the requirements of this part or to reflect changes in equipment or procedures at the affected source. Unless the permitting authority provides otherwise, the owner or operator may make such revisions to the startup, shutdown, and malfunction plan without prior approval by the Administrator or the permitting authority. However, each such revision to a startup, shutdown, and malfunction plan must be reported in the semiannual report required by § 63.10(d)

**Add.13**

(5). If the startup, shutdown, and malfunction plan fails to address or inadequately addresses an event that meets the characteristics of a malfunction but was not included in the startup, shutdown, and malfunction plan at the time the owner or operator developed the plan, the owner or operator must revise the startup, shutdown, and malfunction plan within 45 days after the event to include detailed procedures for operating and maintaining the source during similar malfunction events and a program of corrective action for similar malfunctions of process or air pollution control and monitoring equipment. In the event that the owner or operator makes any revision to the startup, shutdown, and malfunction plan which alters the scope of the activities at the source which are deemed to be a startup, shutdown, or malfunction, or otherwise modifies the applicability of any emission limit, work practice requirement, or other requirement in a standard established under this part, the revised plan shall not take effect until after the owner or operator has provided a written notice describing the revision to the permitting authority.

(ix) The title V permit for an affected source must require that the owner or operator develop a startup, shutdown, and malfunction plan which conforms to the provisions of this part, but may do so by citing to the relevant subpart or subparagraphs of paragraph (e) of this section. However, any revisions made to the startup, shutdown, and malfunction plan in accordance with the procedures established by this part shall not be deemed to constitute permit revisions under part 70 or part 71 of this chapter and the elements of the startup, shutdown, and malfunction plan shall not be considered an applicable requirement as defined in § 70.2 and § 71.2 of this chapter. Moreover, none of the procedures specified by the startup, shutdown, and malfunction plan for an affected source shall be deemed to fall within the permit shield provision in section 504(f) of the Act.

(f) Compliance with nonopacity emission standards—

(1) Applicability. The non-opacity emission standards set forth in this part shall apply at all times except as otherwise specified in an applicable subpart. If a startup, shutdown, or malfunction of one portion of an affected source does not affect the ability of particular emission points within other portions of the affected source to comply with the non-opacity emission standards set forth in this part, then that emission point must still be required to comply with the non-opacity emission standards and other applicable requirements.

(2) Methods for determining compliance.

(i) The Administrator will determine compliance with nonopacity emission standards in this part based on the results of performance tests conducted according to the procedures in § 63.7, unless otherwise specified in an applicable subpart of this part.

(ii) The Administrator will determine compliance with nonopacity emission standards in this part by evaluation of an owner or operator's conformance with operation and maintenance requirements, including the evaluation of monitoring data, as specified in § 63.6(e) and applicable subparts of this part.

(iii) If an affected source conducts performance testing at startup to obtain an operating permit in the State in which the source is located, the results of such testing may be used to demonstrate compliance with a relevant standard if—

(A) The performance test was conducted within a reasonable amount of time before an initial performance test is required to be conducted under the relevant standard;

Add.14

(B) The performance test was conducted under representative operating conditions for the source;

(C) The performance test was conducted and the resulting data were reduced using EPA-approved test methods and procedures, as specified in § 63.7(e) of this subpart; and

(D) The performance test was appropriately quality-assured, as specified in § 63.7(c).

(iv) The Administrator will determine compliance with design, equipment, work practice, or operational emission standards in this part by review of records, inspection of the source, and other procedures specified in applicable subparts of this part.

(v) The Administrator will determine compliance with design, equipment, work practice, or operational emission standards in this part by evaluation of an owner or operator's conformance with operation and maintenance requirements, as specified in paragraph (e) of this section and applicable subparts of this part.

(3) Finding of compliance. The Administrator will make a finding concerning an affected source's compliance with a non-opacity emission standard, as specified in paragraphs (f)(1) and (2) of this section, upon obtaining all the compliance information required by the relevant standard (including the written reports of performance test results, monitoring results, and other information, if applicable), and information available to the Administrator pursuant to paragraph (e)(1)(i) of this section.

(g) Use of an alternative nonopacity emission standard.

(1) If, in the Administrator's judgment, an owner or operator of an affected source has established that an alternative means of emission limitation will achieve a reduction in emissions of a hazardous air pollutant from an affected source at least equivalent to the reduction in emissions of that pollutant from that source achieved under any design, equipment, work practice, or operational emission standard, or combination thereof, established under this part pursuant to section 112(h) of the Act, the Administrator will publish in the Federal Register a notice permitting the use of the alternative emission standard for purposes of compliance with the promulgated standard. Any Federal Register notice under this paragraph shall be published only after the public is notified and given the opportunity to comment. Such notice will restrict the permission to the stationary source(s) or category(ies) of sources from which the alternative emission standard will achieve equivalent emission reductions. The Administrator will condition permission in such notice on requirements to assure the proper operation and maintenance of equipment and practices required for compliance with the alternative emission standard and other requirements, including appropriate quality assurance and quality control requirements, that are deemed necessary.

(2) An owner or operator requesting permission under this paragraph shall, unless otherwise specified in an applicable subpart, submit a proposed test plan or the results of testing and monitoring in accordance with § 63.7 and § 63.8, a description of the procedures followed in testing or monitoring, and a description of pertinent conditions during testing or monitoring. Any testing or monitoring conducted to request permission to use an alternative nonopacity emission standard shall be appropriately quality assured and quality controlled, as specified in § 63.7 and § 63.8.

Add.15

(3) The Administrator may establish general procedures in an applicable subpart that accomplish the requirements of paragraphs (g)(1) and (g)(2) of this section.

(h) Compliance with opacity and visible emission standards—

(1) Applicability. The opacity and visible emission standards set forth in this part must apply at all times except as otherwise specified in an applicable subpart. If a startup, shutdown, or malfunction of one portion of an affected source does not affect the ability of particular emission points within other portions of the affected source to comply with the opacity and visible emission standards set forth in this part, then that emission point shall still be required to comply with the opacity and visible emission standards and other applicable requirements.

(2) Methods for determining compliance.

(i) The Administrator will determine compliance with opacity and visible emission standards in this part based on the results of the test method specified in an applicable subpart. Whenever a continuous opacity monitoring system (COMS) is required to be installed to determine compliance with numerical opacity emission standards in this part, compliance with opacity emission standards in this part shall be determined by using the results from the COMS. Whenever an opacity emission test method is not specified, compliance with opacity emission standards in this part shall be determined by conducting observations in accordance with Test Method 9 in appendix A of part 60 of this chapter or the method specified in paragraph (h)(7)(ii) of this section. Whenever a visible emission test method is not specified, compliance with visible emission standards in this part shall be determined by conducting observations in accordance with Test Method 22 in appendix A of part 60 of this chapter.

(ii) [Reserved]

(iii) If an affected source undergoes opacity or visible emission testing at startup to obtain an operating permit in the State in which the source is located, the results of such testing may be used to demonstrate compliance with a relevant standard if—

(A) The opacity or visible emission test was conducted within a reasonable amount of time before a performance test is required to be conducted under the relevant standard;

(B) The opacity or visible emission test was conducted under representative operating conditions for the source;

(C) The opacity or visible emission test was conducted and the resulting data were reduced using EPA-approved test methods and procedures, as specified in § 63.7(e); and

(D) The opacity or visible emission test was appropriately quality-assured, as specified in § 63.7(c) of this section.

(3) [Reserved]

**Add.16**

(4) *Notification of opacity or visible emission observations.* The owner or operator of an affected source shall notify the Administrator in writing of the anticipated date for conducting opacity or visible emission observations in accordance with § 63.9(f), if such observations are required for the source by a relevant standard.

