**ORAL ARGUMENT NOT YET SCHEDULED**

No. 24-1135 (consolidated with Nos. 24-1228, 24-1246, 24-1249, 24-1250, 24-1251, 24-1252)

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

DENKA PERFORMANCE ELASTOMER LLC,
*Petitioner*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*,
*Respondents*,

AIR ALLIANCE HOUSTON, *et al.*,
*Intervenors for Respondents*.

---

**On Petition for Review of Final Agency Action of the
United States Environmental Protection Agency
89 Fed. Reg. 42,932 (May 16, 2024)**

---

**BRIEF OF THE CHAMBER OF COMMERCE OF THE UNITED STATES
OF AMERICA AND THE NATIONAL ASSOCIATION OF
MANUFACTURERS AS *AMICI CURIAE* IN SUPPORT
OF INDUSTRY AND STATE PETITIONERS AND VACATUR**

---

Charles H. Knauss
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Ave. NW
Washington, DC 20037
(202) 955-1500

Trevor S. Cox
  *Counsel of Record*
J. Pierce Lamberson
HUNTON ANDREWS KURTH LLP
951 East Byrd Street, East Tower
Richmond, VA 23219
(804) 788-8200
tcox@huntonak.com

DATED:  January 24, 2025

*Counsel for* Amici Curiae

*Additional counsel listed on following page*

Andrew R. Varcoe
Christopher J. Walker
U.S. CHAMBER LITIGATION CENTER
1615 H Street, NW
Washington, DC 20062
(202) 463-5337

*Counsel for the Chamber of Commerce of the United States of America*

Erica T. Klenicki
Michael A. Tilghman II
NAM LEGAL CENTER
733 10th Street NW, Suite 700
Washington, DC 20001
(202) 637-3000

*Counsel for the National Association of Manufacturers*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

In accordance with D.C. Circuit Rule 28(a)(1), *amici curiae* state as follows:

## A.    Parties, Intervenors, and *Amici Curiae*

These cases involve the following parties:

### Petitioners:

No. 24-1135:    Denka Performance Elastomer LLC.

No. 24-1228:    State of Louisiana; Louisiana Department of Environmental Quality.

No. 24-1246:    State of Texas.

No. 24-1249:    Vinyl Institute, Inc.

No. 24-1250:    American Chemistry Council; Louisiana Chemical Association; American Fuel & Petrochemical Manufacturers.

No. 24-1251:    Concerned Citizens of St. John; Rise St. James Louisiana; Louisiana Environmental Action Network; Texas Environmental Justice Advocacy Services; Air Alliance Houston; California Communities Against Toxics; Environmental Integrity Project; Sierra Club.

No. 24-1252:    Huntsman Petrochemical LLC.

### Respondents:

Respondents in Nos. 24-1135, 24-1228, 24-1246, and 24-1251 are the U.S. Environmental Protection Agency and Michael S. Regan, Administrator, U.S.

Environmental Protection Agency.  In Nos. 24-1249, 24-1250, and 24-1252, the U.S. Environmental Protection Agency is the sole named Respondent.

**Intervenors and *Amici Curiae*:**

Air Alliance Houston, California Communities Against Toxics, Concerned Citizens of St. John, Environmental Defense Fund; Environmental Integrity Project, Louisiana Environmental Action Network, Rise St. James Louisiana, Sierra Club, and Texas Environmental Justice Advocacy Services are Intervenors for Respondent in No. 24-1135.  As of this time, there are no other *amici curiae*.

**B.     Rulings Under Review**

These consolidated cases involve final agency action of the United States Environmental Protection Agency titled "New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry," 89 Fed. Reg. 42,932 (May 16, 2024).

**C.     Related Cases**

These consolidated cases (Nos. 24-1135, 24-1228, 24-1246, 24-1249, 24-1250, 24-1251, and 24-1252) seek review of the agency action challenged here. Pursuant to the Court's December 30, 2024 Order, ECF No. 2091937, one issue raised in No. 24-1251 has been severed, assigned a separate docket number (No. 24-

1387, *Concerned Citizens of St. John v. EPA*), and held in abeyance pending further order of the Court. *Amici curiae* are unaware of any other related cases.

**CORPORATE DISCLOSURE STATEMENT**

The Chamber of Commerce of the United States of America ("Chamber") states that it is a non-profit, tax-exempt organization incorporated in the District of Columbia.  The Chamber has no parent corporation, and no publicly held company has 10% or greater ownership in the Chamber.