(5) *Conduct of opacity or visible emission observations.* When a relevant standard under this part includes an opacity or visible emission standard, the owner or operator of an affected source shall comply with the following:

(i) For the purpose of demonstrating initial compliance, opacity or visible emission observations shall be conducted concurrently with the initial performance test required in § 63.7 unless one of the following conditions applies:

(A) If no performance test under § 63.7 is required, opacity or visible emission observations shall be conducted within 60 days after achieving the maximum production rate at which a new or reconstructed source will be operated, but not later than 120 days after initial startup of the source, or within 120 days after the effective date of the relevant standard in the case of new sources that start up before the standard's effective date. If no performance test under § 63.7 is required, opacity or visible emission observations shall be conducted within 120 days after the compliance date for an existing or modified source; or

(B) If visibility or other conditions prevent the opacity or visible emission observations from being conducted concurrently with the initial performance test required under § 63.7, or within the time period specified in paragraph (h)(5)(i)(A) of this section, the source's owner or operator shall reschedule the opacity or visible emission observations as soon after the initial performance test, or time period, as possible, but not later than 30 days thereafter, and shall advise the Administrator of the rescheduled date. The rescheduled opacity or visible emission observations shall be conducted (to the extent possible) under the same operating conditions that existed during the initial performance test conducted under § 63.7. The visible emissions observer shall determine whether visibility or other conditions prevent the opacity or visible emission observations from being made concurrently with the initial performance test in accordance with procedures contained in Test Method 9 or Test Method 22 in appendix A of part 60 of this chapter.

(ii) For the purpose of demonstrating initial compliance, the minimum total time of opacity observations shall be 3 hours (30 6–minute averages) for the performance test or other required set of observations (e.g., for fugitive-type emission sources subject only to an opacity emission standard).

(iii) The owner or operator of an affected source to which an opacity or visible emission standard in this part applies shall conduct opacity or visible emission observations in accordance with the provisions of this section, record the results of the evaluation of emissions, and report to the Administrator the opacity or visible emission results in accordance with the provisions of § 63.10(d).

(iv) [Reserved]

(v) Opacity readings of portions of plumes that contain condensed, uncombined water vapor shall not be used for purposes of determining compliance with opacity emission standards.

**Add.17**

(6) Availability of records. The owner or operator of an affected source shall make available, upon request by the Administrator, such records that the Administrator deems necessary to determine the conditions under which the visual observations were made and shall provide evidence indicating proof of current visible observer emission certification.

(7) Use of a continuous opacity monitoring system.

(i) The owner or operator of an affected source required to use a continuous opacity monitoring system (COMS) shall record the monitoring data produced during a performance test required under § 63.7 and shall furnish the Administrator a written report of the monitoring results in accordance with the provisions of § 63.10(e)(4).

(ii) Whenever an opacity emission test method has not been specified in an applicable subpart, or an owner or operator of an affected source is required to conduct Test Method 9 observations (see appendix A of part 60 of this chapter), the owner or operator may submit, for compliance purposes, COMS data results produced during any performance test required under § 63.7 in lieu of Method 9 data. If the owner or operator elects to submit COMS data for compliance with the opacity emission standard, he or she shall notify the Administrator of that decision, in writing, simultaneously with the notification under § 63.7(b) of the date the performance test is scheduled to begin. Once the owner or operator of an affected source has notified the Administrator to that effect, the COMS data results will be used to determine opacity compliance during subsequent performance tests required under § 63.7, unless the owner or operator notifies the Administrator in writing to the contrary not later than with the notification under § 63.7(b) of the date the subsequent performance test is scheduled to begin.

(iii) For the purposes of determining compliance with the opacity emission standard during a performance test required under § 63.7 using COMS data, the COMS data shall be reduced to 6–minute averages over the duration of the mass emission performance test.

(iv) The owner or operator of an affected source using a COMS for compliance purposes is responsible for demonstrating that he/she has complied with the performance evaluation requirements of § 63.8(e), that the COMS has been properly maintained, operated, and data quality-assured, as specified in § 63.8(c) and § 63.8(d), and that the resulting data have not been altered in any way.

(v) Except as provided in paragraph (h)(7)(ii) of this section, the results of continuous monitoring by a COMS that indicate that the opacity at the time visual observations were made was not in excess of the emission standard are probative but not conclusive evidence of the actual opacity of an emission, provided that the affected source proves that, at the time of the alleged violation, the instrument used was properly maintained, as specified in § 63.8(c), and met Performance Specification 1 in appendix B of part 60 of this chapter, and that the resulting data have not been altered in any way.

(8) Finding of compliance. The Administrator will make a finding concerning an affected source's compliance with an opacity or visible emission standard upon obtaining all the compliance information required by the relevant standard (including the written reports of the results of the performance tests required by § 63.7, the results of Test Method 9 or another required opacity or visible emission test method, the observer certification required by paragraph (h)(6) of this section, and the continuous opacity monitoring system results, whichever is/are applicable) and any information available to the Administrator needed to determine whether proper operation and maintenance practices are being used.

(9) Adjustment to an opacity emission standard.

Add.18

(i) If the Administrator finds under paragraph (h)(8) of this section that an affected source is in compliance with all relevant standards for which initial performance tests were conducted under § 63.7, but during the time such performance tests were conducted fails to meet any relevant opacity emission standard, the owner or operator of such source may petition the Administrator to make appropriate adjustment to the opacity emission standard for the affected source. Until the Administrator notifies the owner or operator of the appropriate adjustment, the relevant opacity emission standard remains applicable.

(ii) The Administrator may grant such a petition upon a demonstration by the owner or operator that—

(A) The affected source and its associated air pollution control equipment were operated and maintained in a manner to minimize the opacity of emissions during the performance tests;

(B) The performance tests were performed under the conditions established by the Administrator; and

(C) The affected source and its associated air pollution control equipment were incapable of being adjusted or operated to meet the relevant opacity emission standard.

(iii) The Administrator will establish an adjusted opacity emission standard for the affected source meeting the above requirements at a level at which the source will be able, as indicated by the performance and opacity tests, to meet the opacity emission standard at all times during which the source is meeting the mass or concentration emission standard. The Administrator will promulgate the new opacity emission standard in the Federal Register.

(iv) After the Administrator promulgates an adjusted opacity emission standard for an affected source, the owner or operator of such source shall be subject to the new opacity emission standard, and the new opacity emission standard shall apply to such source during any subsequent performance tests.

(i) Extension of compliance with emission standards.

(1) Until an extension of compliance has been granted by the Administrator (or a State with an approved permit program) under this paragraph, the owner or operator of an affected source subject to the requirements of this section shall comply with all applicable requirements of this part.

(2) Extension of compliance for early reductions and other reductions—

(i) Early reductions. Pursuant to section 112(i)(5) of the Act, if the owner or operator of an existing source demonstrates that the source has achieved a reduction in emissions of hazardous air pollutants in accordance with the provisions of subpart D of this part, the Administrator (or the State with an approved permit program) will grant the owner or operator an extension of compliance with specific requirements of this part, as specified in subpart D.

Add.19

(ii) Other reductions. Pursuant to section 112(i)(6) of the Act, if the owner or operator of an existing source has installed best available control technology (BACT) (as defined in section 169(3) of the Act) or technology required to meet a lowest achievable emission rate (LAER) (as defined in section 171 of the Act) prior to the promulgation of an emission standard in this part applicable to such source and the same pollutant (or stream of pollutants) controlled pursuant to the BACT or LAER installation, the Administrator will grant the owner or operator an extension of compliance with such emission standard that will apply until the date 5 years after the date on which such installation was achieved, as determined by the Administrator.