The National Association of Manufacturers ("NAM") is a non-profit, tax-exempt organization incorporated in New York.  The NAM has no parent corporation, and no publicly held company has 10% or greater ownership in the NAM.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

CORPORATE DISCLOSURE STATEMENT ........................................iv

TABLE OF CONTENTS.........................................................v

TABLE OF AUTHORITIES ................................................... vii

GLOSSARY OF TERMS ........................................................xi

INTEREST OF AMICI CURIAE..................................................1

INTRODUCTION ..............................................................4

ARGUMENT ..................................................................7

I.  Clean Air Act section 112(f) is not an open-ended grant of continuing
    authority to regulate. .................................................7

    A.  Section 112(f)(2) is a limited grant of residual authority
        permitting EPA to perform a one-time assessment of residual
        risk. ............................................................8

        1.  Section 112(f)(2) spells out a back-up plan if Congress fails to
            act. .........................................................8

        2.  If Congress wanted to authorize more than one iteration of
            residual risk review, it would have said so. ...............11

    B.  Significantly, section 112(f)(2) provides no standards or
        guardrails that would guide or constrain further regulation...............13

II. The regulatory uncertainty caused by EPA's interpretation of section
    112(f) would stifle investment and jobs in communities across the
    country. ...............................................................15

    A.  The existing Clean Air Act framework has successfully reduced
        emissions of air pollutants, including those involved in the
        production and use of industrial chemicals. ......................16

    B.  Greenlighting cumulative regulation, under a statutory
        provision that allows only for one-time regulation, would

substantially undermine businesses' long-term plans and deter important investments. ..........................................................................18

C.    The impacts of EPA's interpretation on chemical manufacturers and on the businesses that depend on them underscore the importance of rejecting EPA's interpretation. ....................................20

CONCLUSION ..........................................................................................23

CERTIFICATE OF COMPLIANCE .......................................................25

CERTIFICATE OF SERVICE ..................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Banks v. Booth*,
    3 F.4th 445 (D.C. Cir. 2021) ................................................................. 15

*Czyzewski v. Jevic Holding Corp.*,
    580 U.S. 451 (2017) .............................................................................. 15

*Heating, Air Conditioning & Refrigeration Distributors Int'l v. EPA*,
    71 F.4th 59 (D.C. Cir. 2023) ................................................... 14, 15, 19

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024) ......................................................................... 7, 8, 19

*Loughrin v. United States*,
    573 U.S. 351 (2014) .............................................................................. 13

*Nat. Res. Def. Council v. Regan*,
    67 F.4th 397 (D.C. Cir. 2023) ............................................................... 12

*New Jersey v. EPA*,
    517 F.3d 574 (D.C. Cir. 2008) ............................................................. 12

*Pub. Citizen, Inc. v. Rubber Mfrs. Ass'n*,
    533 F.3d 810 (D.C. Cir. 2008) ............................................................. 12

*Turkiye Halk Bankasi A.S. v. United States*,
    598 U.S. 264 (2023) .............................................................................. 15

*United States Sugar Corp. v. EPA*,
    113 F.4th 984 (D.C. Cir. 2024) .......................................................... 7, 8

*Whitman v. American Trucking Ass'ns, Inc.*,
    531 U.S. 457 (2001) ................................................................. 14, 15, 19

**Statutes**

5 U.S.C. § 706(2) ...................................................................................... 7

42 U.S.C. § 7409(d) ........................................................................12

42 U.S.C. § 7412(d)(2) .....................................................................4

42 U.S.C. § 7412(d)(3) .....................................................................4

42 U.S.C. § 7412(d)(6) ....................................................................12

42 U.S.C. § 7412(e) ..........................................................................4

42 U.S.C. § 7412(f)(1) .......................................................................8

42 U.S.C. § 7412(f)(2)(A) .................................................................9

42 U.S.C. § 7412(f)(2)(C) ............................................................9, 11

42 U.S.C. § 7511b(b) .......................................................................13

42 U.S.C. § 7521(a)(1) .....................................................................13

42 U.S.C. § 7521(a)(2)(B) ...............................................................13

42 U.S.C. § 7521(b)(1) .....................................................................13

42 U.S.C. § 7547(a)(3) .....................................................................13

42 U.S.C. § 7547(a)(4) .....................................................................13

**Other Authorities**

71 Fed. Reg. 76,603 (Dec. 21, 2006) ..............................................10

73 Fed. Reg. 76,220 (Dec. 16, 2008) ..............................................10

76 Fed. Reg. 22,566 (Apr. 21, 2011) ...............................................10

89 Fed. Reg. 24,090 (Apr. 5, 2024) .............................................20, 21

89 Fed. Reg. 42,932 (May 16, 2024)
........................................... 2, 5, 7, 8, 11, 14, 19, 20, 21, 22, 23

American Chemistry Council, *Ethylene Oxide – Critical Building
Block for the Sterilization of Medical Equipment* (May 7, 2024),
https://tinyurl.com/yc3f4vbe .............................................................20

American Chemistry Council, *Ethylene Oxide Powering Electric Vehicles and Global Sustainability Efforts* (Mar. 30, 2023), https://tinyurl.com/5b4ercxe ...................................................................21

American Chemistry Council, *Ethylene Oxide: Necessary For The Production of Semiconductors* (May 15, 2023), https://tinyurl.com/yc5eczhe...............................................................21

EPA, Air Releases (Mar. 2024), https://tinyurl.com/7fybd83n ...............17

EPA, National Emission Standards for Hazardous Air Pollutants (NESHAP) (last updated July 2024), https://tinyurl.com/mxc7rbks..............6, 18

EPA, Residual Risk Report to Congress 1999, https://tinyurl.com/546ceek5 ............................................................10

EPA, Risk and Technology Review of the National Emissions Standards for Hazardous Air Pollutants (last updated Dec. 18, 2024), https://tinyurl.com/muz9dy46 ....................................................4