(3) Request for extension of compliance. Paragraphs (i)(4) through (i)(7) of this section concern requests for an extension of compliance with a relevant standard under this part (except requests for an extension of compliance under paragraph (i)(2)(i) of this section will be handled through procedures specified in subpart D of this part).

(4)(i)(A) The owner or operator of an existing source who is unable to comply with a relevant standard established under this part pursuant to section 112(d) of the Act may request that the Administrator (or a State, when the State has an approved part 70 permit program and the source is required to obtain a part 70 permit under that program, or a State, when the State has been delegated the authority to implement and enforce the emission standard for that source) grant an extension allowing the source up to 1 additional year to comply with the standard, if such additional period is necessary for the installation of controls. An additional extension of up to 3 years may be added for mining waste operations, if the 1–year extension of compliance is insufficient to dry and cover mining waste in order to reduce emissions of any hazardous air pollutant. The owner or operator of an affected source who has requested an extension of compliance under this paragraph and who is otherwise required to obtain a title V permit shall apply for such permit or apply to have the source's title V permit revised to incorporate the conditions of the extension of compliance. The conditions of an extension of compliance granted under this paragraph will be incorporated into the affected source's title V permit according to the provisions of part 70 or Federal title V regulations in this chapter (42 U.S.C. 7661), whichever are applicable.

(B) Any request under this paragraph for an extension of compliance with a relevant standard must be submitted in writing to the appropriate authority no later than 120 days prior to the affected source's compliance date (as specified in paragraphs (b) and (c) of this section), except as provided for in paragraph (i)(4)(i)(C) of this section. Nonfrivolous requests submitted under this paragraph will stay the applicability of the rule as to the emission points in question until such time as the request is granted or denied. A denial will be effective as of the date of denial. Emission standards established under this part may specify alternative dates for the submittal of requests for an extension of compliance if alternatives are appropriate for the source categories affected by those standards.

(C) An owner or operator may submit a compliance extension request after the date specified in paragraph (i)(4)(i)(B) of this section provided the need for the compliance extension arose after that date, and before the otherwise applicable compliance date and the need arose due to circumstances beyond reasonable control of the owner or operator. This request must include, in addition to the information required in paragraph (i)(6)(i) of this section, a statement of the reasons additional time is needed and the date when the owner or operator first learned of the problems. Nonfrivolous requests submitted under this paragraph will stay the applicability of the rule as to the emission points in question until such time as the request is granted or denied. A denial will be effective as of the original compliance date.

(ii) The owner or operator of an existing source unable to comply with a relevant standard established under this part pursuant to section 112(f) of the Act may request that the Administrator grant an extension allowing the source up to 2 years after the standard's effective date to comply with the standard. The Administrator may grant such an extension if he/she finds that such additional period is necessary for the installation of controls and that steps will be taken during the

**Add.20**

period of the extension to assure that the health of persons will be protected from imminent endangerment. Any request for an extension of compliance with a relevant standard under this paragraph must be submitted in writing to the Administrator not later than 90 calendar days after the effective date of the relevant standard.

(5) The owner or operator of an existing source that has installed BACT or technology required to meet LAER [as specified in paragraph (i)(2)(ii) of this section] prior to the promulgation of a relevant emission standard in this part may request that the Administrator grant an extension allowing the source 5 years from the date on which such installation was achieved, as determined by the Administrator, to comply with the standard. Any request for an extension of compliance with a relevant standard under this paragraph shall be submitted in writing to the Administrator not later than 120 days after the promulgation date of the standard. The Administrator may grant such an extension if he or she finds that the installation of BACT or technology to meet LAER controls the same pollutant (or stream of pollutants) that would be controlled at that source by the relevant emission standard.

(6)(i) The request for a compliance extension under paragraph (i)(4) of this section shall include the following information:

(A) A description of the controls to be installed to comply with the standard;

(B) A compliance schedule, including the date by which each step toward compliance will be reached. At a minimum, the list of dates shall include:

(1) The date by which on-site construction, installation of emission control equipment, or a process change is planned to be initiated; and

(2) The date by which final compliance is to be achieved.

(3) The date by which on-site construction, installation of emission control equipment, or a process change is to be completed; and

(4) The date by which final compliance is to be achieved;

(C), (D) [Reserved]

(ii) The request for a compliance extension under paragraph (i)(5) of this section shall include all information needed to demonstrate to the Administrator's satisfaction that the installation of BACT or technology to meet LAER controls the same pollutant (or stream of pollutants) that would be controlled at that source by the relevant emission standard.

(7) Advice on requesting an extension of compliance may be obtained from the Administrator (or the State with an approved permit program).

(8) Approval of request for extension of compliance. Paragraphs (i)(9) through (i)(14) of this section concern approval of an extension of compliance requested under paragraphs (i)(4) through (i)(6) of this section.

(9) Based on the information provided in any request made under paragraphs (i)(4) through (i)(6) of this section, or other information, the Administrator (or the State with an approved permit program) may grant an extension of compliance with an emission standard, as specified in paragraphs (i)(4) and (i)(5) of this section.

(10) The extension will be in writing and will—

(i) Identify each affected source covered by the extension;

(ii) Specify the termination date of the extension;

(iii) Specify the dates by which steps toward compliance are to be taken, if appropriate;

(iv) Specify other applicable requirements to which the compliance extension applies (e.g., performance tests); and

(v)(A) Under paragraph (i)(4), specify any additional conditions that the Administrator (or the State) deems necessary to assure installation of the necessary controls and protection of the health of persons during the extension period; or

(B) Under paragraph (i)(5), specify any additional conditions that the Administrator deems necessary to assure the proper operation and maintenance of the installed controls during the extension period.

(11) The owner or operator of an existing source that has been granted an extension of compliance under paragraph (i)(10) of this section may be required to submit to the Administrator (or the State with an approved permit program) progress reports indicating whether the steps toward compliance outlined in the compliance schedule have been reached. The contents of the progress reports and the dates by which they shall be submitted will be specified in the written extension of compliance granted under paragraph (i)(10) of this section.

(12)(i) The Administrator (or the State with an approved permit program) will notify the owner or operator in writing of approval or intention to deny approval of a request for an extension of compliance within 30 calendar days after receipt of sufficient information to evaluate a request submitted under paragraph (i)(4)(i) or (i)(5) of this section. The Administrator (or the State) will notify the owner or operator in writing of the status of his/her application, that is, whether the application contains sufficient information to make a determination, within 30 calendar days after receipt of the original application and within 30 calendar days after receipt of any supplementary information that is submitted. The 30–day approval or denial period will begin after the owner or operator has been notified in writing that his/her application is complete.

(ii) When notifying the owner or operator that his/her application is not complete, the Administrator will specify the information needed to complete the application and provide notice of opportunity for the applicant to present, in writing, within 30 calendar days after he/she is notified of the incomplete application, additional information or arguments to the Administrator to enable further action on the application.

Add.22

(iii) Before denying any request for an extension of compliance, the Administrator (or the State with an approved permit program) will notify the owner or operator in writing of the Administrator's (or the State's) intention to issue the denial, together with—

(A) Notice of the information and findings on which the intended denial is based; and

(B) Notice of opportunity for the owner or operator to present in writing, within 15 calendar days after he/she is notified of the intended denial, additional information or arguments to the Administrator (or the State) before further action on the request.

(iv) The Administrator's final determination to deny any request for an extension will be in writing and will set forth the specific grounds on which the denial is based. The final determination will be made within 30 calendar days after presentation of additional information or argument (if the application is complete), or within 30 calendar days after the final date specified for the presentation if no presentation is made.