EPA, *Summary of Public Comments and Responses for New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry* 131 (Mar. 2024), https://tinyurl.com/bdjkv4nm ..................................11

EPA, Toxic Release Inventory National Analysis, Ethylene Oxide Releases Trend (Mar. 2024), https://tinyurl.com/ywmfec5r .............................17

Huntsman Corporation, Comments on Proposed Rule at 27–28 (July 7, 2023), https://tinyurl.com/4ddtb287 ..............................................22

Jim Vinoski, *German Deindustrialization Is A Wake-Up Call For U.S. Manufacturers*, FORBES (Mar. 4, 2024), https://tinyurl.com/yrzbzx6j....................................................................22

U.S. Chamber of Commerce Global Energy Institute, *Something to Celebrate on Earth Day* (Apr. 22, 2022), https://tinyurl.com/scwvszd7 ......................................................16, 17

U.S. Food & Drug Admin., Sterilization for Medical Devices (Sept. 26, 2024), https://tinyurl.com/6kk259hk ........................................20

White House, *FACT SHEET: President Biden Takes Action to Protect American Workers and Businesses from China's Unfair Trade Practices* (May 14, 2024), https://tinyurl.com/ycys3akr ...............................21, 22

# GLOSSARY OF TERMS

| | |
|---|---|
| Act | Clean Air Act |
| Agency | U.S. Environmental Protection Agency |
| APA | Administrative Procedure Act |
| CAA | Clean Air Act |
| Chamber | Chamber of Commerce of the United States of America |
| EPA | U.S. Environmental Protection Agency |
| MACT | Maximum Achievable Control Technology |
| NAM | National Association of Manufacturers |
| NESHAP | National Emission Standards for Hazardous Air Pollutants |
| Rule | "New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry," 89 Fed. Reg. 42,932 (May 16, 2024) |

## INTEREST OF *AMICI CURIAE*

The Chamber of Commerce of the United States of America ("Chamber") is the world's largest business federation.[1] It represents approximately 300,000 direct members and indirectly represents the interests of more than 3 million companies and professional organizations of every size, in every sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the business community.

The National Association of Manufacturers ("NAM") is the largest manufacturing association in the United States, representing small and large manufacturers in all 50 states and in every industrial sector. Manufacturing employs nearly 13 million men and women, contributes $2.91 trillion to the United States economy annually, has the largest economic impact of any major sector, and accounts for over half of private sector research and development in the nation. The NAM is the voice for the manufacturing community and the leading advocate for a

---

[1] No counsel for any party authored this brief in whole or in part and no entity or person, aside from *Amici*, their members, or their counsel, made any monetary contribution intended to fund the preparation or submission of this brief. *Amici* have filed an unopposed motion for leave to file this brief.

policy agenda that helps manufacturers compete in the global economy and create jobs across the United States.

The rule challenged in this case—"New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry," 89 Fed. Reg. 42,932 (May 16, 2024) ("Rule")—will impact producers, users, and downstream beneficiaries of industrial chemicals. Industrial chemicals are the basic building blocks necessary for the production of consumer goods, electronics, cleaning products, clothing, and many other necessities of daily life. They are also used for products found in factories, construction sites, farms, and hospitals. If we did not have sufficient organic chemicals, polymers, and resin, many products and processes in already-stressed supply chains would be detrimentally impacted.

*Amici* are well positioned to aid this Court's review of the Rule. *Amici*'s members include businesses from all sectors of the economy that stand to be impacted by the Rule and by the interpretation of the Clean Air Act that the Rule advances. These include not only owners and operators of chemical manufacturing plants, but businesses at every level of the supply chain that benefit from the use of organic chemicals, polymers, and resins in various medical, pharmaceutical, biochemical, bioengineering, and agricultural applications. More broadly, *Amici*

represent businesses that have a strong interest in properly construing regulatory statutes and in ensuring that administrative agencies act within their statutory authority.

While *Amici* support appropriately tailored regulations and the protection of public health, performance by the Environmental Protection Agency ("EPA" or "Agency") of a second "residual risk review" for hazardous air pollutants under Clean Air Act section 112(f)(2) is unlawful. Section 112(f)(2) is a limited grant of authority to perform a one-time residual risk review (following the initial setting of standards under section 112(d) of the Act), which serves as a back-up plan to further congressional action. Section 112(f)(2) was never meant to authorize perpetual, open-ended regulation by the EPA, which would overlap and interfere with the periodic reviews that Congress required in section 112(d)(6) of the Act. If accepted, EPA's attempt to enlarge its limited authority under section 112(f)(2) could be used to encourage unpredictable, counterproductive regulation in other areas. *Amici* have a strong interest in promoting a predictable regulatory environment through advocating for the sound interpretation of statutory grants of authority to regulatory agencies, on which *Amici*'s members rely to invest in and grow their businesses.