(13)(i) The Administrator will notify the owner or operator in writing of approval or intention to deny approval of a request for an extension of compliance within 30 calendar days after receipt of sufficient information to evaluate a request submitted under paragraph (i)(4)(ii) of this section. The 30–day approval or denial period will begin after the owner or operator has been notified in writing that his/her application is complete. The Administrator (or the State) will notify the owner or operator in writing of the status of his/her application, that is, whether the application contains sufficient information to make a determination, within 15 calendar days after receipt of the original application and within 15 calendar days after receipt of any supplementary information that is submitted.

(ii) When notifying the owner or operator that his/her application is not complete, the Administrator will specify the information needed to complete the application and provide notice of opportunity for the applicant to present, in writing, within 15 calendar days after he/she is notified of the incomplete application, additional information or arguments to the Administrator to enable further action on the application.

(iii) Before denying any request for an extension of compliance, the Administrator will notify the owner or operator in writing of the Administrator's intention to issue the denial, together with—

(A) Notice of the information and findings on which the intended denial is based; and

(B) Notice of opportunity for the owner or operator to present in writing, within 15 calendar days after he/she is notified of the intended denial, additional information or arguments to the Administrator before further action on the request.

(iv) A final determination to deny any request for an extension will be in writing and will set forth the specific grounds on which the denial is based. The final determination will be made within 30 calendar days after presentation of additional information or argument (if the application is complete), or within 30 calendar days after the final date specified for the presentation if no presentation is made.

(14) The Administrator (or the State with an approved permit program) may terminate an extension of compliance at an earlier date than specified if any specification under paragraph (i)(10)(iii) or (iv) of this section is not met. Upon a determination to terminate, the Administrator will notify, in writing, the owner or operator of the Administrator's determination to terminate, together with:

(i) Notice of the reason for termination; and

(ii) Notice of opportunity for the owner or operator to present in writing, within 15 calendar days after he/she is notified of the determination to terminate, additional information or arguments to the Administrator before further action on the termination.

(iii) A final determination to terminate an extension of compliance will be in writing and will set forth the specific grounds on which the termination is based. The final determination will be made within 30 calendar days after presentation of additional information or arguments, or within 30 calendar days after the final date specified for the presentation if no presentation is made.

(15) [Reserved]

(16) The granting of an extension under this section shall not abrogate the Administrator's authority under section 114 of the Act.

(j) Exemption from compliance with emission standards. The President may exempt any stationary source from compliance with any relevant standard established pursuant to section 112 of the Act for a period of not more than 2 years if the President determines that the technology to implement such standard is not available and that it is in the national security interests of the United States to do so. An exemption under this paragraph may be extended for 1 or more additional periods, each period not to exceed 2 years.

**Credits**

[67 FR 16599, April 5, 2002; 68 FR 32600, May 30, 2003; 71 FR 20454, April 20, 2006; 85 FR 73885, Nov. 19, 2020; 86 FR 13821, March 11, 2021]

SOURCE: 57 FR 61992, Dec. 29, 1992; 59 FR 12430, March 16, 1994, unless otherwise noted.

AUTHORITY: 42 U.S.C. 7401 et seq.

Current through January 14, 2025, 90 FR 3563. Some sections may be more current. See credits for details.

                © 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Add.24**

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter I. Environmental Protection Agency (Refs & Annos)
      Subchapter C. Air Programs
        Part 63. National Emission Standards for Hazardous Air Pollutants for Source Categories (Refs & Annos)
          Subpart E. Approval of State Programs and Delegation of Federal Authorities (Refs & Annos)

40 C.F.R. § 63.99

§ 63.99 Delegated Federal authorities.

Currentness

(a) This section lists the specific source categories that have been delegated to the air pollution control agencies in each State under the procedures described in this subpart.

(1) Alabama.

(i) The following table lists the specific part 63 standards that have been delegated unchanged to the Alabama Department of Environmental Management for all sources. The "X" symbol is used to indicate each subpart that has been delegated. The delegations are subject to all of the conditions and limitations set forth in Federal law, regulations, policy, guidance, and determinations. Some authorities cannot be delegated and are retained by EPA. These include certain General Provisions authorities and specific parts of some standards.

Part 63 Major & Area Source Rule Delegations—Alabama [1]

| Source category | Subpart | ADEM [2] | JCDH [3] | HDNR [4] |
|---|---|---|---|---|
| 1................ HON.................................................................... | F, G, H, I.................................. | X | X | X |
| 2................ Polyvinyl Chloride & Co-polymers, VACATED on 5/11/05................ | J | | | |
| 3................ Coke Ovens.......................................................... | L.......................................... | X | X | X |
| 4................ Dry Cleaners........................................................ | M......................................... | X | X | X |
| 5............ Chromium Electroplating................................................ | N......................................... | X | X | X |
| 6................ EtO Commercial Sterilization...................................... | O......................................... | X | X | X |
| 7................ Chromium Cooling Towers.......................................... | Q......................................... | X | X | X |
| 8................ Gasoline Distribution (stage 1)..................................... | R......................................... | X | X | X |
| 9................ Pulp & Paper I....................................................... | S......................................... | X | X | X |
| 10.............. Halogenated Solvent Cleaning...................................... | T......................................... | X | X | X |

Add.25

| | | |
|---|---|---|
| ...................................................................... | Fabricated Metal Prod. | .......................................................................... |
| ...................................................................... | Fabricated Plate Work (Boiler Shop) | ........................................................ |
| ...................................................................... | Fabricated Structural Metal Mfg. | .................................................... |
| ...................................................................... | Iron and Steel Forging. | ................................................................ |
| ...................................................................... | Primary Metals Prod. Mfg. | ................................................................ |
| ...................................................................... | Valves and Pipe Fittings Mfg. | .................................................... |
| ...................................................................... | Ferroalloys Production. | ................................................................ |
| 113................................................................ | Ferro/Silico Manganese | ....................................... YYYYYY.................. |

(ii) [Reserved]

(19) Louisiana.

(i) The following table lists the specific part 63 standards that have been delegated unchanged to the Louisiana Department of Environmental Quality for all sources. The "X" symbol is used to indicate each subpart that has been delegated. The delegations are subject to all of the conditions and limitations set forth in Federal law, regulations, policy, guidance, and determinations. Some authorities cannot be delegated and are retained by EPA. These include certain General Provisions authorities and specific parts of some standards. Any amendments made to these rules after July 1, 2013, are not delegated.

### Delegation Status for Part 63 Standards—State of Louisiana

| [Excluding Indian Country] | | |
|---|---|---|
| **Subpart** | **Source category** | **LDEQ**[1][2] |
| A................................................................ | General Provisions................................................................ | X |
| D................................................................ | Early Reductions................................................................ | X |
| F................................................................ | Hazardous Organic NESHAP (HON)—Synthetic Organic Chemical Manufacturing Industry (SOCMI)....................... | X |
| G................................................................ | HON—SOCMI Process Vents, Storage Vessels, Transfer Operations and Wastewater................................................. | X |
| H................................................................ | HON—Equipment Leaks................................................. | X |
| I................................................................ | HON—Certain Processes Negotiated Equipment Leak Regulation................................................................ | X |
| J................................................................ | Polyvinyl Chloride and Copolymers Production.................. | 3 |
| K................................................................ | (Reserved)................................................................ | |