## INTRODUCTION

The Clean Air Act ("CAA" or "Act") establishes a two-step process for initially regulating categories of sources of hazardous air pollutants. At the first step, the Act directs EPA to issue technology-based standards for each source category that are designed to achieve maximum emissions controls for major sources of pollutants through application of technologies used by the best-performing sources in each category. These standards, governed by section 112(d) of the Act, are the focus of the program and are appropriately referred to as Maximum Achievable Control Technology ("MACT") standards. Congress set forth detailed directions and a precise, 10-year schedule for establishing MACT standards. 42 U.S.C. §§ 7412(d)(2)–(3), (e). And, importantly, section 112(d)(6) of the Act provides for periodic technology-based review and, when needed, revisions of the section 112(d) standards, to be performed at least once every 8 years for each source category being regulated. Under section 112(d)(6), EPA has reviewed and revised several of its 112(d) standards. *See* EPA, Risk and Technology Review of the National Emissions Standards for Hazardous Air Pollutants (last updated Dec. 18, 2024), https://tinyurl.com/muz9dy46.

At the second step, after EPA issues technology-based standards for a source category, the Act outlines a process for assessing any risk from pollutants that might remain from that source category. This step—commonly known as the "residual

risk review" step—is governed by section 112(f) of the Act. That provision instructs EPA first to prepare a report for Congress with recommendations for legislation on residual risks. In the event that Congress fails to act on EPA's recommendations, section 112(f)(2) provides a contingency plan—it requires EPA to evaluate and, if appropriate, promulgate so-called "residual risk standards" for a source category within 8 years of the promulgation of the technology-based standards that EPA set for that category under section 112(d). Unlike the technology-focused section 112(d), section 112(f)(2) provides for risk-based standards. Also unlike section 112(d), section 112(f)(2) does not authorize EPA to do any additional rounds of review and regulation.

Because Congress never acted on EPA's report, EPA has performed one-time "residual risk reviews" for dozens of source categories under section 112(f) over the last quarter-century. Until last year, EPA had never, in the program's thirty-five-year history, performed a *second* residual risk review for a source category. Yet, that is what it did in the Rule. EPA's novel attempt to conduct a second residual risk review rests on a fundamental misinterpretation of its own authority under section 112(f)(2) of the Act. As the context and structure of section 112(f) make clear, section 112(f)(2) represents a limited grant of one-time residual authority that serves as a second-best alternative to further congressional action. It was never meant to

grant EPA the massive, open-ended authority to repeat the residual-risk-review process for a source category at the Agency's discretion.

Allowing EPA to convert a statutory back-up plan into a free-ranging license to regulate would cause major uncertainty for regulated businesses. Businesses require stable, predictable regulations to plan for the future and make long-term investments. EPA's novel and unbounded assertion of authority under section 112(f)(2) to conduct additional risk reviews whenever the Agency decides they are "warranted" portends the prospect of regulation under section 112(f)(2) that could come at any time and in any form. In this particular instance, it jeopardizes the interests of chemical manufacturers and the many businesses that rely on them. But the same risk exists for producers, users, and downstream beneficiaries of other substances subject to section 112 of the CAA. *See* EPA, National Emission Standards for Hazardous Air Pollutants (NESHAP) (last updated July 2024), https://tinyurl.com/mxc7rbks (listing over 140 source categories that EPA has established under section 112). Moreover, if accepted by this Court, EPA's unlawful assertion of open-ended authority under section 112(f)(2) could have relevance to other statutory contexts, well beyond the domain of environmental regulation.

Because EPA lacked authority to perform more than one residual risk review under section 112(f)(2) for any source category, the Court should vacate the Rule.[2]

## ARGUMENT

### I. Clean Air Act section 112(f) is not an open-ended grant of continuing authority to regulate.

The Administrative Procedure Act ("APA") requires courts to "set aside agency action[s]" that are, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). The role of this Court in reviewing the Rule is "to independently interpret the [Clean Air Act] and effectuate the will of Congress subject to constitutional limits." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024); *see also United States Sugar Corp. v. EPA*, 113 F.4th 984, 991 n.7 (D.C. Cir. 2024) (explaining that *Loper Bright* "controls EPA interpretations of the Clean Air Act" because "judicial review under the Clean Air Act is 'essentially the same' as judicial review under the APA") (citation omitted).

The Court cannot uphold EPA's interpretation of section 112(f) unless, after "applying all relevant interpretive tools," it determines that EPA's reading is the "single, best meaning" of the provision. *Loper Bright*, 603 U.S. at 400; *see also*

---

[2] *Amici* agree with the Industry and State Petitioners that the Rule is invalid on other grounds, but this brief focuses on the section 112(f)(2) issue and on the impacts of EPA's incorrect interpretation of that provision.

*United States Sugar Corp*, 113 F.4th at 991 (same).  Questions of "the scope of an agency's own power" pursuant to a statute present "perhaps the occasion on which abdication in favor of the agency is *least* appropriate."  *Loper Bright*, 603 U.S. at 401 (emphasis original).

Here, EPA's interpretation of its own power under section 112(f)(2) is far from the best reading of the provision.  The Rule is arbitrary and capricious and should be set aside.

### A.   Section 112(f)(2) is a limited grant of residual authority permitting EPA to perform a one-time assessment of residual risk.

Contrary to EPA's position that section 112(f)(2) permits multiple reviews for the same source category, section 112(f)(2) is a limited grant of one-time authority that serves as a back-up to further congressional action.  This provision does not authorize EPA to engage in repeated residual risk reviews of the same hazardous-air-pollutant standards.