**Add.26**

| L | Coke Oven Batteries | X |
|---|---|---|
| M | Perchloroethylene Dry Cleaning | X |
| N | Chromium Electroplating and Chromium Anodizing Tanks. | X |
| O | Ethylene Oxide Sterilizers | X |
| P | (Reserved) | |
| Q | Industrial Process Cooling Towers | X |
| R | Gasoline Distribution | X |
| S | Pulp and Paper Industry | X |
| T | Halogenated Solvent Cleaning | X |
| U | Group I Polymers and Resins | X |
| V | (Reserved) | |
| W | Epoxy Resins Production and Non-Nylon Polyamides Production | X |
| X | Secondary Lead Smelting | X |
| Y | Marine Tank Vessel Loading | X |
| Z | (Reserved) | |
| AA | Phosphoric Acid Manufacturing Plants | X |
| BB | Phosphate Fertilizers Production Plants | X |
| CC | Petroleum Refineries | X |
| DD | Off-Site Waste and Recovery Operations | X |
| EE | Magnetic Tape Manufacturing | X |
| FF | (Reserved) | |
| GG | Aerospace Manufacturing and Rework Facilities | X |
| HH | Oil and Natural Gas Production Facilities | X |
| II | Shipbuilding and Ship Repair Facilities | X |
| JJ | Wood Furniture Manufacturing Operations | X |
| KK | Printing and Publishing Industry | X |
| LL | Primary Aluminum Reduction Plants | X |
| MM | Chemical Recovery Combustion Sources at Kraft, Soda, Sulfide, and Stand-Alone Semichemical Pulp Mills | X |

| | | |
|---|---|---|
| NN........................................................... | (Reserved) | |
| OO........................................................... | Tanks-Level 1 | X |
| PP........................................................... | Containers | X |
| QQ........................................................... | Surface Impoundments | X |
| RR........................................................... | Individual Drain Systems | X |
| SS........................................................... | Closed Vent Systems, Control Devices, Recovery Devices and Routing to a Fuel Gas System or a Process................... | X |
| TT........................................................... | Equipment Leaks—Control Level 1................... | X |
| UU........................................................... | Equipment Leaks—Control Level 2 Standards................... | X |
| VV........................................................... | Oil—Water Separators and Organic—Water Separators....... | X |
| WW........................................................... | Storage Vessels (Tanks)—Control Level 2........................... | X |
| XX........................................................... | Ethylene Manufacturing Process Units Heat Exchange Systems and Waste Operations................... | X |
| YY........................................................... | Generic Maximum Achievable Control Technology Standards................... | X |
| ZZ–BBB........................................................... | (Reserved) | |
| CCC........................................................... | Steel Pickling—HCI Process Facilities and Hydrochloric Acid Regeneration................... | X |
| DDD........................................................... | Mineral Wool Production................... | X |
| EEE........................................................... | Hazardous Waste Combustors................... | X |
| FFF........................................................... | (Reserved) | |
| GGG........................................................... | Pharmaceuticals Production................... | X |
| HHH........................................................... | Natural Gas Transmission and Storage Facilities................... | X |
| III........................................................... | Flexible Polyurethane Foam Production................... | X |
| JJJ........................................................... | Group IV Polymers and Resins................... | X |
| KKK........................................................... | (Reserved) | |
| LLL........................................................... | Portland Cement Manufacturing................... | X |
| MMM........................................................... | Pesticide Active Ingredient Production................... | X |
| NNN........................................................... | Wool Fiberglass Manufacturing................... | X |
| OOO........................................................... | Amino/Phenolic Resins................... | X |
| PPP........................................................... | Polyether Polyols Production................... | X |

**Add.28**

| | | |
|---|---|---|
| QQQ | Primary Copper Smelting | X |
| RRR | Secondary Aluminum Production | X |
| SSS | (Reserved) | |
| TTT | Primary Lead Smelting | X |
| UUU | Petroleum Refineries—Catalytic Cracking Units, Catalytic Reforming Units and Sulfur Recovery Plants | X |
| VVV | Publicly Owned Treatment Works (POTW) | X |
| WWW | (Reserved) | |
| XXX | Ferroalloys Production: Ferromanganese and Silicomanganese | X |
| AAAA | Municipal Solid Waste Landfills | X |
| CCCC | Nutritional Yeast Manufacturing | X |
| DDDD | Plywood and Composite Wood Products | 4 |
| | | X |
| EEEE | °Organic Liquids Distribution | X |
| FFFF | Misc. Organic Chemical Production and Processes (MON) | X |
| GGGG | Solvent Extraction for Vegetable Oil Production | X |
| HHHH | Wet Formed Fiberglass Mat Production | X |
| IIII | Auto & Light Duty Truck (Surface Coating) | X |
| JJJJ | Paper and other Web (Surface Coating) | X |
| KKKK | Metal Can (Surface Coating) | X |
| MMMM | Misc. Metal Parts and Products (Surface Coating) | X |
| NNNN | Surface Coating of Large Appliances | X |
| OOOO | Fabric Printing Coating and Dyeing | X |
| PPPP | Plastic Parts (Surface Coating) | X |
| QQQQ | Surface Coating of Wood Building Products | X |
| RRRR | Surface Coating of Metal Furniture | X |
| SSSS | Surface Coating for Metal Coil | X |
| TTTT | Leather Finishing Operations | X |
| UUUU | Cellulose Production Manufacture | X |

**Add.29**

| | | |
|---|---|---|
| VVVV | Boat Manufacturing | X |
| WWWW | Reinforced Plastic Composites Production | X |
| XXXX | Rubber Tire Manufacturing | X |
| YYYY | Combustion Turbines | X |
| ZZZZ | Reciprocating Internal Combustion Engines (RICE) | X |
| AAAAA | Lime Manufacturing Plants | X |
| BBBBB | Semiconductor Manufacturing | X |
| CCCCC | Coke Ovens: Pushing, Quenching and Battery Stacks | X |
| DDDDD | Industrial/Commercial/Institutional Boilers and Process Heaters | 5 X |
| EEEEE | Iron Foundries | X |
| FFFFF | Integrated Iron and Steel | X |
| GGGGG | Site Remediation | X |
| HHHHH | Miscellaneous Coating Manufacturing | X |
| IIIII | Mercury Cell Chlor-Alkali Plants | X |
| JJJJJ | Brick and Structural Clay Products Manufacturing | 6 |
| KKKKK | Clay Ceramics Manufacturing | 6 |
| LLLLL | Asphalt Roofing and Processing | X |
| MMMMM | Flexible Polyurethane Foam Fabrication Operation | X |
| NNNNN | Hydrochloric Acid Production, Fumed Silica Production | X |
| OOOOO | (Reserved) | |
| PPPPP | Engine Test Facilities | X |
| QQQQQ | Friction Products Manufacturing | X |
| RRRRR | Taconite Iron Ore Processing | X |
| SSSSS | Refractory Products Manufacture | X |
| TTTTT | Primary Magnesium Refining | X |
| UUUUU | Coal and Oil-Fired Electric Utility Steam Generating Units. | 7 X |
| VVVVV | (Reserved) | |
| WWWWW | Hospital Ethylene Oxide Sterilizers | X |

**Add.30**

| | | |
|---|---|---|
| XXXXX | (Reserved) | |
| YYYYY | Electric Arc Furnace Steelmaking Area Sources | X |
| ZZZZZ | Iron and Steel Foundries Area Sources | X |
| AAAAAA | (Reserved) | |
| BBBBBB | Gasoline Distribution Bulk Terminals, Bulk Plants, and Pipeline Facilities | X |
| CCCCCC | Gasoline Dispensing Facilities | X |
| DDDDDD | Polyvinyl Chloride and Copolymers Production Area Sources | X |
| EEEEEE | Primary Copper Smelting Area Sources | X |
| FFFFFF | Secondary Copper Smelting Area Sources | X |
| GGGGGG | Primary Nonferrous Metals Area Source: Zinc, Cadmium, and Beryllium | X |
| HHHHHH | Paint Stripping and Miscellaneous Surface Coating Operations at Area Sources | X |
| IIIIII | (Reserved) | |
| JJJJJJ | Industrial, Commercial, and Institutional Boilers Area Sources | X |
| KKKKKK | (Reserved) | |
| LLLLLL | Acrylic and Modacrylic Fibers Production Area Sources | X |
| MMMMMM | Carbon Black Production Area Sources | X |
| NNNNNN | Chemical Manufacturing Area Sources: Chromium Compounds | X |
| OOOOOO | Flexible Polyurethane Foam Production and Fabrication Area Sources | X |
| PPPPPP | Lead Acid Battery Manufacturing Area Sources | X |
| QQQQQQ | Wood Preserving Area Sources | X |
| RRRRRR | Clay Ceramics Manufacturing Area Sources | X |
| SSSSSS | Glass Manufacturing Area Sources | X |
| TTTTTT | Secondary Nonferrous Metals Processing Area Sources | X |
| UUUUUU | (Reserved) | |
| VVVVVV | Chemical Manufacturing Area Sources | X |