### 1.   Section 112(f)(2) spells out a back-up plan if Congress fails to act.

In 1990, Congress required EPA to prepare a one-time report on risks that might remain after regulated parties applied technology-based MACT standards to hazardous air pollutants.  42 U.S.C. § 7412(f)(1).  Section 112(f)(1) contemplates a six-year period of study and instructs EPA to provide Congress with recommendations for legislation on residual risks at the conclusion of that period:

> Not later than 6 years after November 15, 1990, the Administrator shall investigate and report . . . to Congress on—
>
> (A)    methods of calculating the risk to public health remaining, or likely to remain, from sources subject to regulation under this section after the application of standards under subsection (d); . . . [and]
>
> (D)    recommendations as to legislation regarding such remaining risk.

*Id.* Section 112(f)(1) thus specifically contemplates further congressional action on residual risk standards.

In section 112(f)(2), Congress set forth a contingency plan "[i]f Congress does not act on any recommendation submitted under paragraph (1) . . . ." *Id.* § 7412(f)(2)(A). That second reference is critical. "If," and only if, Congress fails to act on EPA's recommendation, EPA is required to evaluate and, if appropriate, "promulgate" residual risk standards for a source category "within 8 years" of the issuance of the corresponding MACT standards for that source category. 42 U.S.C. § 7412(f)(2)(A); *see also id.* § 7412(f)(2)(C) ("8 years after promulgation").

Congress was even more specific about a subset of these source categories. In section 112(f)(2)(C), Congress provided: "In the case of categories or subcategories for which standards under subsection (d) are required to be promulgated within 2 years after November 15, 1990, the Administrator shall have 9 years after promulgation of the standards under subsection (d) to make the determination [whether to promulgate residual risk standards] and, if required, to promulgate the standards under this paragraph." This is a reference to section

112(e)(1)(A), which provides that EPA must ensure that "emission standards for not less than 40 categories and subcategories (not counting coke oven batteries) shall be promulgated not later than 2 years after November 15, 1990." As with the default mandate to act within 8 years of promulgation of the section 112(d) standards, this specific mandate makes no provision for recurrence; it is a one-time requirement for each source category.

To sum up, Congress reserved for itself primary authority to dictate residual risk review and the promulgation of standards. Congress delineated a specific, limited contingency plan through which EPA would regulate (if necessary) based on residual risk if Congress did not act, but only one time per source category. As the statutory text makes clear, that was never the primary option.

In 1999, EPA complied with section 112(f)(1) by delivering its residual risk report to Congress. EPA, Residual Risk Report to Congress 1999, https://tinyurl.com/546ceek5. But Congress never acted. So EPA has since performed "residual risk reviews" for various source categories under section 112(f)(2). EPA conducted residual risk reviews for the source categories at issue in the present rulemaking between 2006 and 2011. *See* 71 Fed. Reg. 76,603 (Dec. 21, 2006); 73 Fed. Reg. 76,220 (Dec. 16, 2008); 76 Fed. Reg. 22,566 (Apr. 21, 2011).

**2.    If Congress wanted to authorize more than one iteration of residual risk review, it would have said so.**

That Congress never intended EPA to retain open-ended authority to regulate residual risk in perpetuity is confirmed by section 112(f)(2)'s description of EPA's back-up authority as a one-time event.   Under section 112(f)(2), EPA "shall *promulgate*" standards for each source category or subcategory concerned.   42 U.S.C. § 7412(f)(2)(C) (emphasis added).   And if EPA decides to set a residual risk standard, it must do so *within eight years* of the promulgation of the corresponding MACT standard.   *Id.*   This plain statutory language contemplates a single, time-limited regulation period.   Nothing more is authorized—certainly not the imposition of further review at some indefinite later date based on criteria EPA cuts out of whole cloth.

EPA does not appear to contest that section 112(f)(2) describes a one-time event.   Instead, it insists that section 112(f)(2) "does not *prohibit* the EPA from revisiting standards promulgated under either CAA section 112(f)(2) or other provisions of CAA section 112."   EPA, *Summary of Public Comments and Responses for New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry* 131 (Mar. 2024), https://tinyurl.com/bdjkv4nm (emphasis original); *see also* 89 Fed. Reg. at 42,940–

41 ("[T]he EPA retains discretion to revisit its residual risk reviews where the Agency deems that to be warranted."). But if Congress wanted to grant EPA authority to conduct subsequent risk reviews that could result in new regulations, Congress knew how to do it. That it failed to explicitly grant that authority is damning to the Agency's position. *See Pub. Citizen, Inc. v. Rubber Mfrs. Ass'n*, 533 F.3d 810, 816–17 (D.C. Cir. 2008) (declining to "add[] words that are not in the statute that the legislature enacted"); *see also Nat. Res. Def. Council v. Regan*, 67 F.4th 397, 402 (D.C. Cir. 2023) (explaining that reading an additional grant of authority into the Safe Drinking Water Act "would be to contravene the statute's clear language and structure and 'nullif[y] textually applicable provisions meant to limit [EPA's] discretion'" (citing *New Jersey v. EPA*, 517 F.3d 574, 583 (D.C. Cir. 2008))).

Indeed, Congress demonstrated that it knew how to explicitly authorize the kind of ongoing revision authority that EPA now claims under section 112(f). Prior to section 112(f), subsection 112(d)(6) provides:

> The Administrator shall review, and revise as necessary (taking into account developments in practices, processes, and control technologies), emission standards promulgated under this section no less often than every 8 years.