Add.31

| | | |
|---|---|---|
| WWWWWW | Plating and Polishing Operations Area Sources | X |
| XXXXXX | Metal Fabrication and Finishing Area Sources | X |
| YYYYYY | Ferroalloys Production Facilities Area Sources | X |
| ZZZZZZ | Aluminum, Copper, and Other Nonferrous Foundries Area Sources | X |
| AAAAAAA | Asphalt Processing and Asphalt Roofing Manufacturing Area Sources | X |
| BBBBBBB | Chemical Preparation Industry Area Sources | X |
| CCCCCCC | Paints and Allied Products Manufacturing Area Sources | X |
| DDDDDDD | Prepared Feeds Areas Sources | X |
| EEEEEEE | Gold Mine Ore Processing and Production Area Sources | X |
| FFFFFFF–GGGGGGG | (Reserved) | |
| HHHHHHH | Polyvinyl Chloride and Copolymers Production Major Sources | X |

(20) Maine.

(i) [Reserved]

(ii) Maine Department of Environmental Protection (ME DEP) may implement and enforce alternative requirements in the form of title V permit terms and conditions for Lincoln Pulp and Paper, located in Lincoln, Maine, for subpart S—National Emission Standards for Hazardous Air Pollutants from the Pulp and Paper Industry. This action is contingent upon ME DEP including, in title V permits, terms and conditions that are no less stringent than the federal standard and have been approved by EPA. In addition, the requirement applicable to the source remains the federal section 112 requirement until EPA has approved the alternative permit terms and conditions and the final title V permit is issued.

(iii) Affected area sources within Maine must comply with the Maine Regulations Applicable to Hazardous Air Pollutants (incorporated by reference as specified in § 63.14) as described in paragraph (a)(20)(iii)(A) of this section:

(A) The material incorporated into the Maine Department of Environmental Protection regulations at Chapter 125, Perchloroethylene Dry Cleaner Regulation, effective as of June 2, 1991, last amended on June 24, 2009, pertaining to dry cleaning facilities in the State of Maine jurisdiction, and approved under the procedures in § 63.93 to be implemented and enforced in place of the Federal NESHAP for Perchloroethylene Dry Cleaning Facilities (subpart M of this part), effective as of July 11, 2008, for area sources only, as defined in § 63.320(h).

(1) Authorities not delegated.

Add.32

(i) The Tennessee Department of Environment and Conservation (TDEC) has "up-front" approval to implement an Equivalency by Permit (EBP) program under which TDEC may establish and enforce alternative requirements for the Ellison Surface Technologies, Inc. facility located in Morgan County, Tennessee (Ellison) in lieu of those of the National Emissions Standard for Hazardous Air Pollutants (NESHAP) for Plating and Polishing Operations at 40 CFR part 63, subpart WWWWWW, "National Emission Standards for Hazardous Air Pollutants: Area Source Standards for Plating and Polishing Operations." TDEC may only establish alternative requirements for Ellison that are at least as stringent as the otherwise applicable Federal requirements. TDEC must, in order to establish alternative requirements for Ellison under its EPA–approved EBP program: submit to the EPA for review pre-draft title V permit terms specifying alternative requirements that meet the criteria of 40 CFR 63.94(d), including the criterion that the alternative requirements are at least as stringent as the otherwise applicable Federal requirements; obtain the EPA's written approval of the alternative pre-draft title V permit requirements; and issue a title V permit for Ellison that contains the approved alternative requirements. Until the EPA has approved the alternative permit terms and conditions and TDEC has issued a final title V permit incorporating them, Ellison will remain subject to the Federal NESHAP requirements found at 40 CFR part 63, subpart WWWWWW.

(ii) Reserved.

(44) Texas.

(i) The following table lists the specific part 63 standards that have been delegated unchanged to the Texas Commission on Environmental Quality for all sources. The "X" symbol is used to indicate each subpart that has been delegated. The delegations are subject to all of the conditions and limitations set forth in Federal law and regulations. Some authorities cannot be delegated and are retained by the EPA. These include certain General Provisions authorities and specific parts of some standards. Any amendments made to these rules after August 3, 2016 are not delegated.

**Delegation Status for Part 63 Standards—State of Texas** [1]

| [Excluding Indian Country] | | |
|---|---|---|
| **Subpart** | **Source category** | **TCEQ** [2] |
| A | General Provisions | X |
| F | Hazardous Organic NESHAP (HON)—Synthetic Organic Chemical Manufacturing Industry (SOCMI) | X |
| G | HON—SOCMI Process Vents, Storage Vessels, Transfer Operations and Wastewater | X |
| H | HON—Equipment Leaks | X |
| I | HON—Certain Processes Negotiated Equipment Leak Regulation | X |
| J | Polyvinyl Chloride and Copolymers Production | [3] |
| K | [Reserved] | |
| L | Coke Oven Batteries | X |

Add.33

| M | Perchloroethylene Dry Cleaning | X |
| N | Chromium Electroplating and Chromium Anodizing Tanks... | X |
| O | Ethylene Oxide Sterilizers | X |
| P | [Reserved] | |
| Q | Industrial Process Cooling Towers | X |
| R | Gasoline Distribution | X |
| S | Pulp and Paper Industry | X |
| T | Halogenated Solvent Cleaning | X |
| U | Group I Polymers and Resins | X |
| V | [Reserved] | |
| W | Epoxy Resins Production and Non-Nylon Polyamides Production | X |
| X | Secondary Lead Smelting | X |
| Y | Marine Tank Vessel Loading | X |
| Z | [Reserved] | |
| AA | Phosphoric Acid Manufacturing Plants | X |
| BB | Phosphate Fertilizers Production Plants | X |
| CC | Petroleum Refineries | X |
| DD | Off-Site Waste and Recovery Operations | X |
| EE | Magnetic Tape Manufacturing | X |
| FF | [Reserved] | |
| GG | Aerospace Manufacturing and Rework Facilities | X |
| HH | Oil and Natural Gas Production Facilities | X |
| II | Shipbuilding and Ship Repair Facilities | X |
| JJ | Wood Furniture Manufacturing Operations | X |
| KK | Printing and Publishing Industry | X |
| LL | Primary Aluminum Reduction Plants | X |
| MM | Chemical Recovery Combustion Sources at Kraft, Soda, Sulfide, and Stand-Alone Semichemical Pulp Mills | X |
| NN | Wool Fiberglass Manufacturing Area Sources | X |