42 U.S.C. § 7412(d)(6). And section 112(d)(6) is not alone. Similar provisions abound in the CAA. *See* 42 U.S.C. § 7409(d) (review and revision of ambient air quality standards); *id.* § 7411(b)(1)(b) (review and revision of new source

performance standards); *id.* § 7511b(b) (requirement to periodically review and if necessary update control technology guidelines); *id.* § 7521(a)(1) (authority to revise from time to time motor vehicle emission standards); *id.* § 7521(a)(2)(B) (authorizing revision of pre-1990 standards for heavy duty vehicles and engines); *id.* § 7521(b)(1) (authorizing revision of any standard prescribed under Section 202 as needed to protect public health or welfare, taking costs, energy, and safety into account); *id.* § 7547(a)(3)–(4) (revision from time to time of standards for nonroad engines).

In light of these several nearby provisions, Congress's failure to include a provision like this in section 112(f), or otherwise grant authority for further review, is very strong evidence that it did not authorize subsequent residual risk reviews by EPA. Put otherwise, the structure and text of section 112 and of other CAA provisions show that section 112(f) empowers EPA only to do a one-time residual risk review for a source category, and not to engage in multiple risk reviews. After all, "when Congress includes particular language in one section of a statute but omits it in another," courts "presume that Congress intended a difference in meaning." *Loughrin v. United States*, 573 U.S. 351, 358 (2014).

### B. Significantly, section 112(f)(2) provides no standards or guardrails that would guide or constrain further regulation.

Nothing in section 112(f)(2) guides or places any limits on EPA's claimed authority to revise residual risk standards after their initial promulgation. The

provision provides no process or criteria for reopening or repeating a one-time residual risk review.  And it likewise provides no standards for determining how to conduct such a new residual risk review.

The complete absence of any such guardrails not only provides further evidence that Congress did not authorize subsequent reviews through section 112(f)(2), but it also demonstrates the breadth of EPA's claimed power under its interpretation of the provision.  If the Court were to adopt EPA's reading of section 112(f)(2), EPA would enjoy complete discretion to dictate subsequent reviews.  EPA could reopen residual risk review whenever it chooses and for whatever reason it chooses—*i.e.*, whenever EPA deems it is "warranted."

That cannot be right.  It is well settled that "Congress . . . does not . . . hide elephants in mouseholes."  *Whitman v. American Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001) (finding it "implausible that Congress would give to the EPA . . . the power to determine whether implementation costs should moderate national air quality standards" through "modest words").  Indeed, this Court recently reaffirmed the "long-standing rule of interpretation" that "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions."  *Heating, Air Conditioning & Refrigeration Distributors Int'l v. EPA*, 71 F.4th 59, 67 (D.C. Cir. 2023) (citing *Whitman*, 531 U.S. at 468).  The Court explained that "[o]rdinary readers of English do not expect provisions setting out math equations

to empower an agency to prescribe other 'fundamental details of a regulatory scheme.'" *Id.* (citing *Whitman*, 531 U.S. at 468); *see also, e.g.*, *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 274 (2023) (applying *Whitman* principle to Foreign Service Immunities Act in international criminal dispute); *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 465 (2017) (applying *Whitman* principle in bankruptcy case); *Banks v. Booth*, 3 F.4th 445, 449 (D.C. Cir. 2021) (applying *Whitman* principle to Prison Litigation Reform Act in civil rights dispute).

So too here. Section 112(f)(2) delineates a second-best alternative to congressional action on residual risk, contemplating a single, time-limited period for EPA review. Ordinary readers can see that this one-time back-up plan does not supply "fundamental details of [the] regulatory scheme" that would license unbounded regulation for all time.

## II. The regulatory uncertainty caused by EPA's interpretation of section 112(f) would stifle investment and jobs in communities across the country.

Businesses large and small depend on stable, predictable regulatory regimes to survive, plan, and grow. When regulatory standards are clear, the business community can work with federal and state governments to achieve common objectives. EPA's historic regulation of industrial chemicals proves the point. As detailed below, the industrial chemical industry has cut emissions by over thirty percent in the United States in the last decade.

But allowing EPA to interpret section 112(f)(2) as an open-ended license to regulate threatens this success story. EPA's novel assertion of authority would impose substantial and unpredictable burdens on producers and users of industrial chemicals who are already bearing the heavy costs of existing regulations. And it would set a dangerous precedent, both for businesses subject to the broader residual risk review program and for the wider business community.

A.    **The existing Clean Air Act framework has successfully reduced emissions of air pollutants, including those involved in the production and use of industrial chemicals.**

In the thirty-five years since Congress overhauled the CAA in 1990, businesses have curbed air-pollutant emissions substantially. In response to legal and regulatory requirements—and to protect public health and the environment and respond to community and stakeholder concerns—businesses have installed emissions-control technologies and taken steps to reduce their emissions.