Add.34

| | | |
|---|---|---|
| OO | Tanks-Level 1 | X |
| PP | Containers | X |
| QQ | Surface Impoundments | X |
| RR | Individual Drain Systems | X |
| SS | Closed Vent Systems, Control Devices, Recovery Devices and Routing to a Fuel Gas System or a Process | |
| TT | Equipment Leaks—Control Level 1 | X |
| UU | Equipment Leaks—Control Level 2 Standards | X |
| VV | Oil—Water Separators and Organic—Water Separators | X |
| WW | Storage Vessels (Tanks)—Control Level 2 | X |
| XX | Ethylene Manufacturing Process Units Heat Exchange Systems and Waste Operations | X |
| YY | Generic Maximum Achievable Control Technology Standards | X |
| ZZ-BBB | [Reserved] | |
| CCC | Steel Pickling—HCI Process Facilities and Hydrochloric Acid Regeneration | X |
| DDD | Mineral Wool Production | X |
| EEE | Hazardous Waste Combustors | X |
| FFF | [Reserved] | |
| GGG | Pharmaceuticals Production | X |
| HHH | Natural Gas Transmission and Storage Facilities | X |
| III | Flexible Polyurethane Foam Production | X |
| JJJ | Group IV Polymers and Resins | X |
| KKK | [Reserved] | |
| LLL | Portland Cement Manufacturing | X |
| MMM | Pesticide Active Ingredient Production | X |
| NNN | Wool Fiberglass Manufacturing | X |
| OOO | Amino/Phenolic Resins | X |
| PPP | Polyether Polyols Production | X |
| QQQ | Primary Copper Smelting | X |

**Add.35**

| | | |
|---|---|---|
| RRR | Secondary Aluminum Production | X |
| SSS | [Reserved] | |
| TTT | Primary Lead Smelting | X |
| UUU | Petroleum Refineries—Catalytic Cracking Units, Catalytic Reforming Units and Sulfur Recovery Plants | X |
| VVV | Publicly Owned Treatment Works (POTW) | X |
| WWW | [Reserved] | |
| XXX | Ferroalloys Production: Ferromanganese and Silicomanganese | X |
| AAAA | Municipal Solid Waste Landfills | X |
| CCCC | Nutritional Yeast Manufacturing | X |
| DDDD | Plywood and Composite Wood Products | X [4] |
| EEEE | Organic Liquids Distribution | X |
| FFFF | Misc. Organic Chemical Production and Processes (MON) | X |
| GGGG | Solvent Extraction for Vegetable Oil Production | X |
| HHHH | Wet Formed Fiberglass Mat Production | X |
| IIII | Auto & Light Duty Truck (Surface Coating) | X |
| JJJJ | Paper and other Web (Surface Coating) | X |
| KKKK | Metal Can (Surface Coating) | X |
| MMMM | Misc. Metal Parts and Products (Surface Coating) | X |
| NNNN | Surface Coating of Large Appliances | X |
| OOOO | Fabric Printing Coating and Dyeing | X |
| PPPP | Plastic Parts (Surface Coating) | X |
| QQQQ | Surface Coating of Wood Building Products | X |
| RRRR | Surface Coating of Metal Furniture | X |
| SSSS | Surface Coating for Metal Coil | X |
| TTTT | Leather Finishing Operations | X |
| UUUU | Cellulose Production Manufacture | X |
| VVVV | Boat Manufacturing | X |

**Add.36**

| | | |
|---|---|---|
| WWWW | Reinforced Plastic Composites Production | X |
| XXXX | Rubber Tire Manufacturing | X |
| YYYY | Combustion Turbines | X |
| ZZZZ | Reciprocating Internal Combustion Engines (RICE) | X |
| AAAAA | Lime Manufacturing Plants | X |
| BBBBB | Semiconductor Manufacturing | X |
| CCCCC | Coke Ovens: Pushing, Quenching and Battery Stacks | X |
| DDDDD | Industrial/Commercial/Institutional Boilers and Process Heaters Major Sources | X [5] |
| EEEEE | Iron Foundries | X |
| FFFFF | Integrated Iron and Steel | X |
| GGGGG | Site Remediation | X |
| HHHHH | Miscellaneous Coating Manufacturing | X |
| IIIII | Mercury Cell Chlor-Alkali Plants | X |
| JJJJJ | Brick and Structural Clay Products Manufacturing | X [6] |
| KKKKK | Clay Ceramics Manufacturing | X [6] |
| LLLLL | Asphalt Roofing and Processing | X |
| MMMMM | Flexible Polyurethane Foam Fabrication Operation | X |
| NNNNN | Hydrochloric Acid Production, Fumed Silica Production | X |
| OOOOO | [Reserved] | |
| PPPPP | Engine Test Facilities | X |
| QQQQQ | Friction Products Manufacturing | X |
| RRRRR | Taconite Iron Ore Processing | X |
| SSSSS | Refractory Products Manufacture | X |
| TTTTT | Primary Magnesium Refining | X |
| UUUUU | Coal and Oil-Fired Electric Utility Steam Generating Units | X [7] |
| VVVVV | [Reserved] | |
| WWWWW | Hospital Ethylene Oxide Sterilizers Area Sources | X |
| XXXXX | [Reserved] | |

Add.37

| | | |
|---|---|---|
| YYYYY | Electric Arc Furnace Steelmaking Facilities Area Sources | X |
| ZZZZZ | Iron and Steel Foundries Area Sources | X |
| AAAAAA | [Reserved] | |
| BBBBBB | Gasoline Distribution Bulk Terminals, Bulk Plants, and Pipeline Facilities | X |

Area Sources

| | | |
|---|---|---|
| CCCCCC | Gasoline Dispensing Facilities Area Sources | X |
| DDDDDD | Polyvinyl Chloride and Copolymers Production Area Sources | X |
| EEEEEE | Primary Copper Smelting Area Sources | X |
| FFFFFF | Secondary Copper Smelting Area Sources | X |
| GGGGGG | Primary Nonferrous Metals Area Sources: Zinc, Cadmium, and Beryllium | X |
| HHHHHH | Paint Stripping and Miscellaneous Surface Coating Operations at Area Sources | X |
| IIIIII | [Reserved] | |
| JJJJJJ | Industrial, Commercial, and Institutional Boilers Area Sources | X |
| KKKKKK | [Reserved] | |
| LLLLLL | Acrylic and Modacrylic Fibers Production Area Sources | X |
| MMMMMM | Carbon Black Production Area Sources | X |
| NNNNNN | Chemical Manufacturing Area Sources: Chromium Compounds | X |
| OOOOOO | Flexible Polyurethane Foam Production and Fabrication Area Sources | X |
| PPPPPP | Lead Acid Battery Manufacturing Area Sources | X |
| QQQQQQ | Wood Preserving Area Sources | X |
| RRRRRR | Clay Ceramics Manufacturing Area Sources | X |
| SSSSSS | Glass Manufacturing Area Sources | X |
| TTTTTT | Secondary Nonferrous Metals Processing Area Sources | X |
| UUUUUU | [Reserved] | |
| VVVVVV | Chemical Manufacturing Area Sources | X |
| WWWWWW | Plating and Polishing Operations Area Sources | X |

**Add.38**

| | | |
|---|---|---|
| XXXXXX................................................................ | Metal Fabrication and Finishing Area Sources........................ | X |
| YYYYYY................................................................ | Ferroalloys Production Facilities Area Sources........................ | X |
| *ZZZZZZ*................................................................ | Aluminum, Copper, and Other Nonferrous Foundries Area Sources................................................................ | X |
| AAAAAAA........................................................... | Asphalt Processing and Asphalt Roofing Manufacturing Area Sources........................................................... | X |
| BBBBBBB............................................................ | Chemical Preparations Industry Area Sources........................ | X |
| CCCCCCC........................................................... | Paints and Allied Products Manufacturing Area Sources........ | X |
| DDDDDDD........................................................... | Prepared Feeds Manufacturing Area Sources........................ | X |
| EEEEEEE............................................................. | Gold Mine Ore Processing and Production Area Sources....... | |
| FFFFFFF—GGGGGGG................................... | [Reserved]........................................................................ | |
| HHHHHHH........................................................ | Polyvinyl Chloride and Copolymers Production Major Sources........................................................................ | X |

(ii) Affected sources within Texas shall comply with the Federal requirements of 40 CFR part 63—subpart A—General Provisions, adopted by reference by the Texas Commission on Environmental Quality (TCEQ), with the exception of § 63.5(e)(2)(i), § 63.6(i)(12)(i), § 63.6(i)(13)(i) and (ii), § 63.8(e)(5)(ii), § 63.9(i)(3), and § 63.10(e)(2)(ii). The TCEQ has adopted alternative provisions for the cited exceptions above and affected sources in Texas that are subject to the requirements of Subpart A shall comply with the requirements established at Texas Administrative Code, Title 30, Part 1, Chapter 113, Subchapter C, section 113.100.