As a general matter, these efforts have worked, leading to drastic improvements in air quality. For example, EPA data shows that "between 2005 and 2021, emissions of sulfur dioxide (SO2) and nitrogen oxides (NOX) from electricity generation were reduced by 91% and 79%, respectively." *Something to Celebrate on Earth Day*, U.S. CHAMBER OF COMMERCE GLOBAL ENERGY INSTITUTE (Apr. 22, 2022) ("*Something to Celebrate*"), https://tinyurl.com/scwvszd7. And for the industrial sector in particular, EPA's National Emissions Inventory shows that

"emissions of SO2, NOx, and fine particulate matter (PM2.5)" for fuel combustion "have declined by 81%, 62%, and 29%, respectively, since 2000." *Id.* Chemical air releases declined by 26% from 2013 to 2022. EPA, Air Releases (Mar. 2024), https://tinyurl.com/7fybd83n.

Businesses using and producing industrial chemicals are no exception. Indeed, EPA data shows that, between 2011 and 2020, releases of industrial chemicals decreased by 34%. *Something to Celebrate*, https://tinyurl.com/scwvszd7. And ethylene oxide led all other industrial chemicals with a massive emissions reduction of 54%. More recent data paints a similar picture. Between 2013 and 2022, "releases of ethylene oxide to air decreased by 124,000 pounds (- 43%)." EPA, Toxic Release Inventory National Analysis, Ethylene Oxide Releases Trend (Mar. 2024), https://tinyurl.com/ywmfec5r.

The clarity and certainty that predictable regulatory schemes provide drive these successes. When administrative agencies act within the limits of their statutory authority and apply clear standards that the business community knows about far in advance, businesses can plan ahead, budget for regulation, and work with federal and state governments to implement emissions reduction efforts.

**B.    Greenlighting cumulative regulation, under a statutory provision that allows only for one-time regulation, would substantially undermine businesses' long-term plans and deter important investments.**

In contrast to the successes that can be achieved when businesses operate in a stable and predictable regulatory environment, new and unexpected regulation can devastate businesses. As discussed above, EPA's interpretation of section 112(f) transforms a discrete grant of one-time, residual authority into an open-ended license to promulgate residual risk standards at EPA's discretion. As section 112(f)(2) was not designed for this purpose, it is not surprising that the provision contains no standards that could help a business predict the timing or scope of any new regulation that EPA might try to attempt under its claimed authority. EPA's interpretation of the provision leaves businesses in the dark, unable to make informed calculations about the future.

It bears emphasis that EPA's assertion of authority under section 112(f)(2) has implications ranging far beyond the particular category of sources at issue in this case. If this Court upholds EPA's interpretation of section 112(f)(2), then *any* business subject to one of the over 140 source categories EPA has established under the Act's hazardous air program—or any business that relies on such a business— will not know when or how EPA might decide to exercise the discretionary authority that it has arrogated to itself under section 112(f)(2). *See* EPA, National Emission Standards for Hazardous Air Pollutants (NESHAP) (last updated July 2024),

https://tinyurl.com/mxc7rbks. More broadly, allowing EPA to assert this novel power under section 112(f)(2) will embolden EPA and other agencies to push the envelope in claiming authority to regulate.

That outcome would chafe against precedents from this Court and the Supreme Court. *See Heating, Air Conditioning & Refrigeration Distributors Int'l*, 71 F.4th at 67 (discussing the "long-standing rule of interpretation" that "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions") (citing *Whitman*, 531 U.S. at 468). Indeed, the Supreme Court's recent elimination of *Chevron* deference in *Loper Bright* drives home how unconstrained administrative discretion jeopardizes reliance interests. There, the Court emphasized that discretion to change statutory interpretations under *Chevron* had become "a license authorizing an agency to change positions as much as it likes." 603 U.S. at 410–11. "*Chevron* thus allow[ed] agencies to change course even when Congress ha[d] given them no power to do so." *Id.* at 411.

EPA's unlawful enlargement of its own authority via section 112(f) presents the same kind of problem. EPA is claiming unbounded discretionary power to impose immense costs on regulated parties. As the Supreme Court incisively observed in *Loper Bright*, that level of discretion would "leav[e] those attempting to plan around agency action in an eternal fog of uncertainty." *Id.*

**C.** **The impacts of EPA's interpretation on chemical manufacturers and on the businesses that depend on them underscore the importance of rejecting EPA's interpretation.**

The harmful impacts that EPA's novel assertion of authority pose for industry writ large are illustrated by the serious consequences that the Rule stands to impose upon chemical manufacturers and the businesses that depend on them.

Industrial chemicals play a vital role in several sectors of the economy. Ethylene oxide—one of the main substances regulated under the Rule—is illustrative in this regard.[3] Ethylene oxide is an essential building block for a wide variety of healthcare applications. *See* American Chemistry Council, *Ethylene Oxide – Critical Building Block for the Sterilization of Medical Equipment* (May 7, 2024), https://tinyurl.com/yc3f4vbe. It sterilizes half of all medical devices in America. U.S. Food & Drug Admin., Sterilization for Medical Devices (Sept. 26, 2024) ("Sterilization for Medical Devices"), https://tinyurl.com/6kk259hk. For many devices, it "may be the only [substance] that effectively sterilizes and does not damage the device." *Id.*

---

[3] Ethylene oxide's use in one important process—sterilization—is also regulated under the Commercial Sterilization Facilities source category. EPA finalized a second residual risk review for the Commercial Sterilization Facilities source category in April, 89 Fed. Reg. 24,090 (Apr. 5, 2024), and challenges to that rulemaking are currently pending in this Court, Nos. 24-1178 and 24-1180. As explained here, however, in addition to its sterilization applications, ethylene oxide is an essential input for several other products in some of the most important sectors of the economy.