(45) [Reserved]

(46) Vermont.

(i) Affected area sources within Vermont must comply with Vermont Regulations applicable to Hazardous Air Pollutants (incorporated by reference as specified in § 63.14) as described in paragraph (a)(46)(i)(A) of this section:

(A) The material incorporated into the Vermont Air Pollution Regulations at Chapter 5, Air Pollution Control, section 5–253.11, Perchloroethylene Dry Cleaning (effective as of December 15, 2016) pertaining to area source dry cleaning facilities in the State of Vermont jurisdiction, and approved under the procedures in § 63.93 to be implemented and enforced in place of the requirements for area source dry cleaning facilities in the Federal NESHAP for Perchloroethylene Dry Cleaning Facilities (subpart M of this part), effective as of July 11, 2008. For purposes of this paragraph (a)(46) the term "area source dry cleaning facilities" means any source that qualifies as an area source under § 63.320(h).

(1) Authorities not delegated.

Add.39

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter I. Environmental Protection Agency (Refs & Annos)
      Subchapter C. Air Programs
        Part 63. National Emission Standards for Hazardous Air Pollutants for Source Categories (Refs & Annos)
          Subpart G. National Emission Standards for Hazardous Air Pollutants from the Synthetic Organic Chemical Manufacturing Industry for Process Vents, Storage Vessels, Transfer Operations, and Wastewater (Refs & Annos)

40 C.F.R. § 63.153

§ 63.153 Implementation and enforcement.

Currentness

(a) This subpart can be implemented and enforced by the U.S. EPA, or a delegated authority such as the applicable State, local, or Tribal agency. If the U.S. EPA Administrator has delegated authority to a State, local, or Tribal agency, then that agency, in addition to the U.S. EPA, has the authority to implement and enforce this subpart. Contact the applicable U.S. EPA Regional Office to find out if implementation and enforcement of this subpart is delegated to a State, local, or Tribal agency.

(b) In delegating implementation and enforcement authority of this subpart to a State, local, or Tribal agency under subpart E of this part, the authorities contained in paragraph (c) of this section are retained by the Administrator of U.S. EPA and cannot be transferred to the State, local, or Tribal agency.

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (5) of this section.

(1) Approval of alternatives to the requirements in §§ 63.110, 63.112 through 63.113, 63.119, 63.126, 63.132 through 63.140, 63.148 through 63.149, and 63.150(i)(1) through (4). Follow the requirements in § 63.121 to request permission to use an alternative means of emission limitation for storage vessels. Where these standards reference another subpart, the cited provisions will be delegated according to the delegation provisions of the referenced subpart. Where these standards reference another subpart and modify the requirements, the requirements shall be modified as described in this subpart. Delegation of the modified requirements will also occur according to the delegation provisions of the referenced subpart.

(2) Approval of major alternatives to test methods under § 63.7(e)(2)(ii) and (f), as defined in § 63.90, and as required in this subpart.

(3) Approval of major alternatives to monitoring under § 63.8(f), as defined in § 63.90, and as required in this subpart.

(4) Approval of major alternatives to recordkeeping and reporting under § 63.10(f), as defined in § 63.90, and as required in this subpart.

Add.40

(5) Approval of an alternative to any electronic reporting to the EPA required by this subpart.

**Credits**

[68 FR 37344, June 23, 2003; 89 FR 43212, May 16, 2024]

SOURCE: 57 FR 61992, Dec. 29, 1992; 59 FR 19468, April 22, 1994; 89 FR 43175, May 16, 2024, unless otherwise noted.

AUTHORITY: 42 U.S.C. 7401 et seq.

Current through January 14, 2025, 90 FR 3563. Some sections may be more current. See credits for details.

Add.41

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter C. Air Programs
Part 63. National Emission Standards for Hazardous Air Pollutants for Source Categories (Refs & Annos)
Subpart U. National Emission Standards for Hazardous Air Pollutant Emissions: Group I Polymers and Resins
(Refs & Annos)

40 C.F.R. § 63.507

§ 63.507 Implementation and enforcement.

Currentness

(a) This subpart can be implemented and enforced by the U.S. EPA, or a delegated authority such as the applicable State, local, or Tribal agency. If the U.S. EPA Administrator has delegated authority to a State, local, or Tribal agency, then that agency, in addition to the U.S. EPA, has the authority to implement and enforce this subpart. Contact the applicable U.S. EPA Regional Office to find out if this subpart is delegated to a State, local, or Tribal agency.

(b) In delegating implementation and enforcement authority of this subpart to a State, local, or Tribal agency under subpart E of this part, the authorities contained in paragraph (c) of this section are retained by the Administrator of U.S. EPA and cannot be transferred to the State, local, or Tribal agency.

(c) The authorities that cannot be delegated to State, local, or Tribal agencies are as specified in paragraphs (c)(1) through (6) of this section.

(1) Approval of alternatives to the requirements in §§ 63.480 through 63.481, 63.483(a) through (c), 63.484, 63.485(a) through (k), (m) through (s), (u), 63.486 through 63.487, 63.488(a), (b)(1) through (4), (5)(iv) through (v), (6) through (7), (c) through (i), 63.493 through 63.494, 63.500(a)(1) through (3), (b), 63.501, 63.502(a) through (f), (i), (k) through (m), and 63.503. Where these standards reference another subpart, the cited provisions will be delegated according to the delegation provisions of the referenced subpart. Where these standards reference another subpart and modify the requirements, the requirements shall be modified as described in this subpart. Delegation of the modified requirements will also occur according to the delegation provisions of the referenced subpart.

(2) Approval of major alternatives to test methods under § 63.7(e)(2)(ii) and (f), as defined in § 63.90, and as required in this subpart.

(3) Approval of major alternatives to monitoring under § 63.8(f), as defined in § 63.90, and as required in this subpart.

(4) Approval of major alternatives to recordkeeping and reporting under § 63.10(f), as defined in § 63.90, and as required in this subpart.

Add.42

(5) Approval of an alternative to any electronic reporting to the EPA required by this subpart.

(6) Approval of an extension request under § 63.6(i)(4)(ii).

**Credits**
[68 FR 37349, June 23, 2003; 89 FR 43261, May 16, 2024]

SOURCE: 57 FR 61992, Dec. 29, 1992; 61 FR 46924, Sept. 5, 1996, unless otherwise noted.

AUTHORITY: 42 U.S.C. 7401 et seq.

Current through January 14, 2025, 90 FR 3563. Some sections may be more current. See credits for details.

                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Add.43**

**CERTIFICATE OF SERVICE**

Pursuant to Rules 15(c)(2) and 25(d) of the Federal Rules of Appellate Procedure and Circuit Rule 15, I hereby certify that the foregoing ADDENDUM TO PETITIONERS' OPENING BRIEF was electronically filed with the Clerk of the Court by using the appellate CM/ECF system, causing the above brief to be delivered electronically through CM/ECF on all ECF registered counsel of record.

Date: January 17, 2024        */s/ Jeffrey R. Holmstead*
                                         Jeffrey R. Holmstead