Ethylene oxide also plays a critical role in the production of electric vehicles. American Chemistry Council, *Ethylene Oxide Powering Electric Vehicles and Global Sustainability Efforts* (Mar. 30, 2023), https://tinyurl.com/5b4ercxe. It is used to produce ethylene carbonate, a substance that facilitates the travel of electricity through lithium-ion batteries. *Id.*[4]

Additionally, ethylene oxide is used in the production of various solvents, amines, and surfactants that are used in semiconductor chip manufacturing processes like wafer cutting, chemical mechanical planarization, photoresist, and photoresist residue cleaner. American Chemistry Council, *Ethylene Oxide: Necessary For The Production of Semiconductors* (May 15, 2023), https://tinyurl.com/yc5eczhe. These products are key inputs for semiconductor applications in the fields of aerospace, computing, and telecommunication.

The single example of ethylene oxide illustrates a broadly applicable point: access to industrial chemicals subject to regulation under the Rule is critical not just for the business community, but also for the achievement of some of the nation's most pressing healthcare, sustainability, and national security goals. *See, e.g.*, The White House, *FACT SHEET: President Biden Takes Action to Protect American Workers and Businesses from China's Unfair Trade Practices* (May 14, 2024),

---

[4] Ethylene oxide is also used in other areas of the automotive industry, including in the production of automotive seating, hydraulic and brake fluids, anti-icing additives, and antifreeze. *Id.*

https://tinyurl.com/ycys3akr. These chemicals, used in applications across all sectors of the economy, are invaluable to products that are "vital for America's economic future and national security." *Id.* (highlighting the importance of semiconductors, electric vehicles, and medical products).

EPA's surprise regulation of industrial chemicals under section 112(f)(2) jeopardizes these important national interests by imposing new and unpredictable costs. Indeed, here, the Rule blindly subjects manufacturers to costly control measures regardless of whether they pose unacceptable environmental risks. *See* Huntsman Corporation, Comments on Proposed Rule at 27–28 (July 7, 2023), https://tinyurl.com/4ddtb287. These cumulative—and, in many cases, unnecessary—costs are especially damaging because manufacturers and users of industrial chemicals have already successfully implemented the most effective control measures for these chemicals. Each additional measure comes at higher costs as the standards move closer to zero. Ultimately, many facilities will be unable to bear the additional costs imposed by requirements like those in the Rule.

Moreover, if surprise regulation becomes the norm, domestic manufacturers could move their operations overseas to minimize costs and delays. Germany's recent economic woes are instructive in this regard. Rising costs have discouraged investment, dampened productivity, and ultimately driven industrial production out of the country. *See, e.g.*, Jim Vinoski, *German Deindustrialization Is A Wake-Up*

*Call For U.S. Manufacturers*, FORBES (Mar. 4, 2024), https://tinyurl.com/yrzbzx6j. Strapping regulated parties with additional, unpredictable regulations in pursuit of regulatory goals could have the same impact in United States supply chains.

If allowed to stand, EPA's unlawful assertion of authority under section 112(f)(2) promises serious disruption—not only for chemical manufacturers and associated industries, but for other businesses subject to Clean Air Act section 112 and, more broadly, for the business community generally. The Court should reject EPA's interpretation.

## CONCLUSION

The petition for review should be granted and the Rule vacated.

Dated: January 24, 2025

Respectfully submitted,

 /s/ *Trevor S. Cox*

Trevor S. Cox
J. Pierce Lamberson
HUNTON ANDREWS KURTH LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219
(804) 788-8200
tcox@hunton.ak.com

Charles H. Knauss
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Ave. NW
Washington, DC 20037
(202) 955-1500

*Counsel for* Amici Curiae

Andrew R. Varcoe
Christopher J. Walker
U.S. Chamber Litigation Center
1615 H Street, NW
Washington, DC 20062
(202) 463-5337

*Counsel for the Chamber of Commerce
of the United States of America*

Erica T. Klenicki
Michael A. Tilghman II
NAM Legal Center
733 10th Street NW, Suite 700
Washington, DC 20001
(202) 637-3000

*Counsel for the National Association of
Manufacturers*

# CERTIFICATE OF COMPLIANCE

The undersigned counsel states that this document complies with Federal Rule of Appellate Procedure 29(a)(5) and this Court's briefing order dated October 4, 2024, as amended on December 30, 2024, because it contains 4,992 words, as counted by Microsoft Word, excluding the parts excluded by Federal Rules of Appellate Procedure 27(d)(2) and 32(f) and D.C. Circuit Rule 32(e)(1).

This document also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5) and (6) and Local Rule 27(a)(2) because it has been prepared in a proportionally spaced typeface in 14-point Times New Roman font.

/s/ *Trevor S. Cox*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of January 2025, I caused a true and correct copy of the foregoing to be electronically filed with the Clerk of the Court of the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ *Trevor S. Cox*